1 | Stewart Katz (Bar No. 127425)
stewartkatzlaw@gmail.com
2 | Law Office of Stewart Katz
555 University Avenue, Suite 270
3 | Sacramento, California 95825
(916) 444-5678
4 |
Eric Grant (Bar No. 151064)
5 | grant@hicks-thomas.com
Hicks Thomas LLP
6 | 701 University Avenue, Suite 106
Sacramento, California 95825
7 | (916) 447-4900

8 | Counsel for Plaintiff Philip Debeaubien

9 |

10 | UNITED STATES DISTRICT COURT

11 | EASTERN DISTRICT OF CALIFORNIA

12 |

13 | PHILIP DEBEAUBIEN,                    ) No. 2:19-cv-01329-WBS-DB
                                        )
14 |             Plaintiff,              )
                                        )
15 |      v.                            ) **PLAINTIFF'S SEPARATE STATEMENT**
                                        ) **(1) RESPONDING TO DEFENDANTS'**
                                        ) **STATEMENT OF UNDISUPTED FACTS**
16 | STATE OF CALIFORNIA, et al.,        ) **AND (2) PROVIDING DISPUTED AND**
                                        ) **ADDITIONAL FACTS IN OPPOSITION**
17 |             Defendants.            ) **TO STATE OF CALIFORNIA'S AND CHP**
                                        ) **DEFENDANTS' MOTION FOR SUMMARY**
18 |                                     ) **JUDGMENT**
                                        )
19 |                                     )
                                        ) Date:        February 22, 2022
20 |                                     ) Time:        1:30 p.m.
                                        ) Courtroom:  5 (14th Floor)
21 |                                     ) Judge:       Hon. William B. Shubb
                                        )
22 | _____ )

23 |

24 |

25 |

26 |

27 |

28 |

**INTRODUCTION**

Pursuant to Local Rule 260(b), Plaintiff herein reproduces State of California and CHP Defendants' Statement of Undisputed Facts in Support of Motion for Summary Judgment (ECF 121-1, filed Jan. 7, 2022) and responds thereto. *See* Facts 1–68, *infra* pp. 4–21.

Plaintiff also sets forth disputed and additional facts of his own. *See* Facts 69–136, *infra* pp. 22–34.

Citations to Exhibits 1 through 11 are to the exhibits in the CHP Defendants' evidence in support of their motion (ECF 121-2, filed Jan. 7, 2022), e.g., "Dobler Declaration (CHP Defendants' Exhibit 8) at ___."

Citations to Exhibit A through V are to the exhibits listed (with their abbreviations) in the Index of Exhibits on the following page, e.g., "Brown Deposition (Exhibit A) at ___." Those exhibits are attached hereto.

All of Plaintiffs' evidence other than declarations is authenticated by the Katz Declaration (Exhibit N).

1

## INDEX OF EXHIBITS

2

| | Abbreviation | Full Name and Date |
|---|---|---|
| A | Brown Deposition | Deposition of Todd Brown (Sept. 29, 2020 and June 28, 2021) |
| B | Debeaubien Declaration | Declaration of Plaintiff Philip "Trae" Debeaubien (Feb. 7, 2022) |
| C | Debeaubien Deposition | Deposition of Philip Debeaubien (Oct. 21, 2020). |
| D | Deposition Exhibit 44 | E-mail chain topped by message from Ryan Stonebraker to Todd Brown and others (Aug. 3, 2018) |
| E | Deposition Exhibit 45 | CHP Internal Investigation I-2951804 (Aug. 21, 2018) |
| F | Deposition Exhibit 47 | Chapter 3 ("Response to Domestic Violence") of the Highway Patrol Manual 100.69:  General Law Enforcement Policy Manual (rev. Aug. 2019) |
| G | Deposition Exhibit 51 | Sergeant Jeremy Dobler's #15628 Chronological Summary (undated) |
| H | Deposition Exhibit 62 | Chronological Summary for Brad Wheat, ID 18776 (undated, prepared by Defendant Brown) |
| I | Dobler Deposition | Deposition of Jeremy Dobler (Aug. 26, 2020 and June 25, 2021) |
| J | Graf Deposition | Deposition of Joy Graf (Dec. 9, 2020 and Aug. 11, 2021) |
| K | Form EPO-001 | California Judicial Council Form EPO-001, Emergency Protective Order (Jan. 1, 2014) |
| L | Hooper Deposition | Deposition of Matthew Hooper (Apr. 1, 2021) |
| M | Johnson Deposition | Deposition of Elliotte Johnson (July 27, 2021) |
| N | Katz Declaration | Declaration of Stewart Katz (Feb. 8, 2022) |
| O | Mohandie Declaration | Declaration of Dr. Kris Mohandie (Feb. 6, 2022) |
| P | Newman Deposition | Deposition of David Brent Newman (June 25, 2021 and July 16, 2021) |
| Q | Noble Declaration | Declaration of Jeffrey J. Noble (Feb. 6, 2022) |
| R | Root Deposition | Deposition of Jeffrey Craig Root (June 28, 2021) |
| S | Salvo Declaration | Declaration of Debra Salvo (Feb. 6, 2022) |
| T | Stonebraker Deposition | Deposition of Ryan Stonebraker (July 27, 2021) |
| U | Swain Deposition | Deposition of Sabrena Swain (Dec. 11, 2020 and July 30, 2021) |
| V | Ward Deposition | Deposition of David P. Ward (Dec. 21, 2020) |

**CHP DEFENDANTS' ASSERTEDLY UNDISPUTED**

**FACTS AND PLAINTIFF'S RESPONSES THERETO**

1.   In 2018, Brad Wheat (Wheat) was a California Highway Patrol Officer in the Amador Area Office.  (Dobler Decl. at 2 [¶2].)

Plaintiff's Response:  **Undisputed**.

2.   In 2018, Brad Wheat was married to Mary Wheat.  (Dobler Decl. at 2 [¶2].)

Plaintiff's Response:  **Undisputed**.

3.   In 2018, Mary Wheat's brother, Matthew Hooper (Hooper), lived in the Wheats' residence with his family.  (Hooper Depo. at 10:16-22.)

Plaintiff's Response:  **Undisputed** that Matthew Hooper and his immediate family lived in the same structure (a converted church) as Brad Wheat and two of the Wheat's children.

4.   In 2018, plaintiff Philip "Trae" Debeaubien (Debeaubien) operated a fitness business next to a gym owned by the Wheats.  (First Amended Complaint [FAC] at 2 [¶1]; Debeaubien Depo. at 16:5-11.)

Plaintiff's Response:  **Undisputed** that Plaintiff owned a gym next to Mary Wheat's gym.  **Disputed** that Brad Wheat was an owner of that gym or involved in its operation.  The cited evidence does not support the asserted fact.

5.   In 2018, Debeaubien and Mary Wheat began an extra-marital affair.  (Debeaubien Depo. at 13:23-25.)

Plaintiff's Response:  **Undisputed**.

6.   Wheat became aware of the affair by July of 2018; on July 8, 2018, he contacted Debeaubien directly to let him know he was aware of the affair and to ask him to end the affair. (Debeaubien Depo. at 21:7-13; FAC at 6 [¶35].)

Plaintiff's Response:  **Undisputed** that Brad Wheat called Plaintiff on July 8, 2018.  **Disputed** as to substance of the conversation.  The cited evidence does not support the asserted fact.

7.   In mid-July of 2018, Mary Wheat went to visit her father out-of-state for multiple weeks; she returned from her trip on July 30 or 31, 2018.  (Debeaubien Depo. at 23:7-24.)

1    Plaintiff's Response:  **Undisputed**.

2        8.    On the night of August 2, 2018, Wheat, who was off-duty, began driving to a house

3    where Mary Wheat and Debeaubien were staying.  (FAC at 7 [¶39].)

4    Plaintiff's Response:  **Undisputed**, although the evidence is unclear regarding on which

5    side of midnight Wheat began driving.

6        9.    The Wheats' son, Warren Wheat, told Hooper that Wheat was driving to find Mary

7    Wheat and Debeaubien and he was angry.  (Hooper Depo. at 20:16-21, 21:24-22:24; FAC at 7

8    [¶39].)

9    Plaintiff's Response:  **Disputed** to the extent that the statement is incomplete in failing to

10   include that Warren Wheat was scared by his father's demeanor and by the fact that he was armed

11   and planning to confront Plaintiff and Mary Wheat.  *See* Hooper Deposition (Exhibit L) at 20:16–

12   22:24.  **Disputed** also to the extent that the statement suggests that Brad Wheat was uncertain as

13   to the location of Plaintiff and Mary Wheat; in fact, Brad Wheat was tracking Mary Wheat through

14   her phone and confirmed her location by speaking with several people.  *See* Debeaubien Deposition

15   (Exhibit C) at 42:19–43:6.

16       10.   Hooper tried to contact Wheat but was unable to, so he called 911.  (Hooper Depo.

17   at 20:22-21:16; FAC at 7 [¶39].)

18   Plaintiff's Response:  **Disputed** to the extent that it suggests that the only reason that

19   Warren Hooper called 911 was that he was unable to reach Brad Wheat.  In fact, Hooper placed

20   the call because he was afraid of an imminent potentially violent confrontation between Brad

21   Wheat and Plaintiff (and Mary Wheat) at the location to which Brad Wheat was racing; and

22   because he believed that Brad Wheat was armed, angry, potentially violent, traveling at a high rate

23   of speed and not responding to texts and calls advising him that if he didn't respond that Matthew

24   Hooper would call 911.  *See* Hooper Deposition (Exhibit L) at 20:16–23:12.  **Undisputed**

25   otherwise.

26       11.   Hooper told the dispatcher that Mary Wheat had just gotten back into town and had

27   decided to go on with an affair, and that her husband was driving to find her and the man with

28   whom she was having the affair.  (Hooper Depo. at 22:15-24.)

1   Plaintiff's Response: **Disputed** to the extent that it excludes the fact that Matthew Hooper

2   told the dispatcher Brad Wheat was driving to her location and that he was armed with a gun.  *See*

3   CHP Defendants' Exhibit 2 (audio file constituting Deposition Exhibit 34).  **Disputed** also to the

4   extent that "find" suggests that Brad Wheat was uncertain about the location of Plaintiff and Mary

5   Wheat.  *See* Debeaubien Deposition (Exhibit C) at 42:19–43:6.  **Undisputed** otherwise.

6   12.   The 911 dispatcher asked Hooper if Wheat had a gun, and Hooper responded yes,

7   but denied that Wheat had threatened to use it when he got there.  (Hooper Depo. at 55:3-23, Exh.

8   34 [911 recording].)

9   Plaintiff's Response: **Undisputed** that Matthew Hooper told the 911 call taker that Brad

10  Wheat was armed and that he had not made an explicit threat to use his duty weapon.  **Disputed**

11  to the extent that it implies that Hooper did not express his concern for the safety of both plaintiff

12  and his sister.  *See* CHP Defendants' Exhibit 2 (audio file constituting Deposition Exhibit 34).

13  13.   Hooper provided Wheat's name to the dispatcher.  (Hooper Depo. at 55:3-23, Exh.

14  34 [911 recording].)

15  Plaintiff's Response: **Undisputed**.

16  14.   Hooper also called his brother Monty Hooper's daughter, Madison, who lived with

17  her father in Garden Valley, very close to where Mary Wheat and Debeaubien were staying.

18  (Hooper Depo. at 23:4-16; FAC at 7 [¶39].)

19  Plaintiff's Response: **Undisputed**.

20  15.   Madison went to Mary Wheat and Debeaubien and warned them that Wheat was

21  coming.  (Hooper Depo. at 23:16-24:1; FAC at 7 [¶39].)

22  Plaintiff's Response: **Undisputed** that Madison Hooper did so based on her conversation

23  with Matt Hooper.  *See* Hooper Deposition (Exhibit L) at 59:9–60:9.

24  16.   Monty Hooper also called Mary Wheat and told her that Debeaubien should leave.

25  (Debeaubien Depo. at 82:3-8.)

26  Plaintiff's Response: **Undisputed**.

27  17.   Debeaubien left "in order to avoid a confrontation."  (FAC at 7 [¶40].)

28  Plaintiff's Response: **Undisputed**.

18.     When Wheat arrived at the Garden Valley house, only Mary Wheat was there; Wheat had a verbal altercation with Mary Wheat and left; El Dorado County Sheriff's Deputies arrived at the Garden Valley house after Wheat had left.  (FAC at 7-8 [¶40].)

Plaintiff's Response:  **Disputed** to the extent that this suggests there was a back-and-forth between Mary Wheat and Brad Wheat.  In fact, Brad Wheat verbally assaulted Mary Wheat and took her cell phone charger.  *See* Debeaubien Deposition (Exhibit C) at 41:13–22.

19.     Wheat talked to Hooper about the August 2 incident the following day and told Hooper that he intended to confront Debeaubien and Mary Wheat and it could have become violent or lethal.  (Hooper Depo. at 80:20-24, 25:10-12.)

Plaintiff's Response:  **Undisputed** with clarifications that they spoke on August 3, 2018. Brad Wheat did not arrive at the Georgetown house until shortly after midnight, the early morning of August 3 (though he likely set off on his mission to kill on August 2).  *See* Hooper Deposition (Exhibit L) at 48:3–21, 49:5–7.

20.     By August 4, 2018, Debeaubien was aware that Wheat had told a CHP co-worker that he had gone to confront Debeaubien and CHP personnel and a counselor then went to Wheat's house to talk to him about it.  (Debeaubien Depo. at 47:20-48:19.)

Plaintiff's Response:  **Disputed** to the extent that it implies that Plaintiff was aware that Wheat had gone to *murder* Plaintiff.  In fact, he was not aware of that fact until September 20, 2020.  *See* Debeaubien Declaration (Exhibit B) ¶¶ 3–4, at 1; Debeaubien Deposition (Exhibit C) at 88:5–25.

21.     In August of 2018, after Wheat had returned from a vacation, Hooper spoke with him on a daily basis, and Hooper was "very aware of [Wheat's] mental state."  (Hooper Depo. at 30:21-31:8; 15:21-16:10, 16:23-17:13.)

Plaintiff's Response:  **Undisputed** that Hooper so testified.  **Disputed** that Hooper was in fact aware of Wheat's mental state, given Hooper's later admission that Wheat "wasn't giving any hint" of his true state, given "his capacity to compartmentalize his thoughts and, in a sense, not take ownership of them in such a way that he would communicate them in a relationship, like, with me, his closest confidant at the time."  Hooper Deposition (Exhibit L) at 36:3–8.

22.     Between August 3 and the shooting on September 3, 2018, Hooper did not have any sense that Wheat was thinking of harming Debeaubien, and he was shocked by the shooting. (Hooper Depo. at 35:14-23.)

Plaintiff's Response:  **Undisputed**.

23.     Debeaubien was aware that Wheat had returned to work as a CHP officer by the Friday of Labor Day weekend, August 31, 2018, and he assumed that Wheat was carrying his duty weapon.  (Debeaubien Depo. at 62:17-63:12.)

Plaintiff's Response:  **Undisputed**.

24.     Debeaubien and Mary Wheat returned from Tahoe on September 3, 2018. (Debeaubien Depo. at 54:22-55:9; FAC at 11 [¶60].)

Plaintiff's Response:  **Undisputed**.

25.     The night of September 3, 2018, while Debeaubien and Mary Wheat were at the Debeaubien's business, Wheat entered the building and shot Debeaubien in the shoulder, shot and killed Mary Wheat outside, and then committed suicide; Wheat was off-duty at the time.  (FAC at 1-2 [¶¶1-2].)

Plaintiff's Response:  **Undisputed**.

26.     Jeremy Dobler was a sergeant at the CHP Amador Area Office in 2018.  (Dobler Decl. at 1-2 [¶1].)

Plaintiff's Response:  **Undisputed**.

27.     Todd Brown was the commander of the Amador Area Office in 2018; at that time, he was a lieutenant.  (Brown Decl. at 1-2 [¶1].)

Plaintiff's Response:  **Undisputed**.

28.     In 2018, Ryan Stonebraker was an Assistant Chief in the Valley Division, and he was responsible for the Division's South Sector, which included the Amador Area Office. (Stonebraker Decl. at 2 [¶2].)

Plaintiff's Response:  **Undisputed**.

29.     In 2018, Brent Newman was the Chief of the Valley Division; he retired from the CHP in 2019.  (Newman Decl. at 2 [¶2].)

Plaintiff's Response: **Undisputed**.

30.     On August 3, 2018, Wheat told CHP Officer Ward during a phone call that he had gone looking for his wife and Debeaubien to kill them, but he did not find them.  (Ward Depo. at 22:13-20, 24:24-25:3.)

Plaintiff's Response: **Undisputed**.

31.     Ward asked Wheat to meet him at the Amador Area Office, and when they met Wheat told him that he had his duty weapon with him when he went looking for Mary Wheat and Debeaubien.  (Ward Depo. at 31:13-15, 33:4-7.)

Plaintiff's Response: **Undisputed**.

32.     Ward asked Wheat if he would be willing to secure his duty weapon in his own locker; Wheat agreed and Ward watched him put his duty weapon in his locker, and Wheat gave Ward the locker combination.  (Ward Depo. at 35:1-17, 36:1-6, 38:13-20.)

Plaintiff's Response: **Undisputed**.

33.     After Wheat left, Ward took Wheat's duty weapon from Wheat's locker and placed it in his own locker.  (Ward Depo. at 53:3-17.)

Plaintiff's Response: **Undisputed**.

34.     Ward had called Dobler to notify him, and Dobler then called Brown to notify him. (Dobler Decl. at 3 [¶9]; Brown Decl. at 3-4 [¶10].)

Plaintiff's Response: **Undisputed**.

35.     Dobler went to the office where he met up with Ward, and the two of them drove to Wheat's residence.  (Dobler Decl. at 3 [¶9].)

Plaintiff's Response: **Undisputed**.

36.     Brown contacted CHP Lieutenant Frank Newman, who works in the CHP's Office of Employee Safety and Assistance, to have him arrange for a mental health professional to go to Officer Wheat's house and evaluate him.  (Brown Decl. at 4 [¶11].)

Plaintiff's Response: **Disputed** to the extent that it implies that Brown expected *any* kind of "mental health professional" to evaluate Wheat.  In fact, Brown expected a "[p]sychiatrist or psychologist." *See* Brown Deposition (Exhibit A) at 43:17–20.

37.     The CHP has a contract with Magellan Health Services of California to provide mental health counseling and other assistance to CHP personnel; the CHP has a list of professionals who have special training and who have agreed to respond on an urgent basis to incidents.  (Root Depo. at 19:8-20:5, 45:5-46:11; Brown Decl. at 4 [¶11].)

Plaintiff's Response:  **Disputed** to the extent that it implies that the professionals associated with Magellan have the "special training" required to evaluate any peace officer's emotional and mental condition to determine if that condition might adversely affect his exercise of the powers of a peace officer or otherwise to determine any peace officer's fitness for duty.  In fact, those professional are "therapists" who lack the training and other statutory qualifications to conduct such evaluations.  *See* Root Deposition (Exhibit R) at 19:17–20:5, 61:4–12; Plaintiff's Opposition at 20–25 (Section V.A).  **Undisputed** otherwise.

38.     On the night of August 3 and early morning of August 4, 2018, Brown provided Stonebraker with the following information: Officer Wheat had recently found out that his wife was having an affair; earlier that day, August 3, he had told a fellow officer, Ward, that the prior night he had driven to a location where he thought his wife and her lover were to murder the lover and then commit suicide; Dobler and Ward had located Wheat at his house; Dobler had spoken with Wheat and did not believe he was a threat to his wife or her lover, or to himself; a mental health professional had spoken to Wheat at length at his house and informed CHP personnel that he did not pose a threat to himself or others; and Wheat voluntarily handed over his duty weapon and some personal firearms to CHP personnel.  (Stonebraker Decl. at 2-3 [¶5].)

Plaintiff's Response:  **Disputed** to the extent that it makes a definitive judgment regarding whether Wheat surrendered his weapons "voluntarily."  In fact, the record is unclear, in that Officer Dave Ward stated that he "went with Brad to his car . . . to retrieve his service pistol," and that he "was at least taking away that weapon"  *See* Ward Deposition (Exhibit V) at 37:6–13, 77:24–78:5.  **Disputed** also to the extent that it implies that Wheat surrendered fewer than *all* of his weapons.  *See* Deposition Exhibit 51 (Exhibit G) ¶ 5, at 2 (Defendant Dobler's statement that "I asked Brad as a favor to me as a friend, if would he give me all of the firearms in the house, even though he was not required to.  Officer Wheat agreed and gave me three rifles.").  **Undisputed** otherwise.

39.     At Wheat's residence, Wheat told Dobler that he had been upset because Mary Wheat had told him that she was happy with Debeaubien and did not want to work on the Wheats' marriage, and he had driven around looking for Debeaubien with the intent to hurt him, but had not found him; Wheat also told Dobler that he had intended to commit suicide that night; Wheat also told Dobler he realized he had been acting irrationally and was no longer having any thoughts of harming Debeaubien or himself, and he said he had talked with his children and Hooper at length after he had returned from looking for Debeaubien, and those discussions helped him to overcome his thoughts of harming Debeaubien or himself.  (Dobler Decl. at 3-4 [¶10].)

Plaintiff's Response:  **Disputed.**  Officer Dave Ward testified that while waiting for the arrival of Defendant Swain, there was no discussion of Wheat's conduct, just "small talk."  *See* Ward Deposition (Exhibit V) at 46:4–9 ("A.  Waiting for . . . the person to arrive at the house, and we just sat . . . in the living room having small talk . . . with Brad.  Q.  Okay.  Was there any talk concerning what he'd just had done or just small talk, just sort of?  A.  It was small talk.  Nothing to do with — "

In general, Dobler is not a credible witness whose testimony should be believed in any respect.  *First*, before the documentary and other evidence emerged, Dobler testified under oath that the incident of August 2–3, 2018 "was something that we hadn't heard about, and I was shocked when I heard that" in *September* of 2018.  Dobler Deposition (Exhibit I) at 10:13–14; *accord id.* at 7:6–14, 8:4-11, 9:13–10:21 (denying contemporaneous knowledge of incident).  That testimony cannot be reconciled with Dobler's now detailed recollection of the August 2–3 incident and its immediate aftermath.  *See* Dobler Declaration (CHP Defendants' Exhibit 8) ¶¶ 9–15, at 3–5.

*Second*, Dobler categorically denied under oath that there was "a period of time when Brad [Wheat] was asked to surrender his fireman or not carry his gun."  Dobler Deposition (Exhibit I) at 57:21–23.  But now Dobler has a detailed recollection of the circumstances in which Wheat surrendered his weapons and therefore had no gun to carry between August 4 and 20, 2018.  *See* Dobler Declaration (CHP Defendants' Exhibit 8) ¶¶ 11, 15, at 4–5.

*Third*, Dobler categorically denied under oath that he had prepared any "chronology" or "chronology report" or "chronological report" regarding the August 2–3 incident and its aftermath.

Dobler Deposition (Exhibit I) at 64:12–24, 175:25–176:1.  Yet "Sergeant Jeremy Dobler's #15628 *Chronological Summary*" is an essential part of the summary judgment record.  *See* Deposition Exhibit 51 (Exhibit G).

*Fourth*, Dobler categorically denied under oath that Wheat was ever "on any type of limited duty," an administrative sanction.  Dobler Deposition (Exhibit I) at 57:24–58:1, 78:17–21.  But Dobler's own Chronological Summary recounts that on "August 20, 2018, Officer Wheat returned to work on *limited duty* as the front desk officer."  Deposition Exhibit 51 (Exhibit G) ¶ 7, at 2.

40.    Dobler also spoke with Hooper, who said he was aware that Wheat had gone out looking for Debeaubien while he had a gun; Hooper told Dobler that he felt as though Wheat had overcome his thoughts of harming Debeaubien and himself.  (Dobler Decl. at 4-5 [¶12].)

Plaintiff's Response:  **Disputed**.  *See* Hooper Deposition (Exhibit L) at 53:5–10 ("I wasn't involved in the interaction with the CHP officers and Brad the next day, but I have a recollection of seeing them that day.  So I don't know to what — I don't recall interacting much with them around that, but I do have a memory of seeing them that next day . . . ."); Ward Deposition (Exhibit V) at 43:20–23 ("So you and [Defendant Dobler] get to Brad's house.  You encounter Brad and his brother-in-law [i.e., Hooper].  What's the next thing you recall happening?  A.  The brother-in-law left."); *id.* at 45:8–11 ("Q.  Did Sergeant Dobler have any conversation with the brother-in-law that you witnessed but did not take part in?  A.  If he did, I am unaware of it.").

In general, Dobler is not a credible witness whose testimony should be believed in any respect.  *See* Fact 39, *supra* pp. 11–12.

41.    Hooper told Dobler that he had spoken with Mary Wheat about Wheat driving to find Debeaubien, and that Debeaubien was with her and was also aware of the situation.  (Dobler Decl. at 5 [¶12].)

Plaintiff's Response:  **Disputed**.  *See* Hooper Deposition (Exhibit L) at 53:5–10 ("I wasn't involved in the interaction with the CHP officers and Brad the next day, but I have a recollection of seeing them that day.  So I don't know to what — I don't recall interacting much with them around that, but I do have a memory of seeing them that next day . . . ."); *id.* at 75:22–25 ("Q.  Did you ever have a direct conversation with Mary in which she discussed the fact that Brad had

1    expressed either the thought or desire to kill her?  A.  No.”); Ward Deposition (Exhibit V) at 43:20–

2    23 (“So you and [Defendant Dobler] get to Brad’s house.  You encounter Brad and his brother-in-

3    law [i.e., Hooper].  What’s the next thing you recall happening?  A.  The brother-in-law left.”); *id.*

4    at 45:8–11 (“Q.  Did Sergeant Dobler have any conversation with the brother-in-law that you

5    witnessed but did not take part in?  A.  If he did, I am unaware of it.”).

6        In general, Dobler is not a credible witness whose testimony should be believed in any

7    respect.  *See* Fact 39, *supra* pp. 11–12.

8        42.    After speaking with Wheat and Hooper, Dobler believed that Officer Wheat did not

9    pose a threat to Debeaubien, Mary Wheat or himself; Dobler felt as though Wheat’s statements

10   that he no longer had any thought of harming Debeaubien were credible given that he had

11   voluntarily disclosed his earlier thoughts to Ward; in addition, Dobler knew Wheat well and found

12   him to be a very non-confrontational person, and he did not believe Wheat was capable of

13   physically harming anyone.  (Dobler Decl. at 5 [¶13].)

14       Plaintiff’s Response:  **Disputed**.  Given the lack of evidence that Hooper had a substantive

15   conversation with Ward, a reasonable finder-of-fact need not credit Dobler’s self-serving declaration

16   about what he subjectively “believed.”

17       In general, Dobler is not a credible witness whose testimony should be believed in any

18   respect.  *See* Fact 39, *supra* pp. 11–12.

19       43.    Dobler asked Wheat whether he would be willing to turn over his weapons; Wheat

20   said yes and handed over some personal firearms; Dobler asked Wheat where his duty weapon

21   was, and Wheat replied that he had left it in his locker at the office.  (Dobler Decl. at 4 [¶11].)

22       Plaintiff’s Response:  **Disputed** to the extent that it implies definitively that Wheat turned

23   over his weapons “voluntarily.”  Dobler was under orders from Defendant Brown “to ensure they

24   get all other guns.”  Deposition Exhibit 44 (Exhibit D) at 1.  As Defendant Newman testified that

25   if a superior CHP officer so ordered, a subordinate officer would “be obligated to hand over [his]

26   service weapon.”  Newman Deposition (Exhibit P) at 176:12–14.  **Disputed** also to the extent that

27   it implies that Wheat surrendered fewer than *all* of his weapons.  *See* Deposition Exhibit 51

28   (Exhibit G) ¶ 5, at 2 (Defendant Dobler’s statement that “I asked Brad as a favor to me as a friend,

1    if would he give me all of the firearms in the house, even though he was not required to. Officer

2    Wheat agreed and gave me three rifles.").

3          In general, Dobler is not a credible witness whose testimony should be believed in any

4    respect. *See* Fact 39, *supra* pp. 11–12.

5          44.    Sabrena Swain, a mental health professional who was under contract with Magellan

6    Health Services of California, was requested to go to Wheat's residence and speak with him.

7    (Brown Decl. at 4 [¶13]; Swain Depo. at 148:2-149:5, 172:3-6.)

8          Plaintiff's Response: **Undisputed**.

9          45.    Swain understood that the CHP wanted her to assess Wheat so that the CHP would

10   know how to proceed. (Swain Depo. at 181:16-20.)

11         Plaintiff's Response: **Undisputed**.

12         46.    Swain arrived at Wheat's residence in the early morning hours of August 4, 2018,

13   and spoke with Wheat for two hours; after speaking with Wheat, she had no concern that he was

14   going to harm himself or anyone else, and she saw no reason why Wheat should not get access to

15   firearms. (Dobler Decl. at 5 [¶14]; Swain Depo. at 122:23-25, 129:17-24, 139:12-140:4, 272:9-13.)

16         Plaintiff's Response: **Disputed** that Swain was qualified to evaluate Wheat or that her

17   evaluation was anything less than totally incompetent. *See* Mohandie Declaration (Exhibit O)

18   ¶¶ 4–8, at 2. This is particularly true with respect to Wheat's access to firearms. *See id. ¶* 9, at 2.

19   **Undisputed** otherwise.

20         In general, Dobler is not a credible witness whose testimony should be believed in any

21   respect. *See* Fact 39, *supra* pp. 11–12

22         47.    Swain told Dobler she did not believe that Wheat posed a threat to himself or others,

23   and he appeared to be coping with the situation; Dobler asked Swain whether Wheat could return

24   to work and she said yes; he then asked her whether it was safe for Wheat to have firearms, and

25   she said yes. (Dobler Decl. at 5 [¶14]; Swain Depo. at 129:17-24, 139:12-140:4.)

26         Plaintiff's Response: **Disputed**. The cited passages of Swain's deposition do not support

27   the statement. In fact, she merely told Dobler that Wheat "could benefit from a good night's sleep."

28   Swain Deposition (Exhibit U) at 126:14–127:5.

1    In general, Dobler is not a credible witness whose testimony should be believed in any

2   respect.  *See* Fact 39, *supra* pp. 11–12.

3    48.    Swain told Brown she did not believe that Wheat posed a threat to harm

4   Debeaubien, Mary Wheat or himself.  (Brown Decl. at 4-5 [¶14]; Swain Depo. at 129:17-24,

5   139:12-140:4.)

6    Plaintiff's Response:  **Undisputed** that this is what Swain told Brown.  **Disputed** that Swain

7   was qualified to evaluate Wheat or that her evaluation was anything less than totally incompetent.

8   *See* Mohandie Declaration (Exhibit O) ¶¶ 4–9, at 2.

9    49.    Brown believed that Wheat was not a threat to Debeaubien, Mary Wheat, or him-

10   self; this was based on the fact that Wheat had voluntarily disclosed his thoughts to Ward, Dobler's

11   assessment, and Swain's assessment.  (Brown Decl. at 5 [¶15].)

12    Plaintiff's Response:  **Disputed**.  Given the absurdity of Brown's reasoning about Wheat's

13   so-called "voluntar[y] disclos[ure]," plus the lack of qualifications of either Dobler or Swain to

14   evaluate Wheat, a reasonable finder-of-fact need not credit Brown's self-serving declaration about

15   what he subjectively "believed."

16    50.    Dobler and Ward left Wheat's residence and went to the office, where Ward handed

17   over Wheat's duty weapon, and Dobler stored the duty weapon and the personal firearms Wheat

18   had handed over in a locked closet in the sergeants' office.  (Dobler Decl. at 5 [¶15].)

19    Plaintiff's Response:  **Undisputed**.

20    51.    Wheat requested and was granted time off from work and he did not return to work

21   until August 20, 2018.  (Dobler Decl. at 6 [¶16]; Brown Decl. at 5 [¶17].)

22    Plaintiff's Response:  **Undisputed**.

23    52.    On August 4, 2018, based on this information provided to him, Newman did not

24   believe there were grounds to conclude that Wheat posed a threat to himself or others at that time;

25   Newman understood that Wheat had had the opportunity to act on his homicidal and suicidal

26   ideations on August 3 but had not done so, and instead he had voluntarily disclosed his thoughts

27   to Ward, which Newman saw as a sign he was seeking help; in addition, Wheat had voluntarily

28   turned over his weapons; also the mental health professional had evaluated Wheat and believed

1   that he was not a threat to himself or others; and Dobler had also spoken with Wheat and did not

2   believe that he was a threat to himself or others.  (Newman Decl. at 3 [¶6].)

3          Plaintiff's Response:  **Disputed**.  There is no evidence that Wheat "had had the opportunity

4   to act on his homicidal and suicidal ideations on August 3 but had not done so."  In fact, Wheat's

5   attempt to murder Plaintiff failed not because of Wheat's abandoning the attempt but because

6   Plaintiff had slipped away shortly before his arrival.  *See* Fact 83, *infra* p. 24.  For that reason, plus

7   the lack of qualifications of either the mental health professional (Swain) or Dobler to evaluate

8   Wheat, a reasonable finder-of-fact need not credit Newman's self-serving declaration about what he

9   subjectively "believed."

10         53.     On or about August 15, 2018, while he was still off of work, Wheat went to the

11  office for a critical incident stress debrief session made available to all office staff to help them

12  cope with the recent arrest of a colleague; the debrief session was facilitated by Joy Graf, a therapist

13  whose assistance had been arranged through Magellan Health Services of California.  (Brown

14  Decl. at 5-6 [¶18]; Graf Depo. at 21:20-22:1,160:25-161:1.)

15         Plaintiff's Response:  **Undisputed**.

16         54.     After the critical incident stress debrief session, Graf spoke one-on-one with Wheat;

17  during their private discussion, Graf learned from Wheat that Mary Wheat was having an affair

18  and that he had gone to confront her and her lover; Wheat expressed shame, embarrassment, regret

19  and remorse regarding the episode.  (Graf Depo 62:19-63:4, 195:3-23, 196:10-14; Brown Decl. at

20  5-6 [¶18].)

21         Plaintiff's Response:  **Disputed**.  The term "private discussion" falsely conveys that the

22  discussion was anything other than an evaluation of Wheat's "fitness for duty" as a CHP officer,

23  as that term is used in Penal Code § 832.05, and an evaluation of Wheat's "emotional and mental

24  condition" to determine if that condition "might adversely affect [his] exercise of the powers of a

25  peace officer," as those terms are used in Government Code § 1031(f).  *See* Mohandie Declaration

26  (Exhibit O) ¶¶ 5–6, at 2.  A reasonable finder-of-fact need not credit Graf's self-serving memories

27  in part because she took no notes of her interactions with Wheat.  *See* Graf Deposition (Exhibit J)

28  at 189:8–10.

55.     After speaking with Wheat, Graf determined that there were no indicators Wheat was a threat to others, including Mary Wheat or her lover.  (Graf Depo. at 225:23-226:9.)

Plaintiff's Response: **Disputed** that Graf was qualified to evaluate Wheat or that her evaluation was anything less than totally incompetent.  *See* Mohandie Declaration (Exhibit O) ¶¶ 4–9, at 2.  This is especially evident given that she was not even informed of the incident on August 2–3, 2018 in which Wheat had driven with a loaded gun and with a specific intent to murder Plaintiff and then shoot himself.  *See* Graf Deposition (Exhibit J) at 68:10–17.  Incredibly, Graf thought she was called in "because Brad Wheat had had three car accidents."  *Id.* at 175:13–15; *accord id.* at 194:8–12.

56.     Graf informed Brown that she was not a concerned Wheat would do anything harmful or that he was a threat to himself or others; she told Brown she believed Wheat had good coping skills and understood the consequences that would follow if he harmed himself or others, and she felt that his religious beliefs were beneficial.  (Graf Depo. at 72:3-17, 225:23-226:9; Brown Decl. at 6 [¶18].)

Plaintiff's Response: **Disputed** that Graf was qualified to evaluate Wheat or that her evaluation was anything less than totally incompetent.  *See* Mohandie Declaration (Exhibit O) ¶¶ 4–9, at 2.  This is especially evident given that she was not even informed of the incident on August 2–3, 2018 in which Wheat had driven with a loaded gun and with a specific intent to murder Plaintiff and then shoot himself.  *See* Graf Deposition (Exhibit J) at 68:10–17.

57.     Graf also spoke with Dobler and told him that she did not believe that Wheat posed a threat to himself or others.  (Dobler Decl. at 6 [¶18].)

Plaintiff's Response: **Disputed** that Graf was qualified to evaluate Wheat or that her evaluation was anything less than totally incompetent.  *See* Mohandie Declaration (Exhibit O) ¶¶ 4–9, at 2.  This is especially evident given that she was not even informed of the incident on August 2–3, 2018 in which Wheat had driven with a loaded gun and with a specific intent to murder Plaintiff and then shoot himself.  *See* Graf Deposition (Exhibit J) at 68:10–17.

In general, Dobler is not a credible witness whose testimony should be believed in any respect.  *See* Fact 39, *supra* pp. 11–12.

58.     On August 15, 2018, Brown informed Stonebraker and Newman that Graf had spoken with Wheat for about two hours about his marital problems and his emotional state, and had reported that she did not believe that Wheat was a threat to himself or others.  (Stonebraker Decl. at 4 [¶11]; Newman Decl. at 4 [¶9].)

Plaintiff's Response:  **Disputed** that Graf was qualified to evaluate Wheat or that her evaluation was anything less than totally incompetent.  *See* Mohandie Declaration (Exhibit O) ¶¶ 4–9, at 2.  This is especially evident given that she was not even informed of the incident on August 2–3, 2018 in which Wheat had driven with a loaded gun and with a specific intent to murder Plaintiff and then shoot himself.  *See* Graf Deposition (Exhibit J) at 68:10–17.  Given Graf's evident lack of qualifications and the officers' failure to inform her of Wheat's incident, the officer's reliance on Graf's advice was manifestly unreasonable.

59.     Wheat returned to work on August 20, 2018, and Dobler gave Wheat his duty weapon because Wheat was back on duty.  (Dobler Decl. at 6 [¶19].)

Plaintiff's Response:  **Undisputed** as to giving the weapon and to the extent that it correctly suggests that Dobler gave Wheat his duty weapon "so he could return to work" as an active-duty CHP officer.  Deposition Exhibit 51 (Exhibit G) ¶ 7, at 2.  **Disputed** to the extent that it suggests that Dobler had any obligation to give Wheat the weapon.  *See* Facts 75–77, *infra* pp. 22–23.

In general, Dobler is not a credible witness whose testimony should be believed in any respect.  *See* Fact 39, *supra* pp. 11–12.

60.     When Wheat returned to work, Dobler did not believe that Wheat posed a threat to Debeaubien, Mary Wheat or himself; to Dobler it appeared as though Wheat was coping well with his situation, and Wheat denied having any thoughts of harming himself or others; Dobler was also aware that Wheat's family, including Mary Wheat's siblings, were very supportive of Wheat, and that Wheat was getting counseling.  Dobler also relied on the evaluations of Swain and Graf.  (Dobler Decl. at 6-7 [¶19].)

Plaintiff's Response:  **Disputed.**  Dobler's own assessment belies the notion that Wheat was "coping well," as do the assessments of Defendants Brown and Stonebraker.  *See* Dobler Deposition (Exhibit I) at 70:20–71:11 (Wheat was keeping a personal journal at work instead of

1    doing his job); *id.* at 142:14–143:10 (Wheat was continuing his stalking behavior by asking, during

2    a "ride along" with a fellow officer, to drive by Mary Wheat's gym); Deposition Exhibit 62

3    (Exhibit H) at 2 (Brown's describing Wheat's "unprofessional or inappropriate texts," including

4    his admission that he "had sent texts to Mary that weren't nice"); *id.* at 1 (Brown's recounting that

5    "Officer Peixoto advised Sergeant Dobler that Brad had asked, during the ride-along, to drive by

6    the gym" owned by Mary Wheat); Brown Deposition (Exhibit A) at 279:10–284:4 (recounting

7    numerous deficiencies in Wheat's performance, including not showing up for work on time, not

8    staying at his assigned work station, leaving work in the middle of the day, and generally "not

9    doing what he should be doing"); Stonebraker Deposition at (Exhibit T) at 117:21–24 ("Q  Did

10   you have an understanding as to whether or not there was deficient performance by Wheat even

11   while on limited duty?  A  I don't remember, but it wouldn't surprise me.").

12       For that reason, and because Dobler was not qualified to evaluate Wheat's fitness for duty

13   as a peace officer, a reasonable finder-of-fact need not credit Dobler's self-serving declaration about

14   what he subjectively "believed."  And in general, Dobler is not a credible witness whose testimony

15   should be believed in any respect.  *See* Fact 39, *supra* pp. 11–12.

16       61.     Brown understood that Wheat would receive his duty weapon when he returned to

17   work.  (Brown Decl. at 6 [¶19].)

18       Plaintiff's Response:  **Undisputed**.

19       62.     Brown spoke with Wheat on several occasions after Wheat returned to work, and

20   Brown did not believe that Wheat posed a threat to Debeaubien, Mary Wheat or himself; Wheat

21   told Brown that he was continuing to receive therapy from two separate counselors; Dobler

22   reported to Brown that Wheat appeared to be accepting that his marriage was going to end and was

23   moving forward with his life; Brown was also aware that Wheat was communicating his feelings

24   to his family, including Mary Wheat's brothers who lived in the area, and that the family members

25   were all very supportive of Wheat.  (Brown Decl. at 6-7 [¶20].)

26       Plaintiff's Response:  **Disputed.**  For the reasons in Fact 60, *supra* pp. 18–19, and because

27   Brown was not qualified to evaluate Wheat's fitness for duty as a peace officer, a reasonable finder-

28   of-fact need not credit Brown's self-serving declaration about what he subjectively "believed."

63.     On about August 21, 2018, Graf spoke to Wheat over the telephone for about ten to twelve minutes and Graf's impression was that Wheat was doing well based on their discussion. (Graf Depo. at 78:20-24, 278:14-18.)

Plaintiff's Response: **Disputed** that Graf was qualified to evaluate Wheat or that her evaluation was anything less than totally incompetent. *See* Mohandie Declaration (Exhibit O) ¶¶ 4–9, at 2. This is especially evident given that she was not even informed of the incident on August 2–3, 2018 in which Wheat had driven with a loaded gun and with a specific intent to murder Plaintiff and then shoot himself. *See* Graf Deposition (Exhibit J) at 68:10–17.

64.     Graf informed Dobler that Wheat seemed to be doing well. (Graf Depo. at 280:19-23; Dobler Decl. at 7 [¶21].)

Plaintiff's Response: **Disputed** that Graf was qualified to evaluate Wheat or that her evaluation was anything less than totally incompetent. *See* Mohandie Declaration (Exhibit O) ¶¶ 4–9, at 2. This is especially evident given that she was not even informed of the incident on August 2–3, 2018 in which Wheat had driven with a loaded gun and with a specific intent to murder Plaintiff and then shoot himself. *See* Graf Deposition (Exhibit J) at 68:10–17.

In general, Dobler is not a credible witness whose testimony should be believed in any respect. *See* Fact 39, *supra* pp. 11–12.

65.     Graf also informed Brown about her evaluation of Wheat. (Brown Decl. at 7 [¶21].)

Plaintiff's Response: **Disputed** that Graf was qualified to evaluate Wheat or that her evaluation was anything less than totally incompetent. *See* Mohandie Declaration (Exhibit O) ¶¶ 4–9, at 2. This is especially evident given that she was not even informed of the incident on August 2–3, 2018 in which Wheat had driven with a loaded gun and with a specific intent to murder Plaintiff and then shoot himself. *See* Graf Deposition (Exhibit J) at 68:10–17.

66.     Stonebraker became aware at some point in August of 2018 that Wheat had returned to uniformed duty and he assumed that Wheat would have his duty weapon when he started working; Stonebraker felt it was appropriate for Wheat to return to work and did not believe that he posed a threat to Debeaubien, Mary Wheat or himself, based on the fact that Wheat had been evaluated by two mental health professionals, both of whom reported that they believed he did not

1  pose a threat to himself or others, that Wheat had voluntarily disclosed the homicidal and suicidal

2  thoughts he had on August 2, that Wheat was continuing to receive therapy, that Dobler did not

3  believe that Officer Wheat posed a threat, that Wheat was being supported by his family, including

4  Mary Wheat's brothers, and that Wheat appeared to be focused on his future and coming to accept

5  that his marriage was over.  (Stonebraker Decl. at 4-5 [¶12].)

6        Plaintiff's Response:  **Undisputed** that Stonebraker knew in August of 2018 that Wheat's

7  duty weapon had been returned to him.  **Disputed** that Stonebraker had a reasonable basis for his

8  beliefs, given that they were based on evaluations by mental health professionals and fellow

9  officers who lacked the qualifications to evaluate Wheat.  Indeed, Stonebraker himself believed

10  that Wheat was *not* fit to return to work:  "Q  Is a California Highway Patrol officer who is acting

11  upon an intent to commit murder psychologically fit for duty?  A  I would say no."  Stonebraker

12  Deposition at (Exhibit T) at 100:22–25; *see also id.* at 108:17–109:1 (admitting that, in "hindsight,"

13  a formal "fitness-for-duty examination" should have been ordered for Wheat).  For these reasons,

14  a reasonable finder-of-fact need not credit Stonebraker's self-serving declaration about what he

15  subjectively "believed.".

16        67.  Newman was not aware until after the shooting that Wheat's duty weapon had been

17  returned to him.  (Newman Decl. at 4 [¶12].)

18        Plaintiff's Response:  **Disputed**.  Newman testified:  "I'm trying to be very . . . accurate

19  for you.  I know, generally speaking, based upon the observations, the progression that [Wheat]

20  was making, the observations of his commander, the acting commander, the office staff, and his

21  — and a couple of counselors, that he was making good progress.  And that it was well understood

22  — that was *my understanding at the time* — that he — he had essentially moved beyond that acute

23  moment and at some point the gun was — was returned."  Newman Deposition (Exhibit P) at

24  72:3–14 (emphasis added).

25        68.  Before he was shot by Wheat, Debeaubien did not have any contact with Dobler,

26  Brown, Stonebraker or Newman regarding Wheat.  (Debeaubien Depo. at 99:5-100:8.)

27        Plaintiff's Response:  **Undisputed**.

28  *///*

**PLAINTIFF'S STATEMENT OF DISPUTED AND ADDITIONAL FACTS**

69.     On August 3, 2018, Wheat surrendered *all* of his weapons to CHP officers.

Deposition Exhibit 51 (Exhibit G) ¶ 5, at 2 (Defendant Dobler's statement that "I asked Brad as a favor to me as a friend, if would he give me all of the firearms in the house, even though he was not required to.  Officer Wheat agreed and gave me three rifles.").

70.     Wheat's duty weapon used "hollow-point" ammunition issued by the CHP.

Brown Deposition (Exhibit A) at 182:7–183:3.

71.     Defendant Dobler stated in his declaration:  "Before I returned Wheat's duty weapon, I advised Lt. Brown that I was going to return it."

Dobler Declaration (CHP Defendants' Exhibit 8) ¶ 19, at 21–22.

72.     Defendant Brown knew that Wheat's duty weapon had been returned, and he consciously approved that course of action based on his personal interactions with Wheat and with Defendant Dobler between August 20 and 27, 2018.

Brown Declaration (Exhibit 9) ¶ 19, at 6 (knowledge); *id.* ¶¶ 20–23, at 6–7 (conscious approval).

73.     Although he did not recall the specific date, Defendant Stonebraker knew in August of 2018 that Wheat's duty weapon had been returned to him, and he consciously approved that course of action based on his detailed awareness and understanding of the situation through Defendant Dobler and others).

Stonebraker Declaration (CHP Defendants' Exhibit 10) ¶ 12, at 4–5.

74.     In his "Chronological Summary" of the events at issue, Defendant Dobler wrote: "On August 20, 2018, Officer Wheat returned to work on limited duty as the front desk officer.  I returned his duty weapon to him so he could return to work, but still had possession of his long guns."

Deposition Exhibit 51 (Exhibit G) ¶ 7, at 2.

75.     The weapon that Wheat used to shoot Plaintiff did not belong to Wheat; rather, it belonged to the CHP, which issued it to Wheat for his use in the line of duty, i.e., as his "duty weapon."

Brown Deposition (Exhibit A) at 185:25–186:3, 187:13–15, 215:21–216:3; Dobler Deposition (Exhibit I) at 120:2–3.

76.     Defendant Newman testified that if a superior CHP officer so ordered, a subordinate officer would "be obligated to hand over [his] service weapon."

Newman Deposition (Exhibit P) at 176:12–14.

77.     Defendant Newman generally acknowledged that a subordinate CHP officer is required to comply with an order by a superior officer with respect to a service weapon.

Newman Deposition (Exhibit P) at 175:11–183:6.

78.     Defendant Dobler testified:  "Q.  Okay.  And you didn't do that because you had taken [the gun], not as a highway patrol officer, but as a favor?  A.  Did it, yes, as a friend."

Dobler Deposition (Exhibit I) at 132:6–9.

79.     Defendant Brown testified:  "Q.  And did Sergeant Dobler take possession of those guns as a sergeant with the highway patrol?  A.  No.  He took possession of those guns as a friend of Brad Wheat."

Brown Deposition (Exhibit A) at 192:18–21.

80.     Apart from being shot, Plaintiff "was not afraid that Brad Wheat would hurt" him.

Debeaubien Declaration (Exhibit B) ¶ 5, at 2.

81.     It was only during the deposition of Defendant Brown on September 20, 2020, that Plaintiff first learned that at around midnight on August 2–3, 2018, Wheat drove while armed with his service weapon to the Georgetown/Garden Valley residence where Plaintiff was staying with Mary Wheat, with the specific intent to murder Plaintiff before killing himself.

Debeaubien Declaration (Exhibit B) ¶ 3, at 1.

82.     Wheat was armed with a gun when he drove to Georgetown/Garden Valley on August 2–3, 2018.

Ward Deposition (Exhibit V) at 24:4–7 ("And was it your understanding that he'd gone up there . . . with a handgun or at least a weapon with him?  A.  Yes."); Hooper Deposition (Exhibit L) at 21:6 (expressing understanding that Wheat "had his firearm in the car" on the drive).

///

83.     The reason that Wheat did not commit murder on August 2–3, 2018 was not that he abandoned the attempt but choice but because Plaintiff had slipped away shortly before his arrival.

Ward Deposition (Exhibit V) at 71:18–20 ("Q.  And the reason he didn't kill them is because he couldn't find them; correct?  A.  Based on what he explained to me.").

84.     The officer defendants knew that on August 2–3, 2018, Wheat (armed with a gun) "had driven to a location where he thought his wife and her lover were to murder the lover and then commit suicide," and that the only reason Wheat did not commit murder was that his intended victim had slipped away shortly before his arrival.

Fact 38, *supra* p. 10 (CHP fact) (quotation); Fact 82, *supra* p. 23 (armed with gun); Fact 83, *supra* p. 24 (victim had slipped away).

85.     Wheat's actions on August 2–3, 2018 constituted the crime of attempted murder under Penal Code §§ 187(a) and 664.

Noble Declaration (Exhibit Q) ¶ 5, at 2; Mohandie Declaration (Exhibit O) ¶ 11, at 3.

86.     Defendant Stonebraker so admitted:  "The mind-set of the individual is to murder, is to kill, to fatally shoot two people.  A  So with that assumption, yes.  Q  With that assumption, would you agree that's attempted murder?  A  Yeah."

Stonebraker Deposition at (Exhibit T) at 86:15–21.

87.     Wheat's actions on August 2–3, 2018 constituted the crime of possession of a deadly weapon with intent to assault under Penal Code § 17500.

Noble Declaration (Exhibit Q) ¶ 6, at 2; Mohandie Declaration (Exhibit O) ¶ 11, at 3.

88.     Defendant Stonebraker so admitted:  "And would you also agree that under the Penal Code, even driving with a weapon with the intent to do harm, that's also a crime; isn't it?  A  Yes."

Stonebraker Deposition at (Exhibit T) at 86:23–87:1.

89.     The CHP and its officers did nothing to investigate or prosecute those two crimes.

Noble Declaration (Exhibit Q) ¶ 7, at 2 (concluding based on his review, that the CHP "did not conduct a criminal investigation of Officer Wheat's conduct on August 2–3, 2018, did not prepare a report, and did not refer the matter to prosecutor's office"); Newman Deposition (Exhib-

it P) at 83:12–18 (admitting that as to "the August incident," "there's no internal investigation on Officer Wheat"); Stonebraker Deposition (Exhibit T) at 107:25–108:3 ("Q Best of your knowledge, did anyone ever contact the Amador County District Attorney's Office concerning Brad Wheat's actions on or about August 3rd, 2018?  A  I'm not aware."); Fact 91, *infra* p. 25.

90.     The CHP and its officers took no administrative action against Wheat related to those two crimes.

Noble Declaration (Exhibit Q) ¶ 8, at 2 (concluding based on his review, that the CHP "did not relieve Officer Wheat of his peace officer powers, place him on administrative leave, or conduct a fitness for duty examination prior to returning his duty weapon or allowing him to work as a peace officer"); Newman Deposition (Exhibit P) at 83:12–18 (admitting that as to "the August incident," "there's no internal investigation on Officer Wheat"); Fact 91, *infra* p. 25.

91.     Defendant Brown testified:  "Q. You never did an investigation either, did you.  A. No.  Q.  Did you ever suggest that the CHP investigate Brad Wheat's actions on August 3rd?  A. There was no reason to, so no."

Brown Deposition (Exhibit A) at 304:8–12; *see also id.* at 308:3–9 (asserting that Dobler "gathered the facts and determined that there was nothing of concern").

92.     Defendant Brown testified:  Regarding Wheat's conduct on August 2–3, "had anyone reached out to any allied law enforcement agencies?  A.  I said no, sir.  There was no other . . . reason to reach out to any other law enforcement agencies."

Brown Deposition (Exhibit A) at 66:13–17.

93.     Defendant Brown and Dobler (if not other officers) knew that in August of 2018, Wheat was continuing to send "unprofessional and inappropriate texts" to Mary Wheat; that while on a "ride-along" with a fellow officer, he had asked to drive by the places of business of Mary and of Plaintiff; and that he had instigated some means of tracking Mary through her cell phone.

Deposition Exhibit 62 (Exhibit H) at 2 (Brown's recounting of Wheat's "unprofessional or inappropriate texts" to Mary Wheat); *id.* at 1 (Brown's recounting that "Officer Peixoto advised Sergeant Dobler that Brad had asked, during the ride-along, to drive by the gym" owned by Mary Wheat); Brown Deposition (Exhibit A) at 237:2–12 ("When did you first learn he had a tracking

1   device on Mary's phone?  . . .  I knew that he had some kind of a way to follow her, but I don't

2   know . . . what it was.  Q.  BY MR. KATZ:  When did you discover that?  A.  I don't recall.  Q.

3   Before she was shot; correct?  A.  Yes.  Q.  Before or after August 3rd, 2018?  A.  After, I believe.").

4          94.     Defendant Brown testified:  "Q.  Okay.  And just so I'm clear, is it correct that no

5   one from the department, as far as you know, ever contacted Trae to find out what had happened?

6   A.  Yes.  Q.  And is it correct that no one from the department ever contacted Mary to determine

7   what had happened?  A.  Yes."

8          Brown Deposition (Exhibit A) at 166:25–167:7.

9          95.     CHP Officer Ward recognized on August 3, 2018 that Wheat's conduct was no

10  longer a "peer support" matter but had become a "law enforcement" matter involving criminal

11  conduct.

12         Ward Deposition (Exhibit V) at 26:24–27:7, 70:22–71:7.

13         96.     CHP Sergeant Elliotte Johnson testified:  "So when Lieutenant Newman told you

14  to get on the phone, he didn't tell you anything about Brad Wheat telling Officer Ward that he'd

15  gone to kill some people?  A  No.  Q  Would you have done anything differently if that's what he

16  told you?  A  Yes.  Q  What would you have done differently?  A  'We need to call law enforcement.

17  A person is trying to kill somebody.'"

18         Johnson Deposition (Exhibit M) at 16:1–11.

19         97.     Defendant Brown wrote in his Chronological Summary:  "My concern was not that

20  he was a danger to himself or others.  My concern was that he would put himself into a position

21  where Mary or her boyfriend would file a complaint, falsely or otherwise, when he was already on

22  interim.  My concern was for his career."

23         Deposition Exhibit 62 (Exhibit H) at 3.

24         98.     Defendant Dobler testified with respect to Wheat's criminal conduct on August 2–

25  3, 2018:  "I'd say it's what we refer to commonly as a . . . mental health crisis.  I was concerned

26  about his mental health at that time."

27         Dobler Deposition (Exhibit I) at 127:10–13.

28  ///

99.     Defendant Stonebraker testified: "In this situation, when you wrote this email, what would the purpose have been to obtain an emergency protective order?  A  To protect Brad Wheat, to protect anybody else that might be a concern."

Stonebraker Deposition at (Exhibit T) at 91:20–24.

100.     Both Defendants Swain and Graf are licensed marriage and family therapists; neither is a licensed psychologist.

Swain Deposition (Exhibit U) at 46:12–13 ("What is your scope of practice?  A  I'm a licensed marriage and family therapist."); Graf Deposition (Exhibit J) at 40:2–4 ("So you are a licensed marriage family therapist; is that correct?  A  Correct.").

101.     Neither Defendant Swain nor Defendant Graf met the various requirements set forth in Government Code § 1031(f)(2)(B).

Mohandie Declaration (Exhibit O) ¶ 7, at 2; Swain Deposition (Exhibit U) at 47:3–10 ("Q Are you trained to do fit-for-duty evaluations? . . .  THE WITNESS:  No, I am not."); Graf Deposition (Exhibit J) at 43:14–16 ("Q  You mentioned training.  Have you received any training in doing fit-for-duty examinations?  A  None.").

102.     When she was asked to evaluate Wheat on August 4, 2018, Defendant Swain was not informed that Wheat had been placed on "limited duty" at a "desk job"; that he had been involved in two automobile accidents in the past 30 days; that he had, "without Mary's consent, placed a tracking device on her cell phone"; that he had driven by the places of business of Mary Wheat and of Plaintiff "while on duty for no apparent duty-related purpose"; that while on a "ride-along," he had asked a fellow officer to do the same; that he "had admitted to sending inappropriate text messages to his estranged wife"; or that he was subject to a "pending disciplinary action."

Swain Deposition (Exhibit U) at 109:13–22, 110:9–25, 111:14–18, 116:5–7.

103.     When she was asked to evaluate Wheat on August 14, 2018, Defendant Graf was not informed that "less than two weeks earlier, Brad Wheat had driven with a loaded gun and with a specific intent to murder [Plaintiff] . . . and then shoot himself."

Graf Deposition (Exhibit J) at 68:10–17.

///

104.    Defendant Newman states in his declaration that he knew no later than August 4, 2018 that on "August 2, 2018, [Wheat] had gone looking for his wife and the man with whom she was having the affair, with the intent to murder the man."

Newman Declaration (CHP Defendants' Exhibit 11) ¶ 4, at 3:2–4.

105.    Defendant Newman testified:  "I'm trying to be very . . . accurate for you.  I know, generally speaking, based upon the observations, the progression that [Wheat] was making, the observations of his commander, the acting commander, the office staff, and his — and a couple of counselors, that he was making good progress.  And that it was well understood — that was my understanding at the time — that he — he had essentially moved beyond that acute moment and at some point the gun was — was returned."

Newman Deposition (Exhibit P) at 72:3–14.

106.    Defendant Newman admits that on August 15, 2018, he communicated with Defendant Brown about the progress of the Wheat matter.

Newman Declaration (CHP Defendants' Exhibit 11) ¶ 9, at 4.

107.    In stating that "he was informed that Officer Wheat had spoken a second time with [Defendant] Graf," Defendant Newman admits that he communicated with Defendant Brown (or some other subordinate) *after* August 20, 2018, because Graf spoke to Wheat for the *second* time on August 21, 2018.

Newman Declaration (CHP Defendants' Exhibit 11) ¶ 10, at 4:10–11 (so stating); Deposition Exhibit 51 (Exhibit G) ¶ 6, at 2 ("Officer Wheat had also come back to the office on [August] 14th and talked to a psychologist, Joy Graf, for several hours."); *id.* ¶ 8, at 2 ("On August 21, 2018, Joy Graf called and talked to Officer Wheat for an extended time.").

108.    Defendant Newman states in his declaration that Defendant Swain, a "mental health professional," reported that she "did not believe Officer Wheat posed a threat to himself or others"; and likewise that Defendant Graf, another "mental health professional," twice stated that "she did not believe that Officer Wheat was a threat to himself or others."

Newman Declaration (CHP Defendants' Exhibit 11) ¶ 5, at 3:11–14 (Swain); *id.* ¶ 9, at 4:4–7 (first Graf); *id.* ¶ 10, at 4:11–12 (second Graf).

109.    Defendant Newman admits that he "was employed by the CHP from 1988 to 2019"; that in 2018, he "was the Chief of the CHP's Valley Division"; and that during his "tenure as Chief, there were 20 offices within the Valley Division, and approximately 800 sworn personnel and 200 non-sworn personnel worked in the Valley Division."

Newman Declaration (CHP Defendants' Exhibit 11) ¶¶ 1–2, at 2:2–9.

110.    Defendant Newman testified:

Q    There's nothing that you've heard that makes you believe that things could have been approached differently regarding Brad Wheat's situation?

A    No. . . . There's nothing I've ever heard that causes me to reflect on what happened and think, you know, "Well, we should have thought of that or done something different."

Newman Deposition (Exhibit P) at 123:11–23.

111.    Defendant Dobler gave Wheat his gun in the CHP's Amador Area Office on the morning Monday, August 20, 2018 after Wheat had returned from a two-week vacation.

Deposition Exhibit 51 (Exhibit G) ¶¶ 6–7, at 2.

112.    Defendant Brown acknowledged that in utilizing Defendants Swain and Graf to evaluate Wheat, the CHP was "interested in determining whether or not he was mentally fit to be a highway patrol officer," in that had they "come back and said, hey, he's a danger to himself or someone else, that would have absolutely changed the circumstances."

Brown Deposition (Exhibit A) at 164:4–12; *see also id.* at 59:13–15 (I asked Swain to "do a full evaluation on him . . . to determine whether or not he is a danger to himself or anyone else.").

113.    Defendant Newman testified about referring Wheat to Defendants Swain and Graf: "Q. Am I also correct, though, it was your understanding that the purpose of having a mental health professional see Brad Wheat was to determine whether or not he was a danger to himself or others?  A.  In part, yes.  Absolutely."

Newman Deposition (Exhibit P) at 92:8–12.

///

///

114.    Defendant Newman testified: "Q.  What did you think the evaluation was going to consist of.  What was your understanding, when you were signing on to saying this seems like a good approach — first of all, did — did you think it was going to be done by someone who was qualified to determine whether or not someone was fit for duty?  A.  I was — yes.  Absolutely."

Newman Deposition (Exhibit P) at 87:12–18.

115.    Given their lack of experience, education, and training and otherwise, both Defendants Swain and Graf were unqualified and totally incompetent to conduct the evaluations of Wheat that the CHP asked them to conduct.  Their lack of qualification and competence led Swain and Graf to render erroneous opinions and advice.

Mohandie Declaration (Exhibit O) ¶ 8, at 2; Swain Deposition (Exhibit U) at 47:3–10 ("Q Are you trained to do fit-for-duty evaluations? . . .  THE WITNESS:  No, I am not."); Graf Deposition (Exhibit J) at 43:14–16 ("Q  You mentioned training.  Have you received any training in doing fit-for-duty examinations?  A  None.").

116.    Paragraph 5(g) of Chapter 3 ("Response to Domestic Violence") of the CHP Manual provides in part:  <u>Emergency Protective Order</u>.  Per [Family Code § 6275], a law enforcement officer who responds to a situation in which the officer believes there may be grounds for the issuance of an EPO shall inform the victim . . . that they may request the officer to request an EPO."

Deposition Exhibit 47 (Exhibit F) at 3-10.

117.    An EPO commands one or more of the following to the "restrained person":

a.    "YOU MUST NOT harass, attack, strike, threaten, assault (sexually or otherwise), hit, follow, stalk, molest, destroy any personal property of, disturb the peace of, keep under surveillance, or block the movements of each person named in item 1."

b.    "YOU MUST NOT contact, either directly or indirectly, by any means, including but not limited to by telephone, mail, e-mail or other electronic means, any person named in item 1."

///

1    c.    "YOU MUST stay away at least: _____ yards from each person

2    named in item 1"; or "stay away at least: _____ yards from [or] move out

3    immediately from (address): _____."

4    Form EPO-001 (Exhibit K) at 1 (Item 3).

5    118.    *Every* EPO commands the following to the "restrained person"

6    d.    "YOU MUST NOT own, possess, purchase, receive, or attempt to

7    purchase or receive any firearm or ammunition.  If you have any firearms, you must

8    turn them in to a law enforcement agency or sell them to, or store them with, a

9    licensed gun dealer."

10   Form EPO-001 (Exhibit K) at 1 (Item 3).

11   119.    The "Warnings and Information" on the second page of the EPO include:  "This

12   protective order shall be enforced by all law enforcement officers in the State of California who

13   are aware of or shown a copy of the order."

14   Form EPO-001 (Exhibit K) at 2 (capitalization altered).

15   120.    Defendant Brown testified about the purpose and effect of obtaining an EPO against

16   Brad Wheat:  "Q.  Well, so what was your understanding as to what an emergency protective order

17   was?  A. Emergency protective order would be to keep Brad away from Mary and Trae."

18   Brown Deposition (Exhibit A) at 63:13–16.

19   121.    Wheat's dead-of-night harassment of his estranged wife and his attempted murder

20   of Plaintiff on August 2–3, 2018 constituted an "incident of domestic violence" within the meaning

21   of the Penal Code.

22   Brown Deposition (Exhibit A) at 302:19–21 ("Q.  And would you agree that what

23   happened in this case was domestic violence?  A.  Yes."); Noble Declaration (Exhibit Q) ¶ 9, at 2

24   ("Any reasonable police officer would have known that Officer Wheat's conduct on August 2–3,

25   2018 was an 'incident of domestic violence' under the California Penal Code."); Salvo Declaration

26   (Exhibit S) ¶ 4, at 1.

27   ///

28   ///

122.    In an e-mail message sent to Defendants Brown and Newman (among others), Defendant Stonebraker wrote:  "Chiefs just spoke to Lt. Brown and they are attempting to locate Officer Wheat.  If not located shortly an emergency protective order will be sought and notifications to the other party's will be made with the involvement of the Sheriff's Department and so forth."

Deposition Exhibit 44 (Exhibit D) at 1.

123.    The judgment to obtain an EPO and to notify the victims was based on Wheat's confession to a fellow CHP officer that (in Defendant Brown's words in the same e-mail chain) Wheat "drove to a location where he thought his wife and her lover were last night to murder the lover and then commit suicide."

Deposition Exhibit 44 (Exhibit D) at 2.

124.    The CHP never informed Plaintiff of his statutory right to "request the officer to request an emergency protective order," as required by Family Code § 6275(a).

Debeaubien Declaration (Exhibit B) ¶ 7, at 2; Brown Deposition (Exhibit A) at 75:13–18 ("A. . . .  So we had a discussion relative to, you know, whether or not we needed to notify anyone. [Defendant Swain] felt he was not a threat to anyone and said that she determined he was not a threat.  And the reporting requirements were such that there was no requirement to report to anyone.").

125.    Had Plaintiff been informed of his statutory right to request an officer to request an emergency protective order, Plaintiff would have sought such an order and then sought a more permanent order.

Debeaubien Declaration (Exhibit B) ¶ 8, at 2.

126.    Had Plaintiff sought an emergency protective order and then a more permanent order against Wheat based on Wheat's criminal conduct on August 2–3, 2018, a court more likely than not would have issued those orders.

Salvo Declaration (Exhibit S) ¶¶ 8–9, at 2.

///

///

127.    Regarding the purpose and effect of an emergency protective order against Wheat in the aftermath of his criminal conduct on August 2–3, 2018, Defendant Stonebraker testified: "Q  And what was your understanding as to what an emergency protective order would be?  A  An emergency protective order would be something that would protect Brad Wheat's spouse, or whoever's involved, based on the circumstances, and maybe even protect Officer Wheat from having weapons."

Stonebraker Deposition at (Exhibit T) at 90:21–91:1.

128.    Plaintiff did not actually learn of Wheat's attempted murder of him on August 2–3, 2018 until discovery in this case.

Debeaubien Declaration (Exhibit B) ¶ 3, at 1.

129.    Had Plaintiff learned before September 3, 2018 of Wheat's attempted murder of him on August 2–3, 2018, he would have taken various actions that would have reduced the risk of the shooting:  contacting the CHP and local law enforcement; temporarily relocating to a place physically further removed from and unknown to Wheat; and considering obtaining a firearm as a potential last resort.

Debeaubien Declaration (Exhibit B)  ¶ 8, at 2.

130.    Paragraph 5(i) of Chapter 3 ("Response to Domestic Violence") of the CHP Manual provides in part:  "Any reported crime involving domestic violence to which an officer responds and takes action shall be documented through the preparation of a CHP 216 or CHP 202 [two kinds of reports]."

Deposition Exhibit 47 (Exhibit F) at 3-10.

131.    The CHP prepared no reports or other documentation regarding Brad Wheat's criminal conduct on August 2–3, 2018.

Newman Deposition (Exhibit P) at 57:18–23 ("Were there any reports generated regarding this potentially huge problem?  A.  There — I don't know of a report.  There was a contempo-raneous [9-line] email, . . . but I don't know of other reports per se."); *id.* at 83:19–21 ("Q.  How many pages are there to any investigation regarding the August incident of Officer Wheat?  A.  None."); Noble Declaration (Exhibit Q) ¶ 7, at 2.

132.   The CHP prepared a 69-page report about Wheat's involvement in what Chief Newman admitted were "two single-vehicle fender benders."

Newman Deposition (Exhibit P) at 82:10–11 (so admitting); *see also* Deposition Exhibit 45 (Exhibit E) (69-page report by CHP Internal Affairs).

133.   When given the opportunity to identify any CHP "record that would notify any officer . . . or supervisor or commander or executive staff member who was not privy to the conversations or contemporaneous emails, that Brad Wheat was potentially a danger to himself and others," Defendant Newman identified no such record.

Newman Deposition (Exhibit P) at 58:3–10.

134.   In the absence of any written report about Wheat's attempted murder of his estranged wife and of Plaintiff on August 2–3, 2018, as required by Penal Code § 13730, Plaintiff would have faced much greater difficulty in obtaining an "emergency protective order" pursuant to § 6250 of the Family Code or § 646.91 of the Penal Code, had Plaintiff possessed the necessarily knowledge to seek such an order.

Salvo Declaration (Exhibit S) ¶ 7, at 2.

135.   Defendant Newman testified:  "Q  So am I correct that you testified previously that there was a conscious decision made by yourself to not investigate circumstances surrounding Brad Wheat's murder-suicide and assault with a firearm?  A  I don't remember what I testified specifically.  What I remember is that I made a conscious decision that we would not do the critical incident investigation."

Newman Deposition (Exhibit P) at 187:13–19.

136.   Following the events of August 2–3, 2018, no one from the CHP ever contacted Plaintiff or (to his knowledge) Mary Wheat to ask about their safety or otherwise to investigate those events.  No one from the CHP ever contacted Plaintiff on any occasion.

Debeaubien Declaration (Exhibit B)  ¶ 13, at 3.

///

///

///

1

Dated:  February 8, 2022

Respectfully submitted,

2

*/s/ Eric Grant*

3

Stewart Katz
Law Office of Stewart Katz

4

5

Eric Grant
Hicks Thomas LLP

6

Counsel for Plaintiff Philip Debeaubien

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

PHILIP DEBEAUBIEN,      )
                         ) No. 2:19-cv 01324
          Plaintiff,   )  WBS-DB
                         )
      vs.             )
                         )
STATE OF CALIFORNIA;     )
CALIFORNIA HIGHWAY PATROL; CHP)
LIEUTENANT TODD BROWN; CHP   )
SERGEANT REGGIE WHITEHEAD; CHP)
CHIEF BRENT NEWMAN; and DOES 1)
through 25, inclusive,      )
                         )
         Defendants.   )
                         )

CERTIFIED COPY

Deposition of

TODD BROWN

Tuesday, September 29, 2020

10:33 a.m.

REPORTED BY:  CHARLOTTE A. MATHIAS, CSR 9792, RPR

TENNELEY MICKEL REPORTING
PO Box 1107
Arbuckle, California 95912

(916) 492-9021    fax (916) 922-3461

Todd Brown - September 29, 2020

```
 1       A.   Yes, sir.

 2       Q.   And have you spoken with Lieutenant -- or had

 3   you spoken with Lieutenant Newman on prior occasions?

 4       A.   Yes.

 5       Q.   And on those prior occasions, what type of

 6   phone did you reach Lieutenant Newman on?

 7       A.   On his cell phone.

 8       Q.   Okay.  By the way, had you ever spoken with

 9   Chief Stonebraker concerning Brad Wheat, prior to

10   August 3rd?

11       A.   Yes.

12       Q.   First of all, what's your best estimate; how

13   many times?

14       A.   Well, sir, with regard to what scope?

15       Q.   Anything concerning Officer Wheat.

16       A.   Okay.  I couldn't give you an estimate.  I've

17   spoke to Assistant Chief Stonebraker regarding the fact

18   that we were placing Brad on interim reporting and the

19   fact that we were initiating an adverse action against

20   Brad for the two collisions, and that's basically all I

21   recall.

22       Q.   Okay.  Had you spoken with Lieutenant Newman

23   before in which Brad Wheat was mentioned by name in a

24   conversation?

25       A.   No, sir.  Not that I recall.
```

Todd Brown - September 29, 2020

```
 1      Q.   All right.  Let me read the next sentence.  "We
 2  have a psychiatrist on standby waiting for us to locate
 3  Brad."  Did I read that correctly?
 4      A.   Yes, sir.
 5      Q.   When you say "we," do you mean the Highway
 6  Patrol or the Amador office, or who did you mean by we?
 7      A.   We, is myself, and --
 8      Q.   Okay.
 9      A.   -- Frank Newman.
10      Q.   And who is the psychiatrist who you had on
11  standby?
12      A.   It was Sabrena.  I don't recall her last name.
13      Q.   And I think I can come up with it.  Sabrena
14  Swain, S-w-a-i-n, does that sound right?
15      A.   Sir, I don't know her last name.  If you say
16  so, I --
17      Q.   Okay.  So you recall her name being Sabrena.
18  And your understanding is she was a psychiatrist;
19  correct?
20      A.   Psychiatrist or psychologist, yes.
21      Q.   Okay.  Then it said:
22              "We will make a determination as to
23          whether or not we are going to put him on a
24          psychiatric hold and whether or not we have
25          anything at this point."
```

Todd Brown - September 29, 2020

```
1              Is that a correct reading of the sentence?

2     A.    Yes.

3     Q.    And when you say "psychiatric hold," did you

4  mean a 5150?

5     A.    Yes.

6     Q.    Okay.  And just for the record, your

7  understanding of a 5150 is it was consistent that he was

8  an imminent threat of danger to either himself or

9  others?

10    A.    Well, the definition is the person, yes, is a

11 danger to themselves or others.

12    Q.    Okay.  And a 5150 would be an involuntary hold;

13 correct?

14    A.    Yes.

15    Q.    And then what did "and whether or not we have

16 anything at this point" mean?

17    A.    Well, meaning whether there was anything to the

18 phone calls, the story.  Basically now it's a

19 fact-finding mission and I'm gathering the facts to

20 determine whether or not anything like this actually

21 transpired or whether it's rumors, speculation.

22    Q.    Okay.  So let me ask you, Lieutenant, what did

23 your fact-finding portion then consist of after you had

24 this information in hand?

25    A.    Well, Sergeant Dobler and Dave Ward responded
```

Todd Brown - September 29, 2020

```
 1      A.   So that was my understanding was that, yeah,
 2  they -- they were fine.
 3      Q.   Okay.  But just so we're clear, at least at
 4  that point in time, there was no indication that Brad
 5  intended to kill his estranged wife; correct?
 6      A.   I don't think there was any occasion that he
 7  intended to kill anyone, in my opinion.
 8      Q.   Okay.  Well, so is it your opinion that Brad
 9  didn't intend to kill his wife when he shot her between
10  the eyes?
11      A.   No.  I think at that point, he intended to kill
12  her.
13      Q.   Okay.  And when he shot Trae, it was your
14  belief he was trying to kill him?
15      A.   I don't know if he was trying to kill him or
16  not, sir.
17      Q.   Okay.  All right.  And then you wrote on --
18  continuing this August 3rd, 2018, 11:33 p.m. email, you
19  wrote, am I correct, "I'll keep you updated after she
20  evaluates Brad."  Is that correct?
21      A.   Yes.
22      Q.   Okay.  So at this point, it was your
23  understanding that Sabrena was going to do an evaluation
24  of Brad and update or inform you of the results; is that
25  correct?
```

Todd Brown - September 29, 2020

```
 1        A.    Yes, sir.
 2        Q.    Okay.  At that time, did you have any
 3   understanding as to what that evaluation would consist
 4   of?
 5        A.    Just to determine whether or not he was a
 6   danger to himself or others.
 7        Q.    Okay.  Is that what you asked her to do?
 8        A.    Yes.
 9        Q.    So you -- so just so we're clear, you said, I
10   want you to do a 5150 evaluation?
11        A.    No.  I don't think I said do a 5150 evaluation.
12   I gave her the back story, the context we have just gone
13   over, and I asked her to go out and do a full evaluation
14   on him, whatever that means to her, to determine whether
15   or not he is a danger to himself or anyone else.
16        Q.    When you say the full background, so you told
17   her about your understanding of their domestic
18   situation; correct?
19        A.    Yes.
20        Q.    Okay.  When I say them, I mean Brad and Mary?
21        A.    Well, all three of them really.
22        Q.    And did you tell her that his wife had moved
23   out sometime previously?
24        A.    No, I did not.  I didn't know where his wife
25   was.
```

Todd Brown - September 29, 2020

```
1        Q.    Okay.  Did you tell Sabrena in terms of the

2   background you were giving her that Brad was in the

3   process of getting disciplined for poor work

4   performance?

5        A.    I don't recall.

6        Q.    Did you tell her that he had just had the

7   interview concerning the investigation for his poor work

8   performance?

9        A.    I don't recall that either, sir.

10       Q.    Okay.  Did you tell her that he had just been

11  involved in two seemingly unexplainable car accidents

12  involving Highway Patrol vehicles?

13       A.    I don't recall that, but I seriously doubt it.

14  That was the least of my concern at that time.

15       Q.    Okay.  Well again, I'm not saying, sir, that

16  you were putting a higher significance on some property

17  damage than someone's life, but I'm just trying to find

18  out what information you related to Sabrena per her

19  background before she talked to Brad.  That's what I'm

20  doing.  I'm not suggesting that you thought that was

21  more important.

22       A.    Yes, sir.  I understand.

23       Q.    So did you share any background with her about

24  Brad's work performance issues?

25       A.    Sir, I don't recall whether or not I shared any
```

Todd Brown - September 29, 2020

```
 1    prudent course of action based upon the info we have

 2    right now."

 3         A.    That was not an email to me.

 4         Q.    You're right.  That was cc'd.

 5         A.    Yes, sir.

 6         Q.    I apologize.

 7         A.    That's okay.

 8         Q.    And then this email string actually starts at

 9    2236 and that's to chiefs and you wrote that -- and

10    that's the same email we talked about as Exhibit 9; is

11    that correct?

12         A.    Sir, I don't know what exhibit 9 is, but the

13    2236 we've fully discussed.

14         Q.    Right.  Okay.  Now, let me direct your

15    attention to an email at 10:53 p.m. from Captain

16    Stonebraker.  Was he assistant chief at that point?

17         A.    Yes, sir.

18         Q.    And that's above a captain?

19         A.    Yes, sir.

20         Q.    Okay.  And you wrote, "Chiefs, just spoke to"

21    --

22              THE REPORTER:  Sorry.  Slow down.

23              MR. KATZ:  I'll start over again:

24                   "Chiefs, just spoke to Lieutenant Brown,

25              and they are attempting to locate Officer
```

Todd Brown - September 29, 2020

```
 1              Wheat.  If not located shortly, an emergency

 2              protective order will be sought and

 3              notifications to the other parties will be made

 4              with the involvement of the sheriff's

 5              department and so forth."

 6         What did you understand the sentence, "If not

 7    located shortly, an emergency protective order will be

 8    sought and notifications to the other parties will be

 9    made with the involvement of the sheriff's department

10    and so forth"?

11         A.   I mean, I -- they -- it's what you just read to

12    me, that's what I believe.

13         Q.   Well, so what was your understanding as to what

14    an emergency protective order was?

15         A.   Emergency protective order would be to keep

16    Brad away from Mary and Trae.

17         Q.   Okay.  "And notifications to the other parties

18    will be made with the involvement of the sheriff's

19    department and so forth," what did you understand that

20    that was or that involved?

21         A.   He said if located shortly, those things would

22    occur.  He was located shortly, and those things were

23    not necessary due to the evaluations, multiple from

24    family, Sergeant Dobler, peer support Officer Ward, and

25    Sabrina, the psychiatrist or psychologist.
```

```
 1        Q.    Okay.  Now, let me direct your attention to

 2   another email just to go through this.  Hold on just a

 3   second please.

 4              (Exhibit 11, 1-Page Email Chain Dated
               8/4/2018, was marked for
 5              identification.)

 6        Q.    BY MR. KATZ:  Okay.  Do you see these two

 7   emails, Lieutenant?

 8        A.    No, sir.  I can't read them.

 9              MS. McTAVISH:  It's super small.  Can you make

10   it bigger?

11        Q.    BY MR. KATZ:  Absolutely.  Does that work for

12   you, or do you need it larger, which I can do?

13        A.    No, sir.  That's fine.

14        Q.    Okay.  Great.  And that says, "update.  Officer

15   Wheat has given permission to secure remaining weapons."

16   Do you have an understanding which weapons those were?

17        A.    No, sir.

18        Q.    Okay.  "Sergeant Dobler advised he does not

19   believe he is a threat to himself or the other two

20   parties."  That would be he being Officer Wheat;

21   correct?

22        A.    Yes.

23        Q.    And then you say, "I have the psychiatrist en

24   route to Brad's residence to do an evaluation and make

25   that determination"?
```

Todd Brown - September 29, 2020

```
1      A.   Yes, sir.

2      Q.   Correct?

3      A.   Yes, sir.

4      Q.   And it says "ETA 0030."  Does that ETA stand

5  for estimated time of arrival?

6      A.   Yes.

7      Q.   So in other words, you expected Sabrena to be

8  there about a half hour after you sent this email?

9      A.   Yes, sir.

10      Q.   "I'll keep you updated following the

11  evaluation."  Does that mean you were going to update

12  him following the evaluation?  That's what you said?

13      A.   Yes, sir.

14      Q.   And did you do that?

15      A.   Yes, sir.

16      Q.   How did you do that?  In other words, by

17  another email or telephone or both or text?

18      A.   By -- by telephone.  I'm not sure if there were

19  any other emails.  I don't believe there were any other

20  emails following that.  I believe it was a telephonic

21  discussion post-evaluation after a discussion with

22  Sabrena to Chief Dowling.

23      Q.   Okay.  Now, it says:

24           "As far as we can tell, there have been

25       no criminal acts committed, threats, et cetera.
```

Todd Brown - September 29, 2020

```
 1              More to follow."
 2         Am I correct that, at least as of midnight, no
 3   one had spoken with -- no one from the Highway Patrol
 4   had spoken with either Mary or Trae; correct?
 5      A.   Correct.
 6      Q.   And no one had reached out to any allied law
 7   enforcement agencies to see if they had been involved in
 8   the activities of the evening before or that evening,
 9   depending on how you want to view just after midnight?
10         MS. McTAVISH:  Objection.  Vague as to the
11   activities.  I don't think he answered that as phrased.
12      Q.   BY MR. KATZ:  Well, had anyone reached out to
13   any -- by this time, had anyone reached out to any
14   allied law enforcement agencies?
15      A.   I said no, sir.  There was no other -- there
16   was reason to reach out to any other law enforcement
17   agencies.
18      Q.   Okay.  Now, at some point, did you have an
19   interaction with the person you knew as Sabrena?
20      A.   Yes, sir.
21      Q.   How many interactions did you have with her
22   after midnight on -- after she got -- did she get to the
23   house, as far as you knew, around 12:30?
24      A.   Sir, I'm not sure exactly what time she arrived
25   at the house.  My recollection is it was later than that
```

Todd Brown - September 29, 2020

```
 1   when she arrived.  But again, I don't want to speculate.
 2   I did have conversations with her, I believe around two
 3   conversations with her following her evaluation.
 4        Q.   Okay.  Let me ask you this.  So first of all,
 5   after the concert, did you go over to Brad Wheat's
 6   house?
 7        A.   No, sir.
 8        Q.   Okay.  Did you have additional conversation or
 9   conversations with Sabrena any time following her
10   arriving at Brad Wheat's house to do a complete
11   evaluation?
12        A.   Yes.  I had conversations with her following
13   the evaluations.
14        Q.   What's the first conversation you recall having
15   with her concerning her evaluation of Brad Wheat?
16        A.   My first conversation was essentially that she
17   felt he was not a danger to himself or anyone else, that
18   he had good family, he had good coping skills.  She did
19   not think he was a threat at all.
20             So he understood the difference between right
21   and wrong.  He was religious.  So again, she had no
22   reason to believe after a complete and thorough
23   evaluation that he was a threat to himself or others.
24        Q.   Okay.  Was there any discussion that he
25   expressed a desire to commit suicide after committing a
```

Todd Brown - September 29, 2020

```
 1   health professionals he was already seeing?
 2       A.   No, sir, and I didn't ask.
 3       Q.   Okay.
 4       A.   That's between him and those folks.
 5       Q.   All right.  Now -- so this conversation with
 6   Sabrena is your best estimate a half hour; correct?
 7       A.   Yes, sir.
 8       Q.   Did she ever provide any documentation or
 9   writing about her determination?
10       A.   Not to me, sir.
11       Q.   To the best of your knowledge, did she provide
12   it to anyone else?
13       A.    Not that I'm aware of.  She may have.  I don't
14   understand the process after the fact.
15       Q.   Okay.  And now you said -- now, after that
16   30-minute conversation, did you have any additional
17   conversations with Sabrena concerning Brad Wheat?
18       A.    I did have another conversation with her where
19   we talked about reporting requirements.
20       Q.   And when was that conversation?
21       A.   That was the same night.
22       Q.   Separate conversation?
23       A.   Yes.  As I recall, it was a separate
24   conversation, yes.
25       Q.   Okay.  And again, for point of reference,
```

Todd Brown - September 29, 2020

```
 1   before or after the sun had come up?

 2       A.   I believe it was before the -- well before the

 3   sun came up.

 4       Q.   Okay.  And how long is your best estimate as to

 5   that conversation?

 6       A.   Maybe five or ten minutes.

 7       Q.   Okay.  And what do you recall was said in that

 8   conversation?

 9       A.   Well, we wanted to -- I wanted to make sure we

10   were doing everything the right way and that, you know,

11   following all procedures and necessary notifications and

12   that sort of thing.

13           So we had a discussion relative to, you know,

14   whether or not we needed to notify anyone.  She felt he

15   was not a threat to anyone and said that she determined

16   he was not a threat.  And the reporting requirements

17   were such that there was no requirement to report to

18   anyone.

19       Q.   During either of the conversations, was there

20   any discussions as to whether or not Brad was mentally

21   able to perform properly as a highway patrol officer at

22   that time?

23       A.   I -- I don't recall specifically, but there was

24   no concern that he could not perform as a highway

25   patrolman.
```

Todd Brown - September 29, 2020

```
 1      Q.   In the conversation, was there any concern that
 2  he had firearms or access to firearms?
 3      A.   No.
 4      Q.   In your life experience, how many times have
 5  people told you that they had -- with a weapon, they
 6  drove with the intent to murder someone and then kill
 7  themselves?
 8      A.   I believe we discussed that.  One time.  That's
 9  the only time.
10      Q.   Okay.  And that's professionally or in a
11  nonprofessional context; correct?
12      A.   Both.  Yes.
13      Q.   Okay.  That's what -- I don't think I -- I
14  don't think I've been so broad in my question before.
15  That's why I asked it that way.  Okay.
16           And it may seem self-evident, but no one ever
17  told you that after that; have they?
18      A.   After what, sir?
19      Q.   After -- after this happened in 2018, in other
20  words, up to that point, but since then has anyone ever
21  said that type of thing to you?
22      A.   That they were going to kill themselves or
23  somebody else?
24      Q.   Well both.  Murder someone and then kill
25  themselves?
```

Todd Brown - September 29, 2020

```
 1      Q.   Okay.  Do you have any idea what happened to
 2  the 330s prepared in this case?
 3      A.   I don't know if any 330s were prepared.  Again,
 4  I was on vacation.
 5      Q.   Right.  Right?
 6      A.   Anything that would have been prepared would
 7  have been on somebody other than me.
 8      Q.   Okay.  Fair enough.  Why don't we take a very
 9  short break.  I'm actually, I believe, nearing
10  completion.
11           (Pause in proceedings from 4:12-4:18.)
12      Q.   BY MR. KATZ:  Are you familiar with a fitness
13  for duty evaluation?
14      A.   Somewhat, yes.
15      Q.   Was it your understanding that that's what you
16  were asking the psychologist to do?
17      A.   No, absolutely not.
18      Q.   Absolutely not?  So you were asking her to do a
19  5150 evaluation?
20      A.   No.  I was just asking her to do an evaluation
21  to see if there was anything to the claim.
22      Q.   I'm sorry?  So you wanted her to do an
23  evaluation to determine the truth of whether or not Brad
24  Wheat intended to kill his -- to kill Trae and then
25  commit suicide?
```

Todd Brown - September 29, 2020

```
 1       A.    No.  To find out what his mental health was, to
 2   do an evaluation to find out if he was a danger to
 3   himself or anyone else.
 4       Q.    Were you interested in determining whether or
 5   not he was mentally fit to be a highway patrol officer?
 6       A.    Yeah.  I guess that is part of it.
 7       Q.    Was it part of it, or does that just sound good
 8   and say, yeah, I guess that's part of it?
 9       A.    No.  I guess I was -- that was part of it.  Had
10   she come back and said, hey, he's a danger to himself or
11   someone else, that would have absolutely changed the
12   circumstances.
13       Q.    Okay.  And are you familiar with the -- as the
14   commander, first of all, have you ever requested a fit
15   for duty for any person for mental reasons?
16       A.    I'm sorry.  For what reason?
17       Q.    Psychological reasons?
18       A.    No.
19       Q.    Have you ever in your, how time flies, 24 years
20   with the Highway Patrol?
21       A.    25.
22       Q.    25, sorry.  Have you ever worked within a an
23   office where you understand such an evaluation was
24   requested?
25       A.    For mental?
```

Todd Brown - September 29, 2020

```
 1      Q.   For mental.
 2      A.   Psychological?  No, sir, I don't believe so.
 3      Q.   Okay.  Have you ever been aware of people that
 4   had fitness for duty for physical reasons?
 5      A.   Yes, sir.
 6      Q.   And how many of those have you been aware of,
 7   to your best estimate, in your 25 years that you became
 8   personally aware of?
 9      A.   I don't know.  Just a handful, maybe five.
10      Q.   Okay.  And are you familiar with the mechanism
11   by which an officer cannot be terminated, but their
12   peace officer powers can be suspended because there is a
13   temporary reason to do so, like a protective order?
14      A.   Yes, sir.
15      Q.   Have you ever initiated that?
16      A.   Yes, sir.
17      Q.   Okay.  And without giving the name, what were
18   the circumstances when you took that route?
19      A.   Well, I'll give the name.  Joslin.
20      Q.   Ah.  So that was after he was arrested;
21   correct?  Or you knew he was going to be arrested?
22      A.   Yes.  Yes.
23      Q.   Okay.  But that's not something you undertook
24   before you learned he was going to be arrested for being
25   a sex criminal; right?
```

Todd Brown - September 29, 2020

```
 1      A.   Right.  But I have had experience with others
 2   as well, who have emergency protective orders placed
 3   against them, usually spousal issues.
 4      Q.   Well, have you ever had in those that you have
 5   had spousal issues, was it ever the case when the person
 6   had stated that they intended to kill someone and then
 7   themselves as a result of the issue?
 8      A.   No.
 9      Q.   Okay.  Did you consider suspending the peace
10   officer powers of Brad Wheat?
11      A.   No.  Not until I found out the totality of the
12   circumstances, and then had him evaluated.
13      Q.   And just without trying to beat a -- really no
14   pun intended.  Well, I won't -- I won't even use that --
15   that expression.
16           I know we've been through little of this ground
17   before, but -- so was -- so when you were waiting for
18   the results of the evaluation, was that one of the
19   options you were considering?
20      A.   I don't know that I was considering it at the
21   time.  I was more worried about what the circumstances
22   were, what his mental health was.  But that's certainly
23   an option that we would have considered had it come back
24   differently.
25      Q.   Okay.  And just so I'm clear, is it correct
```

Todd Brown - September 29, 2020

1    that no one from the department, as far as you know,

2    ever contacted Trae to find out what had happened?

3        A.    Yes.

4        Q.    And is it correct that no one from the

5    department ever contacted Mary to determine what had

6    happened?

7        A.    Yes.

8        Q.    And is it correct that, to the best of your

9    knowledge, no one listened to any tapes or reviewed any

10   dispatch records before determining that there would not

11   be a suspension of his peace officer powers?

12       A.    I don't know what tapes you're referring to or

13   dispatch logs you're referring to.  Those, I think I

14   testified to earlier, where we learned about after the

15   incident.

16       Q.    No.  I understand that.  Didn't ask for any

17   other law enforcement input on whether they had any

18   relevant information; correct?

19       A.    I don't understand the question, sir.

20       Q.    Okay.  Well, am I correct that no one from CHP,

21   to the best of your knowledge, reached out to any allied

22   agency or other offices of the CHP to see if they had

23   any additional information?

24       A.    There was no reason to.  We had no information

25   that there was anything to reach out for.

Todd Brown - September 29, 2020

```
 1       Q.    Okay.  Was there any documentation created --
 2   you said for some period of time when Brad's -- let me
 3   rephrase this differently.
 4             Were there any weapons taken from Brad, apart
 5   from his shotgun?
 6       A.    Nothing was taken from Brad.  I think
 7   voluntarily is a better way to put it.  I don't know
 8   what guns were taken.
 9       Q.    Okay.  And was there any documentation done on
10   the weapons --
11       A.    No, not that I -- no.
12       Q.    -- voluntarily?  And when Brad worked in the
13   office during the period of time before you went on
14   vacation, obviously, I can't ask you after, was he
15   wearing -- did he have his department-issued handgun
16   with him?
17       A.    Yes.
18       Q.    Now, if someone -- if Brad Wheat was to take
19   out a patrol vehicle, would he have had to sign that
20   vehicle out?
21       A.    Yes, sir.
22       Q.    And where or how are records kept and which
23   vehicles are checked or signed out?
24       A.    Well, they're kept in a couple of different
25   places depending on the vehicle.  They're signed out in
```

1                    **REPORTER'S CERTIFICATE**

2

3          I certify that the witness in the foregoing

4   deposition was by me duly sworn to testify to the truth

5   in the within-entitled cause; that said deposition was

6   taken at the time and place therein named; that the

7   testimony of said witness was reported by me, a

8   duly-certified shorthand reporter and a disinterested

9   person, and was thereafter transcribed into typewriting.

10          Further, that if the foregoing pertains to the

11   original transcript of a deposition in a Federal Case,

12   before completion of the proceedings, review of the

13   transcript was required.

14          I further certify that I am not of counsel or

15   attorney for either or any of the parties to said

16   deposition, nor in any way interested in the outcome of

17   the cause named in said caption.

18          IN WITNESS WHEREOF, I have hereunto set my hand

19   this 6th day of October, 2020.

20

21

22   _____

                CHARLOTTE A. MATHIAS, CSR 9792, RPR

23                   State of California

24

25

1           UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF CALIFORNIA

3

4    PHILIP DEBEAUBIEN,

5              Plaintiff,

6    vs.                          Case No. 2:19-cv-01329-WBS-DB

7    STATE OF CALIFORNIA;
     CALIFORNIA HIGHWAY PATROL;
8    TODD BROWN; SABRENA SWAIN;
     JOY GRAF; REGGIE
9    WHITEHEAD; RYAN
     STONEBRAKER; BRENT NEWMAN;
10   JEREMY DOBLER,

11             Defendants.

12   _____/

13

14                Deposition of

15                 TODD BROWN

16         Volume 2, Pages 175 - 335

17          Monday, June 28, 2021

18

19

20    REPORTER:  DEBRA P. CODIGA, CSR NO. 5647

21

22   _____

23

24         TENNELEY MICKEL REPORTING
               P.O. Box 1107
25        Arbuckle, California 95912
        Tel 916-492-9021   Fax 916-922-3461

CERTIFIED COPY

Todd Brown - Vol. II - June 28, 2021

1      A.   Yes, sir.  My deposition transcripts, a couple

2  of emails, and a 268.

3      Q.   Okay.  And when you say "emails," which email

4  or emails have you reviewed?

5      A.   I reviewed an email that I drafted to 20Chiefs,

6  I believe it was on the 4th, August 4th, and some

7  follow-up emails the same evening.

8      Q.   And when you say -- and you mean drafted in

9  that you wrote them, or drafted -- or drafted in that

10  you wrote them and sent them, or drafted in that you

11  wrote them but they weren't sent?

12      A.   I drafted and sent them, and then I also looked

13  at some responses back to my drafts.

14      Q.   Okay.  Did any of those emails strike you as

15  being factually incorrect?

16      A.   No, sir.

17      Q.   Okay.  Did you review any CHP policies?

18      A.   No, sir.

19      Q.   All right.  Who did the murder weapon that Brad

20  Wheat used belong to?

21      A.   I believe it belonged to CHP.

22      Q.   And in fact, am I correct that you had

23  communications with -- with the folks from the academy

24  on when they were going to get their gun back?

25           MS. McTAVISH:  Objection; vague as to time and

Todd Brown - Vol. II - June 28, 2021

1    "folks."

2        Q.    BY MR. KATZ:  Sure.  After the shooting, did

3    you have communications with a unit assigned out of the

4    California Highway Patrol Academy, physically, regarding

5    the return of the weapon?

6        A.    I don't recall.

7        Q.    Okay.  The CHP -- do officers buy their own

8    ammunition?

9        A.    No.

10       Q.    Does the CHP provide ammunition for CHP service

11   weapons?

12       A.    Yes, sir.

13       Q.    Do officers have a choice or option as to which

14   type of ammunition they use?

15       A.    No, sir.

16       Q.    And what type of ammunition are they issued?

17       A.    It just depends.  I don't know what the current

18   is.  We change manufacturers often, so --

19       Q.    Do you have an understanding as to what type of

20   handgun ammunition was used?

21       A.    I can tell you it's .40 caliber, if that's what

22   you're asking.

23       Q.    Okay.

24       A.    Hollow point.

25       Q.    Okay.  And what's your understanding as to what

Todd Brown - Vol. II - June 28, 2021

```
 1   a hollow-point round is, Captain?
 2      A.   A hollow-point round is a round that expands
 3   when it enters.
 4      Q.   Okay.  And you have a general understanding
 5   that that's to increase the stopping power of the round?
 6      A.   Yes, sir.
 7      Q.   And do you understand that, other things being
 8   equal, hollow point will tend to cause more damage on
 9   the recipient of that round?
10      A.   It depends on what round you're comparing it
11   to.
12      Q.   Okay.  Fair enough.
13           Now, it's -- was it your understanding that the
14   CHP came back into possession of, first of all, the
15   service handgun issued to Brad Wheat prior to
16   September 3rd but after August 3rd?
17           Let me rephrase it.  Between August 2nd and
18   September 3rd, did the service weapon issued to Brad
19   Wheat leave his control?
20      A.   Yes.
21      Q.   And whose control was that weapon within?
22      A.   Can I rephrase it?
23           It left his possession, not his control.  In
24   other words, if he had wanted the -- the weapon back, it
25   had -- it would have been returned.
```

Todd Brown - Vol. II - June 28, 2021

```
 1       Q.   Okay.  Well, who was -- how was the weapon
 2  being held?
 3       A.   It was being held in a locker at the office.
 4       Q.   For safekeeping?
 5       A.   You could call it that, I suppose.
 6       Q.   What would you call it?
 7       A.   Safekeeping, an abundance -- an abundance of
 8  caution, storage.
 9       Q.   Okay.  Isn't it important to the California
10  Highway Patrol to know where their weapons are?
11       A.   Yes.
12       Q.   Okay.  And the CHP tracks weapons, don't they?
13       A.   Tracks weapons how?  Through an --
14       Q.   In other words, the weapons that they issue,
15  they want to know where their weapons are; correct?
16       A.   I don't understand what the question is.  We
17  have an annual inventory, a weapons inventory.
18       Q.   Right.
19       A.   So every year, we look at every single weapon
20  and determine where it is.
21            But if you're asking about a tracking system --
22  some other form of tracking system, I'm not familiar
23  with any.
24       Q.   Okay.  Well, the CHP wouldn't want their weapon
25  to be used in a crime and no one know -- knows where
```

Todd Brown - Vol. II - June 28, 2021

1    that weapon was; correct?

2        A.   Correct.

3        Q.   Okay.  Now, am I correct that that weapon

4    was -- first of all, is it your understanding that

5    Mr. Wheat was asked to surrender that weapon to Officer

6    Ward?

7        A.   He was asked if he would -- if he -- if he

8    wanted to give the weapon up.

9        Q.   His choice?

10       A.   His choice.

11       Q.   And what if he said no?

12       A.   Then he would have been allowed to keep it.

13       Q.   For how long?

14       A.   Indefinitely.

15       Q.   Okay.  Well, in fact, though, he did give the

16   weapon to Officer Ward; is that correct?

17       A.   That's correct.

18       Q.   And --

19       A.   Actually --

20       Q.   Sorry.

21       A.   Sorry.  I believe Officer Ward didn't take

22   possession of the weapon because we don't normally take

23   possession of other officers' weapons.  I believe that

24   Brad took the weapon and -- and locked it up.

25       Q.   Okay.  And when you say "officers' weapons,"

Todd Brown - Vol. II - June 28, 2021

1    its the highway patrol's weapon issued to Mr. Wheat;
2    correct?
3         A.    Yes.
4         Q.    Okay.  And when you say -- and is it your
5    understanding that what happened is that initially it's
6    placed in a locker by Wheat?
7         A.    By Wheat or Dave Ward.  I'm not sure whom.
8         Q.    Okay.  And isn't what happened, to refresh your
9    recollection, that Wheat opened the locker -- I'm
10   sorry -- that Officer Dave Ward opened the locker and
11   removed the gun.
12        A.    That he opened -- I don't understand what your
13   question is.
14        Q.    Okay.  So the gun was put in a locker --
15        A.    Uh-huh.
16        Q.    -- by Officer Wheat; correct?
17        A.    Again, I don't know if it was put in the looker
18   by Officer Wheat or Officer Ward.
19        Q.    Okay.
20        A.    But it was put in a locker.
21        Q.    At some point is it your understanding that
22   Officer Ward gave that weapon to Sergeant Dobler?
23        A.    I don't know who gave the weapon to Sergeant
24   Dobler.
25        Q.    Is it your understanding that Sergeant Dobler

Todd Brown - Vol. II - June 28, 2021

1   at some point took physical possession of the weapon?

2       A.   I don't know that to be the case.

3       Q.   Well, what is your understanding as to where

4   the weapon went after -- at some --

5       A.   I don't have any knowledge of where the weapon

6   went.

7       Q.   Do you ever -- do you ever wonder?

8       A.   No.

9       Q.   So let me see if I understand this.

10          There's a murder involving one of your

11  officers; correct?

12      A.   Yes.

13      Q.   And the gun he uses to do that was his

14  service-issued handgun; correct?

15      A.   Correct.

16      Q.   And at some point between the time he confesses

17  to attempting to kill my client and his wife, the weapon

18  leaves his possession but comes back into his possession

19  prior to actually murdering his wife and shooting my

20  client; correct?

21      A.   I think that misstates the facts.

22          I think the -- the facts were that he said he

23  was going to shoot your client and then kill himself.

24      Q.   We'll get -- assuming for the point of this

25  question that he only said he was just going to shoot my

Brown 06-28-2021

Todd Brown - Vol. II - June 28, 2021

```
 1   client, between the time that he said "I'm going to
 2   shoot" my client and the time he actually did so, was
 3   there a period of time during which the weapon was not
 4   in his possession?
 5        A.   Yes.
 6        Q.   And have you ever attempted to determine how it
 7   was the weapon came back into the possession of
 8   Mr. Wheat?
 9        A.   No.
10        Q.   Never?
11        A.   Never.
12        Q.   Did any supervisor ever ask you that?
13        A.   Not that I recall.
14        Q.   Did any colleague -- in other words, someone
15   who's not a supervisor, but a fellow sworn officer of
16   the highway patrol of any rank -- ask you how that
17   happened?
18        A.   No.  Not that I recall.
19        Q.   Did you ever wonder how that occurred?
20        A.   No.
21        Q.   Did you ever consider that if Mr. Wheat hadn't
22   had that gun back, there -- that he would still be
23   alive?
24             MS. McTAVISH:  Objection; calls for
25   speculation.
```

Todd Brown - Vol. II - June 28, 2021

1      Q.   Did any supervisor direct you to share that

2  information with the Amador County Sheriff's Department?

3      A.   No.

4      Q.   Did you receive any orders about your degree of

5  cooperation with the Amador County Sheriff's Department?

6      A.   No.

7      Q.   Now, the CHP has policies about keeping --

8  about how they treat firearms that come into their

9  possession, don't they?

10     A.   It depends on the circumstances.

11     Q.   And how does it depend upon the circumstances?

12     A.   Well, if you're talking specifically about this

13 case, where we took Brad's weapons, he volunteered his

14 weapons to us in an unofficial capacity, and so we

15 stored them.

16     Q.   I'm sorry.  So am I correct that Officer Ward

17 was compensated -- paid for his time as an officer

18 during the interactions with the -- Mr. Wheat on

19 August 3rd, August 4th?

20     A.   Yes.

21     Q.   And was Sergeant Dobler, though not scheduled

22 to work, in fact paid for his efforts in dealing with

23 Mr. Wheat?

24     A.   Yes, sir.

25     Q.   And while working for CHP, would it be a fair

1   statement that Officer Ward came into physical custody

2   of the service weapon which had at one point been issued

3   to Wheat for his use as an officer?

4        A.   Yes.

5        Q.   And is it your understanding that at some point

6   that handgun came into possession of Sergeant Dobler?

7        A.   I believe so.  Yes.

8        Q.   Okay.  And apart from the handgun, were there

9   several long guns -- to be specific, two rifles and a

10  shotgun -- that came into the possession of Sergeant

11  Dobler in the late hours of August 3rd or early morning

12  hours of August 4th, 2018?

13       A.   Yes.  There were.  I don't know specifically if

14  they're the weapons that you're describing.  I don't

15  know what type of weapons they were.  I know one was a

16  shotgun.  I don't want to speculate as to what the other

17  number of guns are.

18       Q.   And did Sergeant Dobler take possession of

19  those guns as a sergeant with the highway patrol?

20       A.   No.  He took possession of those guns as a

21  friend of Brad Wheat.

22       Q.   Okay.  And did his time compensation for that

23  day reflect a period of time which he -- which he

24  indicated he was off duty as a California Highway Patrol

25  sergeant and now being a friend only?

Todd Brown - Vol. II - June 28, 2021

```
 1      A.   I think what you're -- what you're trying to
 2  get at -- we're going around in circles here.
 3           So was he working for the department at the
 4  time that the guns were taken?
 5      Q.   Yes.
 6      A.   Yes.
 7      Q.   I'm sorry; I apologize.  I was -- I thought you
 8  were restating -- I didn't mean to cut you off.  I
 9  thought you were trying to restate that.
10      A.   That's okay.  So just for clarification, yes,
11  he was in an official capacity, meaning that he was
12  being compensated for his time as an officer and Dobler
13  as a sergeant.
14           Were the guns taken in an official capacity?
15  The answer to that is no, they were not.  So there's a
16  differentiation between official capacity -- so just
17  because they're working doesn't have any relevance to
18  asking Brad if he would voluntarily give up his weapons.
19      Q.   Was Officer -- was Sergeant Dobler directed to
20  obtain those weapons by a CHP supervisor?
21      A.   I asked Sergeant Dobler if he would mind asking
22  Brad if he would volunteer the weapons, and he did.
23      Q.   And those are the -- let me show you what's
24  previously been marked as Exhibit 44 in this case.
25      A.   Okay.
```

Todd Brown - Vol. II - June 28, 2021

1   weapons back?

2       A.   Did I ever ask how it was?

3       Q.   Yes.

4       A.   No.

5       Q.   Do you have an understanding as to when Brad

6   Wheat received his service weapon back?

7       A.   I believe he received it back when he returned

8   to -- from vacation back to full duty.

9       Q.   And who made the decision -- from your

10  knowledge, who participated in the decision to do that?

11      A.   I'm sure I may have had some say in the

12  decision.  It wasn't really a -- much of a decision.  It

13  was his gun to have.

14      Q.   Okay.  I'm sorry.  So it wasn't much of a

15  decision.

16           So did Sergeant Dobler speak to you about this

17  before he returned the weapon?

18      A.   I don't recall.

19      Q.   Well, what role did you have in the decision?

20      A.   I don't recall.

21      Q.   Did you have any role in the decision?

22      A.   I don't recall.

23      Q.   Did Sergeant Dobler ask you if he should return

24  the weapon?

25      A.   I don't recall.

Todd Brown - Vol. II - June 28, 2021

```
 1        Q.    Are you telling the truth?

 2        A.    Yes.

 3        Q.    Okay.  How important is it, as a supervisor in

 4   the California Highway Patrol, for officers to be

 5   truthful in their testimony?

 6        A.    Incredibly important.

 7        Q.    Tell us why, please.

 8        A.    Because we testify, because it's a matter of

 9   integrity, because it's part of our organizational -- or

10   professional, rather, values.

11        Q.    And do you believe that people who lie under

12   oath are qualified to be officers?

13        A.    No.

14        Q.    So how did you learn that Officer Wheat had

15   taken possession of his firearm again?

16        A.    I don't recall.

17        Q.    And by "his," I mean the CHP firearm to which

18   it had been lent to him.

19        A.    Can you repeat the question?  "Had been lent to

20   him"?

21        Q.    Well, sure.  He didn't own the gun; correct?

22        A.    Correct.

23        Q.    He never owned the gun, did he?

24        A.    No.

25        Q.    Okay.  So it was issued to him for his use in
```

Todd Brown - Vol. II - June 28, 2021

1    the course of his performing a duty as a CHP officer;

2    correct?

3         A.    Yes.

4         Q.    Okay.  So what is your understanding as to when

5    the service weapon was returned to the possession of

6    Brad Wheat?

7         A.    When he came back from vacation to full duty.

8         Q.    Were you working that day?

9         A.    I don't recall.

10        Q.    Did he go back to full duty?

11        A.    He went back to full duty, yes.

12        Q.    Okay.  Now, if you receive an email from a

13   supervisor about the course of actions going to be taken

14   that is factually wrong or you disagree with, what do

15   you typically do?

16        A.    I'm not sure I understand the question.

17        Q.    Okay.  Well, if the supervisor told you,

18   "Here's what we're going to do," and what he says

19   doesn't make any sense, do you tell he or she that that

20   doesn't make any sense?

21        A.    I would certainly hope so.

22        Q.    Okay.  Or if it's based on a misconception,

23   would you try to clear up that misconception?

24        A.    If I knew it was a misconception, yes.

25             MR. KATZ:  Okay.  We'll have this marked as

Todd Brown - Vol. II - June 28, 2021

 1   next in order, please.

 2            (Exhibit 61 marked.)

 3       Q.   BY MR. KATZ:   And Exhibit 61 is a one-page

 4   printout of an email dated August 4th, 2018, at

 5   3:45 a.m.

 6            Do you have that before you, sir?

 7       A.   I do.

 8       Q.   Okay.  And you understood that Chief Dowling

 9   spoke on the phone with Ms. Swain; correct?

10       A.   I don't know.

11       Q.   Okay.  Well, you were on a three-way call for

12   part of the time with Miss Swain, weren't you, after she

13   met with Mr. Wheat?

14       A.   I don't recall if we were on a three-way call.

15   I don't believe we were on a three-way call.

16       Q.   Okay.

17       A.   Not that I recall.

18       Q.   All right.  Let me direct your attention to the

19   second paragraph.  Do you see that?

20            And it says, "Guns will continue to be secured

21   over the weekend and re assessed on Monday, Wheats next

22   workday."

23            Do you see that?

24       A.   Yes.

25       Q.   When you received that email from Steve

Todd Brown - Vol. II - June 28, 2021

1    refused Officer -- or, I'm sorry, Sergeant Dobler
2    advised me, and I directed him to direct Brad not to --
3    not to go to the gym.
4        Q.   And why did you do that?
5        A.   Because he didn't need any other issues, and it
6    was inappropriate for him to be using State time to --
7    to want to go by a gym for what reason, I don't know.
8        Q.   Okay.  Well, you understood, though -- well,
9    was it your suspicion that he wanted to go by the gym as
10   a consequence of his situation with his wife?
11       A.   Yes.
12       Q.   Would you agree that wanting to drive by to
13   deal with those issues while on work in a uniform in a
14   patrol car suggests a lack of coping skills?
15       A.   Well --
16            MS. McTAVISH:  Objection; calls for
17   speculation.
18            THE WITNESS:  When you say "to deal with those
19   issues," I'm not sure he was driving by to deal with any
20   issues.  I think he -- I don't know why he wanted to
21   drive by, so --
22       Q.   BY MR. KATZ:  Were you concerned that he was
23   engaged in stalking behavior?
24       A.   Absolutely not.
25       Q.   Absolutely not.

Todd Brown - Vol. II - June 28, 2021

```
 1        A.   Yes.  Absolutely not.
 2        Q.   Okay.  When did you first learn he had a
 3   tracking device on Mary's phone?
 4             MS. McTAVISH:  Objection; mischaracterizes.
 5             THE WITNESS:  I knew that he had some kind of a
 6   way to follow her, but I don't know what -- what it was.
 7        Q.   BY MR. KATZ:  When did you discover that?
 8        A.   I don't recall.
 9        Q.   Before she was shot; correct?
10        A.   Yes.
11        Q.   Before or after August 3rd, 2018?
12        A.   After, I believe.
13        Q.   Okay.  How did you find that out?
14        A.   Well, again, I don't want to speculate.  It may
15   have been before.  I don't recall, to be honest.
16             It came up in a conversation with Brad that
17   I -- that I had.
18        Q.   Okay.  And how did that come up in a
19   conversation?
20        A.   I don't recall specifically how it came up.
21        Q.   Did it cross your mind that that would be
22   consistent with someone who might be engaging in
23   stalking behavior?
24        A.   No.  I think it's seriously common to -- I have
25   an app on my phone that tracks both my boys.  So I
```

Todd Brown - Vol. II - June 28, 2021

```
 1   don't -- I don't think that's unusual at all.
 2        Q.   Okay.  And you're not estranged from your boys,
 3   are you?
 4        A.   I'm not --
 5        Q.   Hopefully.
 6        A.   -- really going to answer that.
 7             MS. McTAVISH:  That's personal.  Yeah.  You
 8   don't have to answer that.
 9        Q.   BY MR. KATZ:  And so August 2nd, you spoke --
10   you spoke to Brad and asked how he was doing?
11        A.   Yes.
12        Q.   And it's your recollection -- when it says
13   "EAP," does that mean you offered him Employee
14   Assistance Program, to take part in that?
15        A.   Yes, sir.
16        Q.   And he declined; is that right?
17        A.   No.  He said that he was already speaking to
18   two professionals.
19        Q.   Well, if he's speaking with two professionals
20   and having all these other problems as it's going on,
21   would that be a suggestion that he was still having some
22   difficulty in coping with his situation?
23             MS. McTAVISH:  Calls for speculation.
24             THE WITNESS:  Again, I don't really understand
25   what your question is.
```

1    Q.   Okay.  And before then, so Brad's back to work

2    for, what, a couple days, week?

3    A.   I believe a week.

4    Q.   Okay.  And how is his performance in that week?

5    A.   I think his performance was fine.  I think

6    there were some issues with him not being where he was

7    supposed to be.

8         It was my direction that he stay up front and

9    help answer the phones and do miscellaneous duties to

10   assist clerical with things and so on and so forth, and

11   I think there were some issues that were being

12   documented relative to his -- him not necessarily

13   following that direction to a T.

14   Q.   Did he mention that -- "Sandi" refers to an

15   administrative person at the office?

16   A.   Yes, sir.

17   Q.   Sandi's last name?

18   A.   M-u-f-f, Muff.

19   Q.   And Sandi's with an "i" at the end of it?

20   S-a-n-d-i?

21   A.   It's Sandra, but she goes by Sandi with an "i"

22   at the end.  Yes, sir.

23   Q.   Okay.  Thank you.

24        MR. KATZ:  Show you what will be next in order,

25   I believe.

Todd Brown - Vol. II - June 28, 2021

```
 1              (Exhibit 63 marked.)
 2              THE WITNESS:  Are we done with this 62?
 3              MR. KATZ:  No.
 4              THE WITNESS:  I just don't want to get yelled
 5    at.
 6              MR. KATZ:  God forbid.
 7              Whoops, I think I gave you the wrong email.
 8              Not you, her.
 9              MS. McTAVISH:  They didn't match.
10       Q.   BY MR. KATZ:  Do you have this one-page email
11    dated August 23rd, 2018, at 1:56 p.m., in front of you,
12    sir?
13       A.   Yes, I do.
14       Q.   And that's Exhibit --
15              THE COURT REPORTER:  63.
16       Q.   BY MR. KATZ:  -- 63.
17              Is that one of the emails you reviewed since
18    your last deposition?
19       A.   No.
20       Q.   Okay.  Do you recall receiving this email?
21       A.   Yes.
22       Q.   Okay.  And this is from Sergeant Dan Lopez; is
23    that correct?
24       A.   Yes, sir.
25       Q.   And he was one of the three sergeants at the
```

Brown 06-28-2021

Todd Brown - Vol. II - June 28, 2021

1    Amador office?

2        A.    Yes, sir.

3        Q.    Okay.  And it says, "I had a talk with Brad,"

4    and he says that he's told to show up at work ready to

5    go at eight o'clock.

6            Did that tell you that he hadn't been showing

7    up to work on time?

8        A.    I think it, yeah, intimated that he hadn't

9    necessarily been showing up at 8:00, ready to go on

10   time, so he may have shown up at 8:00 and not been ready

11   to go in uniform.  I don't specifically recall.

12       Q.    Okay.  And No. 2 says he's to stay up front.

13           Did that tell you that he wasn't staying up

14   front?

15       A.    Yeah.  I mean I -- I knew this.  I knew that he

16   would -- you know, he'd get bored up front, and there's

17   not a lot -- a whole lot of high volume of calls coming

18   into the Amador CHP office.  So, you know, he'd walk

19   around and try to kill time and, you know, just walk

20   around the office.

21           And I wanted him to stay up front and be

22   visible, and it's important for me, always, that there's

23   an individual that's armed up front because the women up

24   there, the ladies that are on staff, aren't, so --

25       Q.    Okay.  Now, No. 3 says "If he leaves, he is to

Brown 06-28-2021

Todd Brown - Vol. II - June 28, 2021

```
 1    let his supervisor know, even if it's to go back and
 2    talk to his wife."
 3            Had he been going outside and talking on the
 4    phone --
 5        A.   Not --
 6        Q.   -- or in person with someone?
 7        A.   Not personally, to my knowledge.  He -- he did
 8    go out back occasionally to talk on the phone.  I'm not
 9    sure who he was talking to, if it was Mary or someone
10    else.
11        Q.   Okay.  And 4 says, "He is not to make several
12    'errands' throughout the day.  I advised him just to
13    take the day off if that was the case."
14            Had he been taking off in the middle of the
15    day?
16        A.   I don't know.
17        Q.   Is that what this told you, though?
18        A.   Yes.
19        Q.   Okay.  And then No. 5 is he also says that let
20    him or anyone else know if he needs to talk to anybody.
21        A.   Yes.  And get an outside second opinion.  That
22    we're here to listen.  Yeah.
23        Q.   And you -- it also said, "If he doesn't live up
24    to this gift of being inside, we'll have to start
25    documenting it on his 100."
```

Todd Brown - Vol. II - June 28, 2021

```
 1          What did Sergeant Lopez -- what did it mean to
 2   you when he said "If he doesn't live up to this gift"?
 3       A.   I think, you know, it was something that we
 4   were doing as a favor to him, to allow him to stay
 5   inside to -- to work through issues that he was having.
 6   So, you know, I think that's why he referred to it as a
 7   gift.
 8       Q.   Okay.  And did you reply, "Thanks Dan.  I
 9   appreciate you handling"?
10       A.   I did.
11       Q.   And why did you send that email?
12       A.   To express that I appreciated Dan handling.
13       Q.   Okay.
14       A.   Is that a trick question?
15       Q.   No trick questions from me.
16          Next -- I can't find it again.  I apologize.
17          Show you what's been previously marked as
18   Exhibit 54.
19       A.   Were we done with the 268 or --
20       Q.   No.
21       A.   Okay.
22       Q.   Do you recognize the email that is Exhibit --
23   email chain that is Exhibit 54?
24       A.   I do.  I recognize it, yes.
25       Q.   Is this an email that you reviewed prior to
```

Todd Brown - Vol. II - June 28, 2021

```
 1   coming in here today but after your last deposition?

 2       A.   No, sir.

 3       Q.   Okay.  Am I correct that the next day he's

 4   indicating more problems with Wheat's performance?

 5       A.   Yes, sir.  They are dated one day apart.

 6       Q.   And dated 11:05 a.m.; is that right?

 7       A.   Yes, sir.

 8       Q.   And it sounds like --

 9       A.   Can we go back?

10       Q.   Yes.

11       A.   My -- my response is dated -- I'm sorry; the

12   time was 11:05.  His --

13       Q.   Ah.

14       A.   -- was 11:03.

15       Q.   Thank you.

16       A.   Not that it makes a huge difference.

17       Q.   Okay.  So within three hours of him coming in

18   or so the next day, he's still not doing what he should

19   be doing.

20       A.   Yes.

21       Q.   Did that indicate to you that Brad Wheat may

22   not have been coping to well with the situation?

23            MS. McTAVISH:  Objection; calls for

24   speculation.

25            THE WITNESS:  I mean this is a -- he's out --
```

Todd Brown - Vol. II - June 28, 2021

```
 1  he's in the back debriefing room for a period of time,

 2  so it's -- he knows what the expectations are, and he's

 3  not -- he's not adhering to the expectation, but I don't

 4  know why he was not -- why he was back there.

 5      Q.   BY MR. KATZ:   Okay.   Page 2.   Going back to

 6  the -- your chronology, you wrote, "I spoke to Reggie

 7  and Dan on Friday to advise them that if they decided to

 8  send back" -- "Brad back to the field while I was away,

 9  to make it a unanimous decision among all the

10  sergeants."

11          Did that occur?

12      A.   I don't recall whether it occurred or not.

13      Q.   Did Brad go back to the field?

14      A.   I don't -- honestly, I don't recall if he did

15  or not.

16      Q.   You were on vacation, obviously?

17      A.   Yes, sir.

18      Q.   Okay.   But before you went on vacation, you

19  spoke to her again -- you spoke to Brad again about his

20  situation?

21      A.   Yes, sir.

22          MR. KATZ:   And, you know, why don't we take a

23  short break and then we'll get to the last paragraph --

24          MS. McTAVISH:   Okay.

25          MR. KATZ:   -- on 68, and we're --
```

Todd Brown - Vol. II - June 28, 2021

```
 1              (Recess.)

 2              MR. KATZ:  Let's go back on the record.

 3      Q.    Okay.  To finish up, Captain, on your

 4    chronology.

 5              So you were having daily conversations about

 6    Brad with his state of mental affairs?

 7      A.    Yes.

 8      Q.    And that started from when he was put in the

 9    office following the second accident?

10      A.    Yes, sir.

11      Q.    Okay.  Now, it says here, "My concern was that

12    he would put himself into a position where Mary or her

13    boyfriend would file a complaint, falsely or otherwise,

14    when he was on interim."

15              What would be a complaint that was filed

16    otherwise?

17      A.     Well, if he went by -- if he drove by the --

18    the office and they filed -- or not the office, the --

19    the gym, and they filed a complaint that he was driving

20    by the gym.  That would be an otherwise.  Be not a false

21    complaint, but a complaint that could potentially get

22    him into trouble.

23      Q.    Okay.  So it would be a fair statement that

24    your concern was that he in fact might do something that

25    would result in truthful complaints about his behavior;
```

Brown 06-28-2021

Todd Brown - Vol. II - June 28, 2021

```
 1      A.    I don't believe it is.

 2      Q.    Why do you say that?

 3      A.    Because it's a misdemeanor that occurred -- in

 4  this particular case, you're talking about a misdemeanor

 5  that occurred that is not in the presence of an officer.

 6            In other words, if all of those elements were

 7  actually met and they weren't committed in the presence

 8  of an officer, there's no way that that crime could be

 9  charged.

10      Q.    Well, I'm sorry; Brad Wheat had a gun; correct?

11      A.    Uh-huh.

12      Q.    He was off duty.  Is there any doubt in your

13  mind that he was off duty when he went to find and kill

14  Trae?

15      A.    No.

16      Q.    Okay.  He certainly confessed or acknowledged

17  his guilt; correct?

18      A.    He made some statements, yes.

19      Q.    And he actually did have a weapon; correct?

20      A.    I don't know.

21      Q.    Well, there were weapons that he was asked to

22  surrender; is that right?

23      A.    That's right.

24      Q.    So he had a weapon.  And in addition to simply

25  having the weapon and having the intent, he stated that
```

Todd Brown - Vol. II - June 28, 2021

```
 1   he'd gone to look for Trae for the purpose of killing
 2   him.
 3       A.    Uh-huh.
 4       Q.    And you don't think there's any possibility
 5   that he could have been charged for 17500 or any other
 6   crime for that?
 7            MS. McTAVISH:  Objection; calls for
 8   speculation, calls for a legal conclusion.
 9            THE WITNESS:  No.
10       Q.    BY MR. KATZ:  Okay.  Now, does the CHP give any
11   guidance regarding emergency protective orders?
12       A.    Yes.
13       Q.    And from your training as a law enforcement
14   officer, do you know that part of the reason they have
15   emergency protective orders is because, historically,
16   domestic violence situations can escalate rapidly and
17   lead to tragic consequences?
18       A.    Yes.
19       Q.    And would you agree that what happened in this
20   case was domestic violence?
21       A.    Yes.
22       Q.    And is it correct that one of the purposes of
23   an emergency protective orders is to lessen the
24   likelihood of that sort of tragic outcome being the end
25   result, to make it impossible, or at least much more
```

Todd Brown - Vol. II - June 28, 2021

1   difficult, for someone involved in that type of

2   situation to have access to a deadly weapon,

3   specifically, a firearm?

4        MS. McTAVISH:  Objection; calls for

5   speculation.

6        THE WITNESS:  Yeah.  I think if there's a, you

7   know, immediate and present danger, then certainly that

8   is a -- is an option.

9        Q.   BY MR. KATZ:  And am I correct that you never

10  directed anyone from the highway patrol to advise Mary

11  Wheat of what Brad Wheat had said his intentions were on

12  August 3rd; is that correct?

13       A.   I believe that I had a conversation with

14  Sergeant Dobler with regard to making sure that -- I

15  believe it's Matt, the brother, was notified.  And I

16  know that he was aware of the situation, obviously,

17  because he was present the night of.

18       Q.   Okay.  Well, when you say "aware of the

19  situation," do you mean to tell me -- first of all, did

20  you direct Sergeant Dobler to tell Mary Wheat's brother

21  that Brad Wheat had gone to kill Trae deBeaubien?

22       A.   I believe I did.  I believe I had a

23  conversation with -- with Jeremy stating that.

24       Q.   And is that documented anywhere?

25       A.   Not that I'm aware of.

Todd Brown - Vol. II - June 28, 2021

1      Q.   And did you know that the brother, who was

2  living in the same house as Brad Wheat, had made a 911

3  call the morning of August 3rd because he was worried

4  about what Brad Wheat might do?

5      A.   No.

6      Q.   Did you ever find that out?

7      A.   No.

8      Q.   You never did an investigation either, did you.

9      A.   No.

10     Q.   Did you ever suggest that the CHP investigate

11  Brad Wheat's actions on August 3rd?

12     A.   There was no reason to, so no.

13     Q.   Okay.  Now, what's the purpose of an

14  investigation?

15     A.   To gather the facts, draw a conclusion,

16  determine whether or not elements of a crime have been

17  met for charging.

18     Q.   Okay.

19     A.   Or -- yeah.  Whether or not they've been met

20  for charge or not charging.

21     Q.   Now, let me direct your attention to your

22  testimony starting on page 55.  The question's on page

23  55, line 25 and continuing until page 57 line 5.

24          MS. McTAVISH:  Starting on page 55 at line 25?

25          MR. KATZ:  Yes.  Through page 57.  Actually --

Todd Brown - Vol. II - June 28, 2021

1   yeah, line 5 of 57.

2       Q.   I'll give you a chance to review your testimony

3   on that, and let me know when you've had a chance to

4   review that, Captain.

5           MS. McTAVISH:  Ending where?

6           MR. KATZ:  57, line 5.

7           MS. McTAVISH:  Okay.

8           THE WITNESS:  Okay.  Go ahead.

9       Q.   BY MR. KATZ:  Okay.  So am I correct that you

10  thought that it would be -- that based upon your 25

11  years with the CHP, it would be a mistake to simply rely

12  on a report from Officer Ward that that's what actually

13  happened, that Brad Wheat had driven to kill Trae?

14      A.   I don't understand the question.  Can you

15  rephrase it?

16      Q.   Okay.  Well, you indicate -- so let me read the

17  question starting on 55, and I'll stop when we -- when I

18  think it's pretty clear.

19          "So it was your understanding that Brad Wheat

20  had driven to the location where he believed Mary and

21  Trae were with the intention of murdering them;

22  correct?"

23          You said, "Sir, that is what I was told."

24          Is that a true answer?

25      A.   You're on 55?

Todd Brown - Vol. II - June 28, 2021

1    A.   Well, define "investigation."

2    Q.   Well, when you ask questions and pursue

3  evidence to find out what actually happened.

4    A.   Yes, I did.

5    Q.   Okay.  And did you contact Mary Wheat to see if

6  they'd made contact that day regarding --

7    A.   No.

8    Q.   -- Matt?

9    A.   But I know her brother had contact with her.

10  It was my understanding that her brother had been in

11  contact with her.

12    Q.   Did you direct anyone to take a statement from

13  Mr. Hooper about what he knew?

14    A.   I don't know who Mr. Hooper is.

15    Q.   Well, who's Mary Wheat's brother?

16    A.   I guess it's her brother, would be my guess.

17         MS. McTAVISH:  It calls for speculation

18  regarding the name.

19    Q.   BY MR. KATZ:  Did you request that anyone take

20  a statement from Mary Wheat's brother?

21    A.   No.

22    Q.   Are you aware, sir, that Mary Wheat's brother

23  was woken up by Brad Wheat's son, petrified about what

24  his father might do because of his state of mind when he

25  left their house around midnight August 2nd to

Todd Brown - Vol. II - June 28, 2021

1   August 3rd?

2       A.   No.

3       Q.   Did you do any investigation to determine what

4   in fact Brad Wheat had done in the early morning hours

5   of August 3rd, 2018?

6       A.   Yes.  I believe when Jeremy Dobler got there,

7   he gathered the facts and talked to, not only Matt, or

8   Mr. Hooper, but talked to Brad and gathered the facts

9   and determined that there was nothing of concern.

10      Q.   So did Brad -- is it your understanding that

11  Brad Wheat told Dobler that he did not drive up to

12  Georgetown the previous -- or earlier that morning or

13  the previous morning with the intention of killing Trae

14  deBeaubien?

15      A.   No.  It's not what I said.

16      Q.   Okay.  Well, did he prepare a report?

17      A.   No.

18      Q.   Would you agree that attempted murder is a

19  serious crime?

20      A.   Yes.

21      Q.   And would you agree that, if believed, there's

22  the possibility that the actions of Trae -- of -- of --

23  the actions of Brad Wheat towards Trae deBeaubien on

24  August 3rd, 2018, may have constituted attempted murder?

25      A.   No.

Todd Brown - Vol. II - June 28, 2021

1    Q.   Not a possibility.

2    A.   No.

3    Q.   Okay.  And you knew that why?  Or how?

4    A.   Again, there was no one there.

5    Q.   Okay.  Well, in fact, sir, he said he didn't

6  find Trae deBeaubien there; correct?

7    A.   He didn't find anyone there.

8    Q.   And what's your basis for that statement?

9    A.   The comments made by Brad, the comments made to

10  Dave Ward, the comments made by Dave, comments made by

11  Mr. Hooper, comments made by Sergeant Dobler.

12   Q.   So it's your testimony that no one was at that

13  location?

14        MS. McTAVISH:  Misstates the testimony.

15   Q.   BY MR. KATZ:  Sir, did you investigate where it

16  was that he was going to?

17   A.   No.

18   Q.   And by "he" I mean Brad Wheat.

19        Did you attempt to determine whether anyone was

20  at that location?

21   A.   No.

22   Q.   Did you attempt to contact any allied law

23  enforcement agency to see if they'd received any calls

24  about Brad Wheat?

25   A.   No.

```
 1                    REPORTER'S CERTIFICATE

 2                         --o0o--

 3          I certify that the witness in the foregoing

 4   deposition,

 5                      TODD BROWN,

 6   was administered the oath by me to testify to the truth,

 7   the whole truth, and nothing but the truth in the

 8   within-entitled cause; that the deposition was taken at

 9   the time and place named; that the testimony of the

10   witness was reported by me, a duly certified shorthand

11   reporter; that it was thereafter transcribed into

12   typewriting, and that the transcript is a true record of

13   the testimony given.

14          Pursuant to Federal Rule 30(e), transcript

15   review was requested.

16          I further certify that I am not financially

17   interested in the action, nor a relative or employee of

18   any attorney or any party to the action.

19

20   Dated:  July 8, 2021

21

22

23   _____

24          DEBRA P. CODIGA, CSR No. 5647

25          State of California
```

Exhibit B

1

UNITED STATES DISTRICT COURT

2

EASTERN DISTRICT OF CALIFORNIA

3

4  PHILIP DEBEAUBIEN,  ) No. 2:19-cv-01329-WBS-DB
   )
5  Plaintiff,  )
   ) **DECLARATION OF PLAINTIFF PHILIP**
6  v.  ) **"TRAE" DEBEAUBIEN IN SUPPORT OF**
   ) **PLAINTIFF'S OPPOSITION TO STATE OF**
7  STATE OF CALIFORNIA, et al.,  ) **CALIFORNIA'S AND CHP DEFENDANTS'**
   ) **MOTION FOR SUMMARY JUDGMENT**
8  Defendants.  )
   )
9  _____  )
   ) Date:       February 22, 2022
10 ) Time:       1:30 p.m.
   ) Courtroom: 5 (14th Floor)
11 ) Judge:      Hon. William B. Shubb
12 _____ )

13        I, Philip "Trae" Debeaubien, declare as follows:

14        1.     I am the Plaintiff in this action. I make this declaration in support of Plaintiff's op-

15  position to the motion for summary judgment filed by the State of California and the CHP Defend-

16  ants. I make the statements of fact in this declaration of my own personal knowledge. If called as

17  a witness in this action, I could and would testify competently to the facts set forth herein.

18        2.     I have been deposed twice in this action, and I believe that this declaration is con-

19  sistent generally with my prior testimony and specifically with my answers to all questions. This

20  declaration has been prepared with the assistance and at the request of my lawyer to clarify and to

21  expand on certain potentially significant facts that were not fully explored at my depositions.

22        3.     It was only during the deposition of Defendant Todd Brown on September 20, 2020,

23  that I first learned that at around midnight on August 2–3, 2018, Brad Wheat drove while armed

24  with his service weapon to the Georgetown/Garden Valley residence where I was staying with Mary

25  Wheat, with the specific intent to murder me before killing himself.

26        4.     Before seeing e-mail messages produced at that deposition, I never knew, thought,

27  or even suspected that Brad Wheat had attempted to murder me on August 2–3, 2018.

28  ///

5.      Around midnight of August 2–3, 2018, I was told that Brad Wheat was heading to the Georgetown/Garden Valley residence where I was staying with Mary Wheat.  I left the house before Brad Wheat arrived in order to avoid a confrontation or argument with him, which I thought would be upsetting to Mary Wheat, and because one of her brothers advised or asked me to leave. No one told me that Brad Wheat was armed or expressed any concern that he might use a gun.  At that time, I was not afraid that Brad Wheat would hurt me, as I had never imagined his using a gun to shoot me, and I was considerably larger and stronger than he was and in excellent physical shape.

6.      Mary Wheat told me that Brad Wheat arrived at the house shortly after I left.  She told me that he yelled at her, called her names (including "whore"), and took her cell phone charger.  She never told me that Brad Wheat had threatened her with a firearm or physically hurt her.  Had Brad Wheat done so, I believe Mary would have told me that.  Mary Wheat told me that El Dorado County Sheriff's deputies arrived shortly after Brad Wheat left.

7.      Prior to being shot on September 3, 2018, I was never advised by anyone from the CHP or by anyone else that Brad Wheat had driven to the Georgetown/Garden Valley residence to murder me or had otherwise traveled there while armed and with the intention to harm me.  This information shocked me.  I was never advised of either my status as a potential domestic violence victim or any of the information that I now understand that I was required to be given, including: my right to make a citizen's arrest of Brad Wheat; my right to seek a restraining order against him; my right to ask officers to request an emergency protective order against him; my right to receive the report number concerning his actions; or any other information as to what my rights were as a potential victim of domestic violence.

8.      Had I been advised in a timely manner of Brad Wheat's actions and his homicidal intentions, I am certain that I would have sought an emergency protective order and then a more permanent order from the courts.  In addition, I would have contacted the CHP; and if I had felt that the CHP was being unresponsive, I would have contacted local law enforcement about Brad Wheat's actions on August 2–3, 2018.  I might have also considered temporarily relocating to a place physically further removed from and unknown to Brad Wheat.  I might also have considered obtaining a firearm as a potential last resort to protect myself from Brad Wheat.

9.     I heard through Mary Wheat that Brad Wheat had told a colleague that he had gone to Georgetown/Garden Valley to confront her and had gotten in trouble for that.  Mary said that Brad told him he was taken off work as punishment for driving to the Georgetown/Garden Valley residence, but that he was told he would be able to use his vacation time.  Mary said nothing to me that indicated that she had been told that Brad Wheat had driven to our location on August 2–3, 2018, with homicidal intentions or other intentions of harming anyone.

10.     I did learn or realize shortly after August 2–3, 2018, that a 9-1-1 call had been made about Brad Wheat's driving to Georgetown/Garden Valley at some point, I found out or came to believe that the call was placed by one of Mary Wheat's brothers.  I never heard or learned, prior to learning through the discovery process in this case, that the 9-1-1 call was prompted by a concern over Brad Wheat's being armed and potentially having homicidal or other violent intentions.

11.     I testified regarding Mary's call to the Amador CHP office to complain about Brad Wheat's continuing harassing and stalking behavior, only to have her call answered by Brad Wheat himself, after which she hung up in frustration. She attempted that call after the August 2–3, 2018 incident and approximately ten days before the September 3, 2018 murder-suicide.

12.     I had no personal experience either as a victim or perpetrator of domestic violence prior to August 3, 2018.  To the best of my recollection, I had never discussed domestic violence or the potential remedies available to victims of domestic violence prior to the August 2–3, 2018 incident.  Though I am a college graduate (University of Oregon), I took no criminal justice classes.

13.     Following the events of August 2–3, 2018, no one from the CHP ever contacted me or (to my knowledge) Mary Wheat to ask about our safety or otherwise to investigate those events. No one from the CHP ever contacted me on any occasion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 7, 2018.

*/s/ Philip "Trae" Debeaubien*
Philip "Trae" Debeaubien
(original signature retained by
attorney Stewart Katz)

Exhibit C

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF CALIFORNIA

 3                    SACRAMENTO DIVISION

 4                        --oOo--

 5   PHILIP DEBEAUBIEN,              )
                                     )
 6              Plaintiff,           )
                                     )
 7              vs.                  )   No. 2:19-cv-01329-WBS-DB
                                     )
 8   STATE OF CALIFORNIA;            )
     CALIFORNIA HIGHWAY PATROL;      )
 9   CHP LIEUTENANT TODD BROWN;      )
     CHP SERGEANT REGGIE             )
10   WHITEHEAD; CHP CHIEF BRENT      )
     NEWMAN; and DOES 1 through      )
11   25,                            )
                                     )
12              Defendants.          )
                                     )
13

14

15                        --oOo--

16           VIDEOCONFERENCE DEPOSITION

17                         OF

18              PHILIP DEBEAUBIEN

19                        --oOo--

20           Wednesday, October 21, 2020

21                  CERTIFIED
22                  TRANSCRIPT

23

24   20-160
     Stenographically Reported By:
25   ROSE GONI DAVIS, CRR/RMR, CSR 8760
```

1            his niece, who warned Mary.  Wheat stormed

2            into the Garden Valley home, finding only his

3            wife, who he accused her of being a 'whore,'

4            among other things, and took her cell phone

5            charger.  DeBeaubien was not at the Garden

6            Valley house while Wheat was there.  Wheat

7            left the Garden Valley house before El Dorado

8            County sheriff's deputies, responding to the

9            911 call, arrived."

10           Now, as of August 2nd, were you living in the

11   Garden Valley home?

12      A.   The night that the 911 call took place --

13      Q.   Yes.

14      A.   -- that night?

15      Q.   Yes.

16      A.   I didn't -- I hadn't stayed -- I think I had

17   stayed there one night previous before that had

18   happened.

19           MR. KATZ:  Just for clarification, when you

20   say "previous," do you mean the night before?

21           THE WITNESS:  Yes.  Because she returned, like

22   I said, July 31st or August 1st, and that happened on

23   the 2nd.  So I didn't stay with her the first night; so

24   I don't know if it was one night before or two nights

25   before, but it was -- I hadn't stayed there very long,

D&B DEPOSITION REPORTERS
(916) 649-1060 | rose@dbreporters.com

1    no.

2              MR. KATZ:   Okay.

3    BY MS. McTAVISH:

4        Q.    Okay.  So regarding this allegation -- and I

5    understand you didn't write the complaint -- did Mary

6    tell you that she had confronted Brad on August 2nd?

7        A.    You mean the night --

8              MR. KATZ:  I'll object.  That misstates the

9    complaint.  I believe that -- to the extent that who's

10   confronting who, I believe the complaint states that

11   Brad confronted her.

12   BY MS. McTAVISH:

13       Q.    With that clarification, did Mary tell you

14   that Brad Wheat had confronted her on or about

15   August 2nd?

16       A.    Yes.  So she told me that night on my way

17   home -- I had already left -- that he had come by.  And

18   it was pretty much exactly like it's written in the

19   complaint, that he had come by, yelled at her and called

20   her a whore and a couple other names, took her cell

21   phone charger, which was really weird, and then abruptly

22   left.

23       Q.    Did Mary tell you regarding this incident that

24   Brad Wheat had threatened her with a firearm?

25       A.    No.

1       Q.     Did Mary Wheat tell you regarding this

2  August 2nd incident that Brad Wheat had physically

3  threatened her?

4       A.     No.

5       Q.     If Mary Wheat felt physically threatened by

6  Brad Wheat, do you believe she would have told you?

7       A.     Yes.

8       Q.     To your knowledge, did Mary Wheat tell any of

9  her brothers that she felt physically threatened by Brad

10 Wheat?

11      A.     Not to my knowledge.

12      Q.     To your knowledge, did Mary Wheat tell anyone

13 she felt physically threatened by Brad Wheat?

14      A.     Not to my knowledge.  I don't think so.  No.

15      Q.     Did Mary Wheat ever convey to you that there

16 was any type of physical domestic violence in their

17 marriage to Brad Wheat?

18      A.     Not physical.

19      Q.     So do you believe that Brad Wheat knew where

20 Mary Wheat was because of the tracking app that was on

21 her phone?

22      A.     Are you talking that night?

23      Q.     Yes.

24      A.     That night, I don't think it -- I don't -- I

25 don't think it had anything to do with it.  I believe

1   her -- her brother that lived behind the house called

2   him.

3       Q.    So you think it was the brother that lived

4   there in the Georgetown house, he's the one who called

5   Brad Wheat and told him that Mary is back?

6       A.    That would be my best guess.  Yes.

7       Q.    Do you know Sergeant Reginald Whitehead?

8       A.    Reggie, yes.

9       Q.    How do you know Sergeant Whitehead?

10      A.    Reggie was a patron of my supplements store

11  for years.  My son went to school with his son.

12      Q.    And what is your knowledge of the relationship

13  between Reggie Whitehead and Mary Wheat?

14      A.    They were -- I don't know if I would use the

15  word "friends."  They definitely were acquaintances.  I

16  don't think he was ever a member of her gym, but -- I

17  mean, they knew of each other.  I just don't know what

18  the extent of their relationship was.

19      Q.    Did Mary Wheat do, like, half marathons or

20  running?

21      A.    More of -- they did a Spartan race, I think,

22  once before.  The Tough Mudder-type stuff.  I wouldn't

23  say marathon.

24      Q.    And how about an Officer Ward?

25      A.    I don't know Officer Ward, or I don't think I

1  do.  I don't -- unless I saw him in person, I don't know

2  the name.

3      Q.   Now, regarding this August 2nd incident, did

4  you speak to Brad Wheat at all about it?

5      A.   No.

6      Q.   Now, going back to the conversations that you

7  had with Brad Wheat, we only have the three.  Then we

8  get to the night of the murder.

9           Between this August 2nd incident and the night

10  of the murder, did Mary Wheat convey to you that Brad

11  Wheat had made any threats to her?

12      A.   No.  No.

13      Q.   From this August 2nd incident to September

14  the 3rd, did Mary tell you that Brad had contacted her

15  via text message?

16      A.   Oh, yeah.  From that -- from the August 2nd to

17  the day of her death?  Yes.

18      Q.   What was the nature of those text messages?

19      A.   They varied.  There was stuff as simple as

20  like he was taking a trip to Southern California to see

21  their older son.  There was messages where he would --

22  they went -- they wanted to see -- her family wanted her

23  to see a marriage counselor of some sort; so she agreed.

24  So there was that.  And then just other times it would

25  be him, you know, trying to get her back and saying the

1        Q.    Late June.  Okay.

2              During that time did either of you have a

3    birthday?

4        A.    No.  Hers is in March.  Mine is in February.

5        Q.    Okay.  Besides the bachelorette/bachelor party

6    in Lake Tahoe, did you go on any trips together?

7        A.    Yeah.  So it was either the weekend before or

8    the weekend before that, we were in Lake Tahoe for a

9    friend of mine, who I referenced earlier, John, was

10   doing a bodybuilding show that was at the Montbleu in

11   Las -- or not Las Vegas -- in Lake Tahoe.  And we went

12   for the weekend for that.

13       Q.    Is this the John that you called the night of

14   the shooting?

15       A.    Yes.

16       Q.    And also in response to the request for

17   production, you furnished me with a Facebook post that

18   was posted September 3rd.  It says:

19              "Two years, still lying."

20              What were you referring to there?

21       A.    Your clients.

22       Q.    Lying about what?

23       A.    That they didn't know anything about him or

24   taking of guns or any of the situation.

25       Q.    When you say not knowing anything about him,

D&B DEPOSITION REPORTERS
(916) 649-1060 | rose@dbreporters.com

1    what are you specifically referring to?

2         A.    Just meaning that, when Stewart turned in my

3    allegations, it was still portrayed as the CHP knew

4    nothing about anything, pretty much.

5         Q.    What did you know that -- what do you believe

6    you knew that they did not?

7         A.    I knew the story that I was told and all the

8    information that Mary gave me.

9               And I knew from seeing the emails for sure a

10   few weeks ago that the CHP was well aware of what had

11   happened.

12        Q.    What are you referring to with "what had

13   happened"?

14        A.    About going to his house and removing

15   handguns.  Some of the information I wasn't even aware

16   of, that Brad had confided in Officer Ward that he went

17   up the night of August 3rd to kill me.

18        Q.    You testified earlier that Mary Wheat told you

19   Brad had informed her of that the day after.

20        A.    Informed her?  No, she never told me he went

21   up there to kill me.  She wasn't aware of that.

22        Q.    That you were informed as early as August 4th

23   that CHP officers had gone to Brad Wheat's house and

24   talked to him about trying to confront you?

25        A.    Yes.  She told me that.  He told her that.

1       Q.    And just kind of -- some of the themes of the

2   Facebook posts that you have produced today, it looks

3   like, just -- kind of just to generalize them -- and

4   tell me if I'm fair -- that some people, you believe,

5   did not take your side regarding this incident?

6       A.    Not some.  A lot.

7       Q.    How do you believe you were portrayed by some

8   people regarding this incident?

9       A.    I believe I was blamed by a lot because I was

10  the loan survivor; so they didn't really have anybody to

11  blame besides me.  I felt like I was the one who did the

12  shooting.  They made me feel like I was the guilty one

13  who killed somebody.

14          Mary's family was very religious, and so was

15  the group of people that the family was associated with.

16  And it just was a weird situation.  They treated me

17  terribly.

18      Q.    Do you believe that you should have been

19  treated differently by the community as a whole?

20      A.    I don't necessarily think they should have

21  reached out in loving support.  I mean, there was a --

22  you know, infidelity in a marriage.  But I don't feel

23  like I deserved the hate.

24          I mean, I was called saying that I killed her.

25  It's my fault.  I was told by a sheriff's officer's wife

D&B DEPOSITION REPORTERS
(916) 649-1060 | rose@dbreporters.com

```
 1                   REPORTER'S CERTIFICATE

 2    State of California          )
                                   ) ss.
 3    County of Sacramento         )

 4           I, ROSE GONI DAVIS, a Certified Shorthand

 5    Reporter of the State of California, duly authorized to

 6    administer oaths, do hereby certify:

 7           That I am a disinterested person herein; that

 8    the witness, PHILIP DEBEAUBIEN, named in the foregoing

 9    deposition, was by me duly sworn to testify the truth,

10    the whole truth, and nothing but the truth; that the

11    deposition was reported in shorthand by me, ROSE GONI

12    DAVIS, a Certified Shorthand Reporter of the State of

13    California, and thereafter transcribed using

14    computer-aided transcription and is a true and correct

15    record of the testimony so given.

16           Pursuant to Federal Rule 30(e), review of the

17    transcript was requested.

18           IN WITNESS WHEREOF, I hereby certify this

19    transcript at my office in the County of Sacramento,

20    State of California, this November 6, 2020.

21

22

23           _____
              ROSE GONI DAVIS, CSR NO. 8760
24            Certified Shorthand Reporter of
              the State of California
25
```

D&B DEPOSITION REPORTERS
(916) 649-1060 | rose@dbreporters.com

Exhibit D

| | |
|---|---|
| **From:** | Stonebraker, Ryan@CHP |
| **Sent:** | Friday, August 3, 2018 10:58 PM |
| **To:** | Brown, Todd@CHP; Dowling, Steve@CHP |
| **Cc:** | CHP-20Chiefs; Newman, Frank@CHP; Root, Craig@CHP |
| **Subject:** | Re: Notification***** |

Great news thanks Todd!

Assistant Chief Ryan "Stoney" Stonebraker
California Highway Patrol
Valley Division
2555 First Avenue
Sacramento, CA 95818
(916) 731-6300

This e-mail contains Unclassified//For Official Use Only (U//FOUO) information that may be exempt from public release under the California Public Records Act (Govt. Code Sec. 6250-6270). Precautions should be taken to ensure this information is controlled, stored, handled, transmitted, distributed, and disposed of in a manner that precludes unauthorized access.

---

**From:** Brown, Todd@CHP <tbrown@chp.ca.gov>
**Sent:** Friday, August 3, 2018 22:57
**To:** Dowling, Steve@CHP
**Cc:** Stonebraker, Ryan@CHP; CHP-20Chiefs; Newman, Frank@CHP; Root, Craig@CHP
**Subject:** Re: Notification*****

Sergeant Dobler is with Brad at his house. They are code-4 and assessing the situation. I asked them to ensure they get all other guns. I'll advise as I get further.

Todd

On Aug 3, 2018, at 10:55 PM, Dowling, Steve@CHP <SDowling@chp.ca.gov> wrote:

> Copy.  Thanks Stoney.  That sounds like the most prudent course of action based upon the info we have right now.
>
> Steve Dowling
> Assistant Chief
> CHP - Valley Division
>
> On Aug 3, 2018, at 10:53 PM, Stonebraker, Ryan@CHP <RStonebraker@chp.ca.gov> wrote:
>
>> Chiefs just spoke to Lt. Brown and they are attempting to locate Officer Wheat.  If not located shortly an emergency protective order will be sought and notifications to the other party's will be made with the involvement of the Sheriff's Department and so forth.

Witness: S. Duryee
**EXHIBIT**
**44**
Charlotte A. Mathias
CA CSR 9792, RPR
Jun 24, 2021

1

Assistant Chief Ryan "Stoney" Stonebraker
California Highway Patrol
Valley Division
2555 First Avenue
Sacramento, CA 95818
(916) 731-6300

This e-mail contains Unclassified//For Official Use Only (U//FOUO) information that may be exempt from public release under the California Public Records Act (Govt. Code Sec. 6250-6270). Precautions should be taken to ensure this information is controlled, stored, handled, transmitted, distributed, and disposed of in a manner that precludes unauthorized access.

**From:** Brown, Todd@CHP <tbrown@chp.ca.gov>
**Sent:** Friday, August 3, 2018 22:36
**To:** CHP-20Chiefs
**Cc:** Newman, Frank@CHP; Root, Craig@CHP
**Subject:** Notification*****

Chiefs,

Officer Brad Wheat is currently on interim and has had two collisions in less than a month. We initiated an adverse action and conducted a Form 8 yesterday. He's been going through some personal issues and recently found out his wife has been cheating on him with a work colleague. I just learned this evening that Brad confided in an officer (Dave Ward) tonight that he drove to a location where he thought his wife and her lover were last night to murder the lover and then commit suicide. Officer Ward was able to secure his duty weapon and we have a sergeant (Jeremy Dobler) en route to Brad's location to try to get a hold of him. I have notified assistant chief Stonebraker and Lieutenant Frank Newman from OESA. We have a psychiatrist on standby waiting for us to locate Brad. We will make a determination as to whether or not we are going to put him on a psychiatric hold and whether or not we have anything at this point. That is the latest. I will keep you updated once we get a hold hold of Brad.

Todd

Exhibit E

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

# INTERNAL INVESTIGATION
CHP 7 (Rev. 1-13) OPI 031

☒ Request for Adverse Action
☐ Rejection During Probation

☐ Miscellaneous Investigation
☐ Complaint from Dept. Personnel
☐ Non-Punitive Termination

**Control Number**

| Division Code | Year | Seq. No |
|---|---|---|
| 1 - 2 9 | 5 1 8 | 0 4 |

| Routed To | Date | INCIDENT DATE(S) | DEPARTMENT AWARE DATE | OIA NOTIFIED DATE |
|---|---|---|---|---|
| Division For Review | | 06/20/18 and 07/19/2018 | 07/19/2018 | 07/19/2018 |
| Area For Corrections | 08/15/2018 | MISCELLANEOUS INVESTIGATION CLOSING ACTION | SPECIAL | PROBATION END DATE |
| Division For Review | 08/21/2018 | ☐ M.O.D. ☐ Censurable CHP 2 ☐ M.O.F. | ☐ CHP 268 Completed | |
| Area For Corrections (if applicable) | | CASE NUMBER (OIA USE ONLY) | SUSPENSE DATE (OIA USE ONLY) | INITIATING COMMAND |
| Division For Review (If applicable) | | | | Amador |
| Office of Internal Affairs | 9/13/18 | | | EMPLOYEE ON ATO? ☒ No |

| EMPLOYEE'S NAME (LAST, FIRST, M.I.) | I.D. NUMBER | AREA | RANK | SEX | AGE | YEARS EMPLOYED |
|---|---|---|---|---|---|---|
| Wheat, Brad | 18776 | Amador | Officer | M | 45 | 11 |

## AREAS/AGENCIES INVOLVED

| AGENCY/DEPARTMENT NAME | CONTACT PERSON | BUSINESS TELEPHONE |
|---|---|---|
| California Highway Patrol | Sgt. Lopez | (209)223-4890 |
| DIVISION/AREA/SECTION | BUSINESS ADDRESS | |
| Valley/Amador | 301 Clinton Road, Jackson, CA. 95642 | |
| AGENCY/DEPARTMENT NAME | CONTACT PERSON | BUSINESS TELEPHONE |
| | | |
| DIVISION/AREA/SECTION | BUSINESS ADDRESS | |

☒ EXHIBIT 45
Deponent NEWMAN
Date 6-25-21 Rptr SOLT
WWW.DEPOBOOKPRODUCTS.COM

## INVESTIGATOR(S)

| PRIMARY (LAST, FIRST, M.I.) | I.D. NUMBER | RANK | AREA | TELEPHONE NUMBER |
|---|---|---|---|---|
| Lopez, Dan | 13833 | Sergeant | Amador | (209)223-4890 |
| SECONDARY (LAST, FIRST, M.I.) | I.D. NUMBER | RANK | AREA | TELEPHONE NUMBER |
| Hannum, Jennifer | 16055 | Sergeant | San Andreas | (209)754-3541 |

| ADMINISTRATIVE VIOLATIONS (GOVERNMENT CODE § 19572) | CRIMINAL INVESTIGATION INFORMATION |
|---|---|

| | | |
|---|---|---|
| ☐ J Fraud in securing employment. | ☐ (M) Discourteous treatment of public or other employees. | ☒ Non-criminal |
| ☐ (B) Incompetency. | ☐ (N) Improper political activity. | |
| ☐ (C) Inefficiency. | ☐ (O) Willful disobedience. | ☐ Commissioner's office notified |
| ☒ (D) Inexcusable neglect of duty. | ☐ (P) Misuse of state property. | |
| ☐ (E) Insubordination. | ☐ (R) Violation of Section 19990. | |
| ☐ (F) Dishonesty. | ☐ (S) Refusal to take/subscribe any oath required by employment. | |
| ☐ (G) Drunkenness on duty. | | |
| ☐ (H) Intemperance. | ☒ (T) Other failure of good behavior. | |
| ☐ (I) Addiction to controlled substances. | ☐ (U) Negligent behavior at a state hospital. | |
| ☐ (J) Absence without leave. | ☐ (V) Unauthorized use target practice. | |
| ☐ (K) Conviction of a felony or a misdemeanor (moral turpitude. | ☐ (W) Unlawful discrimination. | |
| ☐ (L) Immorality. | ☐ (X) Unlawful retaliation. | |

| | ☐ Allied Agency conducting Name: | ☐ CHP conducting |
|---|---|---|
| | ☐ Case submitted for prosecution | ☐ CHP 216/202 completed |

| Section | Felony/ Misd. | Brief Description of Violation | Prosecution Status |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

### SYNOPSIS

While on interim reporting, Officer Wheat was involved in two separate on-duty patrol vehicle collisions. Officer Wheat was on interim reporting for lack of activity, work ethic, and report writing.

Officer Wheat passed away on 09/04/2018. The recommendation was changed to Miscellaneous at that time.

**TABLE OF CONTENTS**

| | |
|---|---|
| Involved Parties | 2 |
| Employee Profile | 3 |
| Investigative Summary | 4 |
| Findings | 5 |
| Chronological Summary | 5 |
| Exhibits | 8 |

| COMMANDER RECOMMENDATION | | |
|---|---|---|
| Miscellaneous | | |
| COMMANDER NAME | COMMANDER SIGNATURE | DATE |
| T. H. Brown | [signature] | 08/21/2018 |
| DIVISION RECOMMENDATION | | |
| MISC | | |
| DIVISION REVIEWER NAME | DIVISION REVIEWER SIGNATURE | DATE |
| D. P. NEWMAN | [signature] | 9/10/18 |

Chp7_0v14.pdf

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

CHP 000321

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

**INVOLVED PARTIES**

CHP 7A (New 1-13) OPI 031

| Control Number | | |
|---|---|---|
| Division Code | Year | (Seq. No. |
| I - 2 9 | 5 1 | 8 0 4 |

| NAME (LAST, FIRST, M.I.) | ROLE | I. D. NUMBER | AGE | SEX |
|---|---|---|---|---|
| ...eat, Brad | Subject | 18776 | | M |

RESIDENCE ADDRESS — TELEPHONE

| BUSINESS ADDRESS | TELEPHONE |
|---|---|
| 301 Clinton Road, Jackson, CA. 95642 | (209) 223-4890 |

INTERVIEW DOCUMENTATION
☒ Summary memorandum in exhibit # 23    ☐ Synopsis in Chronological Summary entry number(s) ____    ☐ Transcribed in exhibit #

| NAME (LAST, FIRST, M.I.) | ROLE | I. D. NUMBER | AGE | SEX |
|---|---|---|---|---|
| Lopez, Dan | Investigator | 13833 | 50 | M |

RESIDENCE ADDRESS — TELEPHONE

| BUSINESS ADDRESS | TELEPHONE |
|---|---|
| 301 Clinton Road, Jackson, CA. 95642 | (209) 223-4890 |

INTERVIEW DOCUMENTATION
☐ Summary memorandum in exhibit #    ☐ Synopsis in Chronological Summary entry number(s) ____    ☐ Transcribed in exhibit #

| NAME (LAST, FIRST, M.I.) | ROLE | I. D. NUMBER | AGE | SEX |
|---|---|---|---|---|
| Archer, Kevin | Witness | 18684 | | M |

RESIDENCE ADDRESS — TELEPHONE

| BUSINESS ADDRESS | TELEPHONE |
|---|---|
| 301 Clinton Road, Jackson, CA. 95642 | (209) 223-4890 |

INTERVIEW DOCUMENTATION
☒ Summary memorandum in exhibit # 15    ☐ Synopsis in Chronological Summary entry number(s) ____    ☐ Transcribed in exhibit #

| NAME (LAST, FIRST, M.I.) | ROLE | I. D. NUMBER | AGE | SEX |
|---|---|---|---|---|
| Hannum, Jennifer | Investigator | 16055 | | F |

RESIDENCE ADDRESS — TELEPHONE

| BUSINESS ADDRESS | TELEPHONE |
|---|---|
| 749 Mountain Ranch Road, San Andreas, CA. 95649 | (209) 754-3541 |

INTERVIEW DOCUMENTATION
☐ Summary memorandum in exhibit #    ☐ Synopsis in Chronological Summary entry number(s) ____    ☐ Transcribed in exhibit #

| NAME (LAST, FIRST, M.I.) | ROLE | I. D. NUMBER | AGE | SEX |
|---|---|---|---|---|
| Brown, Todd | Commander | 14738 | | M |

RESIDENCE ADDRESS — TELEPHONE

| BUSINESS ADDRESS | TELEPHONE |
|---|---|
| 301 Clinton Road, Jackson, CA. 95642 | |

INTERVIEW DOCUMENTATION
☐ Summary memorandum in exhibit #    ☐ Synopsis in Chronological Summary entry number(s) ____    ☐ Transcribed in exhibit #

| NAME (LAST, FIRST, M.I.) | ROLE | I. D. NUMBER | AGE | SEX |
|---|---|---|---|---|
| | | | | |

RESIDENCE ADDRESS — TELEPHONE

BUSINESS ADDRESS — TELEPHONE

INTERVIEW DOCUMENTATION
☐ Summary memorandum in exhibit #    ☐ Synopsis in Chronological Summary entry number(s) ____    ☐ Transcribed in exhibit #

| NAME (LAST, FIRST, M.I.) | ROLE | I. D. NUMBER | AGE | SEX |
|---|---|---|---|---|
| | | | | |

RESIDENCE ADDRESS — TELEPHONE

BUSINESS ADDRESS — TELEPHONE

INTERVIEW DOCUMENTATION
☐ Summary memorandum in exhibit #    ☐ Synopsis in Chronological Summary entry number(s) ____    ☐ Transcribed in exhibit #

Page 1 of 1

Chp7A_0714.pdf

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

CHP 000322

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

**EMPLOYEE PROFILE**
CHP 7B (New 1-13) OPI 031

| Control Number | | |
|---|---|---|
| Division Code | Year | Seq. No. |
| 1 - 2 9 5 | 1 8 | 0 4 |

| DATE | TYPE | EXHIBIT# |
|---|---|---|
| 2-18-2016 | Form 2 Commendable | n/a |

SUMMARY
Officer Wheat received a Form 2 Commendable for his participation and assistance in the Butte Fire.

| DATE | TYPE | EXHIBIT# |
|---|---|---|
| 06-27-2018 | Form 2 Censurable | 4 |

SUMMARY
Officer Wheat received a Form 2 Censurable for being involved in a preventable patrol vehicle collision.  Officer wheat was backing up in a patrol vehicle and struck a metal guard rail.

| DATE | TYPE | EXHIBIT# |
|---|---|---|
|  |  |  |

SUMMARY

| DATE | TYPE | EXHIBIT# |
|---|---|---|
|  |  |  |

SUMMARY

| DATE | TYPE | EXHIBIT# |
|---|---|---|
|  |  |  |

SUMMARY

| DATE | TYPE | EXHIBIT# |
|---|---|---|
|  |  |  |

SUMMARY

Chp7B_0714.pdf

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**
CHP 000323

**INVESTIGATIVE SUMMARY**

On June 1, 2018, Officer Brad Wheat, ID 18776, was placed on interim reporting (60 days) for low activity, substandard performance and excessive time use for report writing/not getting collisions completed within the eight day requirement.

On June 20, 2018, Officer Wheat was working a Cozeep detail in the Stockton Area and was involved in a preventable patrol vehicle collision. Officer Wheat was in the vicinity of I-5 and Monte Diablo Avenue. Officer Wheat was inside of a lane closure and had to move onto the right shoulder in order to let some construction equipment by. Officer Wheat attempted to reposition his patrol vehicle back to its original location by backing up on the shoulder. In doing so, Officer Wheat's patrol vehicle struck a metal guard rail. The right rear of the patrol vehicle's bumper received minor damage.

On July 19, 2018, Officer Wheat was involved in another preventable patrol vehicle collision. Officer Wheat was at the Amador Area office and was just starting his shift. Wheat activated the security gate by remote and started to approach the opened gate. Officer Wheat noted the gate was still open, and proceeded straight at approximately 5 mph. At that moment, the automatic gate began to close and officer Wheat drove right into it. The right front of the patrol vehicle received moderate damage, and the gate also received moderate damage.

**FINDINGS**

The specific allegation(s) from this investigation are:

1.  Officer Wheat was involved in two preventable patrol vehicle collisions within a one month period of time.

    **-Founded**

This misconduct represents a violation of Government Code 19572 Section(s):

(d) Inexcusable neglect of duty.

(t) Other failure of good behavior either during or outside of duty hours, which is of such a nature that it causes discredit to the appointing authority or the person's employment.

**The determination of "founded" is based upon:**

a.  Officer Wheat was involved in an on-duty patrol vehicle collision on June 20, 2018, while working a Cozeep detail in the Stockton Area. Officer Wheat was backing up on the right shoulder on N/B I-5 in the vicinity of Monte Diablo Ave. and ended up striking a metal guard rail causing damage to the right rear bumper of the patrol vehicle. CHP 555, Traffic Collision Report (Exhibit #13).

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**
CHP 000324

b.  Officer Wheat was involved in another on-duty patrol vehicle collision on July 19, 2018, at the Amador Area. Officer Wheat was about to exit the Area office when his patrol vehicle struck the automatic gate as it was closing. CHP 555, Traffic Collision Report **(Exhibit #14)**.

c.  Officer Wheat is currently on interim reporting as of June 1, 2018, for lack of activity, work ethic, and excessive time spent on report writing, specifically not completing collision reports with the eight day time frame.

**Prior training includes the following:**

- Officer Wheat has been employed with the California Highway Patrol for eleven years.

- Officer Wheat received extensive driver training in the California Highway Patrol Academy.

- Officer Wheat completed Ford SUV Training and Stability Control Course on June 30, 2014.

- Officer Wheat completed Driver Training/Awareness on April 12, 2017.

- Officer Wheat admitted during his Administrative Interrogation to knowing and understanding departmental policy contained in Highway Patrol Guide (HPG) 70.14, *Enforcement Driving Guide,* Chapter 5, section 9 (A-E) **(Exhibit #18)**.

- Officer Wheat admitted during his Administrative Interrogation to knowing and understanding departmental policy contained in Highway Patrol Guide (HPG) 70.14, *Enforcement Driving Guide,* Chapter 5, section 2-3 **(Exhibit #19)**.

- Officer Wheat also agreed to being in violation of Government Code 19572 section (d), *Inexcusable neglect of duty* and section (t), *Other failure of good behavior either during or outside of duty hours, which is of such a nature that it causes discredit to the appointing authority or the person's employment* **(Exhibit #20)**.

**CHRONOLOGICAL SUMMARY**

1.  On June 1, 2018, Officer Wheat, ID 18776, was placed on interim reporting for the following reasons: low enforcement activity, substandard performance, and excessive time use for report writing **(Exhibit #1)**.

2.  On June 20, 2018, Officer Wheat was involved in a preventable patrol vehicle collision, in which he backed into a metal guard rail while working a Cozeep detail in the Stockton Area. Sergeant Lopez completed a STD 270, Vehicle Accident Report **(Exhibit #2)** and the CHP 208, Collision Prevention Report **(Exhibit #3)**.

3.  On June 27, 2018, Sergeant Lopez drafted a CHP 2, Incident Report-Censurable, for the collision Officer Wheat was involved in on June 20, 2018 **(Exhibit #4)**.

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

CHP 000325

4.  On July 19, 2018, at 0730 hours, Officer Wheat, ID 18776, was involved in another preventable patrol vehicle collision.  Officer Wheat was exiting the office parking lot and struck the automatic gate causing moderate damage to the patrol vehicle and the automatic gate.

5.  On July 19, 2018, at 0730 hours, Sergeant Lopez, ID 13833, heard the collision and walked out to the area of the damaged patrol vehicle and damaged gate.  Sergeant Lopez took photos **(Exhibit #5)** and notified Lieutenant Commander Todd Brown, ID 14738.

6.  On July 19, 2018, at approximately 0830 hours, Sergeant Lopez was assigned an adverse action against Officer Wheat due to the fact officer Wheat is on Interim Reporting for activity and was previously involved in a previous preventable collision on June 20, 2018.  Lieutenant Brown notified Valley Division of an Internal Investigation against Officer Wheat **(Exhibit #6)**.

7.  On July 19, 2018, Sergeant Lopez obtained the Mobile Video and Audio Recording System (MVARS) compact disc containing video of the collision from the vehicle (1365345) Officer Wheat was driving.  Sergeant Lopez booked the original into evidence on a CHP 36, Property Receipt **(Exhibit #7)(Evidence #E20180034 )**.  Sergeant Lopez made one copy of the event on a compact disc for the investigation report.

8.  On July 19, 2018, Sergeant Lopez completed the STD 270, Vehicle Accident Report **(Exhibit #8)** and the CHP 208, Collision Prevention Report **(Exhibit #9)** and forwarded it through channels.

9.  On July 25, 2018, Sergeant Lopez made copies of four interim reporting ride-along memos conducted during Officer Wheat's interim reporting process.   None of which mentioned any significant issues with Officer Wheat's driving abilities **(Exhibit #10)**.

10.  On July 25, 2018, Sergeant Lopez made a copy of CHP 415, Daily Field Record, for Officer Wheat, dated June 19, 2018 (the night prior to June 20th) **(Exhibit #11)**.  Sergeant Lopez also made a copy of Officer Wheat's ATS 415 for July 19, 2018 **(Exhibit #12)**.

11.  On July 25, 2018, Sergeant Lopez made copies of CHP 555, Traffic Collision Report, dated June 20, 2018, involving Officer Wheat **(Exhibit #13)**, and CHP 555, Traffic Collision Report, dated July 19, 2018, also involving Officer Wheat **(Exhibit #14)**.

12.  On July 26, 2018, Sergeant Lopez conducted an interview with Officer Kevin Archer, ID 18684.  At the conclusion of the interview with Officer Archer, Sergeant Lopez wrote a CHP 51, Memorandum of the interview **(Exhibit #15)**.

13.  On July 26, 2018, Sergeant Lopez drafted a CHP 51, Memorandum- Notice of Administrative Interrogation **(Exhibit #16)**.

## CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14. On July 26, 2018, Officer Wheat was served with a Notice of Administrative Interrogation (**Exhibit #16**).

15. On July 26, 2018, Sergeant Lopez obtained Officer Wheat's Employee Training Records Report (ETRS) as it pertains to driving. On June 30, 2014, Officer Wheat completed four hours of Ford SUV Training and Stability Control Course, and his last Driver Training/Awareness training was on April 12, 2017 (**Exhibit #17**).

16. On July 27, 2018, Sergeant Lopez made copies of Highway Patrol Guide (HPG) 70.14 Chapter 5, section 9 (**Exhibit #18**), (HPG) 70.14 Chapter 5, sections 2 and 3 (**Exhibit #19**), and Government Code 19572, specifically sections (d) and (t) (**Exhibit #20**).

17. On July 31, 2018, Officer Wheat was re-served with a Notice of Administrative Interrogation. Changes were made to who the second Sergeant would be (Sergeant Hannum, ID 16055, would be replacing Sergeant Dobler, ID 15628) and the scope was slightly changed. (**Exhibit #21**).

18. On August 2, 2018, Sergeant Lopez and Sergeant Jennifer Hannum, ID 16055, conducted an interrogation on Officer Wheat at the Amador Area office. A CHP 8, Administrative Interrogation Record was completed (**Exhibit #22**). The interrogation was recorded and audio was copied on a compact disc (**Evidence #E20180034**).

19. On August 3, 2018, Sergeant Lopez completed summary memorandum of the interrogation on Officer Wheat (**Exhibit #23**).

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

CHP 000327

**EXHIBITS**

1. Copy of Officer Wheat's Interim reporting package starting June 1, 2018.

2. Copy of STD 270, Vehicle Accident Report for June 20, 2018.

3. Copy of CHP 208, Collision Prevention Report for June 20, 2018.

4. Copy of CHP 2, Incident Report-Censurable, for the collision Officer Wheat was involved in on June 20, 2018.

5. Copy of photos taken by Sergeant Lopez of the collision Officer Wheat was involved in on July 19, 2018.

6. Copy of Internal Investigation notification to Valley Division.

7. Copy of CHP 36, Property Receipt (E20180034).

8. Copy of STD 270, Vehicle Accident Report for July 19, 2018.

9. Copy of CHP 208, Collision Prevention Report for July 19, 2018.

10. Copies of four interim reporting ride-along memos conducted during Officer Wheat's interim reporting process.

11. A copy of CHP 415, Daily Field Record, for Officer Wheat, dated June 19, 2018 (the night prior to June 20th).

12. A copy of Officer Wheat's ATS 415 for July 19, 2018.

13. A copy of CHP 555, Traffic Collision Report, dated June 20, 2018, involving Officer Wheat.

14. CHP 555, Traffic Collision Report, dated July 19, 2018, also involving Officer Wheat.

15. A copy of CHP 51, Memorandum of the interview with Officer Archer.

16. CHP 51, Memorandum- Notice of Administrative Interrogation.

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**
CHP 000328

17. Copies of Officer Wheat's training records including four hours of Ford SUV Training and Stability Control Course taken on June 30, 2014, and his last Driver Training/Awareness training was taken on April 12, 2017.

18. Copy of Highway Patrol Guide (HPG) 70.14 Chapter 5, section 9.

19. Copy of Highway Patrol Guide (HPG) 70.14 Chapter 5, sections 2 and 3.

20. Copy of Government Code 19572, specifically sections (d) and (t).

21. CHP 51, Memorandum- Notice of Administrative Interrogation (adding Sergeant Jennifer Hannum, ID16055).

22. CHP 8, Administrative Interrogation Record.

23. A CHP 51, Memorandum of Summary of the Interrogation on Officer Wheat.

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

CHP 000329

**EXHIBITS**

1. Copy of Officer Wheat's interim reporting package starting June 1, 2018.

2. Copy of STD 270, Vehicle Accident Report for June 20, 2018.

3. Copy of CHP 208, Collision Prevention Report for June 20, 2018.

4. Copy of CHP 2, Incident Report-Censurable, for the collision Officer Wheat was involved in on June 20, 2018.

5. Copy of photos taken by Sergeant Lopez of the collision Officer Wheat was involved in on July 19, 2018.

6. Copy of Internal Investigation notification to Valley Division.

7. Copy of CHP 36, Property Receipt (E20180034).

8. Copy of STD 270, Vehicle Accident Report for July 19, 2018.

9. Copy of CHP 208, Collision Prevention Report for July 19, 2018.

10. Copies of four interim reporting ride-along memos conducted during Officer Wheat's interim reporting process.

11. A copy of CHP 415, Daily Field Record, for Officer Wheat, dated June 19, 2018 (the night prior to June 20th).

12. A copy of Officer Wheat's ATS 415 for July 19, 2018.

13. A copy of CHP 555, Traffic Collision Report, dated June 20, 2018, involving Officer Wheat.

14. CHP 555, Traffic Collision Report, dated July 19, 2018, also involving Officer Wheat.

15. A copy of CHP 51, Memorandum of the interview with Officer Archer.

16. CHP 51, Memorandum- Notice of Administrative Interrogation.

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

17. Copies of Officer Wheat's training records including four hours of Ford SUV Training and Stability Control Course taken on June 30, 2014, and his last Driver Training/Awareness training was taken on April 12, 2017.

18. Copy of Highway Patrol Guide (HPG) 70.14 Chapter 5, section 9.

19. Copy of Highway Patrol Guide (HPG) 70.14 Chapter 5, sections 2 and 3.

20. Copy of Government Code 19572, specifically sections (d) and (t).

21. CHP 51, Memorandum- Notice of Administrative Interrogation (adding Sergeant Jennifer Hannum, ID16055).

22. CHP 8, Administrative Interrogation Record.

23. A CHP 51, Memorandum of Summary of the interrogation on Officer Wheat.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

CHP 000331

Officer Brad Wheat, ID 18776
Interim Reporting
Page 1

## 1.  POLICIES AND PROCEDURES, LAWS, CODE, AND REGULATIONS

### PROBLEM IDENTIFICATION:

As discussed with you on May 29, 2018, with Sergeant J. Dobler, ID 15628, and Sergeant R. Whitehead, ID 15885, your performance evaluation identified a consistent level of substandard performance in enforcement activities. In eight of the twelve months of your December 2016 through December 2017 evaluation period, Sergeant R. Whitehead, ID 15885, has repeatedly admonished you for your low enforcement activity on your California Highway Patrol (CHP) 100 Forms, *Officer's Evaluation/Activity Summary*, and directed you to be more proactive in your efforts. You were informed on January 1, 2018; you had the first quarter of the year to increase your low activity. You failed to constructively address these comments and supervisory counseling's, and apply demonstrable enforcement on a consistent basis. This level of poor performance does not support the Department's mission and goals.

At times, you have demonstrated improvement and performed at an acceptable level in enforcement activity, demonstrating you have the ability to perform at a satisfactory level when you choose to do so, or when under close supervision. These months of satisfactory performance illustrate that months of substandard performance are related to inadequate levels of personal motivation, time management, commitment to goals, dedication to duty, and are not related to training or availability of equipment.

## 2.  PROFESSIONAL DEMEANOR

### PROBLEM IDENTIFICATION:

As discussed with you on numerous occasions during the past year, your performance evaluation identified a consistent level of substandard performance which reflects your poor responsibility when it comes to beat accountability and work ethic. As a member of this Department, you need to remember the Department's mission of providing the highest level of Safety, Service, and Security. This is accomplished through five departmental goals. As an officer with this Department, you must strive every day to protect life and property and most importantly, provide superior service to the public. The citizens of the State of California and Amador County expect you to display beat accountability, to enforce the laws, and protect them every day you work, not just when you choose to do it.

Employee's Initials _____   Rater's Initials _____   Reviewer's Initials _____

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

Officer Brad Wheat, ID 18776
Interim Reporting
Page 2

## 1. POLICIES AND PROCEDURES, LAWS, CODE, AND REGULATIONS

PROBLEM IDENTIFICATION:

As discussed with you on May 29, 2018, with Sergeant J. Dobler, ID 15628, and Sergeant R. Whitehead, ID 15885, your performance evaluation identified a consistent level of substandard performance in enforcement activities.  In eight of the twelve months of your December 2016 through December 2017 evaluation period, Sergeant R. Whitehead, ID 15885, has repeatedly admonished you for your low enforcement activity on your California Highway Patrol (CHP) 100 Forms, *Officer's Evaluation/Activity Summary*, and directed you to be more proactive in your efforts.  You were informed on January 1, 2018, you had the first quarter of the year to increase your low activity.  You failed to constructively address these comments and supervisory counseling's, and apply demonstrable enforcement on a consistent basis.  This level of poor performance does not support the Department's mission and goals.

At times, you have demonstrated improvement and performed at an acceptable level in enforcement activity, demonstrating you have the ability to perform at a satisfactory level when you choose to do so, or when under close supervision.  These months of satisfactory performance illustrate that months of substandard performance are related to inadequate levels of personal motivation, time management, commitment to goals, dedication to duty, and are not related to training or availability of equipment.

## 2. PROFESSIONAL DEMEANOR

PROBLEM IDENTIFICATION:

As discussed with you on numerous occasions during the past year, your performance evaluation identified a consistent level of substandard performance which reflects your poor responsibility when it comes to beat accountability and work ethic.  As a member of this Department, you need to remember the Department's mission of providing the highest level of Safety, Service, and Security.  This is accomplished through five departmental goals.  As an officer with this Department, you must strive every day to protect life and property and most importantly, provide superior service to the public.  The citizens of the State of California and Amador County expect you to display beat accountability, to enforce the laws, and protect them every day you work, not just when you choose to do it.

Employee's Initials _____   Rater's Initials _____   Reviewer's Initials _____

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

Officer Brad Wheat, ID 18776
Interim Reporting
Page 3

*You have demonstrated that you possess the ability and knowledge to perform at acceptable
levels when you choose to do so. It is imperative that you immediately evaluate your priorities
and focus your efforts.*

METHODS OUTLINED TO REACH OBJECTIVES:

1. You will be placed on Interim Reporting status for 60 work days starting June 1, 2018. At the
conclusion of this period, you will be reevaluated. If you are performing your duties at the
required minimum standards, you will be removed from Interim Reporting status. If you have
not improved, you will be extended for 30 days and administratively assigned to a work shift.
Any sick or vacation days during the Interim Reporting period will extend the Interim Reporting
period by the number of sick/vacation days used.

2. You are to review HPM 100.68, Chapters 1, 2, 3 and 5; HPM 70.4, Chapters 1, 2, 3, and 4;
HPM 110.5. You shall submit a memorandum to Sergeant Whitehead indicating you have
completed this assignment and understand the outlined policies, no later than the end of your
regular shift, June 16, 2018.

3. A supervisor will ride along with you at least once each week to monitor your progress and
provide guidance.

4. You will maintain your CHP 415 and CHP 100 forms, as required by departmental policy.
Your CHP 415 will be electronically submitted at the end of each work shift (daily).

5. You will be provided with an Interim Reporting log, which you shall maintain current at all
times.

Employee's Initials _BW_.    Rater's Initials _____    Reviewer's Initials _____

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

CHP 000334

Officer Brad Wheat, ID 18776
Interim Reporting
Page 4

## CONTROLS AND FOLLOW UP:

1. During the 60 day period, upon the conclusion of your assigned shift, you shall submit all of your written work directly to the shift sergeant. The following items are required to be submitted at the end of each shift:

   - A copy of your daily activity summary (CHP 415) completed in the LAN.
   - All enforcement documents (CHP 215s, CHP 281s, CHP 267s) issued during your shift.
   - All Arrest/Incident Reports (CHP 202s, CHP 216s) investigated during the shift, and any previous reports that were returned for correction/completion.
   - All Collision Reports (CHP 555s) without follow up shall be completed without overtime. This includes those investigated during the shift and any previous reports that were returned for correction/completion.
   - All Vehicle Storage/Impound Reports (CHP 180s) completed during your shift.
   - Your Interim Reporting log for supervisory signature.

Employee's Initials _____      Rater's Initials _____       Reviewer's Initials _____

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
CHP 000335

STATE OF CALIFORNIA - DGS ORIM
# VEHICLE ACCIDENT REPORT
STD. 270 ( REV. 2/2002o) (CHP Automated)

**NOTIFICATION DATE:** 06/20/2018

THIS REPORT MUST BE MAILED WITHIN 48 HOURS AFTER ACCIDENT. (ACCIDENTS INVOLVING INJURY SHOULD FIRST BE CALLED OR FAXED TO ORIM AT (916) 376-5392 - CALNET 480-5302 - FAX (916) 376-5277.)
* CONFIDENTIAL INFORMATION *
DO NOT RELEASE TO OTHER PARTIES WITHOUT CONSENT OF THE OFFICE OF RISK AND INSURANCE MANAGEMENT

- [ ] EMAILED: clrims@dgs.ca.gov; RiskManagement.Unit@chp.ca.gov
- [ ] FAXED
- [ ] MAILED

DISTRIBUTION: OFFICE OF RISK AND ORIGINAL - INSURANCE MANAGEMENT 707 THIRD STREET, FIRST FLOOR WEST SACRAMENTO, CA 95605
COPY-DEPT HEAD
COPY- STATE DRIVER (Dept. owned vehicle only)

**ACCIDENT PREVIOUSLY REPORTED TO ORIM ?** (If yes, give date)
- [ ] YES   DATE:
- [✓] NO

Page 1 of 2

| | | |
|---|---|---|
| NAME Brad Wheat | AGE 45 | EMPLOYING DEPARTMENT California Highway Patrol |

**STATE DRIVER**

DRIVERS LICENSE NO. ▮▮▮▮▮

OFFICE ADDRESS 301 Clinton Road Jackson CA 95642

AGENCY BILLING CODE

AGENCY DOCUMENT NO. (Optional)

ACCIDENT DATE 06/20/2018    TIME 03:30

WAS VEHICLE BEING USED ON OFFICIAL STATE BUSINESS? (If NO, attach explanation)
- [✓] YES
- [ ] NO

DATE DRIVER LAST COMPLETED (Month/Year) STATE DEFENSIVE DRIVER TRAINING
- [✓] NOT TAKEN

JOB TITLE Officer

BUSINESS TELEPHONE (209) 223-4890

**STATE VEHICLE**

VEHICLE LICENSE NUMBER 1365351

VEHICLE YEAR, MAKE, MODEL 2015, Ford, Explorer

VEHICLE OWNER
- [✓] DEPARTMENT OWNED
- [ ] DGS POOL
- [ ] RENTAL
- [ ] EMPLOYEE OWNED

DEPT. VEHICLE NO. (Optional) 1365351

DESCRIBE DAMAGES TO STATE VEHICLE Damage to right rear bumper.

ESTIMATED REPAIR COST $2,000.00

IF DEPARTMENT OWNED OR RENTAL, ENTER OWNERS NAME California Highway Patrol

**ACCIDENT DETAILS** (See Reverse for Diagram and Condition)

ACCIDENT LOCATION (Address/Area) Interstate 5 N/B just north of Mount Diablo (right shoulder)

(City/State) Stockton

(County) San Jauquin

ROAD CONDITIONS good

WEATHER CONDITIONS Clear

TRAFFIC CONDITIONS light

HOW FAST WERE YOU DRIVING? 5 mph

EST. SPEED OF OTHER CAR N/A

POLICE REPORT MADE
- [✓] YES
- [ ] NO

AGENCY
- [✓] CHP
- [ ] OTHER

NAME AND ADDRESS OF INVESTIGATING AGENCY Amador CHP 301 Clinton Road Jackson CA 95642

**OTHER VEHICLE**

DRIVERS NAME N/A

AGE / DOB

VEHICLE LICENSE NUMBER

VEHICLE YEAR, MAKE, MODEL

NO. OF PASSENGERS

DRIVERS LICENSE NO.

HOME TELEPHONE

WORK TELEPHONE

REGISTERED OWNER

DRIVERS ADDRESS (Street, City, State, Zip Code)

OWNER'S ADDRESS

HOME TELEPHONE

WORK TELEPHONE

BRIEFLY DESCRIBE DAMAGES TO OTHER VEHICLE OR PROPERTY

NAME AND ADDRESS OF OTHER PARTY'S INSURANCE

**INJURED**

| NAME N/A | AGE | ADDRESS | HOSPITAL |
|---|---|---|---|
| NAME | AGE | ADDRESS | HOSPITAL |

**WITNESS**

| NAME N/A | TELEPHONE | ADDRESS |
|---|---|---|
| NAME | TELEPHONE | ADDRESS |

**VEHICLE PASSENGERS STATE / OTHER**

| NAME | ADDRESS |
|---|---|
| NAME | ADDRESS |
| NAME | ADDRESS |
| NAME | ADDRESS |

(CONTINUE ON REVERSE)

Std 270_0415.pdf

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

CHP 000336

STATE OF CALIFORNIA - DGS ORIM
**VEHICLE ACCIDENT REPORT**
STD. 270 (REV. 2/2002c) (CHP Automated)

* CONFIDENTIAL INFORMATION *
DO NOT RELEASE TO OTHER PARTIES WITHOUT CONSENT OF THE
OFFICE OF RISK AND INSURANCE MANAGEMENT

**ACCIDENT DETAILS - DESCRIPTION**

FULLY STATE HOW ACCIDENT OCCURRED (Give Details, attach additional sheets if necessary)

State Driver was initially parked in the #4 lane of I-5 n/b. State Driver was working a construction detail and had to move to allow some construction vehicles to pass by so State Driver moved onto the shoulder. State Driver then backed up to get back into his initial position. While backing, State Driver backed into a metal guard rail causing damage to the rear bumper.

**ACCIDENT DETAILS - DIAGRAM**



Number State vehicle as 1, other vehicle(s) as 2, 3, etc.

Show pedestrian by O

Show direction of travel as follows:
Before accident
After accident

Give names or numbers of streets or roads

Indicate Points
of Compass
N. S. E. W.

SEE COLLISION INVESTIGATION

**ADDITIONAL VEHICLE/PASSENGER(S) INJURED / PASSENGERS**

| DRIVER'S NAME | | AGE/DOB | VEHICLE LICENSE NUMBER | VEHICLE YEAR, MAKE, MODEL |
|---|---|---|---|---|
| N/A | | | | |

| DRIVER'S LICENSE NO. | HOME TELEPHONE | WORK TELEPHONE | REGISTERED OWNER |
|---|---|---|---|

| ADDRESS (Street, City, State, Zip Code) | | ADDRESS (Street, City, State, Zip Code) | HOME TELEPHONE |
|---|---|---|---|

| BRIEFLY DESCRIBE DAMAGES TO OTHER VEHICLE OR PROPERTY | | WORK TELEPHONE |
|---|---|---|

NAME AND ADDRESS OF OTHER PARTY'S INSURANCE CARRIER

| NAME | AGE | ADDRESS | HOSPITAL |
|---|---|---|---|
| NAME | AGE | ADDRESS | HOSPITAL |
| NAME | | ADDRESS | |
| NAME | | ADDRESS | |

The answers in this report contain a true and full account of the accident, and the vehicle was being operated on official business of the state of California at the time of the accident. (This reviewing officer is to explain any exception) Attach extra pages as necessary.

Employee Signature and Date

Reviewing Officer Signature (Supervisor or Safety Coordinator)

Type Name and Title of Reviewing Officer
D. Lopez Sergeant

Telephone Number of Reviewing Officer
(209) 223-4890

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**
CHP 000337

DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**COLLISION PREVENTION REPORT**

AREA AND LOCATION CODE
Amador 295

☒ ORIGINAL REPORT   ☐ SUPPLEMENTAL REPORT

*INSTRUCTIONS: Refer to HPM 110, Chapter 7. Do not delay submission; if report and review cannot be fully completed, submit supplementary reports.*

1. CHP DRIVER'S NAME
Brad Whelt

| ID NUMBER | RANK |
|---|---|
| 18776 | Officer |

5. EQUIPMENT/LICENSE #
1363351

2. DATE OF COLLISION
06-20-2018

TIME
05:30

4. COLLISION NUMBER OF CHP 555
0195-2018-00211

6. YEARS OF EXPERIENCE AS CHP DRIVER (4-5 years; 6 years 11 months; since 11 months since 1 accident)
11 YEARS

(only one time if any accident)   YEARS

(with plus mid 6mo)

7. WAS DRIVER USING (check all applicable)
☐ AIR BAG EQUIPPED   ☒ SEAT BELT/SHOULDER HARNESS   ☐ NONE
☐ AIR BAGS DEPLOYED

**A. CHP DISTRACTED DRIVER**
☐ CELL PHONE   ☒ NO DISTRACTION
☐ LOUDSPEAKER   ☐ CPIC/MDC
☐ OTHER (explain)   ☐ VISUAL DISTRACTION

8. EQUIPMENT USED TO INDICATE EMERGENCY/VEHICLE OPERATION
☐ AMBER FLASHER   ☐ WIGWAG
☐ SIREN   ☐ BLUE/AMBER
☐ RED

8A. EQUIPPED WITH
☐ DECK LIGHTS
☐ CAB LIGHTS
☐ BACKUP CAMERA
☐ REVERSE SENSE/AUDIBLE TONE
☐ BLIND SPOT WARNING
☒ NO EMERGENCY EQUIPMENT IN USE

B. LOCATION OF COLLISION
☐ PARKING LOT   ☐ SHOULDER
☐ INTERSECTION   ☐ ROADWAY
☐ DRIVEWAY   ☒ CENTER DIVIDER/MEDIAN
☐ OTHER (explain)

9. WAS CHP VEHICLE PARKED
☐ YES
☒ ON ROADWAY   ☐ ON CENTER DIVIDER/MEDIAN   ☐ ON ROADWAY
☐ AT CURB   ☐ IN PARKING LOT   ☐ OTHER (explain)

9a. WERE THERE ANY MECHANICAL DEFECTS OR FACTORS WHICH CONTRIBUTED TO THE COLLISION?   ☐ YES   ☒ NO
HOW WAS THIS DETERMINED AND VERIFIED?   ☒ PRE-PATROL CHECK   ☐ OTHER (explain)
Driver also stated there were no issues detected.

C. CHP EQUIPMENT DAMAGED            YES   NO
VEHICLE TOWED ☐ ☒      CAMERA ☐ ☒
RADIO(S) ☐ ☒      SHOTGUN ☐ ☒
LIGHTBAR(S) ☐ ☒      LESS-LETHAL SHOTGUN ☐ ☒
CPIC/MDC ☐ ☒      LOJAD/RADAR ☐ ☒
LPR ☐ ☐      RIFLE ☐ ☐
                 AUTO CITATION DEVICE ☐
PRISONER BARRIER ☐ ☒
BACKUP CAMERA ☐ ☒
REAR BARRIER ☐ ☒
(UTILITY & ALL TERRAIN ONLY)

OTHER ITEMS
Damage to right rear bumper.

2. CHP VEHICLE CAPTURING COLLISION?   ☐ YES   ☒ NO

11. TRAFFIC COLLISION STATISTICAL CODES (same codes as used for CHP 555-COMPLETE THIS ITEM IF CHP 555 IS NOT ATTACHED)

| ROAD TYPE | CHP | OTHER | | TYPE OF MOVEMENT PRECEDING COLLISION | CHP | OTHER | | SOBRIETY - DRUGS PHYSICAL | CHP | OTHER |
|---|---|---|---|---|---|---|---|---|---|---|
| WEATHER | | | | A. CHP VEHICLE | | | | A. CHP DRIVER | | |
| LIGHTING | | | | B. VEHICLE 2 | | | | B. DRIVER VEHICLE 2 | | |
| ROAD SURFACE | | | | C. VEHICLE 3 | | | | C. DRIVER VEHICLE 3 | | |
| ROAD CONDITIONS | | | | D. VEHICLE 4 | | | | | | |
| RIGHT-OF-WAY CONTROL | | | | | | | | | | |

5. IS CHP AT FAULT?   ☐ YES   ☒ NO
PCF: 21804 VC

6. CHP VEHICLE MILEAGE   162,200

3. SHOULD CHP COLLECT DAMAGES? (explain)   ☐ YES   ☒ NO
No other parties involved.

**SUPERVISOR'S EVALUATION OF COLLISION SEVERITY**

Number of Persons Involved   Number of Vehicles Involved

| ITEM | CHP | OTHER | | ITEM | CHP | OTHER |
|---|---|---|---|---|---|---|
| | 0 | | | WITHOUT DAMAGE | | |
| | | | | MINOR | | 1 |
| | | | | MODERATE | | |
| | | | | MAJOR | | |
| | | | | TOTALED | | |

| | NAMES OF INJURED | SEATBELT USAGE |
|---|---|---|
| | | YES NO N/A |
| WITHOUT INJURY | N/A | |
| PAIN ONLY | | |
| VISIBLE INJURY | | |
| SEVERE WOUNDS | | |
| FATAL | | |

CHP 268 (Rev. 7-15) OPI 033            Destroy Previous Versions

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

CHP 000338

**12. TO BE COMPLETED BY DRIVER** - FROM A STUDY OF CAUSES OF CAUSES OF THIS COLLISION, ARE THERE DRIVING HABITS OR DRIVING SKILLS THAT YOU MIGHT MODIFY TO STAY OUT OF A SIMILAR OCCURRENCE? (explain)

I was initially parked in the #4 lane of I-5 N/B.  I was working a construction vehicle detail and had to move to allow some construction vehicles by in the #4 lane.  I moved to the right shoulder, and I backed up to get back into my initial position.  While backing, I backed into a metal guard rail causing damage to the right rear bumper.

SIGNATURE OF CHP DRIVER

DATE  06/21/2018

## SUPERVISOR'S REVIEW

**13. DID SUPERVISOR RESPOND TO THE COLLISION SCENE?**
☐ YES   ☒ NO

**14. IN SUPERVISOR'S OPINION, DID THE CHP DRIVER PRACTICE DEFENSIVE DRIVING TECHNIQUES AS OUTLINED IN THE DEPARTMENTAL MANUALS, INCLUDING HPO 70.14, SUPERVISOR'S OF DRIVING GUIDE?**
☐ YES   ☒ NO

Explain:
On call Sergeant Whitehead was notified via cell phone at the time of the Collision.
Sergeant Whitehead then notified Sergeant Lopez.  Sergeant Lopez was starting his shift and met the officer back at the office.

Explain:
The driver was working a Cozeep detail and was backing up on the right shoulder. The driver should have visibly checked behind his vehicle prior to backing, along with utilizing his back up camera.

**15. SUPERVISOR'S VERSION OF HOW COLLISION OCCURRED**

The officer was backing up on the right shoulder and backed into a metal guard rail.

**16. AS A SUPERVISOR, WHAT ACTION HAVE YOU TAKEN OR INTEND TO MINIMIZE THE POSSIBILITY OF THIS INDIVIDUAL BEING INVOLVED IN A SIMILAR COLLISION? (be specific)**

The collision was talked about in briefing.

SIGNATURE OF SUPERVISOR

DATE  06/21/2018

## COMMANDER'S REVIEW

| | YES | NO | REMARKS (use for explanation - may be item no.) |
|---|---|---|---|
| 17. DID YOU DISCUSS THIS COLLISION WITH THE EMPLOYEE INVOLVED? IF NOT, EXPLAIN | X | | |
| 18. DID YOU DISCUSS THE REPORT WITH THE SUPERVISOR? | X | | |
| 19. DO YOU CONCUR WITH THIS REPORT? IF NOT, EXPLAIN | X | | |
| 20. IN YOUR OPINION, WAS THE COLLISION REASONABLY PREVENTABLE BY THE CHP DRIVER? | X | | |
| 21. SHOULD THE LESSONS LEARNED FROM THIS COLLISION BE USED TO AUGMENT TRAINING, OR FOR THE SAFE OR A CHANGE IN POLICY, ETC. OR POLICY? EXPLAIN | X | | |
| 22. IF THE DRIVER REASONABLY COULD HAVE PREVENTED THIS COLLISION, WHAT FURTHER STEPS HAVE BEEN OR WILL BE TAKEN TO MINIMIZE THE POSSIBILITY OF A RECURRENCE? (explain) | X | | |

Supervisor's have briefed the incident at shift briefings and the collision will also be discussed at training days.

SIGNATURE OF COMMANDER

DATE  06/21/2018

## DIVISION'S REVIEW

**23. DID YOU COUNT THIS COLLISION (copy HPM 16.5, Chapter 6, Annex A)**
☒ RECORDABLE   ☐ NON-RECORDABLE

Reasons

☐ CONCUR
☐ REFERRED BACK TO COMMANDER FOR THE FOLLOWING REASONS:

SIGNATURE                                                DATE

CHP 268 (Rev     ) OPI 033

PAGE 2 OF 2

# CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

CHP 000339

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

## INCIDENT REPORT

CHP 2 (Rev. 1-13) OPI 006

| REPORT TYPE | |
| --- | --- |
| ☐ Commendable | ☒ Censurable |

| EMPLOYEE'S NAME | I.D. NUMBER |
| --- | --- |
| Brad Wheat | 18776 |

| ASSIGNED COMMAND AND LOCATION CODE | CLASSIFICATION |
| --- | --- |
| Amador 295 | Officer |

INCIDENT DETAILS (include date, time and location of incident as appropriate)

On June 20, 2018, at approximately 0330 hours, you were working a Cozeep detail in the Stockton Area on I-5 N/B in the vicinity of Mount Diablo. You were initially parked in the #4 lane of I-5 n/b within the lane closure. You drove over to the right shoulder in order to allow some construction vehicles to pass by. In an attempt to reposition the patrol vehicle, you started a backing movement from the right shoulder. While backing, the right rear of the patrol vehicle struck a metal guard rail causing damage to the rear bumper.

In the future, it is your obligation to make sure there are no objects behind your patrol vehicle while backing. At the very least use your back up camera or physically get out of the vehicle and look prior to backing.

This document will be retained in the personnel file for three years from the date of issuance.          ☐ See attached

## EMPLOYEE DISCUSSION AND REVIEW

| EMPLOYEE'S SIGNATURE | | | DATE |
| --- | --- | --- | --- |
| | | | 6-28-2018 |

| SUPERVISOR'S SIGNATURE | I.D. NUMBER | CLASSIFICATION | DATE |
| --- | --- | --- | --- |
| | 13833 | Sergeant | 06-27-2018 |

Use previous editions until depleted

Chpd_0118.pdf

## CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

CHP 000340



CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
CHP 000341



CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
CHP 000342



CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
CHP 000343



**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

CHP 000344



CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

## VALLEY DIVISION NOTIFICATION OF INTERNAL INVESTIGATION

## ** CONFIDENTIAL **

**Investigation Control #:**

**Name, Rank and ID:**  Officer Brad Wheat ID #18776

**Area:**  Amador

**Duty Status:**  Full time

**Date of Incident:**  July 19, 2018

**Date Area Aware:**  July 19, 2018

**Date Division Notified:**  July 19, 2018

**Date Initiated:** July 19, 2018

**Probation End Date (if applicable):**  N/A

**Summary of Allegations:**
Officer Wheat is currently on Interim Reporting for substandard enforcement activity.  On June 20, 2018, Officer Wheat, (while on Interim Reporting) unsafely backed his marked patrol vehicle into a guardrail, causing minor damage to the patrol vehicle.  On July 19, 2018, Officer Wheat (while still on Interim Reporting), collided with the entrance gate at the Amador Area Office with a marked patrol vehicle, causing major damage to the patrol vehicle and gate.

**Assigned Investigator:**       Administrative:  Sergeant Dan Lopez, ID 13833
                                          Criminal:  N/A

**Date Due to Division: (30 days from Area Aware):**  August 19, 2018

**Date Due to OIA (60 Days from Area Aware):**  September 19, 2018

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

**PROPERTY RECEIPT**

CHP 36 (Rev. 4-15) OPI 031

PROPERTY CONTROL NUMBER: **E 2018 0034**

CHARGES: ☐ Misdemeanor/Infraction   ☐ Felony

PROPERTY NUMBER: E2018 0034

**A** ☐ EVIDENCE (If applicable, select all sub-class that applies)
  ○ Asset Forfeiture
  ○ Domestic Violence
  ○ Recovered Stolen

☐ FOUND (Refer finder to Section D, File a finder claim box)
☐ CONTRABAND (No charges-for destruction only)

☑ ADMINISTRATIVE
☐ SAFE KEEPING
  ○ Domestic Violence

VIOLATION(S):

SEARCH WARRANT NUMBER:

DATE SEIZED/SURRENDERED   CHP CASE NUMBER: **C/C  295-2018-0004**

BOOKING DATE **08-07-18**
BOOKING LOCATION CODE **295**
INCIDENT LOCATION **AMADOR AREA OFFICE**

**B** INDICATE IF INDIVIDUAL IS:  S-Suspect   O-Owner   F-Finder   ☐ Check if additional CHP 36 used for additional names

| NAME (LAST, FIRST, MIDDLE) | DATE OF BIRTH | AGE | DRIVER LICENSE NUMBER | STATE | GENDER |
| --- | --- | --- | --- | --- | --- |
| RESIDENCE ADDRESS (CITY, STATE, ZIP CODE) | | | PHONE NUMBER | | |
| NAME (LAST, FIRST, MIDDLE) | DATE OF BIRTH | AGE | DRIVER LICENSE NUMBER | STATE | GENDER |
| RESIDENCE ADDRESS (CITY, STATE, ZIP CODE) | | | PHONE NUMBER | | |
| NAME (LAST, FIRST, MIDDLE) | DATE OF BIRTH | AGE | DRIVER LICENSE NUMBER | STATE | GENDER |
| RESIDENCE ADDRESS (CITY, STATE, ZIP CODE) | | | PHONE NUMBER | | |

**C**

| ITEM NUMBER | QUANTITY AMOUNT | DESCRIPTION (Serial number, Size, Color, Marking, etc. Refer to HPM 70.1, Chapter 6. Indicate owner, if applicable) Found Property-Requires a complete synopsis. Use Remarks section found on card stock or attach a CHP 556. Money (not Asset Forfeiture)-Complete financial tally on the back of page 1. Only note total amount on page 1 as an item. | PROPERTY OFFICER USE ONLY |
| --- | --- | --- | --- |
| 1 | 1 | Compact Disc (COPY) of MVARS Video of Collision 07-19-18 | |
| 2 | 1 | Compact Disc Containing Photos of Collision 07-19-18 | |
| 3 | 1 | Compact Disc of Audio of Interview ~~                  ~~ | |
| | | ~~    ~~ ADMIN INTERROGATION | |
| 4 | 1 | Compact Disc of Interview w/ Officer | |
| | | REGARDING AA. | |
| | | ADMIN | |
| | | RETAIN FOR 5 YEARS | |
| | | CITIZEN'S COMPLAINT #  295-2018-0004 | |

**D** I have read the reverse of this receipt and elect to:
☐ Exercise my claim to items:
☐ Waive my claim to items:
☐ File a finder claim to items (excluding items illegal to possess):
  - Value of Found Property: ☐ $250 or more   ☐ Less than $250
SIGNATURE OF CLAIMANT (If waived, shall also read and sign Waiver Advisement found on the back of original CHP36)

**E** AIS CASE NUMBER:

OTHER CASE/CITATION NUMBERS:

COURT(S):

**F** BOOKING EMPLOYEE PRINT NAME (LAST, FIRST) **LOPEZ, DAN**
SIGNATURE
I.D. NUMBER **13833**
DATE SIGNED **08-07-18**

REVIEWER PRINT NAME (LAST, FIRST) **HAGEMANN, BRIAN**
SIGNATURE
☐ Reviewed CHP36 only.
I.D. NUMBER **15330**
DATE SIGNED **08-07-18**

**H** # of PKGS RCVD  **1**
PROPERTY OFFICER SIGNATURE
I.D. NUMBER **15330**
DATE RECEIVED **08-07-18**

DISTRIBUTION:  Original  - Property room
White  - Report copy
Cardstock  - Property room
Yellow  - Receipt

Page 1 of 1

Chp36_0415.pdf

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

CHP 000347

STATE OF CALIFORNIA - DGS ORIM
**VEHICLE ACCIDENT REPORT**
STD. 270 ( REV. 2/2002c) (CHP Automated)
☑ Preliminary

**DGS**

THIS REPORT MUST BE MAILED WITHIN 48 HOURS AFTER ACCIDENT (ACCIDENTS INVOLVING INJURY SHOULD FIRST BE CALLED OR FAXED TO ORIM AT (916) 376-5300 - CALNET 480-5303 - FAX (916) 376-5277.)
* CONFIDENTIAL INFORMATION *
DO NOT RELEASE TO OTHER PARTIES WITHOUT CONSENT OF THE OFFICE OF RISK AND INSURANCE MANAGEMENT

DISTRIBUTION: OFFICE OF RISK AND ORIGINAL - INSURANCE MANAGEMENT
707 THIRD STREET, FIRST FLOOR
WEST SACRAMENTO, CA 95605
COPY - DEPT. FILES (Dept. owned vehicle only)
COPY - STATE DRIVER (Dept. owned vehicle only)

NOTIFICATION DATE: 07/20/2018
☑ E-MAILED claims@dgs.ca.gov; RiskManagementUnit@chp.ca.gov
☐ FAXED
☐ MAILED

ACCIDENT PREVIOUSLY REPORTED TO ORIM? (if yes, give date)
☐ YES   DATE:   ☑ NO

Page   of

| | | |
|---|---|---|
| NAME Brad Wheat | AGE 45 | EMPLOYING DEPARTMENT California Highway Patrol |

AGENCY BILLING CODE

| | | |
|---|---|---|
| DRIVERS LICENSE NO. | ACCIDENT DATE 07/19/2018 | TIME 07:30 |

OFFICE ADDRESS
301 Clinton Road
Jackson CA 95642

AGENCY DOCUMENT NO. (Optional)

WAS VEHICLE BEING USED ON OFFICIAL STATE BUSINESS?   ☑ YES   ☐ NO
(if NO, attach explanation)

JOB TITLE
Officer

DATE DRIVER LAST COMPLETED STATE DEFENSIVE DRIVER TRAINING   Month/Year   ☑ NOT TAKEN

BUSINESS TELEPHONE
(209) 223-4890

VEHICLE LICENSE NUMBER 1365345   VEHICLE YEAR, MAKE, MODEL 2015, Ford, Explorer

VEHICLE OWNER   ☑ DEPARTMENT OWNED   ☐ DGS POOL

DEPT. VEHICLE NO. (Optional)
1365345

DESCRIBE DAMAGES TO STATE VEHICLE
Damage to right front bumper, right front fender, headlight and hood.

ESTIMATED REPAIR COST
$5,000.00

☐ RENTAL   ☐ EMPLOYEE OWNED
IF DEPARTMENT OWNED OR RENTAL, ENTER OWNER'S NAME
California Highway Patrol

ACCIDENT LOCATION (Address/Area)
301 Clinton Road
Jackson, CA. 95642
(City/State)
Jackson
(County)
Amador

ROAD CONDITIONS
good
WEATHER CONDITIONS
Clear
TRAFFIC CONDITIONS
light
HOW FAST WERE YOU DRIVING? 5 mph
EST. SPEED OF OTHER CAR N/A

POLICE REPORT MADE   ☑ YES   ☐ NO
AGENCY   ☑ CHP   ☐ OTHER

NAME AND ADDRESS OF INVESTIGATING AGENCY
Amador CHP
301 Clinton Road
Jackson CA 95642

**OTHER VEHICLE**

| DRIVER'S NAME N/A | AGE / DOB | VEHICLE LICENSE NUMBER | VEHICLE YEAR, MAKE, MODEL | NO. OF PASSENGERS |
|---|---|---|---|---|
| DRIVER'S LICENSE NO. | HOME TELEPHONE | WORK TELEPHONE | REGISTERED OWNER | |

DRIVER'S ADDRESS (Street, City, State, Zip Code)

OWNER'S ADDRESS

HOME TELEPHONE

WORK TELEPHONE

BRIEFLY DESCRIBE DAMAGES TO OTHER VEHICLE OR PROPERTY

NAME AND ADDRESS OF OTHER PARTY'S INSURANCE

**INJURED**

| NAME N/A | AGE | ADDRESS | HOSPITAL |
|---|---|---|---|
| NAME | AGE | ADDRESS | HOSPITAL |

**WITNESS**

| NAME Officer Archer | TELEPHONE (209) 223-4890 | ADDRESS 301 Clinton Road, Jackson, Ca. 95642 |
|---|---|---|
| NAME | TELEPHONE | ADDRESS |

**STATE PASSENGERS**

| NAME | ADDRESS |
|---|---|
| NAME | ADDRESS |

**OTHER VEHICLE PASSENGERS**

| NAME | ADDRESS |
|---|---|
| NAME | ADDRESS |

(CONTINUE ON REVERSE)

STD270_0415.pdf

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**
CHP 000348

STATE OF CALIFORNIA - DGS ORIM

**VEHICLE ACCIDENT REPORT**

STD. 270 (REV. 2/2002s) (REVERSE) (CHP Automated)

**\* CONFIDENTIAL INFORMATION \***

DO NOT RELEASE TO OTHER PARTIES WITHOUT CONSENT OF THE OFFICE OF RISK AND INSURANCE MANAGEMENT

---

**ACCIDENT DETAILS - DESCRIPTION**

FULLY STATE HOW ACCIDENT OCCURRED (Give Details, attach additional sheets if necessary)

State Driver was exiting a state parking lot through a driveway and was approaching an automatic gate that was already cycled in the open position. As the State Vehicle approached the exit, the automatic gate started to cycle to its closed position. State Vehicle then drove into gate as it was closing. Damage was caused to the State Vehicle and the gate.

---

**ACCIDENT DETAILS - DIAGRAM**



Number State vehicle as 1,
other vehicle(s) as 2, 3, etc.

Show pedestrian by O

Show direction of travel as follows:
Before accident
After accident

Give names or numbers of streets or roads

Indicate Points
of Compass
N. S. E. W.

---

**ADDITIONAL VEHICLE/PASSENGER(S) INJURED**

| DRIVER'S NAME | AGE/DOB | VEHICLE LICENSE NUMBER | VEHICLE YEAR, MAKE, MODEL |
|---|---|---|---|
| N/A | | | |

| DRIVER'S LICENSE NO. | HOME TELEPHONE | WORK TELEPHONE | REGISTERED OWNER |
|---|---|---|---|

| ADDRESS (Street, City, State, Zip Code) | ADDRESS (Street, City, State, Zip Code) | HOME TELEPHONE |
|---|---|---|

BRIEFLY DESCRIBE DAMAGES TO OTHER VEHICLE OR PROPERTY | | WORK TELEPHONE

NAME AND ADDRESS OF OTHER PARTY'S INSURANCE CARRIER

---

**ADDITIONAL PASSENGER(S) INJURED**

| NAME | AGE | ADDRESS | HOSPITAL |
|---|---|---|---|
| NAME | AGE | ADDRESS | HOSPITAL |
| NAME | | ADDRESS | |
| NAME | | ADDRESS | |

---

The answers in this report contain a true and full account of the accident, and the vehicle was being operated on official business of the state at the time of the accident. (The assigned officer to explain any exception.) Attach extra pages as necessary.

Employee Signature and Date

Reviewing Officer Signature (Supervisor or Safety Coordinator)

Type Name and Title of Reviewing Officer
T.H. Brown/Lieutenant

Telephone Number of Reviewing Officer
(209) 223-4890

---

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

CHP 000349

CHP 000350

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**COLLISION PREVENTION REPORT**

AREA AND LOCATION CODE: Amador 295

☒ ORIGINAL REPORT   ☐ SUPPLEMENTAL REPORT

*INSTRUCTIONS: Refer to HPM 11.1, Chapter 7. Do not delay submission, if report and review cannot be fully completed, submit supplementary reports.*

| 1. CHP DRIVER'S NAME | | I.D. NUMBER | RANK |
|---|---|---|---|
| Brad Wheat | | 18776 | Officer |

| 2. DATE OF COLLISION | 3. TIME | 4. COLLISION NUMBER OF CHP 555 | 5. EQUIPMENT/LICENSE # |
|---|---|---|---|
| 07-19-2018 | 7:30 | | 1365345 |

6. YEARS OF EXPERIENCE AS CHP DRIVER (to nearest 4 years 11 months, date 4 years)

(auto plus mc time)    11 YEARS    (only mc time if m/c accident)         YEARS

7. WAS DRIVER USING (check all applicable)
☒ SEAT BELT/SHOULDER HARNESS   ☐ NONE
☐ AIR BAGS EQUIPPED   ☐ AIR BAGS DEPLOYED

8. EQUIPMENT USED TO INDICATE EMERGENCY VEHICLE OPERATION
☐ 4-WAY FLASHER   ☐ WIG-WAG   ☐ RED SPOT   8A. EQUIPPED WITH
☐ SIREN   ☐ BLUE/AMBER   ☐ FRONT RED   ☐ DECK LIGHTS
☒ RED   ☐ FRONT RED-BLUE   ☐ DIM LIGHTS
☐ NO EMERGENCY EQUIPMENT IN USE   ☐ BACKUP CAMERA
☐ REVERSE SENSE AUDIBLE TONE
☐ BLIND SPOT WARNING
☐ NO EMERGENCY EQUIPMENT

9. WAS CHP VEHICLE PARKED
☐ YES   ☐ NO
☐ ON SHOULDER   ☐ IN CENTER DIVIDE/MEDIAN   ☐ ON ROADWAY
☒ AT CURB   ☒ IN PARKING LOT   ☐ OTHER (explain)

10. WERE THERE ANY MECHANICAL DEFECTS OR FACTORS WHICH CONTRIBUTED TO THE COLLISION?   ☐ YES   ☒ NO
HOW WAS THIS DETERMINED AND VERIFIED? ☒ PRE-PATROL CHECK   ☐ OTHER (explain)
Driver also stated there were no issues detected.

A. CHP DISTRACTED DRIVER   ☒ NO DISTRACTION
☐ CELL PHONE   ☐ CVP/EMDC
☐ LDAR/RADAR   ☐ VISUAL DISTRACTION
☐ OTHER   (explain)

B. LOCATION OF COLLISION
☐ PARKING LOT   ☐ SHOULDER
☐ INTERSECTION   ☐ ROADWAY
☒ DRIVEWAY   ☐ CENTER DIVIDE/MEDIAN
☐ OTHER   (explain)

CHP EQUIPMENT DAMAGE:
|  | YES | NO |
|---|---|---|
| VEHICLE TO/AID | ☐ | ☒ |
| RADIO(S) | ☐ | ☒ |
| MVARS | ☐ | ☒ |
| CVP/EMDC | ☐ | ☒ |
| LPR | ☐ | ☒ |

|  | YES | NO |
|---|---|---|
| CAMERA | ☐ | ☒ |
| SHOTGUN | ☐ | ☒ |
| LESS-LETHAL SHOTGUN | ☐ | ☒ |
| LIDAR/RADAR | ☐ | ☒ |
| RIFLE | ☐ | ☒ |
| AUTO CITATION DEVICE | ☐ | ☒ |

OTHER ITEMS:
Damage to right front and right front fender. Also damage to the security gate.

|  | YES | NO |
|---|---|---|
| PRISONER BARRIER | ☐ | ☒ |
| BACKUP CAMERA | ☐ | ☒ |
| REAR BARRIER (UTILITY & ALL TERRAIN ONLY) | ☐ | ☒ |

C. DID MVARS CAPTURE COLLISION?   ☒ YES   ☐ NO

D. IS CHP AT FAULT?   ☐ YES   ☒ NO
PCR used/issued

F. CHP VEHICLE MILEAGE   171,990

G. SHOULD CHP COLLECT DAMAGES? (explain)   ☐ YES   ☒ NO

No other parties involved.

11. TRAFFIC COLLISION STATISTICAL CODES (same codes as used for CHP 555)—COMPLETE THIS ITEM IF CHP 555 IS NOT ATTACHED

| ROAD TYPE | TYPE OF MOVEMENT PRECEDING COLLISION | SOBRIETY, DRUGS PHYSICAL | Number of Vehicles Involved |
|---|---|---|---|
| | | | CHP | OTHER |
| WEATHER | A. CHP VEHICLE | A. CHP DRIVER | ☐ NO | |
| LIGHTING | B. VEHICLE 2 | B. DRIVER VEHICLE 2 | | |
| ROAD SURFACE | C. VEHICLE 3 | C. DRIVER VEHICLE 3 | | |
| ROAD CONDITIONS | D. VEHICLE 4 | | | |
| RIGHT-OF-WAY CONTROL | | | | |

**SUPERVISOR'S EVALUATION OF COLLISION SEVERITY**

Number of Persons Involved

| ITEM | CHP | OTHER | ITEM | CHP | OTHER |
|---|---|---|---|---|---|
| WITHOUT INJURY | 0 | | WITHOUT DAMAGE | | |
| PAIN ONLY | | | MINOR | | |
| VISIBLE INJURY | | | MODERATE | 1 | |
| SEVERE WOUNDS | | | MAJOR | | |
| FATAL | | | TOTALED | | |

| NAMES OF INJURED | | SEATBELT USAGE |
|---|---|---|
| | | YES | NO | N/A |
| N/A | | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ |

CHP 208 (Rev. 6-15) OPI 083        Destroy Prior Editions

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
CHP 000351

**12. TO BE COMPLETED BY DRIVER** - *FROM A STUDY OF THE CAUSES OF THIS COLLISION, ARE THESE DRIVING HABITS OR SKILLS THAT YOU MIGHT MODIFY TO STAY OUT OF A SIMILAR OCCURRENCE? (explain)*

On 07-19-18, at approximately 0730 hours, I was just starting my shift and was about to leave the office. I activated the security gate by remote and started to approach the opened gate. The sun was slightly in my eyes and I noted the gate was still open. As I proceeded straight at approximately 5 mph, I felt an impact on the right front of the patrol vehicle. As I felt the impact, I immediately stopped. Upon impact, I also realized the gate had started to close and the patrol vehicle struck the gate.

SIGNATURE OF CHP DRIVER

DATE: 07/20/2018

## SUPERVISOR'S REVIEW

**13. DID SUPERVISOR RESPOND TO THE COLLISION SCENE?**
☐ YES   ☒ NO

Explain:
Sergeant Lopez was at the office when the collision occurred. Sergeant Lopez walked outside took photos, and began the documentation process.

**14. IN SUPERVISOR'S OPINION, DID THE CHP DRIVER PRACTICE DEFENSIVE DRIVING TECHNIQUES AS OUTLINED IN THE DEPARTMENTAL MANUALS, INCLUDING HPG POL/IE ENFORCEMENT DRIVING GUIDE?**
☐ YES   ☒ NO

Explain:
The officer should have anticipated the gate to be cycling to its close position. The officer is familiar with the cycle of the gate but failed to recognize it was closing and drove into the gate.

**15. SUPERVISORS VERSION OF HOW COLLISION OCCURRED**

The officer was driving up to an open gate and as the officer proceeded straight the gate began to close and the officer accelerated into the closing gate.

**16. AS A SUPERVISOR, WHAT ACTION HAVE YOU TAKEN OR INITIATED TO MINIMIZE THE POSSIBILITY OF THIS INDIVIDUAL BEING INVOLVED IN A SIMILAR COLLISION? (list specific)**

The collision was talked about to the employee and appropriate punitive action has been taken.

SIGNATURE OF SUPERVISOR

DATE: 07/20/2018

## COMMANDER'S REVIEW

| | YES | NO | REMARKS (use for supervisors-refer to item no.) |
|---|---|---|---|
| 17. DID YOU DISCUSS THIS COLLISION WITH THE EMPLOYEE INVOLVED? IF "NO" EXPLAIN | X | | |
| 18. DID YOU DISCUSS THE REPORT WITH THE SUPERVISOR? | X | | |
| 19. DO YOU CONCUR WITH THIS REPORT? IF "NO" EXPLAIN | X | | |
| 20. IN YOUR OPINION WAS THE COLLISION REASONABLY PREVENTABLE BY THE CHP DRIVER? | X | | |
| 21. SHOULD THE LESSONS LEARNED FROM THIS COLLISION BE USED TO AUGMENT TRAINING, OR FORM THE BASIS FOR A CHANGE IN POLICY OR PROCEDURE? IF SO, EXPLAIN | | X | |
| 22. IF THE DRIVER REASONABLY COULD HAVE PREVENTED THIS COLLISION, WHAT FURTHER STEPS HAVE BEEN OR WILL BE TAKEN TO MINIMIZE THE POSSIBILITY OF A RECURRENCE? (explain) | | | |

Supervisors have briefed the incident at shift briefings and the collision will also be discussed at training days and at the quarterly occupational safety meeting.

SIGNATURE OF COMMANDER

DATE: 07/20/2018

## DIVISION'S REVIEW

**23. DID YOU CONCUR THIS COLLISION** *(approved 10.6 Chapter 6, Annex A)*
☒ RECORDABLE   ☐ NON-RECORDABLE

Remarks:

☐ CONCUR
☐ REFERRED BACK TO COMMANDER FOR THE FOLLOWING REASONS:

SIGNATURE

DATE:

CHP 268 (Rev. 2—45) CPI 553

PAGE 2 OF 2

State of California                                               Transportation Agency

# M e m o r a n d u m

Date:        June 16, 2018

To:          Amador Area

From:        **DEPARTMENT OF CALIFORNIA HIGHWAY PATROL**
             Amador Area

File No.:    295.13833

Subject:     OFFICER B. WHEAT, ID 18776, INTERIM REPORTING RIDE-ALONG


On June 15, 2018, at approximately 1130 hours, Sergeant D. Lopez, ID 13833, conducted a ride-along with Officer Wheat as part of the Interim Reporting process. Officer Wheat's attitude was positive and he displayed a willingness to perform his duties. During the ride-along, Officer Wheat and Sergeant Lopez discussed the importance of the Interim Reporting training process. While patrolling his assigned beat, Officer Wheat made two traffic enforcement stops, one for a primary collision factor (PCF), and one for failure to obey a regulatory sign. Officer Wheat acted on each of the violations that he observed. Officer Wheat received a call of a cow in the roadway in the Ione area and a 10851 report for a stolen ATV in the Fiddletown area. The calls were handled correctly and professionally.

While driving in his main area of patrol, Officer Wheat used a high visual horizon to address the violations observed and he utilized good officer safety tactics upon contact with the drivers. During each contact with the violator, Officer Wheat was polite, explained the reason for the enforcement stop and was professional throughout the contact. Officer Wheat was receptive to suggestions made, and will take the necessary steps in an effort to achieve his assignment and goals.

D. LOPEZ, ID 13833                            B. WHEAT, ID 18776
Sergeant                                      Officer




*Safety, Service, and Security*                 *An Internationally Accredited Agency*
CHP 51 (Rev. 08/2013) OPI 076

## CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
**CHP 000352**

State of California                                                                    Transportation Agency

# Memorandum

Date:        June 28, 2018

To:          Amador Area

From:        **DEPARTMENT OF CALIFORNIA HIGHWAY PATROL**
             Amador Area

File No.:    295.13833

Subject:     OFFICER B. WHEAT, ID 18776, INTERIM REPORTING RIDE-ALONG (2)


On June 28, 2018, at approximately 0930 hours, Sergeant D. Lopez, ID 13833, conducted a
second ride-along with Officer Wheat as part of the Interim Reporting process. Officer Wheat's
attitude was positive and he displayed a willingness to perform his duties. During the ride-along,
Sergeant Lopez discussed the importance of the Interim Reporting training process. Officer
Wheat was advised that his self-initiated enforcement documents for the month of June,
specifically the CHP 215, were still below average of his peers. Officer Wheat was also advised
to make sure his collision reports were to be in prior/within eight days. Sergeant Lopez
reiterated the importance of succeeding through the Interim Reporting process. Officer Wheat
made two traffic enforcement stops, one for a mechanical violation and the other a primary
collision factor (PCF) violation for excessive speed. Officer Wheat acted on each of the
violations that he observed.

While driving in his main area of patrol, Officer Wheat used a high visual horizon to address the
violations observed and he utilized good officer safety tactics upon contact with the drivers.
During each contact with the violator, Officer Wheat was polite, explained the reason for the
enforcement stop and was professional throughout the contact. Officer Wheat was receptive to
suggestions made, and will take the necessary steps in an effort to achieve his assignment and
goals.


D. LOPEZ, ID 13833                                          B. WHEAT, ID 18776
Sergeant                                                    Officer




*Safety, Service, and Security*                             *An Internationally Accredited Agency*
CHP 51 (Rev. 06/2013) OP1 076

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**
CHP 000353

State of California                                    Transportation Agency

# M e m o r a n d u m

Date:       July 14, 2018

To:         Amador Area

From:       **DEPARTMENT OF CALIFORNIA HIGHWAY PATROL**
            Amador Area

File No.:   295.13833

Subject:    OFFICER B. WHEAT, ID 18776, INTERIM REPORTING RIDE-ALONG (3)


On July 14, 2018, at approximately 0940 hours, Sergeant D. Lopez, ID 13833, conducted a third
ride-along with Officer Wheat as part of the Interim Reporting process. Officer Wheat received
a call of an 11-82 with a vehicle down an embankment on Blue Sky and S.R. 88 and we
responded from the office. We arrived on scene, and Officer Wheat conducted a possible
collision with a vehicle down an embankment. It was determined that no report was needed and
a tow was called for the involved party. Officer Wheat conducted himself in a professional
manner and obtained all the proper information. During the ride-along, Sergeant Lopez
discussed the importance of the Interim Reporting training process. Officer Wheat was advised
that his 100 form for the month of June needed to finalize. The June 100 form needs to be
signed off in order for me to see his end results for June. Officer Wheat was also advised that his
report writing for collisions were still excessive and taking too long to complete even if they are
completed prior to the eight days. Officer Wheat made one traffic enforcement stop for a
mechanical violation and the appropriate action was taken. Officer Wheat's attitude was positive
and he displayed a willingness to perform his duties.

While driving in his main area of patrol, Officer Wheat used a high visual horizon to address the
violations observed and he utilized good officer safety tactics upon contact with the drivers.
During the contact with the violator, Officer Wheat was polite, explained the reason for the
enforcement stop and was professional throughout the contact. Officer Wheat was receptive to
suggestions made, and will take the necessary steps in an effort to achieve his assignment and
goals.


D. LOPEZ, ID 13833                          B. WHEAT, ID 18776
Sergeant                                    Officer


*Safety, Service, and Security*                    *An Internationally Accredited Agency*
CHP 51 (Rev. 08/2013) CPI 076

## CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
CHP 000354

State of California                                                 Transportation Agency

# Memorandum

Date:        July 15, 2018

To:          Amador Area

From:        **DEPARTMENT OF CALIFORNIA HIGHWAY PATROL**
             Amador Area

File No.:    295.15628

Subject:     OFFICER BRAD WHEAT, ID 18776, INTERIM REPORTING RIDE-ALONG

On July 15, 2018, at approximately 0700 hours, Sergeant J. Dobler, ID 15628, conducted a ride-along with Officer B. Wheat, ID 18776, as part of the Interim Reporting process. Officer Wheat checked his beat at the beginning of shift, checking on all vehicles on the shoulder and assisting Jackson Police Department. Officer Wheat did not have any calls during the ride-along, but made multiple stops and issues three citations for moving violations. He provided excellent service and conducted himself very professionally during all of his contacts. He was aware of violations occurring around him and took appropriate enforcement action on the violations. He showed good judgement throughout the ride-along while conducting all of his duties. He took the time to appropriately document his activity on his 415 and to take notes on his 215's. Officer Wheat showed good judgement and tactics during his observed shift. During each contact with violator, Officer Wheat was polite, explained the reason for the enforcement stop and was professional. He was also very professional and polite in providing service to everyone he contacted.

Officer Wheat appears to have a clear idea of the departmental mission and goals. He conducted himself appropriately and professional, and had a positive attitude throughout the ride-along.


J. DOBLER, ID 15628                    B. Wheat, ID 18776
Sergeant                               Officer




*Safety, Service, and Security*                *An Internationally Accredited Agency*
CHP 51 (Rev. 08/2013) OPI 076

DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
## DAILY FIELD RECORD

☒ 1. ORIGINAL  ☐ 2. SUPPLEMENTAL  ☐ 3. DELETION

| I.D. NUMBER | AREA | LAST NAME, FIRST, INITIAL |
|---|---|---|
| 018776 | 295 | Wheat, Brad |

| MO DAY YEAR | SHIFT | START TIME | ELAPSED TIME | END TIME |
|---|---|---|---|---|
| 06/19/2018 | 0600 | | | 08/02/2018 0800 |

START TIME | ELAPSED TIME | BEAT | ACTIVITY/COMMENTS

1. ACTIVITY TIME SUMMARY

A. ADMIN
B. MISC TRAINING
C. COURT
D. ENFORCE DOC.
E. ACCIDENT (INVEST., CONF.)
F. ACCIDENT REPORT COMP.
G. DUI ARRESTS
H. FELONY ARR (NON DUI)

2. ENFORCEMENT SERVICE COUNT

A. CHP 216
B. CHP 215 ENFORCEMENT
C. CHP 215 COMBO
D. CHP 281
E. ACCIDENT INVEST. CONF.
F. ASSIGNMENT REPORT COMP.
G. DUI ARRESTS
H. FELONY ARR (NON DUI)
I. OTHER (IN CUSTODY)
J. CHP 422 WARNINGS
K. VERBAL WARNING
L. PARTNER ASSIST
M. P.D. ASSIST
N. M.O. ASSIST
O. OTHER ARRESTS
P. MOTORIST SERVICE
Q. AID DISABLED MOTORIST
R. VEHICLE STORAGE
S. IMPOUND VEH. RECV.
T. ROLL STEALTH VEH. RECOV.
U. MOTORIST AID
V. VIOL. RPT. INCIDENTS
W. MISC.
X. DIV. CODE
Y. AREA CODE
Z. COUNT CANCEL

3. DETENTION

A. REGULAR WORK SHIFT / REGULAR TIME ON
B. SPECIAL TIME ON
C. DISTINCTION
D. BUSINESS
E. VACATION
F. SICK (SELF)
G. SICK (FAMILY)
H. BEREAVEMENT
I. INJURY (IN CUSTODY)
J. INJURY (ADMIT/DL.)
K. TIME OFF
L. PERSONAL LEAVE
M. DOCK
N. AWOL
O. JURY DUTY
P. MILITARY LEAVE
Q. SUBPOENAED WITNESS
R. OTHER
S. CODE

4. OVERTIME

TOTAL WORK/SHIFT
DUTY CODE | PAY CODE | HOLIDAY

5. PROJECTED ABSENCES

ABS. CODE
R ___ 19

BEAT HOURS SUMMARY
REGULAR HRS MIN | OVERTIME HRS MIN

BEAT CODE

SUPERVISOR'S APPROVAL  [REQUIRED FOR O.T.]
SUPERVISOR'S APPROVAL  [BARGAINING UNIT ITEMS]

TOTAL ACTIVITY

SIGNATURE: Wheat

CHECKED BY: DL

NOTES

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

CHP 000356

DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

**DAILY FIELD RECORD**   08/02/2018 0801

| START TIME | ELAPSED TIME | BEAT | ACTIVITY/COMMENTS |
|---|---|---|---|
| 1800 | 01:00 | 904 | RT--TO STOCKTON AREA FOR COZEEP OVERTIME |
| 1900 | 09:00 | 904 | 1184 --TRAFFIC CONTROL - IS AT MONTE DIABLO |
| 0400 | 01:00 | 900 | RT--TO AMADOR OFFICE |

NOTES:
COZEEP OVERTIME IN STOCKTON
VEHICLE NUMBER: 1365351
START: 1800 HOURS
END: 0500 HOURS
TOTAL WORKED: 11 HOURS
PROJECT REPORT NUMBER: 10129504

CHP 000357

## CHP FORM (Rotated left column)

☐ 1. ORIGINAL   ☒ 2. SUPPLEMENTAL   ☐ 3. DELETION

| I.D. NUMBER | AREA | TIME |
|---|---|---|
| 018776 | 295 | |

DAY / DAY / YEAR: 06/19/2018

LAST NAME, FIRST, INITIAL: Wheat, Brad

SHIFT: 1800

| | ENFORCEMENT SERVICES COUNT | REGULAR | SPECIAL 132 | SKILL 00 | SPECIAL 810 |
|---|---|---|---|---|---|
| A. RADAR | A. CHP 215 REGULAR | | | A. REGULAR WORK SHIFT | |
| B. TRAFFIC TRAINING | B. CHP 215 MONTHLY | | | B. SPECIAL TIME ON | |
| C. COURT | C. CHP 281 COMBO | | | C. OIC TIME ON | |
| D. DRINKING DOG. | D. CHP 281 | | | D. BUSINESS CALL | |
| E. ACCIDENT INVEST. COMP. | E. ACCIDENT INVEST. COMP. | | | E. VACATION | |
| F. ACCIDENT REPORT COMP. | F. ACCIDENT REPORT COMP. | | | F. SICK (SELF) | |
| G. DUI ARRESTS | G. DUI ARRESTS | | | G. SICK (FAMILY) | |
| H. FELONY ARR. (NON DUI) | H. FELONY ARR. (NON DUI) | | | H. BEREAVEMENT | |
| I. OTHER DUI CUSTODY | I. OTHER DUI CUSTODY | | | I. INJURY LEAVE, CRED. | |
| J. CHP 422 WARNINGS | J. CHP 422 WARNINGS | | | J. INJURY LEAVE OFF. | |
| K. VERBAL WARNING | K. VERBAL WARNING | | | K. COMP. TIME OFF | |
| L. FAHRDIUM ASSIST | L. FAHRDIUM ASSIST | | | L. PERSONAL LEAVE | |
| M. P.D. ASSIST | M. P.D. ASSIST | | | M. DOCK | |
| N. S.O. ASSIST | N. S.O. ASSIST | | | N. AWOL | |
| O. OTHER ARRESTS | O. OTHER ARRESTS | | | O. JURY DUTY | |
| P. RESPONSE TIME | P. RESTRICT DUTY | 2 | 00 | P. MILITARY LEAVE | |
| Q. AID DISABLED MOTORIST | Q. AID DISABLED MOTORIST | | | Q. SUSPENDED W/OUT | |
| R. VEHICLE STORAGE | R. VEHICLE STORAGE | | | R. OTHER | |
| S. THEFT | S. STANDING VEH. RECOV. | | | S. CODE | |
| T. TRAFFIC CONTROL | T. SOLO/STOLEN VEH. RECOV. | 9 | 00 | | TOTAL WORK SHIFT |
| U. EMERGENCY SERVICES | U. ENTERPRISE AID | | | | |
| V. HAZ. MAT. INCIDENTS | V. HAZ. MAT. INCIDENTS | | | | |
| W. VID. CODE | W. VID. CODE | | | | |
| X. DIV. CODE | X. DIV. CODE | | | | |
| Y. AREA CODE | Y. AREA CODE | | | | |
| Z. MISC | Z. COUNT CANCEL | | | | |

**4. OVERTIME**

| DUTY CODE | PAY HRS MIN | MON-PAY HRS MIN |
|---|---|---|
| 10 | | 11 00 |

FROM Q.T. WORKED TO: 1800 — 0500

FROM LUNCH PERIOD TO: NONE

DAY OF / PRIOR

SUPERVISOR'S APPROVAL (REQUIRED FOR O.T.): Dan Lopez

SUPERVISOR'S APPROVAL (BARGAINING UNIT ITEMS)

ABS. CODE:

**5. PROJECTED ABSENCES**

| | HRS | MIN |
|---|---|---|
| TOTAL ACTIVITY | 11 | 00 |

**BEAT HOURS SUMMARY**

| | REGULAR HRS MIN | OVERTIME HRS MIN |
|---|---|---|
| BEAT CODE | | 11 00 |

I CERTIFY THIS INFORMATION IS CORRECT — SIGNATURE: Wheat

CHECKED BY: DL

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

## Activity For 018776 on 07/19/2018 Regular @ 06:00 Hours

| Start | Elapsed | Beat | Primary Activity | Additional Activity | Special Project | Activity Comment |
|-------|---------|------|------------------|---------------------|-----------------|------------------|
| 1000 | 0600 | 907 | Admin Administration | n/a | n/a | IN OFFICE TO ASST. |
| 6300 | 0100 | 908 | Misc. Miscellaneous | n/a | n/a | EMAIL / 415 / MEETING WITH LT. |
| 0730 | 0120 | 900 | 5551 T Accident Investigation Time Only No Count | n/a | n/a | PATROL VEHICLE T/C - 6148 - VEH. INTO EAST GATE OF AMADOR OFC. |
| 0040 | 0040 | 905 | PV Svcs. Servicing Patrol Vehicle | n/a | n/a | PRE PAT CHK / NPA / RADAR / NVARS |
| 0600 | 0100 | 909 | Admin Administration | n/a | n/a | n/a |

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

CHP 000358

DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
# TRAFFIC COLLISION REPORT
CHP 555 PAGE 1 (REV. 04-11) OPI 060

PAGE 1 OF 7

| SPECIAL CONDITIONS | NUMBER INJURED | HIT & RUN FELONY | CITY | JUDICIAL DISTRICT | LOCAL REPORT NUMBER |
|---|---|---|---|---|---|
| ON-DUTY EMERGENCY VEHICLE | 0 | | STOCKTON | STOCKTON SUPERIOR | 9295-2018-00211 |
| | NUMBER KILLED | HIT & RUN MISDEMEANOR | COUNTY | REPORTING DISTRICT | BEAT | DAY OF WEEK | TOW AWAY |
| | 0 | | SAN JOAQUIN | | 504 | WEDNESDAY | ☐ YES ☒ NO |

**LOCATION**

| COLLISION OCCURRED ON: | | | MO | DAY | YEAR | TIME (2400) | NCIC # | OFFICER I.D. |
|---|---|---|---|---|---|---|---|---|
| I-5 N/B | | | 06/20/2018 | | | 0330 | 9295 | 017198 |
| MILEPOST INFORMATION: | | GPS COORDINATES | | | | | PHOTOGRAPHS BY: | ☒ NONE |
| | | LATITUDE 37.956378° | LONGITUDE - 120.325019° | | | | | |
| ☐ AT INTERSECTION WITH: | | | | STATE HWY REL. | | | | |
| ☒ OR: .1 MILE(S) NORTH OF MT DIABLO OFF RAMP | | | | ☒ YES ☐ NO | | | | |

| PARTY 1 | DRIVER'S LICENSE NUMBER | STATE | CLASS | AIR BAG | SAFETY EQUIP. | VEH YEAR | MAKE / MODEL / COLOR | LICENSE NUMBER | STATE |
|---|---|---|---|---|---|---|---|---|---|
| ☒ DRIVER | ▓▓▓▓ | CA | C | M | G | 2013 | FORD PIU BLK/WHI | 1365351 | CA |
| ☐ PEDES- TRIAN | NAME (FIRST, MIDDLE, LAST) ON DUTY EMERGENCY VEHICLE | | | | | OWNER'S NAME ☐ SAME AS DRIVER | | | |
| | BRAD WHEAT | | | | | CALIFORNIA HIGHWAY PATROL | | | |
| ☐ PARKED VEHICLE | STREET ADDRESS 301 CLINTON RD | | | | | OWNER'S ADDRESS ☐ SAME AS DRIVER | | | |
| | CITY / STATE / ZIP | | | | | 3300 REED AVE WEST SACRAMENTO CA 95605 | | | |
| ☐ BICY- CLIST | JACKSON | CA | 95642 | | | DISPOSITION OF VEHICLE ON ORDERS OF: ☒ OFFICER ☐ DRIVER ☐ OTHER | | | |
| | SEX | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE MO DAY YEAR | RACE | DRIVEN AWAY | |
| | M | BRN | BLU | 5-10 | 175 | 05/01/1973 | W | PRIOR MECH. DEFECTS ☒ NONE APP. ☐ REFER TO NARRATIVE | |
| ☐ OTHER | HOME PHONE NONE | | | BUSINESS PHONE (209)223-4890 | | VEHICLE IDENTIFICATION NUMBER: 1FM5K8AR8DGC72882 | | | |
| | INSURANCE CARRIER SELF-INSURED | | | POLICY NUMBER | | VEHICLE TYPE 48 | DESCRIBE VEHICLE DAMAGE ☐ UNK ☐ NONE ☒ MINOR ☐ MOD ☐ MAJOR ☐ ROLL-OVER | SHADE IN DAMAGED AREA CONTACT 119 | |
| | DIR OF TRAVEL ON STREET OR HIGHWAY S I-5 N/B | | | SPEED LIMIT 65 | | CA DOT CAL-T TCP/PSC MC/MX | | | |

| PARTY 2 | DRIVER'S LICENSE NUMBER | STATE | CLASS | AIR BAG | SAFETY EQUIP. | VEH. YEAR | MAKE / MODEL / COLOR | LICENSE NUMBER | STATE |
|---|---|---|---|---|---|---|---|---|---|
| ☐ DRIVER | NAME (FIRST, MIDDLE, LAST) | | | | | OWNER'S NAME ☐ SAME AS DRIVER | | | |
| ☐ PEDES- TRIAN | STREET ADDRESS | | | | | OWNER'S ADDRESS ☐ SAME AS DRIVER | | | |
| ☐ PARKED VEHICLE | CITY / STATE / ZIP | | | | | DISPOSITION OF VEHICLE ON ORDERS OF: ☐ OFFICER ☐ DRIVER ☐ OTHER | | | |
| ☐ BICY- CLIST | SEX | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE MO DAY YEAR | RACE | PRIOR MECHANICAL DEFECTS ☐ NONE APP. ☐ REFER TO NARRATIVE | |
| ☐ OTHER | HOME PHONE | | | BUSINESS PHONE | | VEHICLE IDENTIFICATION NUMBER: | | | |
| | INSURANCE CARRIER | | | POLICY NUMBER | | VEHICLE TYPE | DESCRIBE VEHICLE DAMAGE ☐ UNK ☐ NONE ☐ MINOR ☐ MOD ☐ MAJOR ☐ ROLL-OVER | SHADE IN DAMAGED AREA | |
| | DIR OF TRAVEL ON STREET OR HIGHWAY | | | SPEED LIMIT | | CA DOT CAL-T TCP/PSC MC/MX | | | |

| PARTY 3 | DRIVER'S LICENSE NUMBER | STATE | CLASS | AIR BAG | SAFETY EQUIP. | VEH. YEAR | MAKE / MODEL / COLOR | LICENSE NUMBER | STATE |
|---|---|---|---|---|---|---|---|---|---|
| ☐ DRIVER | NAME (FIRST, MIDDLE, LAST) | | | | | OWNER'S NAME ☐ SAME AS DRIVER | | | |
| ☐ PEDES- TRIAN | STREET ADDRESS | | | | | OWNER'S ADDRESS ☐ SAME AS DRIVER | | | |
| ☐ PARKED VEHICLE | CITY / STATE / ZIP | | | | | DISPOSITION OF VEHICLE ON ORDERS OF: ☐ OFFICER ☐ DRIVER ☐ OTHER | | | |
| ☐ BICY- CLIST | SEX | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE MO DAY YEAR | RACE | PRIOR MECHANICAL DEFECTS ☐ NONE APP. ☐ REFER TO NARRATIVE | |
| ☐ OTHER | HOME PHONE | | | BUSINESS PHONE | | VEHICLE IDENTIFICATION NUMBER: | | | |
| | INSURANCE CARRIER | | | POLICY NUMBER | | VEHICLE TYPE | DESCRIBE VEHICLE DAMAGE ☐ UNK ☐ NONE ☐ MINOR ☐ MOD ☐ MAJOR ☐ ROLL-OVER | SHADE IN DAMAGED AREA | |
| | DIR OF TRAVEL ON STREET OR HIGHWAY | | | SPEED LIMIT | | CA DOT CAL-T TCP/PSC MC/MX | | | |

| PREPARER'S NAME | DISPATCH NOTIFIED | REVIEWER'S NAME | DATE REVIEWED |
|---|---|---|---|
| DRAKE E. WILBURN JR 014943 | ☐ YES ☐ NO ☒ N/A | A G SMITH 017198 | 06/29/2018 |

AN INTERNATIONALLY ACCREDITED AGENCY

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

CHP 000359

**TRAFFIC COLLISION CODING**

HP.555 CARS PAGE2 (REV. 04-11) OPI 060

PAGE 2   OF 7

| TE OF COLLISION (MO. DAY YEAR) | TIME(2400) | NCC # | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 6/20/2018 | 0338 | 9265 | 017198 | 9295-2018-00211 |

| | OWNER'S NAME | OWNER ADDRESS | | NOTIFIED |
|---|---|---|---|---|
| **PROPERTY DAMAGE** | | | | ☐YES ☐NO |
| | DESCRIPTION OF DAMAGE | | | |

## SEATING POSITION

1 - DRIVER
2 TO 6 - PASSENGERS
7 - STATION WAGON REAR
8 - REAR OCC TRK, OR VAN
9 - POSITION UNKNOWN
0 - OTHER

1 2 3
4 5 6
7

## SAFETY EQUIPMENT

**OCCUPANTS**
A - NONE IN VEHICLE
B - UNKNOWN
C - LAP BELT USED
D - LAP BELT NOT USED
E - SHOULDER HARNESS USED
F - SHOULDER HARNESS NOT USED
G - LAP/SHOULDER HARNESS USED
H - LAP/SHOULDER HARNESS NOT USED
J - PASSIVE RESTRAINT USED
K - PASSIVE RESTRAINT NOT USED
P - NOT REQUIRED

**CHILD RESTRAINT**
Q - IN VEHICLE USED
R - IN VEHICLE NOT USED
S - IN VEHICLE USE UNKNOWN
T - IN VEHICLE IMPROPER USE
U - NONE IN VEHICLE

**M / C BICYCLE HELMET**
DRIVER      PASSENGER
V - NO      X - NO
W - YES     Y - YES

## AIR BAG
B - UNKNOWN
L - AIR BAG DEPLOYED
M - AIR BAG NOT DEPLOYED
N - OTHER
P - NOT REQUIRED

**EJECTED FROM VEHICLE**
0 - NOT EJECTED
1 - FULLY EJECTED
2 - PARTIALLY EJECTED
3 - UNKNOWN

## INATTENTION CODES
A - CELL PHONE HANDHELD
B - CELL PHONE HANDSFREE
C - ELECTRONIC EQUIPMENT
D - RADIO / CD
E - SMOKING
F - EATING
G - CHILDREN
H - ANIMALS
I - PERSONAL HYGIENE
J - READING
K - OTHER

ITEMS MARKED BELOW FOLLOWED BY AN ASTERISK (*) SHOULD BE EXPLAINED IN THE NARRATIVE.

| PRIMARY COLLISION FACTOR<br>LIST NUMBER (#) OF PARTY AT FAULT | TRAFFIC CONTROL DEVICES | 1 | 2 | 3 | SPECIAL INFORMATION | 1 | 2 | 3 | MOVEMENT PRECEDING COLLISION |
|---|---|---|---|---|---|---|---|---|---|
| A  VC SECTION VIOLATED  CITED ☐YES ☐NO | A  CONTROLS FUNCTIONING | | | | A  HAZARDOUS MATERIAL | | | | A  STOPPED |
| B  OTHER IMPROPER DRIVING*<br>UNSAFE BACKING | B  CONTROLS NOT FUNCTIONING* | | | | B  CELL PHONE HANDHELD IN USE | | | | B  PROCEEDING STRAIGHT |
| | C  CONTROLS OBSCURED | | | | C  CELL PHONE HANDSFREE IN USE | | | | C  RAN OFF ROAD |
| | D  NO CONTROLS PRESENT / FACTOR* | X | | | D  CELL PHONE NOT IN USE | X | | | D  MAKING RIGHT TURN |
| C  OTHER THAN DRIVER* | TYPE OF COLLISION | | | | E  SCHOOL BUS RELATED | | | | E  MAKING LEFT TURN |
| D  UNKNOWN* | A  HEAD - ON | | | | F  75 FT MOTORTRUCK COMBO | | | | F  MAKING U TURN |
| | B  SIDE SWIPE | | | | G  32 FT TRAILER COMBO | | X | | G  BACKING |
| | C  REAR END | | | | H | | | | H  SLOWING / STOPPING |
| | D  BROADSIDE | | | | I | | | | I  PASSING OTHER VEHICLE |
| WEATHER   (MARK 1 TO 2 ITEMS) | E  HIT OBJECT | X | | | J | | | | J  CHANGING LANES |
| A  CLEAR | F  OVERTURNED | | | | K | | | | K  PARKING MANEUVER |
| B  CLOUDY | G  VEHICLE / PEDESTRIAN | | | | L | | | | L  ENTERING TRAFFIC |
| C  RAINING | H  OTHER* | | | | M | | | | M  OTHER UNSAFE TURNING |
| D  SNOWING | | | | | N | | | | N  XING INTO OPPOSING LANE |
| E  FOG    VISIBILITY         FT. | MOTOR VEHICLE INVOLVED WITH | | | | O | | | | O  PARKED |
| F  OTHER* | A  NON - COLLISION | | | | | | | | P  MERGING |
| G  WIND | B  PEDESTRIAN | | | | | | | | Q  TRAVELING WRONG WAY |
| LIGHTING | C  OTHER MOTOR VEHICLE | | | | OTHER ASSOCIATED FACTORS | | | | R  OTHER* |
| A  DAYLIGHT | D  MOTOR VEHICLE ON OTHER ROADWAY | | | | (MARK 1 TO 2 ITEMS) | 1 | 2 | 3 | |
| B  DUSK - DAWN | E  PARKED MOTOR VEHICLE | | | | A  VC SECTION VIOLATED  CITED ☐YES ☐NO | | | | |
| C  DARK - STREET LIGHTS | F  TRAIN | | | | B  VC SECTION VIOLATED  CITED ☐YES ☐NO | | | | |
| D  DARK - NO STREET LIGHTS | G  BICYCLE | | | | | | | | SOBRIETY - DRUG<br>PHYSICAL |
| E  DARK - STREET LIGHTS NOT FUNCTIONING* | H  ANIMAL | | | | C  VC SECTION VIOLATED  CITED ☐YES ☐NO | | | | (MARK 1 TO 2 ITEMS) |
| ROADWAY SURFACE | I  FIXED OBJECT:<br>METAL GUARDRAIL | X | | | D | X | | | A  HAD NOT BEEN DRINKING |
| A  DRY | | | | | E  VISION OBSCUREMENT* | | | | B  HBD - UNDER INFLUENCE* |
| B  WET | J  OTHER OBJECT | | | | F  INATTENTION* | | | | C  HBD - NOT UNDER INFLUENCE* |
| C  SNOWY - ICY | | | | | G  STOP & GO TRAFFIC | | | | D  HBD - IMPAIRMENT UNKNOWN* |
| D  SLIPPERY (MUDDY, OILY, ETC.) | | | | | H  ENTERING / LEAVING RAMP* | | | | E  UNDER DRUG INFLUENCE* |
| ROADWAY CONDITION(S)<br>(MARK 1 TO 2 ITEMS) | PEDESTRIAN'S ACTIONS | | | | I  PREVIOUS COLLISION | | | | F  IMPAIRMENT - PHYSICAL* |
| A  HOLES, DEEP RUT* | A  NO PEDESTRIANS INVOLVED | X | | | J  UNFAMILIAR WITH ROAD | | | | G  IMPAIRMENT NOT KNOWN* |
| B  LOOSE MATERIAL ON ROADWAY* | B  CROSSING IN CROSSWALK -<br>AT INTERSECTION | | | | K  DEFECTIVE VEH. EQUIP.:  ☐CITED ☐YES ☐NO | | | | H  NOT APPLICABLE |
| C  OBSTRUCTION ON ROADWAY* | | | | | | | | | I  SLEEPY / FATIGUED* |
| D  CONSTRUCTION - REPAIR ZONE | C  CROSSING IN CROSSWALK - NOT<br>AT INTERSECTION | | | | | | | | |
| E  REDUCED ROADWAY WIDTH | | | | | L  UNINVOLVED VEHICLE | | | | |
| F  FLOODED* | D  CROSSING - NOT IN CROSSWALK | | | | M  OTHER* | | | | |
| G  OTHER* | E  IN ROAD - INCLUDES SHOULDER | | | | N  NONE APPARENT | | | | |
| H  NO UNUSUAL CONDITIONS | F  NOT IN ROAD | X | | | O  RUNAWAY VEHICLE | | | | |
| | G  APPROACHING / LEAVING SCHOOL BUS | | | | | | | | |

| SKETCH | **FOR SKETCH DIAGRAM, SEE PAGE 3** | MISCELLANEOUS |
|---|---|---|
| | INDICATE NORTH | |

AN INTERNATIONALLY ACCREDITED AGENCY

## CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

CHP 000360

STATE OF CALIFORNIA
## SKETCH DIAGRAM
CHP 555 Page 4(Rev. 04-11) OPI 060                                   PAGE 3 OF 7

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 06/20/2018 | 0330 | 9265 | 017198 | 9295-2018-00211 |

ALL MEASUREMENTS ARE APPROXIMATE AND NOT TO SCALE UNLESS STATED (SCALE=        )



| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| DRAKE E. WILBURN JR | 014943 | 06/20/2018 | A G SMITH 017198 | 06/29/2018 |

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**
CHP 000361

STATE OF CALIFORNIA
**FACTUAL DIAGRAM**
CHP 555 Page 4(Rev. 04-11) OPI 060                                    PAGE 4 OF 7

| DATE OF INCIDENT 06/20/2018 | TIME 0330 | NCIC NUMBER 9265 | OFFICER I.D. 017198 | NUMBER 9295-2018-00211 |
|---|---|---|---|---|

ALL MEASUREMENTS ARE APPROXIMATE AND NOT TO SCALE UNLESS STATED (SCALE=        )



| PREPARED BY DRAKE E. WILBURN JR | I.D. NUMBER 014943 | DATE 06/20/2018 | REVIEWER'S NAME A G SMITH 017198 | DATE 06/29/2018 |
|---|---|---|---|---|

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                    PAGE 5 OF 7

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 06/20/2018 | 0330 | 9265 | 017198 | 9295-2018-00211 |

1   **FACTS:**

2

3   **NOTIFICATION:**

4

5   I was working a COZEEP detail on I-5 S/B at March Ln in Stockton, CA on 6-20-18. I was

6   working with CHP Officer Wheat #18776 who was in a separate patrol vehicle on the

7   opposite (N/B) side of the freeway. At approx. 0333 hours, Officer Wheat notified me that

8   he had backed into a guardrail and his patrol vehicle was damaged as a result. I

9   responded to the scene and the On Call Sgt. (CHP Sgt. Whitehead, ID 15885) was notified.

10  All times, speeds and measurements are approximate. Measurements were obtained by

11  estimation.

12

13  **SCENE:**

14

15  At the scene of this collision, N/b I-5 has four paved concrete lanes. The #1 lane was open

16  for n/b traffic and the #2, 3 and 4 lanes were coned-off by Caltrans and closed to vehicular

17  traffic. There was a concrete jersey wall separating the n/b and s/b lanes and a metal

18  guardrail e/of I-5. The posted speed limit was 65 mph in this area with temporary

19  cautionary signs erected warning n/b traffic of the lane closures and construction ahead.

20  Refer to factual diagram.

21

22  **PARTIES:**

23

24  **PARTY # 1 (Wheat)(P-1)** was contacted at the scene sitting in the driver's seat of V-1

25  (Ford). P-1 was identified by a California Driver License. P-1 was determined to be the

26  driver of V-1 by his own statements, and he uses V-1 in the course of his employment.

27

28

29

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| DRAKE E. WILBURN JR | 014943 | 06/20/2018 | A G SMITH 017198 | 06/29/2018 |

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**
CHP 000363

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                              PAGE 6 OF 7

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 06/20/2018 | 0330 | 9265 | 017198 | 9295-2018-00211 |

1    **PARTIES (continued):**

2

3    **Vehicle #1 (Ford)** was moved after the collision, prior to my arrival by P-1.  V-1 was on its

4    wheels facing north, on the n/b shoulder of I-5 n/of the Mt. Diablo off ramp.  V-1 had minor

5    bumper cover damage to the r/rear corner.  No other damage was noted or claimed.

6

7    **PHYSICAL EVIDENCE:**

8

9    V-1 had minor damage to the r/rear bumper cover.

10

11   **STATEMENTS:**

12

13   Party # 1 (P-1 ) (Wheat) was contacted at the scene and related in essence that he was

14   stopped on the n/b shoulder of I-5, working the COZEEP detail within the closure area.  V-1

15   had the rear amber and directional arrow lights activated.  P-1 began to back V-1 up slowly

16   to reposition his vehicle.  V-1 was traveling at approx. 1-2 mph when P-1 felt the rear of V-1

17   impact something.  P-1 exited his patrol vehicle and observed that the r/rear portion of

18   V-1's bumper cover struck the end of a metal guardrail.  P-1 then contacted me and

19   informed me what had occurred.

20

21   **OPINIONS AND CONCLUSIONS:**

22

23   **SUMMARY:**

24

25   P-1 was working a COZEEP detail within the lane closure of n/b I-5 n/of the Mt. Diablo Ln

26   off ramp in V-1.  V-1 was on the n/b shoulder with its rear amber and directional arrow

27   lights activated.  P-1 began to back V-1 on the shoulder at approx. 1-2 mph.  The r/rear

28   corner of V-1's bumper cover stuck a metal guardrail.

29

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| DRAKE E. WILBURN JR | 014943 | 06/20/2018 | A G SMITH 017198 | 06/29/2018 |

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

CHP 000364

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                               PAGE  7  OF  7

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 06/20/2018 | 0330 | 9265 | 017198 | 9295-2018-00211 |

1    **AREA OF IMPACT:**

2

3    The area where the r/rear corner of V-1 struck the metal guardrail was located approx. .1

4    mile n/of the n/rdwy edge of I-5 Mt. Diablo off ramp and approx. 12 ft. e/of the e/rdwy edge

5    of n/b I-5.  The AOI was established by P-1's statement and physical evidence.

6

7    **CAUSE:**

8

9    Party #1 (Wheat) caused this collision by backing unsafely.  The cause is based on

10   statements, vehicle damage and physical evidence.

11

12   **RECOMMENDATIONS:**

13

14   None.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| DRAKE E. WILBURN JR | 014943 | 06/20/2018 | A G SMITH 017198 | 06/29/2018 |

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

CHP 000365

CHP 555 PAGE 1 (REV. 04-11) OPI 060

| SPECIAL CONDITIONS ON-DUTY EMERGENCY VEHICLE | NUMBER INJURED 0 | HIT & RUN FELONY ☐ | CITY JACKSON | JUDICIAL DISTRICT AMADOR SUPERIOR | LOCAL REPORT NUMBER 9295-2018-00258 |
|---|---|---|---|---|---|
| | NUMBER KILLED 0 | HIT & RUN MISDEMEANOR ☐ | COUNTY AMADOR | REPORTING DISTRICT | BEAT 740 | DAY OF WEEK THURSDAY | TOW AWAY YES ☐ NO ☒ |

**LOCATION**

| COLLISION OCCURRED ON: 301 CLINTON ROAD (AMADOR CHP) | | MO 07 | DAY 19 | YEAR 2018 | TIME (2400) 0730 | NCIC # 9295 | OFFICER I.D. 015164 |
|---|---|---|---|---|---|---|---|
| MILEPOST INFORMATION: | GPS COORDINATES LATITUDE 38.343211° | LONGITUDE -120.763379° | | PHOTOGRAPHS BY: NONE ☐ SGT. LOPEZ / 13833 |

AT INTERSECTION WITH: ☐ OR: ☒ 120 FEET WEST OF BROADWAY     STATE HWY REL. YES ☐ NO ☒

| PARTY 1 | DRIVER'S LICENSE NUMBER A4081980 | STATE CA | CLASS C | AIR BAG M | SAFETY EQUIP. G | VEH. YEAR 2013 | MAKE / MODEL / COLOR FORD EXPLORER BLK/WHT | LICENSE NUMBER 1365345 | STATE CA |

**DRIVER** NAME (FIRST, MIDDLE, LAST)
BRAD WARREN WHEAT     ON DUTY EMERGENCY VEHICLE

OWNER'S NAME  SAME AS DRIVER ☐
CALIFORNIA HIGHWAY PATROL

**PEDES-TRIAN** ☐

STREET ADDRESS ▮▮▮▮▮

OWNER'S ADDRESS  SAME AS DRIVEN ☐
3300 REED AVE WEST SACRAMENTO CA 95605

**PARKED VEHICLE** ☐

CITY / STATE / ZIP ▮▮▮▮▮

DISPOSITION OF VEHICLE ON ORDERS OF: OFFICER ☐ DRIVER ☒ OTHER ☐
DRIVEN AWAY

**BICY-CLIST** ☐

| SEX M | HAIR BRN | EYES BLU | HEIGHT 5-10 | WEIGHT 170 | BIRTHDATE MO ▮ DAY ▮ YEAR ▮ | RACE W |

PRIOR MECH. DEFECTS  NONE APP. ☒  REFER TO NARRATIVE ☐

**OTHER** ☐

HOME PHONE NONE     BUSINESS PHONE (209)223-4890

VEHICLE IDENTIFICATION NUMBER:

VEHICLE TYPE 48

DESCRIBE VEHICLE DAMAGE: UNK ☐ NONE ☐ MINOR ☐  MOD ☒ MAJOR ☐ ROLL-OVER ☐

SHADE IN DAMAGED AREA SUV - TOP

INSURANCE CARRIER STATE OF CALIFORNIA     POLICY NUMBER STATE OF CALIFORNIA

CA _____ DOT _____
CAL-T _____ TCP/PSC _____ MC/MX _____

DIR OF TRAVEL ON STREET OR HIGHWAY E     301 CLINTON ROAD     SPEED LIMIT N/A

| PARTY 2 | DRIVER'S LICENSE NUMBER | STATE | CLASS | AIR BAG | SAFETY EQUIP. | VEH. YEAR | MAKE / MODEL / COLOR | LICENSE NUMBER | STATE |

**DRIVER** NAME (FIRST, MIDDLE, LAST)

OWNER'S NAME  SAME AS DRIVER ☐

**PEDES-TRIAN** ☐ STREET ADDRESS

OWNER'S ADDRESS  SAME AS DRIVER ☐

**PARKED VEHICLE** ☐ CITY / STATE / ZIP

DISPOSITION OF VEHICLE ON ORDERS OF: OFFICER ☐ DRIVER ☐ OTHER ☐

**BICY-CLIST** ☐ | SEX | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE MO DAY YEAR | RACE |

PRIOR MECHANICAL DEFECTS  NONE APP. ☐  REFER TO NARRATIVE ☐

**OTHER** ☐ HOME PHONE     BUSINESS PHONE

VEHICLE IDENTIFICATION NUMBER:

VEHICLE TYPE

DESCRIBE VEHICLE DAMAGE: UNK ☐ NONE ☐ MINOR ☐  MOD ☐ MAJOR ☐ ROLL-OVER ☐

SHADE IN DAMAGED AREA

INSURANCE CARRIER     POLICY NUMBER

CA _____ DOT _____
CAL-T _____ TCP/PSC _____ MC/MX _____

DIR OF TRAVEL ON STREET OR HIGHWAY     SPEED LIMIT

| PARTY 3 | DRIVER'S LICENSE NUMBER | STATE | CLASS | AIR BAG | SAFETY EQUIP. | VEH. YEAR | MAKE / MODEL / COLOR | LICENSE NUMBER | STATE |

**DRIVER** NAME (FIRST, MIDDLE, LAST)

OWNER'S NAME  SAME AS DRIVEN ☐

**PEDES-TRIAN** ☐ STREET ADDRESS

OWNER'S ADDRESS  SAME AS DRIVER ☐

**PARKED VEHICLE** ☐ CITY / STATE / ZIP

DISPOSITION OF VEHICLE ON ORDERS OF: OFFICER ☐ DRIVER ☐ OTHER ☐

**BICY-CLIST** ☐ | SEX | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE MO DAY YEAR | RACE |

PRIOR MECHANICAL DEFECTS  NONE APP. ☐  REFER TO NARRATIVE ☐

**OTHER** ☐ HOME PHONE     BUSINESS PHONE

VEHICLE IDENTIFICATION NUMBER:

VEHICLE TYPE

DESCRIBE VEHICLE DAMAGE: UNK ☐ NONE ☐ MINOR ☐  MOD ☐ MAJOR ☐ ROLL-OVER ☐

SHADE IN DAMAGED AREA

INSURANCE CARRIER     POLICY NUMBER

CA _____ DOT _____
CAL-T _____ TCP/PSC _____ MC/MX _____

DIR OF TRAVEL ON STREET OR HIGHWAY     SPEED LIMIT

| PREPARER'S NAME S. T. LADD 015164 | DISPATCH NOTIFIED YES ☐ NO ☐ N/A ☒ | REVIEWER'S NAME D HAGEMANN 015330 | DATE REVIEWED 07/24/2018 |

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| DATE OF COLLISION (MO., DAY, YEAR) | TIME (2400) | NCIC # | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 07/19/2018 | 0730 | 9295 | 015164 | 9295-2018-01258 |

| | OWNER'S NAME | OWNER ADDRESS | NOTIFIED |
|---|---|---|---|
| PROPERTY DAMAGE | CALIFORNIA HIGHWAY PATROL | 301 CLINTON ROAD JACKSON, CA 95642 | [x] YES [ ] NO |
| | DESCRIPTION OF DAMAGE | | |
| | DAMAGE TO STEEL ENTRANCE GATE | | |

## SEATING POSITION

```
        /\
    1  2  3
    4  5  6
       7
```

1 - DRIVER
2 TO 6 - PASSENGERS
7 - STATION WAGON REAR
8 - REAR  OCC TRK OR VAN
9 - POSITION UNKNOWN
0 - OTHER

## SAFETY EQUIPMENT

**OCCUPANTS**
A - NONE IN VEHICLE
B - UNKNOWN
C - LAP BELT USED
D - LAP BELT NOT USED
E - SHOULDER HARNESS USED
F - SHOULDER HARNESS NOT USED
G - LAP/SHOULDER HARNESS USED
H - LAP/SHOULDER HARNESS NOT USED
J - PASSIVE RESTRAINT USED
K - PASSIVE RESTRAINT NOT USED
P - NOT REQUIRED

**CHILD RESTRAINT**
Q - IN VEHICLE USED
R - IN VEHICLE NOT USED
S - IN VEHICLE USE UNKNOWN
T - IN VEHICLE IMPROPER USE
U - NONE IN VEHICLE

M / C BICYCLE HELMET
DRIVER   PASSENGER
V - NO     X - NO
W - YES    Y - YES

## AIR BAG
B - UNKNOWN
L - AIR BAG DEPLOYED
M - AIR BAG NOT DEPLOYED
N - OTHER
P - NOT REQUIRED

**EJECTED FROM VEHICLE**
0 - NOT EJECTED
1 - FULLY EJECTED
2 - PARTIALLY EJECTED
3 - UNKNOWN

## INATTENTION CODES
A - CELL PHONE HANDHELD
B - CELL PHONE HANDSFREE
C - ELECTRONIC EQUIPMENT
D - RADIO / CD
E - SMOKING
F - EATING
G - CHILDREN
H - ANIMALS
I - PERSONAL HYGIENE
J - READING
K - OTHER

**ITEMS MARKED BELOW FOLLOWED BY AN ASTERISK (*) SHOULD BE EXPLAINED IN THE NARRATIVE.**

| PRIMARY COLLISION FACTOR | | TRAFFIC CONTROL DEVICES | 1 | 2 | 3 | SPECIAL INFORMATION | 1 | 2 | 3 | MOVEMENT PRECEDING COLLISION | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| LIST NUMBER (#) OF PARTY AT FAULT | | A CONTROLS FUNCTIONING | | | | A HAZARDOUS MATERIAL | | | | A STOPPED | |
| VC SECTION VIOLATED     CITED [ ] YES | | B CONTROLS NOT FUNCTIONING* | | | | B CELL PHONE HANDHELD IN USE | X | | | B PROCEEDING STRAIGHT | |
| A | [ ] NO | C CONTROLS OBSCURED | | | | C CELL PHONE HANDSFREE IN USE | | | | C RAN OFF ROAD | |
| 1 | B OTHER IMPROPER DRIVING* UNSAFE SPEED | X D NO CONTROLS PRESENT / FACTOR* | X | | | D CELL PHONE NOT IN USE | | | | D MAKING RIGHT TURN | |
| | C OTHER THAN DRIVER* | TYPE OF COLLISION | | | | E SCHOOL BUS RELATED | | | | E MAKING LEFT TURN | |
| | D UNKNOWN* | A HEAD - ON | | | | F 76 FT MOTORTRUCK COMBO | | | | F MAKING U TURN | |
| | | B SIDE SWIPE | | | | G 32 FT TRAILER COMBO | | | | G BACKING | |
| | | C REAR END | | | | H | | | | H SLOWING / STOPPING | |
| WEATHER   (MARK 1 TO 2 ITEMS) | | D BROADSIDE | | | | I | | | | I PASSING OTHER VEHICLE | |
| X | A CLEAR | X E HIT OBJECT | X | | | J | | | | J CHANGING LANES | |
| | B CLOUDY | F OVERTURNED | | | | K | | | | K PARKING MANEUVER | |
| | C RAINING | G VEHICLE / PEDESTRIAN | | | | L | | | | L ENTERING TRAFFIC | |
| | D SNOWING | H OTHER* | | | | M | | | | M OTHER UNSAFE TURNING | |
| | E FOG / VISIBILITY ____ FT. | | | | | N | | | | N XING INTO OPPOSING LANE | |
| | F OTHER* | MOTOR VEHICLE INVOLVED WITH | | | | O | | | | O PARKED | |
| | G WIND | A NON - COLLISION | | | | | | | | P MERGING | |
| LIGHTING | | B PEDESTRIAN | | | | | | | | Q TRAVELING WRONG WAY | |
| X | A DAYLIGHT | C OTHER MOTOR VEHICLE | | | | OTHER ASSOCIATED FACTORS | 1 | 2 | 3 | R OTHER* | |
| | B DUSK - DAWN | D MOTOR VEHICLE ON OTHER ROADWAY | | | | (MARK 1 TO 2 ITEMS) | | | | | |
| | C DARK - STREET LIGHTS | E PARKED MOTOR VEHICLE | | | | A VC SECTION VIOLATED    CITED [ ] YES [ ] NO | | | | | |
| | D DARK - NO STREET LIGHTS | F TRAIN | | | | B VC SECTION VIOLATED    CITED [ ] YES [ ] NO | | | | | |
| | E DARK - STREET LIGHTS NOT FUNCTIONING* | G BICYCLE | | | | C VC SECTION VIOLATED    CITED [ ] YES [ ] NO | | | | SOBRIETY - DRUG PHYSICAL | |
| | | H ANIMAL* | | | | | | | | (MARK 1 TO 2 ITEMS) | |
| ROADWAY SURFACE | | I FIXED OBJECT* | | | | D | | X | | A HAD NOT BEEN DRINKING | |
| X | A DRY | | | | | E VISION OBSCUREMENT* | | | | B HBD - UNDER INFLUENCE | |
| | B WET | X J OTHER OBJECT: STEEL ENTRANCE GATE | X | | | F INATTENTION* | | | | C HBD - NOT UNDER INFLUENCE* | |
| | C SNOWY - ICY | | | | | G STOP & GO TRAFFIC | | | | D HBD - IMPAIRMENT UNKNOWN* | |
| | D SLIPPERY (MUDDY, OILY, ETC.) | | | | | H ENTERING / LEAVING RAMP | | | | E UNDER DRUG INFLUENCE* | |
| ROADWAY CONDITION(S) (MARK 1 TO 2 ITEMS) | | PEDESTRIAN'S ACTIONS | | | | I PREVIOUS COLLISION | | | | F IMPAIRMENT - PHYSICAL* | |
| | A HOLES, DEEP RUT* | X A NO PEDESTRIANS INVOLVED | X | | | J UNFAMILIAR WITH ROAD | | | | G IMPAIRMENT NOT KNOWN | |
| | B LOOSE MATERIAL ON ROADWAY* | B CROSSING IN CROSSWALK - AT INTERSECTION | | | | K DEFECTIVE VEH. EQUIP.*  CITED [ ] YES [ ] NO | | | | H NOT APPLICABLE | |
| | C OBSTRUCTION ON ROADWAY* | C CROSSING IN CROSSWALK - NOT AT INTERSECTION | | | | | | | | I SLEEPY / FATIGUED* | |
| | D CONSTRUCTION - REPAIR ZONE | | | | | | | | | | |
| | E REDUCED ROADWAY WIDTH | D CROSSING - NOT IN CROSSWALK | | | | L UNINVOLVED VEHICLE | | | | | |
| | F FLOODED* | E IN ROAD - INCLUDES SHOULDER | | | | M OTHER* | | | | | |
| | G OTHER* | F NOT IN ROAD | X | | | N NONE APPARENT | | | | | |
| X | H NO UNUSUAL CONDITIONS | G APPROACHING / LEAVING SCHOOL BUS | | | | O RUNAWAY VEHICLE | | | | | |

## SKETCH

FOR SKETCH, SEE ATTACHMENT.

(INDICATE NORTH ⊙)

MISCELLANEOUS

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

CHP 000367

CHP 555 CARS PAGE 3 (REV 11-16) OPI 060

PAGE ▼ OF ▼

| DATE OF COLLISION (MO. DAY YEAR) | TIME (2400) | NCIC # | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 07/19/2018 | 0730 | 9295 | 015164 | 9295-2018-00258 |

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | EXTENT OF INJURY ('X' ONE) | | | | INJURED WAS ('X' ONE) | | | | | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | FATAL INJURY | SUSPECTED SERIOUS INJURY | SUSPECTED MINOR INJURY | POSSIBLE INJURY | DRIVER | PASS. | PED. | BICYCLIST | OTHER | | | | | |
| 1 | | | M | | | | | | | | | | | | | | |

NAME / D.O.B. / ADDRESS
OFFICER KEVIN ARCHER   301 CLINTON ROAD JACKSON CA 95642

TELEPHONE
(209)223-4890

(INJURED ONLY) TRANSPORTED BY:   EMS RUN NUMBER   TAKEN TO:

DESCRIBE INJURIES:

VICTIM OF VIOLENT CRIME NOTIFIED

NAME / D.O.B. / ADDRESS   TELEPHONE

(INJURED ONLY) TRANSPORTED BY:   EMS RUN NUMBER   TAKEN TO:

DESCRIBE INJURIES:

VICTIM OF VIOLENT CRIME NOTIFIED

NAME / D.O.B. / ADDRESS   TELEPHONE

(INJURED ONLY) TRANSPORTED BY:   EMS RUN NUMBER   TAKEN TO:

DESCRIBE INJURIES:

VICTIM OF VIOLENT CRIME NOTIFIED

NAME / D.O.B. / ADDRESS   TELEPHONE

(INJURED ONLY) TRANSPORTED BY:   EMS RUN NUMBER   TAKEN TO:

DESCRIBE INJURIES:

VICTIM OF VIOLENT CRIME NOTIFIED

NAME / D.O.B. / ADDRESS   TELEPHONE

(INJURED ONLY) TRANSPORTED BY:   EMS RUN NUMBER   TAKEN TO:

DESCRIBE INJURIES:

VICTIM OF VIOLENT CRIME NOTIFIED

NAME / D.O.B. / ADDRESS   TELEPHONE

(INJURED ONLY) TRANSPORTED BY:   EMS RUN NUMBER   TAKEN TO:

DESCRIBE INJURIES:

VICTIM OF VIOLENT CRIME NOTIFIED

| PREPARER'S NAME | I.D. NUMBER | MO. DAY YEAR | REVIEWER'S NAME | MO. DAY YEAR |
|---|---|---|---|---|
| S. T. LADD | 015164 | 07/19/2018 | B HAGEMANN 015330 | 07/24/2018 |

AN INTERNATIONALLY ACCREDITED AGENCY

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
CHP 000368

STATE OF CALIFORNIA
## SKETCH DIAGRAM
VIS-1T-20-1PAGE

ATTACHMENT PAGE 1

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 07/19/2018 | 0730 | 9295 | 015164 | 9295-2018-00258 |

NOT TO SCALE



### 301 CLINTON RD.
### EAST PARKING
### LOT GATE



A) ASPHALT ROADWAY
B) CONCRETE SIDEWALK
C) RAISED CURB
D) CHAIN LINK FENCE/ GATE
E) STOP LIMIT LINE
F) METAL POST

STOP

V1

## AMADOR CHP
## OFFICE

35 ft.

5 ft.

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| K. ARCHER | 018684 | 07/19/2018 | | |

## CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

CHP 000369

STATE OF CALIFORNIA
**FACTUAL DIAGRAM**
VIS-17-20-1PAGE

ATTACHMENT PAGE 2

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 07/19/2018 | 0730 | 9295 | 015164 | 9295-2018-00258 |

NOT TO SCALE



### 301 CLINTON RD. EAST PARKING LOT GATE

Vehicle moved from its point of rest prior to taking measurements.

A) ASPHALT ROADWAY
B) CONCRETE SIDEWALK
C) RAISED CURB
D) CHAIN LINK FENCE/ GATE
E) STOP LIMIT LINE
F) METAL POST

**STOP**

**AMADOR CHP OFFICE**

1) 5'X5' MISC. VEHICLE DEBRIS
2) BENT METAL GATE

35 ft.

5 ft.

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| K. ARCHER | 016684 | 07/19/2018 | | |

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

CHP 000370

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                            PAGE 4 OF 7

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 07/19/2018 | 0730 | 9295 | 015164 | 9295-2018-00258 |

1  **Facts:**

2  **Notification:**

3  I was contacted by CHP dispatch to respond to the office for documentation of a collision

4  involving a California Highway Patrol vehicle at approximately 0850 hours. I responded

5  from SR-88 and Buckhorn Ridge Road and arrived at the office at approximately 0920

6  hours. All times, speeds and measurements in this investigation are approximate.

7  Measurements were taken by roll-meter and visual estimation except where otherwise

8  indicated.

9

10  **Scene Description:**

11  This traffic collision occurred at the address of 301 Clinton Road in Jackson, California at

12  the California Highway Patrol Office staff and patrol vehicle parking lot. This collision

13  occurred at the Broadway entrance from within this parking area. This entrance is

14  controlled by a remotely activated, double hung, swing type gate. The gate is constructed

15  of steel pipe and chain link and swings to the inside of the parking area when activated.

16

17  The parking area is oriented in a north to south direction and is a State of California

18  maintained property. This area is designed with the Broadway gate facing east with a short

19  paved drive to enter Broadway, if viewed from standing within the parking lot itself. The

20  Clinton Road entrance is oriented facing south with a paved drive and parking area for

21  customers prior to Clinton Road.

22

23  The weather was clear and warm at the time of the collision. See Factual Diagram for

24  scene specifics.

25

26

27

28

29

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| S. T. LADD | 015164 | 07/19/2018 | B HAGEMANN 015330 | 07/24/2018 |

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**
**CHP 000371**

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                        PAGE 5 OF 7

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 07/19/2018 | 0730 | 9295 | 015164 | 9295-2018-00258 |

1  **Parties:**

2   **Party #1 (Brad Wheat):**

3   P-1 was contacted at the Amador CHP Office upon my arrival at the scene. He was

4   identified as the driver of V-1 by his statement and by witness statements and he is

5   employed by the California Highway Patrol. He was identified by use of a valid State of

6   California driver's license.

7

8   **Vehicle #1 (Ford Explorer/California Highway Patrol):**

9   Vehicle #1 was moved from its' original point of rest prior to my arrival at the scene of the

10  collision. No mechanical defects were noted or claimed by P-1. V-1 sustained moderate

11  damage as result of striking the steel gate.

12

13  **Physical Evidence:**

14  -Vehicle Debris.

15  -Damage sustained by V-1.

16

17  **Statements:**

18  **Party #1 (Brad Wheat):** Gave his statement to me at the Amador CHP Office and the

19  collision scene. He stated to me in essence that he had activated the gate opener in his

20  patrol vehicle and was traveling east in the parking lot towards the security gate. He was

21  pulling ahead at approximately 5 miles per hour and was now approaching the fully open

22  gate. While looking forward past the gate, he noted that the sun's glare had obstructed his

23  vision to the right front of his patrol vehicle and the direction of the gate. His vision had

24  cleared the gate and he was looking ahead towards Broadway when he then unexpectedly

25  felt and heard an impact from the right front of his patrol vehicle. He simultaneously

26  applied the brakes and looked to the right front of the patrol vehicle where he felt the force

27  of the impact come from. He immediately observed that the right front fender area of the

28  patrol vehicle had collided with the right side of the security gate.

29

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| S. T. LADD | 015184 | 07/19/2018 | B HAGEMANN 015330 | 07/24/2018 |

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**
CHP 000372

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                                PAGE 6 OF 7

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 07/19/2018 | 0730 | 9295 | 015164 | 9295-2018-00258 |

1  **Statements (Continued):**

2  **Witness #1 (Kevin Archer):** Gave his statement to me at the Amador CHP Office and the

3  collision scene. He stated to me in essence that he was sitting in his patrol vehicle that

4  was parked facing the east security gate. He observed the east gate open all the way to

5  the metal stop posts. Approximately three seconds later, he observed Officer Wheat drive

6  past his location in a patrol vehicle. The patrol vehicle was eastbound in the parking lot,

7  approaching the east gate at approximately 7 miles per hour. As the patrol vehicle passed

8  the stop limit line for the east gate, the gate began to close by approximately three feet.

9  The right front of the patrol vehicle struck the gate, and the patrol vehicle came to a stop.

10  He noted the early morning sun was coming up to the east, directly in line with the open

11  gate.

12

13  **Opinions and Conclusions:**

14     **Summary:**

15  This collision occurred in the staff and patrol vehicle parking lot of the Amador California

16  Highway Patrol Office (301 Clinton Road, Jackson California). Party #1(Brad Wheat) was

17  traveling eastbound in the parking lot and was approaching the east security gate to exit

18  the CHP office and continue to Broadway for the start of his work shift. He activated the

19  remote to open the gate as he was backing away from the building to proceed east. The

20  gate was fully open when he began to travel eastbound towards the gate. He continued

21  towards the gate at 5-7 miles per hour and began to prepare to pass through the gate when

22  the right side security gate began to close, impacting the right front fender of

23  V-1. P-1 immediately stopped the patrol vehicle and backed V-1 away from the gate. It

24  was then that he observed the damage to the right front of his vehicle and the damage

25  sustained by the security gate.

26

27

28

29

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| S. T. LADD | 015164 | 07/19/2018 | B HAGEMANN 015330 | 07/24/2018 |

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

**CHP 000373**

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                      PAGE 7 OF 7

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 07/19/2018 | 0730 | 9295 | 015164 | 9295-2018-00258 |

1  **Areas of Impact (AOI):**

2      **Area of Impact: (V-1 VS Security Gate):**

3      The area of impact for this traffic collision was determined by statements and the physical

4      evidence at the scene.  The area of impact was located 120 feet west of the west roadway

5      edge prolongation of Broadway and 140 feet north of the north roadway edge prolongation

6      of Clinton Road.

7

8      **Cause:**

9      The cause for this traffic collision was determined by statements and the physical evidence

10     at the scene.  P-1 caused this traffic collision by operating V-1 at a speed that was unsafe

11     for the conditions of the roadway.

12

13     **Recommendations:**

14     None.

15

16

17

18

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| S. T. LADD | 015164 | 07/19/2018 | B HAGEMANN 015330 | 07/24/2018 |

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

CHP 000374

State of California                                        Transportation Agency

# M e m o r a n d u m

Date:        July 26, 2018

To:          Amador Area

From:        **DEPARTMENT OF CALIFORNIA HIGHWAY PATROL**
             Amador Area

File No.:    295.13833

Subject:     SUMMARY OF INTERVIEW OF OFFICER KEVIN ARCHER, ID 18684.

On Thursday, July 26, 2018, at 0700 hours, Officer Kevin Archer, ID 18684, was interviewed regarding his observations of a collision that occurred at the Amador Area involving Officer Brad Wheat, ID 18776, on July 19, 2018. The interview was conducted in the Sergeant's office at the Amador Area by Sergeant D. Lopez, ID 13833. The interview was memorialized using a digital audio recorder.

Officer Archer related he was preparing his vehicle for patrol at approximately 0700 hours on July 19, 2018, and had parked his patrol vehicle on the north side of the Amador Area building and was facing the east gate (the gate that was hit by Officer Wheats patrol vehicle). Officer Archer was sitting in his patrol vehicle when he observed the east gate open. Shortly thereafter he observed Officer Wheat drive by and wave to him. The gate started to close just as Officer Wheat approached. Officer Wheat's patrol vehicle then struck the closing gate.

Officer Archer had nothing else to add or any further information he thought would be useful. The interview was concluded at 0703 hours.



D. Lopez, ID 13833
Sergeant

*Safety, Service, and Security*
CHP 51 (Rev. 06/2013) OPI 076                    *An Internationally Accredited Agency*

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**
**CHP 000375**

State of California                                                    Transportation Agency

**M e m o r a n d u m**

# C O N F I D E N T I A L

Date:        July 26, 2018

To:          Officer Brad Wheat, ID 18776

From:        **DEPARTMENT OF CALIFORNIA HIGHWAY PATROL**
             Amador Area

File No.:     295.14738.13833

Subject:     NOTICE OF ADMINISTRATIVE INTERROGATION

If you have not been previously advised, the Department is conducting an internal investigation
into allegations of misconduct involving you. You are hereby notified you will be the subject of
an Administrative Interrogation on Thursday, August 2, 2018 at 0915 hours. The interrogation
will be conducted at the Amador Area office located at 301 Clinton Road, Jackson, CA 95642.
Sergeant Dan Lopez, ID 13833, will be in charge of the interrogation and will be assisted by
Sergeant Jeremy Dobler, ID 15628. The interrogation is related to the following:

- A collision you were involved in on June 20, 2018.
- A collision you were involved in on July 19, 2018.
- Your current status of being on interim reporting.

As an employee of the California Highway Patrol, you are entitled to have a representative
present. The selected representative may not be in your chain of command or a subject to this
investigation. If you desire, you may audio record the interrogation. You may also provide any
evidence you believe may be directly related to the alleged misconduct.

Due to the sensitivity of the investigation, you are directed not to discuss its details with any
member of this Department other than supervisors, and/or manager of the Amador Area
command, or your chosen representative. Further, to ensure the integrity of the investigation,
you are not to have any contact or communication regarding this investigation with any of the
involved parties or witnesses. Once presented with this memorandum, your failure to adhere to
the directions and/or prohibitions provided herein may result in additional charges/discipline
against you.



*Safety, Service, and Security*                          *An Internationally Accredited Agency*

CHP 61WP (Rev. 04-11) OPI 076

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**
**CHP 000376**

Officer Wheat, ID 18776
Page 2
July 26, 2018

Your assistance and cooperation in this matter is appreciated. Should you have any questions, you may contact me, or a supervisor of this command, or an employee representative of your choice.

T. H. BROWN, Lieutenant
Commander

I hereby acknowledge receipt of this memorandum.

_____     _18776_     _7-26-2018_
Employee's Signature                   ID                   Date

Service Information

_____     _3833_     _07-26-18_
Supervisor's Signature                  ID                   Date

**California Highway Patrol**
Employee Training Records Report
*Thursday, July 26, 2018*

| Officer ID | Officer Name |
| --- | --- |
| 018776 | WHEAT, BRAD |

| Course Title | Agency/Institution | Training Hours Required | POST Required | Completion Date | Quarter | Instructor Region | Shoot Type | Primary Weapon | Score | Aerosol Restraint Date |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Driver Training/Awareness | | 4 | ☑ | ☑ | 4/12/2017 | 0 | | | ☐ | |
| Driver Training/Awareness | | 8 | ☑ | ☑ | 11/11/2015 | 0 | | | ☐ | |
| Driver Training/Awareness | | 8 | ☑ | ☑ | 12/31/2014 | 0 | | | ☐ | |
| Driver Training/Awareness | | 4 | ☑ | ☑ | 6/30/2014 | 0 | | | ☐ | |
| Driver Training/Awareness | | 4 | ☑ | ☑ | 12/31/2013 | 0 | | | ☐ | |
| Driver Training/Awareness | | 4 | ☑ | ☑ | 12/1/2012 | 0 | | | ☐ | |
| Driver Training/Awareness | | 4 | ☑ | ☑ | 12/28/2011 | 0 | | | ☐ | |
| Driver Training/Awareness | | 4 | ☑ | ☑ | 5/26/2009 | 0 | | | ☐ | |
| Driver Training/Awareness | | 4 | ☑ | ☑ | 4/5/2008 | 0 | | | ☐ | |

*Page 1 of 1*

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

CHP 000378

# California Highway Patrol

**Employee Training Records Report**

*Thursday, July 26, 2018*

| Officer ID | Officer Name |
|---|---|
| 018776 | WHEAT, BRAD |

| Course Title | Agency/Institution | Hours | Training Required | POST Required | Completion Date | Quarter | Instructor Region | Shoot Type | Primary Weapon | Score | Aerosol Restraint Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Ford SUV Training and Stability Control Course | | 4 | ☑ | ☐ | 6/30/2014 | 0 | | | ☐ | | |

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

CHP 000379

b.   Reentering a Freeway After a Traffic Stop.

(1)  Use the shoulder, if available, as an acceleration lane to match the speed of traffic before merging.

(2)  Signal your intention to merge with the turn signal, check the traffic-side mirror, and check the blind spot by looking over your left or right shoulder as appropriate.

c.   Driving at High Speed for Long Periods (Loss of Speed Reference).

(1)  Checking your speedometer frequently will assist in maintaining appropriate speed awareness.

d.   Wrong-Way Driver.

(1)  Encountering a wrong-way driver should always be a consideration when driving on the freeway.  Use of the leftmost lane should be avoided as wrong-way drivers are often impaired or disoriented and operate in the leftmost lane.

(2)  Maintaining a high visual horizon is the best defense from being involved in a collision due to a wrong-way driver.

**9.   OPERATING A VEHICLE IN REVERSE.**  Peace officers should be aware that a large percentage of collisions occur while operating a vehicle in reverse.  When operating a vehicle in reverse, peace officers should:

a.   Exit the vehicle and visually check behind the vehicle if you are not certain the area is clear.

b.   Look over your right shoulder to look through the rear window for maximum visibility.  Confirm the blind spot directly behind the vehicle is clear prior to beginning any backing maneuvers.

c.   Continue to look back until the vehicle stops.

d.   Use someone to assist while backing if necessary.

e.   Use all available equipment (mirrors/camera) if the view out of the back window is obstructed.

**10.  BACKING HAZARDS.**  The following represent specific backing situations peace officers may encounter:

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**
CHP 000380

# CHAPTER 5

## COLLISION AVOIDANCE

1.   <u>DEFENSIVE DRIVING</u>.  Safe driving habits can reduce the risk of collision and injury.  Peace officers have a duty to drive in an exemplary manner, as this can affect the driving habits of other drivers and their attitude toward law enforcement.  Defensive driving is driving in a manner that avoids collisions at all times regardless of who has the right-of-way, whether in normal conditions, during Code 3 response, or while engaged in pursuit operations.

   a.   Defensive drivers possess the following characteristics:

      (1)  View safe driving as a personal responsibility.

      (2)  Recognize the dangers involved in driving a law enforcement vehicle.

      (3)  Drive at a speed that is safe for existing conditions.

      (4)  Yield the right-of-way when necessary.

      (5)  Make exemplary and safe decisions while driving.

   b.   It is the obligation of all officers to respond to emergency calls in a responsible manner, balancing the risk of their driving behaviors with the risk to the public posed by the call.  Peace officers operating emergency vehicles are accountable under federal and state laws as well as agency policies.  Failure to operate within the law and policy can result in criminal prosecution, civil liability, and agency discipline.

2.   <u>SPACE CUSHION</u>.  The term "space cushion" refers to the clear area surrounding a vehicle.  It includes the front, rear, and sides of the vehicle.  Enforcement driving requires constant vigilance and officers should always be aware of the area surrounding their vehicles.

3.   <u>VISION</u>.  The greatest asset to a law enforcement driver is vision.  An increase in speed or driver stress can significantly reduce an officer's visual acuity.

   a.   The following are critical components of vision:

      (1)  Focal point – The specific point at which a driver is looking at any given moment.

(2)  Central vision – That part of a driver's field of view that measures about 15 degrees around the focal point.  Vision is sharpest within this area.

(3)  Peripheral vision – The part of the driver's field of view that lies outside central vision and extends approximately 160 to 180 degrees horizontally, and 100 degrees vertically.  Peripheral vision is especially useful for detecting moving hazards outside central vision.

(4)  Tunnel vision – With an increase in speed or stress, peripheral vision can significantly decrease, making it more difficult to detect objects outside central vision.

(5)  High visual horizon – The distance a driver looks ahead of the vehicle.  A fluid concept that fluctuates with speed and available roadway.  High visual horizon encompasses using the full spectrum of vision including looking at a distance, laterally scanning, and identifying and linking components of a turn (high entry/apex/exit) in a smooth, arching manner.

4.   PERCEPTION/REACTION TIME.  The average driver's perception time is 0.75 seconds and their reaction time (which includes the decision-making process) is 0.75 seconds.  It takes a total of 1.5 seconds to perceive and react to a problem on the road.  Depending on the speed of the vehicle, a significant distance can be covered during the 1.5-second perception/reaction period.

a.   For example, a vehicle traveling 60 miles per hour (mph) will cover 132 feet in 1.5 seconds during the average driver's perception/reaction time.  The calculation for the distance covered during 1.5 seconds is as follows:

(1)  Speed multiplied by 1.1 equals distance traveled in 0.75 seconds (perception time); speed multiplied by 1.1 equals distance traveled in 0.75 seconds (reaction time).

(a)  (60 x 1.1 = 66) + (60 x 1.1 = 66) = 132 feet

5.   FOLLOWING DISTANCE.  A safe minimum following distance is at least 3 seconds of time between vehicles.  This allows sufficient time for a driver to react to sudden hazards.

a.   For example, a vehicle traveling at 60 mph should be approximately 270 feet from the vehicle in front.

(1)  Speed multiplied by 1.5 equals feet per second (approximately).

(a)  (60 x 1.5 = 90) x 3 seconds = 270 feet

HPG 70.14                                          5-4

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

**CHP 000382**



California
LEGISLATIVE INFORMATION

Home    Bill Information    California Law    Publications    Other Resources    My Subscriptions    My Favorites

Code: [Select Code ▽]   Section: [          ]   [Search]   ⓘ

Up^   << Previous   Next >>    cross-reference chaptered bills    PDF |  Add To My Favorites
[Highlight]

GOVERNMENT CODE - GOV
   TITLE 2. GOVERNMENT OF THE STATE OF CALIFORNIA [8000 - 22980]  ( Title 2 enacted by Stats. 1943, Ch. 134 )
      DIVISION 5. PERSONNEL [18000 - 22980]  ( Division 5 added by Stats. 1945, Ch. 123. )
         PART 2. STATE CIVIL SERVICE [18500 - 19799]  ( Part 2 added by Stats. 1945, Ch. 123 )
            CHAPTER 7. Separations From Service [19570 - 19593]  ( Heading of Chapter 7 renumbered from Chapter 8 by
Stats. 1985, Ch. 794, Sec. 27 )

   ARTICLE 1. Disciplinary Proceedings [19570 - 19589]  ( Heading of Article 1 renumbered from Article 3 by Stats. 1985, Ch. 142,
Sec. 55 )

   19572.  Each of the following constitutes cause for discipline of an employee, or of a person whose name appears on
any employment list:

   (a) Fraud in securing appointment.

   (b) Incompetency.

   (c) Inefficiency.

   (d) Inexcusable neglect of duty.

   (e) Insubordination.

   (f) Dishonesty.

   (g) Drunkenness on duty.

   (h) Intemperance.

   (i) Addiction to the use of controlled substances.

   (j) Inexcusable absence without leave.

   (k) Conviction of a felony or conviction of a misdemeanor involving moral turpitude. A plea or verdict of guilty, or a
conviction following a plea of nolo contendere, to a charge of a felony or any offense involving moral turpitude is
deemed to be a conviction within the meaning of this section.

   (l) Immorality.

   (m) Discourteous treatment of the public or other employees.

   (n) Improper political activity.

   (o) Willful disobedience.

   (p) Misuse of state property.

   (q) Violation of this part or of a board rule.

   (r) Violation of the prohibitions set forth in accordance with Section 19990.

   (s) Refusal to take and subscribe any oath or affirmation that is required by law in connection with the employment.

   (t) Other failure of good behavior either during or outside of duty hours, which is of such a nature that it causes
discredit to the appointing authority or the person's employment.

   (u) Any negligence, recklessness, or intentional act that results in the death of a patient of a state hospital serving
the mentally disabled or the developmentally disabled.

   (v) The use during duty hours, for training or target practice, of any material that is not authorized for that use by
the appointing power.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
CHP 000383

Law section                                            Page 2 of 2

(w) Unlawful discrimination, including harassment, on any basis listed in subdivision (a) of Section 12940, as those bases are defined in Sections 12926 and 12926.1, except as otherwise provided in Section 12940, against the public or other employees while acting in the capacity of a state employee.

(x) Unlawful retaliation against any other state officer or employee or member of the public who in good faith reports, discloses, divulges, or otherwise brings to the attention of, the Attorney General or any other appropriate authority, any facts or information relative to actual or suspected violation of any law of this state or the United States occurring on the job or directly related to the job.

*(Amended by Stats. 2004, Ch. 788, Sec. 8. Effective January 1, 2005.)*

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

CHP 000384

State of California                                      Transportation Agency

# Memorandum

## C O N F I D E N T I A L

Date:        July 31, 2018

To:          Officer Brad Wheat, ID 18776

From:        **DEPARTMENT OF CALIFORNIA HIGHWAY PATROL**
             Amador Area

File No.:     295.13833

Subject:     NOTICE OF ADMINISTRATIVE INTERROGATION

If you have not been previously advised, the Department is conducting an internal investigation into allegations of misconduct involving you. You are hereby notified you will be the subject of an Administrative Interrogation on Thursday, August 2, 2018 at 1600 hours. The interrogation will be conducted at the Amador Area office located at 301 Clinton Road, Jackson, CA 95642. Sergeant Dan Lopez, ID 13833, will be in charge of the interrogation and will be assisted by Sergeant Jen Hannum, ID 16055. The interrogation is related to the following:

- A collision you were involved in on June 20, 2018.
- A collision you were involved in on July 19, 2018.
- Being involved in two separate collisions while on interim reporting to include your status and expectations of the interim reporting process.

As an employee of the California Highway Patrol, you are entitled to have a representative present. The selected representative may not be in your chain of command or a subject to this investigation. If you desire, you may audio record the interrogation. You may also provide any evidence you believe may be directly related to the alleged misconduct.

Due to the sensitivity of the investigation, you are directed not to discuss its details with any member of this Department other than supervisors, and/or manager of the Amador Area command, or your chosen representative. Further, to ensure the integrity of the investigation, you are not to have any contact or communication regarding this investigation with any of the involved parties or witnesses. Once presented with this memorandum, your failure to adhere to the directions and/or prohibitions provided herein may result in additional charges/discipline against you.



*Safety, Service, and Security*                          *An Internationally Accredited Agency*

CHP 51WP (Rev. 04-11) OPI 076

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**
**CHP 000385**

Officer Brad Wheat, ID 19158
Page 2
July 31, 2018

Your assistance and cooperation in this matter is appreciated. Should you have any questions, you may contact me, or a supervisor of this command, or an employee representative of your choice.

T. H. BROWN, Lieutenant
Commander

I hereby acknowledge receipt of this memorandum.

_____    _____    _____
Employee's Signature          ID                   Date

Service Information

_____    _____    _____
Supervisor's Signature        ID                   Date

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**ADMINISTRATIVE INTERROGATION RECORD**
CHP 8 (Rev. 9-17) OPI 031

## ADMINISTRATIVE INTERROGATION ONLY

...en recording and state the following:

The date is 08/02/2018 , the time is approximately 0915      hours. I am the lead interrogator:

| RANK | LEAD INTERROGATOR'S NAME *(FIRST M I LAST)* | I.D. NUMBER | COMMAND NAME |
|------|------|------|------|
| Sergeant | Dan Lopez | 13833 | Amador |

Assisting in this interrogation today is:

| RANK | ASSISTANT INTERROGATOR'S NAME *(FIRST M I LAST)* | I.D. NUMBER | COMMAND NAME |
|------|------|------|------|
| Sergeant | Jennifer Hannum | 16055 | San Andreas |

The subject of this interrogation is:

| RANK | INTERROGATED PERSON'S NAME *(FIRST M I LAST)* | I.D. NUMBER | COMMAND NAME |
|------|------|------|------|
| Officer | Brad Wheat | 18776 | Amador |

Representing the subject is:

| REPRESENTATIVE'S NAME *(FIRST M I LAST)* | BARGAINING UNIT, LAW FIRM, ETC. |
|------|------|
| Warren Clawson | Unit 5 |

This interrogation is being recorded at:

LOCATION
Amador Area 301 Clinton Road, Jackson Ca. 95642

This is an administrative interrogation concerning the California Highway Patrol, involving (briefly describe the nature of the interrogation): Officer Wheat who was involved in two collisions, the first being on June 20, 2018, and the second on July 19, 2018. Also, Officer Wheat was involved in two separate collisions while on interim reporting to include his status and expectations of the interim reporting process.

You are being questioned as part of an official internal investigation. You are hereby directed to answer all questions honestly and completely. Your refusal to answer, or any type of evasion, deception, dishonesty, or lack of cooperation on your part, could constitute insubordination and/or inexcusable neglect of duty, and result in disciplinary action up to and including dismissal.

Neither your statement nor any information or evidence which is gained by reason of such statement can be used against you in any criminal proceedings. No promise or reward will be made as an inducement for the answer to any question. You may record this interrogation or have access to the Department's recording if any further proceedings are contemplated. You have the right to be represented by an individual of your choice who may be present at all times during your interrogation, provided the person chosen is not the subject of this inquiry or in your chain of command. In addition, you may also voluntarily provide any evidence you feel may be directly related to this investigation.

*(Directed to representative, if present.)* Although you as a representative are here to assist the employee, the Department is only interested in hearing the employee's account of the matter under investigation. You may participate during the interrogation, when appropriate, but you may not interfere with or cause unnecessary delay in the orderly course of the interrogation. You will be given an opportunity to make clarifying statements and ask clarifying questions.

Do you both understand?  ☒Yes  ☐No          Do either of you have any questions?  ☐Yes  ☒No

### SIGNATURES

| LEAD INTERROGATOR | PERSON INTERROGATED |
|------|------|
| ASSISTANT INTERROGATOR | REPRESENTATIVE |

### RECORDING(S)

| WHOSE EQUIPMENT WAS USED? | EVIDENCE NUMBER(S) |
|------|------|
| ☐DEPARTMENTAL  ☑PERSONAL  ☐OTHER: | E20180034 |
| ARE OTHER RECORDINGS MADE?  ☑YES  ☐NO | IF YES, WHO MADE THEM?  WARREN CLAWSON |

Use CHP 556 or plain paper for remarks, comments, and/or complaints.

Destroy Previous Editions                    Chp8_0917.pdf

## CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
## CHP 000387

State of California

Transportation Agency

# M e m o r a n d u m

## C O N F I D E N T I A L

Date:          August 3, 2018

To:            Amador Area

From:          **DEPARTMENT OF CALIFORNIA HIGHWAY PATROL**
               Amador Area

File No.:       295.13833

Subject:       SUMMARY OF AMINISTRATIVE INTERROGATION OF OFFICER BRAD
               WHEAT, ID 18776

On Thursday, August 2, 2018, at 0915 hours, Officer Brad Wheat, ID 18776, was the subject of
an administrative interrogation. The interrogation lasted approximately 20 minutes, concluding
at 0935 hours. The purpose of the interrogation was to question Officer Wheat in regards to his
involvement in two on-duty patrol vehicle collisions which occurred on June 20, 2018 and July
19, 2018 while on interim reporting. Additionally, Officer Wheat was questioned in regards to
his interim reporting process.

The interrogation was conducted by the lead investigator, Sergeant Dan Lopez, ID 13833, who
was assisted by Sergeant Jennifer Hannum, ID 16055. The administrative interrogation was
conducted at the Amador Area Office, 301 Clinton Road, Jackson, CA 95642. Officer Wheat
was represented by California Association of Highway Patrolmen (CAHP) representative Officer
Warren Clawson, ID 17776. The interrogation was memorialized using digital audio recorders.
The interrogation began with the reading and completion of the information contained on the
CHP 8, *Administrative Interrogation Record*. The CHP 8 was signed by all parties present.

Officer Wheat was placed on interim reporting on June 1, 2018, for lack of activity, work ethic,
and excessive time spent on report writing, specifically not getting his collision reports
completed by the eight day time frame. Officer Wheat understood his expectations while being
on interim reporting and agreed in the decision to be placed on interim reporting. Officer Wheat
had extensive driver training at the Academy as a Cadet to include Ford SUV training stability
control course on June 30, 2014, and Driver Training/Awareness last one being on April 12,
2017.

*Safety, Service, and Security*

CHP 61WP (Rev. 08/2013) OPI 078



*An Internationally Accredited Agency*

## CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

Amador Area
Page 2
August 3, 2018

On June 20, 2018, at approximately 0330 hours, Officer Wheat was working a Cozeep detail in the Stockton Area on I-5 in the vicinity of Monte Diablo and was involved in a preventable patrol vehicle collision. Officer Wheat was on the right shoulder and was backing up. Officer Wheat's patrol vehicle's right rear bumper struck a metal guard rail. Officer Wheat accepted he was at fault in the collision and that he had violated Highway Patrol Guide (HPG) 70.14, Chapter 5, section 9 (A-E) on backing.

On July 19, 2018, at approximately 0730 hours, Officer Wheat was involved in another preventable patrol vehicle collision. Officer Wheat was at the Amador Area office and was just starting his shift. Wheat activated the security gate by remote and started to approach the opened gate. Officer Wheat noted the gate was still open, and proceeded straight at approximately 5 mph, at that moment that automatic gate began to close and officer Wheat drove right into it. The right front patrol vehicle received moderate damage and the gate also received moderate damage. Officer Wheat accepted he was at fault in the collision and that he had violated Highway Patrol Guide (HPG) 70.14, Chapter 5, section 2-3 which discusses a space cushion around the vehicle and vision. Officer Wheat also admitted to driving through this particular gate hundreds of times in the last two and a half years.

The interrogation concluded with Officer Wheat admitting he also violated Government Section 19572 subsection (d) Inexcusable neglect of duty and subsection (t) Other failure of good behavior...

Officer Wheat was ordered not to discuss this investigation or disclose the contents of his audio recording, until he has been served with a final notice of Adverse Action, or he is otherwise notified this investigation has been completed.

D. Lopez, ID 15833
Sergeant

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

Exhibit F



# California Highway Patrol



EXHIBIT 47
Deponent NEWMAN
Date 6-25-21 Rpt 5647
WWW.DEPOBOOKPRODUCTS.COM

# HPM 100.69

# GENERAL LAW ENFORCEMENT POLICY MANUAL

This publication contains material exempt from public disclosure identified by a shaded overlay. Exempt material shall not be disclosed outside the California Highway Patrol except to allied agencies with their agreement not to disclose the information outside their agency.



*Safety, Service, and Security*                    *An Internationally Accredited Agency*

# CHAPTER 3

## RESPONSE TO DOMESTIC VIOLENCE

### REVISED AUGUST 2019

### TABLE OF CONTENTS

PURPOSE .................................................................................................. 3-3
POLICY .................................................................................................... 3-3
AUTHORITY ............................................................................................. 3-4
  Statutory Requirements .......................................................................... 3-4
  Definitions ............................................................................................. 3-4
  Instructional Guides and Forms .............................................................. 3-5
COMMANDERS' RESPONSIBILITY ........................................................... 3-7
PROCEDURES ......................................................................................... 3-7
  Arrests .................................................................................................. 3-7
  Felony Arrest ......................................................................................... 3-8
  Misdemeanor Arrest .............................................................................. 3-8
  Cite and Release .................................................................................... 3-9
  Private Person's Arrest .......................................................................... 3-9
  Emergency Protective Order .................................................................. 3-10
  Domestic Violence Counselor/Advocate and Support Person .................. 3-10
  Documenting Incidents to Which the Officer Responded and Took Action ... 3-10
  Information Required in the Report .......................................................... 3-11
  Right to Confidentiality ........................................................................... 3-12
  Written Notice to Victim about Follow-up Rights ...................................... 3-12
  Victims of Violent Crime ......................................................................... 3-13
  Seizure of Weapons ............................................................................... 3-13
  Injuries .................................................................................................. 3-14
  Enforcement or Initiation of Court Protective Orders ............................... 3-14
  Tenancy ................................................................................................ 3-15
  Shelter .................................................................................................. 3-15
REPORTING TO THE DEPARTMENT OF JUSTICE .................................... 3-15
  Reporting by County ............................................................................... 3-15
  Weapon-Involved Information .................................................................. 3-16
  Negative Reporting Not Required ............................................................ 3-16

HPM 100.69

4.   <u>COMMANDERS' RESPONSIBILITY</u>.  Area commanders shall take the necessary steps to obtain current "Victims of Domestic Violence" cards from the local law enforcement agencies within their jurisdictions.  These cards shall be carried by all officers in the field.  Additionally, commanders shall ensure their Area's standard operating procedure contains the necessary direction about local procedures for handling incidents of domestic violence, including, at a minimum:

a.   The countywide protocol which has been developed pursuant to Section 853.6 PC to assist officers in determining when arrest and release is appropriate, rather than taking the arrested person before a magistrate.  Include protocol for each county within the Area's jurisdiction.  (See Chapter 4 of this manual for additional information.)

b.   A method for the verification of the existence and validity of court protective orders issued and/or served by allied agencies within the Area's jurisdiction.  (See Chapter 4, paragraphs 5.g. and 5.h., of this manual for additional information.)

c.   Procedures for contacting the on-call magistrate, should it be necessary to issue an EPO.  (See Chapter 4, paragraph 5.h.[4], of this manual for additional information.)

d.   Procedures for notifying the originating court or allied agency when previously unserved protective orders are served by the CHP.  (See Chapter 4 of this manual for additional information.)

5.   <u>PROCEDURES</u>.

a.   Officers shall treat all domestic violence as criminal conduct and will respond accordingly.

b.   <u>Arrests</u>.  The existence of the elements of a crime and/or the willingness of the victim to make a private person's arrest shall be the sole factors that determine the proper method of handling the incident.

(1)   Pursuant to Section 13701 PC, officers shall attempt to identify the dominant aggressor in an incident and, where possible, arrest that individual rather than routinely making dual arrests.

(2)   The following definition of dominant aggressor should be used in evaluating which person to arrest:

(a)   The dominant aggressor is the person determined to be the most significant, not necessarily the first, aggressor.  In identifying the dominant aggressor, officers shall consider the intent of the law to protect victims of

domestic violence from continuing abuse, the threats creating fear of physical injury, the history of domestic violence between the persons involved, and whether either person acted in self-defense.

c. Felony Arrest. A felony arrest shall be made when the conditions required by Section 836 PC are met. (See Annex A.) Pursuant to Chapter 1, Arrest Policies, of this manual, all felony violators shall be physically arrested.

d. Misdemeanor Arrest. A misdemeanor arrest shall be made when there is reasonable cause to believe that a misdemeanor (including violations of court protective orders) has occurred. (See Annex A and Chapter 4 of this manual for further information on court protective orders.)

(1) Pursuant to the provisions of Section 836(c)(1) PC, when responding to a call alleging a violation of a domestic violence protective or restraining order, or a domestic violence protective or restraining order issued by the court of another state, tribe, or territory, if a peace officer has probable cause to believe that the person against whom the order is issued has notice of the order and has committed an act in violation of the order, the officer shall arrest the violator without a warrant and take the person into custody whether or not the violation occurred in the officer's presence. Confirmation that a copy of the order has been registered shall be obtained as soon as possible after the arrest unless the victim provides the officer with a copy of the order.

(2) Pursuant to the provisions of Section 836(d) PC, if a suspect commits an assault or battery upon a current or former spouse, fiancé, fiancée, a current or former cohabitant, a person with whom the suspect currently is having or has previously had an engagement or dating relationship, a person with whom the suspect has parented a child, or is presumed to have parented a child, a child of the suspect, a child whose parentage by the suspect is the subject of an action under the Uniform Parentage Act, a child of a person in one of the above categories, any other person related to the suspect by blood or marriage, or any person who is 65 years of age or older and related to the suspect by blood or legal guardianship, an officer may arrest the suspect without a warrant if both of the following circumstances apply:

(a) The officer has probable cause to believe that the person to be arrested has committed the assault or battery whether or not it has in fact been committed; and

(b) The officer makes the arrest as soon as probable cause arises to believe that the person to be arrested has committed the assault or battery whether or not it has in fact been committed.

e.   Cite and Release.  Officers shall evaluate the likelihood of a continuing offense in deciding whether to cite and release pursuant to Section 853.6 PC.

(1)   Cite and release does not apply to crimes specified in Section 1270.1 PC, including Sections 243(e)(1), 273.5, 273.6 (if the detained person made threats to kill or harm, engaged in violence against, or has gone to the residence or workplace of the protected party), and 646.9 PC.

(2)   Any one of the following might constitute a continuing offense and pose grounds for not invoking the cite and release option:

(a)   The suspect has a prior history of arrests or citations involving domestic violence.

(b)   The suspect has previously violated valid emergency, temporary, or permanent court protective orders.

(c)   The suspect has a prior history of assaultive behavior.

(d)   Statements taken from the complainant that the suspect has a history of physical abuse toward the complainant.

(e)   Statements taken from the victim expressing fear of retaliation or further violence should the suspect be released.  (See Chapter 4 of this manual for further information.)

f.   Private Person's Arrest.  Section 836(b) PC states, "Any time a peace officer is called out on a domestic violence call, it shall be mandatory that the officer make a good faith effort to inform the victim of his or her right to make a citizen's arrest...This information shall include advising the victim how to safely execute the arrest."  Where an officer has reasonable cause to believe that a misdemeanor has occurred, although not in their presence, the victim shall be informed of the right to make a private person's arrest.  After the officer has advised the victim of their right to do so, that fact shall be documented in the narrative of the CHP 216 or CHP 202.

(1)   The victim shall be notified that, despite official restraint of the person alleged to have committed domestic violence, the restrained person may be released at any time.

(2)   The officer shall notify the victim of the existence of a local shelter and transport the victim to the shelter if the victim fears retribution from the individual placed under citizen's arrest.  (See paragraph 5.l.)

(3)   The notification of the right to make a private person's arrest shall be made in private or out of the hearing range of the alleged violator for the protection of both the victim and the officer.

g.   Emergency Protective Order.  Per Section 6275 FC, a law enforcement officer who responds to a situation in which the officer believes there may be grounds for the issuance of an EPO shall inform the victim, or if the victim is a minor, their parent or guardian, provided the parent or guardian is not the person against whom the EPO may be obtained, that they may request the officer to request an EPO.  An officer shall request an EPO if the officer believes that the person requesting an EPO is in immediate and present danger.  (See Chapter 4 of this manual for further information.)

h.   Domestic Violence Counselor/Advocate and Support Person.  Pursuant to Section 679.05 PC, a victim of domestic violence or abuse has the right to have a domestic violence counselor/advocate and a support person of the victim's choosing present at any interview by law enforcement authorities, prosecutors, or defense attorneys.  An initial investigation by law enforcement to determine whether a crime has been committed and the identity of the suspects shall not constitute a law enforcement interview for these purposes.

(1)   Prior to the commencement of the initial interview by law enforcement authorities or the prosecutor pertaining to any criminal action arising out of a domestic violence incident, a victim of domestic violence or abuse shall be notified orally or in writing by the attending law enforcement authority or prosecutor that the victim has the right to have a domestic violence advocate and a support person of the victim's choosing present at the interview or contact.  This subdivision applies to investigators and agents employed or retained by law enforcement or the prosecutor.

(2)   The support person may be excluded from an interview if the law enforcement authority or the prosecutor determines that the presence of that individual would be detrimental to the purpose of the interview.

i.   Documenting Incidents to Which the Officer Responded and Took Action.  Any reported crime involving domestic violence to which an officer responds and takes action shall be documented through the preparation of a CHP 216 or CHP 202.  A report shall be prepared whether or not an arrest is made (Sections 13730[a] and 13730[c] PC).  If the CHP's response is limited to "standing by" until a local agency officer has arrived and assumed responsibility, no report is necessary.  If, however, any further action is taken at the scene by an officer of this Department, such as the service of a previously issued but unserved protective order, that action must be documented on a CHP 216 or CHP 202, as appropriate.  Misdemeanor or felony case numbers shall be assigned consistent with the policy established in General

HPM 100.69                                3-10

Order (GO) 100.38, Assignment of Case Numbers, and the officer shall check the Domestic Violence box on the report. In instances where it is not possible to immediately obtain a misdemeanor or felony case number, a field-generated report number shall be used.

j.   Information Required in the Report. A number of items are required by statute to be documented in the body of a report prepared in response to a domestic violence-related call. Those items are identified below. Recommended report format and headings are contained in Annex C. The items which must be included by law are as follows:

(1)   That the victim was given a CHP 173 with resource information inserted.

(2)   Whether or not the complainant was the victim of a sexual assault.

(3)   If weapons were involved, or specify if the incident involved strangulation or suffocation.

(4)   That the victim was advised of the right to confidentiality. (See paragraph 5.k.)

(5)   That the victim was advised of their follow-up rights.

(6)   That the victim was advised of their right to make a private person's arrest, if appropriate.

(7)   That the victim was advised of their right to have a domestic violence counselor/advocate and a support person present at any interview by law enforcement authorities, prosecutors, or defense attorneys.

(8)   Whether or not a weapon was used. If a weapon was used, officers shall indicate if it was: a firearm; knife or cutting instrument; other deadly weapon; or personal weapon (hands, fists, feet, etc.). Additionally, the reporting law enforcement officer shall note if they found it necessary, for them or other person's protection, to inquire of the victim, the alleged abuser, or both, whether a firearm or other deadly weapon is present at the location. If the response is affirmative, the officer shall confiscate any firearm or deadly weapon.

(9)   Whether or not the officer(s) responding to the incident observed any signs that the alleged abuser was under the influence of alcohol and/or a controlled substance.

(10) Whether or not the officer(s) responding to the incident determined if any law enforcement agency had previously responded to a domestic violence call

at the same address involving the same alleged abuser or victim. Officers shall contact the agency with primary jurisdiction over the residence address to attempt to determine this information. Any information received from an allied agency indicating a past history of domestic violence, or a previous call for domestic violence at the residence address shall be documented in the report.

(a)   If information is received that indicates either party has a past history of domestic violence, this shall be briefly documented in the report.

k.   Right to Confidentiality. Pursuant to Section 293(a) PC and Section 6254(f)(2) GC, victims of sexual assault crimes have the right to have their name and address withheld from the CHP 216 or CHP 202, if requested. Pursuant to Section 6254(f)(2) GC, victims of crimes committed against a spouse, cohabitant, or the parent of one's child have the right to have their name and address withheld, if requested.

(1)   The officer must notify the victim of the right to request confidentiality in both situations and explain that the victim's name and address will become public record if confidentiality is not requested. The offer of confidentiality shall be made prior to the initiation of a report and a CHP 174 completed with the victim's name and address.

(2)   The officer shall then document in the narrative of the CHP 216 or CHP 202 whether or not the victim chose to exercise that right. If confidentiality is not invoked, the CHP 174 shall become an attachment to the CHP 216 or CHP 202. If confidentiality is invoked, the CHP 174 shall become the face page to the report. "John/Jane Doe" shall be inserted in place of the victim's name on the CHP 216 or CHP 202, and the address shall be excluded. The CHP 174 shall remain confidential and only be released with the report when it is provided to the district attorney's office for purposes of prosecution or to an allied law enforcement agency for follow-up investigation.

l.   Written Notice to Victim about Follow-up Rights. Pursuant to Section 13701(c)(9) PC, an officer who handles a domestic violence call must provide the victim with a written notice explaining their future options. The CHP 182 contains noncounty-specific information for victims of domestic violence and must be provided at the scene. Some victim assistance information is city/county-specific. This information is contained on a "Victims of Domestic Violence" card (to be obtained from allied law enforcement agencies in the Area's jurisdiction) and includes information such as names, addresses, and telephone numbers of shelters, rape crisis centers, and other community resources. If the local agency having jurisdiction is not able to respond and a CHP officer handles the incident, the CHP 182 and "Victims of Domestic Violence" card shall be placed inside the CHP 173 and furnished to the victim. The CHP 182 provides many of the items

that are required to be provided to the victim. The items which are required by law are:

(1)   A statement informing the victim that, despite official restraint of the person alleged to have committed domestic violence, the restrained person may be released at any time.

(2)   A statement informing the victim that they can ask the district attorney to file a criminal complaint.

(3)   A statement informing the victim of the right to go to the superior court and file a petition requesting one of eight orders of relief. (See Annex A and Chapter 4 of this manual for further information.)

(4)   A statement informing the victim of the right to file a civil suit for losses suffered as a result of the abuse.

m.   Victims of Violent Crime. Pursuant to Sections 13959-13969 GC, law enforcement agencies are required to inform individuals who are victims of violent crimes of the availability of the indemnification program. If the victim of a domestic violence incident is also the victim of a crime of violence, the officer shall include the CHP 170, Notice to Victims of Violent Crimes, (see HPM 11.1, Administrative Procedures Manual, Chapter 9, Civil Actions, Defense of Employees, Small Claims Actions, Constitutionalist Actions, Indemnification of Citizens, Victims of Violent Crimes) with the materials placed into the CHP 173.

n.   Seizure of Weapons. Pursuant to Section 18250 PC, peace officers who are at the scene of a domestic violence incident involving a threat to human life or a physical assault, serving a protective order as defined in Section 6218 FC, or serving a gun violence restraining order issued pursuant to Division 3.2 of the PC, commencing with Section 18100, shall take temporary custody of any firearm or other deadly weapon in plain sight or discovered pursuant to a consensual or other lawful search, as necessary, for the protection of the peace officer or other persons present.

(1)   Officers shall use the CHP 36, Evidence/Property Receipt/Report, to document the seizure of weapons. The CHP 36 shall be completed with a description of the weapon, indicate any identification or serial number (on firearms), include the date after which the owner or possessor can recover the weapon, and include the name and residential mailing address of the owner or possessor of the weapon. A copy of the CHP 36 must be given to the person who possessed the weapon. Information regarding seized weapons shall be recorded on the CHP 216 or CHP 202.

HPM 100.69

(2)  Weapons shall be held not less than 48 hours and, unless retained for evidence, must be available for release not more than 48 hours after the seizure, or no later than five business days after a Law Enforcement Gun Release Application is approved by DOJ.  (See HPM 70.1, Evidence Manual, Chapter 11, Release/Disposal of Weapons, for more information regarding releasing weapons.)

o.  Injuries.

(1)  Treatment.  Officers shall ask the victim if they wish to receive medical treatment, even if injuries are not visible.  Officers shall inform the victim that strangulation may cause internal injuries and encourage the victim to seek medical attention.  Officers shall arrange for medical treatment, if requested.

(2)  Sexual Assault Victims.  Pursuant to Section 264.2 PC, if a victim of an alleged violation of Section 261, 261.5, 262, 286, 288a, or 289 PC is transported to a hospital for any medical evidentiary or physical examination, the victim shall have the right to have a sexual assault counselor/advocate, and a support person of the victim's choosing present at the examination.  However, a support person may be excluded from the examination if the law enforcement officer or medical provider determines their presence would be detrimental to the purpose of the examination.

(3)  Documentation.  Describe any injuries and medical treatment in the narrative of the CHP 216 or CHP 202.  This type of documentation is extremely important to support criminal charges.  Officers may wish to use the diagram in the CHP 330, Emergency Medical Report (EMT-P, EMT-1, EMR), to assist in the documentation of injuries.  Photographs of injuries are extremely helpful in the successful prosecution of domestic violence offenses.  Photos taken several days after an incident when bruising appears should be obtained, if possible.

(4)  Telephone Number and Address.  If a victim intends to leave the premises, the officer shall attempt to obtain the telephone number and address where they can be reached.

p.  Enforcement or Initiation of Court Protective Orders.  Officers may need to enforce the provisions of a previously issued court protective order at the scene of a domestic violence incident, or they may need to initiate the securement of an EPO.  Due to the complexity of court protective orders, they are discussed in detail in Chapter 4 of this manual.

q.   Tenancy.  Section 602.5 PC makes it a misdemeanor for any person other than a public officer or employee acting within the course and scope of their employment to enter or remain in a residence without the consent of the owner.

(1)   Standby.  If requested to remove a person from a premises and the officer has determined that the person has no lawful right to occupancy, the officer shall order the person to leave.  The officer shall then remain until the person has had the opportunity to remove a reasonable amount of their personal belongings.

(2)   Arrest.  If the person refuses to leave, the officer shall inform the complainant, preferably in private, that the person refusing to leave is violating the law.  The officer may make an arrest for violation of Section 602.5 PC or the complainant may make a private person's arrest.  If the individual is in violation of a previously issued order restraining them from the address or individual at the scene, an arrest should be made for violation of Section 166(4) PC, Contempt of Court, or if the order being violated is a domestic violence order, for Section 273.6 PC, Violation of Restraining Order.

r.   Shelter.  If the officer determines that a need exists, they shall offer to arrange to transport the victim to a shelter.  The victim shall be advised of this option out of the presence of the suspect.  The suspect shall not be allowed to know the name or location of the shelter in order to protect the victim and the staff of the shelter. Section 273.7 PC makes it a misdemeanor to maliciously disclose the location of any domestic violence shelter.

6.   REPORTING TO THE DEPARTMENT OF JUSTICE.

a.   Reporting by County.  The total number of domestic violence-related calls and/or incidents responded to by each Area must be reported to the DOJ, by county of occurrence, on a monthly basis.

(1)   Reporting will be accomplished through use of the Uniform Crime Reporting System (UCRS).

(2)   For all domestic violence-related incidents where an officer has completed a CHP 216 or CHP 202, a CHP 729, Uniform Crime Report, shall also be completed.  If there were indications of strangulation or suffocation, include this information on the CHP 729.  (Refer to GO 100.100, Uniform Crime Reporting Program, for additional information on completion of the CHP 729 and use of the UCRS.)

Exhibit G



EXHIBIT 51
Deponent DOBLER
Date 8·25·21 Rptr. JW
WWW.DEPOBOOKPRODUCTS.COM

## SERGEANT JEREMY DOBLER'S #15628 CHRONOLOGICAL SUMMARY

Historical information:

Officer Brad Wheat, ID 18776, and I have known each other since 2003. I met Brad when he returned to the Amador Area from seminary in southern California. Brad and his wife, Mary, have a son and a daughter the same age as my son and daughter, so the families spent some time together as the kids grew up and were friends. I got Brad his application for the department, mentored him through the process, and was there with his family at his graduation. I have come to know most of both his and his wife's families and have been close with them over the years. I had many conversations with Brad throughout the entire ordeal with his marriage and we spoke candidly, and I felt I could judge his state of mind and where he was fairly well given our long standing relationship and friendship.

1.  On June 1, 2018, Officer Brad Wheat, ID 18776, was placed on interim reporting (60 days) for low activity, substandard performance and excessive time use for report writing/not getting collisions completed within the eight day requirement. I was on vacation all month, but Officer Wheat had let me know of marital issues with him and his wife.

2.  On July 8, 2018, Officer Wheat called Sergeant Whitehead and advised him that his wife was having an affair. I had multiple conversations with Wheat over the next several weeks regarding his marriage and how he was coping with it all. Officer Wheat had a lot of support from his wife's family and his own children.

3.  On July 15, 2018, I conducted a ride along with Officer Wheat as part of the interim reporting process. We discussed his performance as well as his marriage and the effect that was having on his work performance.

4.  August 2, 2018, I had numerous conversations with wheat regarding how he was doing. He was having a rough time after his wife returned from visiting her father. She was not willing to engage with him or work on their marriage.

5.  August 3, 2018, Officer David Ward, #16661, notified me that he was concerned about Officer Wheat after a conversation he had with him that evening. Officer Wheat stated that he had gone looking for his wife's boyfriend with the intention of hurting him. I responded to the office. Officer Ward advised me that he had removed Officer Wheat's duty weapon from his locker after his conversation with him. Officer Ward and I responded to Officer Wheat's house. I advised the commander, Lieutenant Todd Brown, #14738, who called out a departmental phycologist, Sabrina Swain. Officer Ward and I sat and talked with Officer Wheat until the phycologist arrived. Officer Wheat expressed that he had been upset because his wife stated she was happy with her boyfriend and did not want to work on her marriage with Brad. Brad had gone looking for his wife's boyfriend, but did not find him. Brad said he wanted to hurt him. But Brad also expressed that his kids and family had talked him down and he no longer felt that way. The

phycologist arrived and talked to Brad for two to three hours. At the conclusion she advised me that Brad was coping well and was not a danger to himself or anyone else. She advised me that he can return to work. I asked Brad as a favor to me as a friend, if would he give me all of the firearms in the house, even though he was not required to. Officer Wheat agreed and gave me three rifles. I suggested Officer Wheat take some time and spend time with his family until he feels able to come back to work. Officer Wheat agreed.

6.      Officer Wheat left and went to southern California with his four children. Officer Wheat took vacation from August 4th through the 19th. He felt ready to come back to work on the 20th. During his vacation, Officer Wheat advised me that he was getting counseling twice a week from a counselor in Roseville. Officer Wheat had also come back to the office on the 14th and talked to a phycologist, Joy Graf, for several hours. Joy advised that Officer Wheat was doing well and had many good coping tools. Joy Graf advised Officer Wheat was good to continue working. I continued to check in with Officer Wheat daily while he was on vacation to check on his wellbeing.

7.      On August 20, 2018, Officer Wheat returned to work on limited duty as the front desk officer. I returned his duty weapon to him so he could return to work, but still had possession of his long guns. I continued to check on Wheat everyday they worked together and on his days off. Officer Wheat continued to see his counselor twice a week in Roseville.

8.      On August 21, 2018, Joy Graf called and talked to Officer Wheat for an extended time. She then talked to me and advised she had called to check on Officer Wheat and the rest of the office. She again stated that Officer Wheat was coping well and was fine to be working.

9.      August 27, 2018, Officer Wheat expressed he wanted to return to working the road to me. Officer Wheat and I discussed this at length, he seemed to be coping well with all that was going on. Officer Wheat seemed to be doing well, he had returned to coaching football at the high school and had returned to back doing things for himself. Getting back to normal life. Officer Wheat and I came up with a plan to return to work the following week.

10.     August 29, 2018, I had another conversation with Officer Wheat about his mental status and how he was coping before Sergeant Dobler left for a camping trip. He also discussed returning to working and expectations.

11.     September 3, 2018, I was called out for a shooting involving Officer Wheat. Upon arriving on scene he learned that Officer Wheat had shot his wife's boyfriend, then shot and killed his wife and himself.

Exhibit H



<u>CHRONILOGICAL SUMMARY FOR BRAD WHEAT, ID 18776</u>

<u>Lieutenant Todd Brown, ID 14738</u>

Interim reporting- After second TC within a one month time period, he was pulled into office.

August 2nd was Brad's Form 8 for the collisions. I spoke to Brad for approximately one hour following the Form 8. We discussed him being able to put this behind us and get back on track. I explained it was water under the bridge and we began to discuss some of his personal issues I'd already been made aware of, but we hadn't yet officially spoken about, as my memory serves (I'd sent a text or two stating I'd heard he had some personal issues happening and offering support (see attached texts).

Evening before Ward's notification, Mary returned from one of the Carolinas where she was staying with her father.

I allowed Brad to do a ride-along with Officer Peixoto to help with peer support and to be a sounding board/friend in an effort to get Brad back on track. Officer Peixoto advised Sergeant Dobler that Brad had asked, during the ride-along, to drive by the gym. Peixoto refused and made mention of it to Sergeant Dobler. Dobler advised me and I directed Sergeant Dobler to tell Brad he was not to go by the gym. He did.

I spoke to Brad that same day and asked how he was doing. He indicated he was dealing with some personal issues relative to Mary's infidelity with their business partner. EAP offered. He said he was already speaking to two professionals. I explained I thought Brad should stay in the office longer to allow himself the opportunity to not have to worry about patrol/interim reporting. He told some officers he was bored in the office and wanted to get back out in the field. He was pacing in the wash shed (in uniform) speaking on the phone when I left the office at the end of the day. He appeared upset and animated. I called Sergeant Dobler (they were long-time friends) and asked him if he was comfortable asking Brad if he was thinking of hurting himself or someone else (this was based on previous suicide prevention training and there was no indication either was an issue). Jeremy agreed he'd ask and did. Brad said that he was not thinking of hurting himself or anyone else and just upset about his current situation (personal and career).

Notification by Officer Ward (evening of Brad Paisley Concert). Ward and I spoke before the concert on the phone as he was unaware of what Brad's current issues were and what had been discussed and offered. We discussed allowing Brad to stay in the office longer, which I had already encouraged Brad to do. Ward said he'd encourage Brad to stay in the office longer.

Text from Dobler to call. I called… Notification of events of that evening outlined in 20-chief's email and subsequent follow-ups.

Sabrina's interview (approx. 3 hours) determined not a threat to himself or others and had good family support, a Christian background (did not want to go to prison or Jail), and had good coping skills. Said reporting requirements only if we believe him to be threat. She also advised per some authority that notification to parties that someone was a threat was only necessary prior to an incident, not after (and

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

also not believed to be a threat). Conversation discussing such that evening around 0400 hours with AC Dowling.

Asked that reps and sergeants observe and report on Brad's demeanor. Brad was granted vacation time. Spoke to reps following Joslin's arrest and asked if reps would ask Brad to voluntarily come in for group debrief (he was on an extended vacation to allow him to deal with his personal life, at his request). He agreed. I spoke to therapist Joy Graf who was here for the debrief about Brad and asked if she'd mind speaking to him following the group debrief. She said she'd be happy to. I asked Brad if he'd mind, (again, telling him it was completely voluntary) and he agreed. I'd estimate 2 hour evaluation. I spoke to Brad after and explained how appreciative I was. We discussed the very real consequences of people's (Mike's) actions and the everlasting effects those actions have on himself, his family, our reputation, and the community we serve. The conversation was very positive and he advised he was doing better. He was very appreciative of the assistance Joy provided.

Therapist Graf and I spoke, immediately after their session. Again, she said she gave him coping skills (i.e. AR's pointed at him and to leave any general situation where they may encounter one another in the community). She said not a threat to himself or others, good family support, understands consequences of any behavior, etc. (I'm told she had a long follow-up call with him approximately a week later).

Spoke to Reps Clawsen and Archer about encouraging Brad to stay in the office longer to deal with issues. I explained my concerns with him making any mistake (general law enforcement mistake or another crash) and losing his job. I did not want him working distracted. They agreed to speak to him.

Spoke to sergeants and reps about the possibility of asking for a transfer to Gold Run where his father lives. Discussed it with him and he said he appreciated it but was doing fine and did not want to uproot his daughter form HS. We discussed the current situation (He didn't know where Mary was currently living, we spoke about not sending any unprofessional or inappropriate texts that could be used against him from a departmental or legal/divorce standpoint, and I told him he was not to go by the gyms or put himself in a position where he'd be in the same place as they are). He understood and agreed. He said he had sent texts to Mary that weren't nice but that sometimes he gets emotional. He expressed his concern for his kids and her lack of communication with them. He seemed very calm and relaxed and provided no red flags or indications that were of concern. He also mentioned that Sandi asked him if he was ok and in that moment he realized he probably needed to stay in the office a little longer to deal with things and allow time to pass. I approved.

I spoke to Reggie and Dan on Friday to advise them that, if they decided to send Brad to the field while I was away, to make it a unanimous decisions among all of the sergeants.

Monday before the Tuesday I left for vacation, I had approximately a one hour conversation with Brad about his current status. He said things were slowly starting to improve from the standpoint that he was coming to terms with the situation (she'd left him). We again discussed the importance of keeping texts and exchanges professional in the event his situation ends in divorce. We again discussed the coping skills he and Joy had talked about specifically discussing the AR scenario Joy explained to him (i.e. If you run into them, pretend they're both AR's pointed at you. Immediately turn around and get away from the situation). He assured me he wouldn't put himself in a situation where it would be problematic. I left for vacation Tuesday and didn't hear anything from anyone relative to Brad until the night of the incident.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

I am writing this on October 2, 2018, and have added info to dates on my calendar for some events (Specifically- Brad's Form 8, Brad Paisley Concert, Joslin Arrest/debrief, Wheat's meeting with Joy, and the date of the incident). These are being added to the calendar to assist with the timeline of events.

Although not all documented, I had DAILY conversations and updates from Brad about his current state when he was in the office. My concern was not that he was a danger to himself or others. My concern was that he would put himself into a position where Mary or her boyfriend would file a complaint, falsely or otherwise, when he was already on interim. My concern was for his career.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

Exhibit I

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


PHILIP DEBEAUBIEN,

        Plaintiff,

vs.                 Case No. 2:19-cv-01324-WBS-DB

STATE OF CALIFORNIA;
CALIFORNIA HIGHWAY PATROL;
CHP LIEUTENANT TODD BROWN;
CHP SERGEANT REGGIE
WHITEHEAD; CHP CHIEF BRENT
NEWMAN; and DOES 1 through
25, inclusive,

        Defendants.

_____/



CERTIFIED COPY


Deposition Via Remote Videoconference of

JEREMY DOBLER

Wednesday, August 26, 2020


REPORTER:  DEBRA P. CODIGA, CSR NO. 5647

_____

TENNELEY MICKEL REPORTING
P.O. Box 1107
Arbuckle, California 95912
Tel 916-492-9021  Fax 916-922-3461

Jeremy Dobler - August 26, 2020

```
 1          THE WITNESS:  Not that I remember.  I don't --
 2   I'm not sure if I've ever met him.  But it sounds
 3   familiar.  The name sounds familiar.
 4      Q.    BY MR. KATZ:  Do you know when I -- when I use
 5   the term "ISU," do you understand that that means
 6   "Investigative Service Unit"?
 7      A.    I do.
 8      Q.    Okay.  Have you had any communications with
 9   anyone from CHP ISU regarding Brad Wheat?
10      A.    Not that I remember.
11      Q.    Have you had any communications with anyone
12   working out of the Valley Division division office
13   regarding Brad Wheat?
14      A.    Yes.
15      Q.    With whom?
16      A.    Well, there would be the chiefs.  I know
17   specifically Chief Stonebraker.
18      Q.    And who else?
19      A.    I can't remember who was on call the night that
20   I went out to Brad's house.  I believe it was Dowling, I
21   believe.  Steve --
22      Q.    Okay.
23      A.    -- Dowling, to the best of my knowledge.
24      Q.    And how many times did you communicate with
25   Chiefe Stonebroker -- Chief Stonebraker?  Stonebroker?
```

Jeremy Dobler - August 26, 2020

```
 1      A.     Stonebraker?

 2      Q.     -- Stonebraker regarding Mr. Wheat?

 3      A.     Twice.

 4      Q.     Okay.  When was the last time?

 5      A.     Year and a half ago.

 6      Q.     Okay.  And could you please tell us what you

 7   recall about that interaction with Chief Stonebraker?

 8      A.     I contacted Steve -- excuse me Chief

 9   Stonebraker -- I almost said "Steve" -- approximately

10   two to three weeks after Brad and Mary because one of my

11   officers said something about a 911 call that we hadn't

12   heard about, and I had mentioned it to him for ISU to

13   investigate because it's prior to the whole incident,

14   and I had --

15           (Interruption in proceedings.)

16           THE WITNESS:  We -- the Internet at the office

17   here is -- we're actually on cellular because the

18   Internet wasn't even allowing us to --

19           MS. McTAVISH:  Yeah.  The connection was so

20   bad, I'm actually tethering to my 5G.

21           (Interruption in proceeding.)

22           (Record read by reporter.)

23      Q.     BY MR. KATZ:  Does -- does that accurately --

24   well, let me rephrase.  Let me ask it in this way,

25   Sergeant.
```

Jeremy Dobler - August 26, 2020

```
 1           And can you hear me okay, sir?
 2   A.      Yes, sir.
 3   Q.      Okay.  Great.
 4           So am I correct that approximately three weeks
 5   after the shooting you contacted Chief Stonebraker
 6   because you heard from another officer about a 911 call
 7   that happened prior to the shooting that you were
 8   unaware of but you thought that he should make ISU aware
 9   of so they could investigate.
10           Is that a correct statement?
11   A.      Yes.
12   Q.      Okay.  And what officer told you about the 911
13   call?
14   A.      That would be Officer John Hardey.
15   Q.      Could you spell his last name, please, sir?
16   A.      H-a-r-d-y.
17   Q.      Great.
18           And he's a patrol officer?
19   A.      He was.  He retired.
20   Q.      Okay.  Do you know where he retired to?
21   A.      Amador County.
22   Q.      Okay.  You know, I -- I totally understand why
23   a lot of peace officers want their sort of -- I don't
24   want to make part of the record, if you will, his
25   address.
```

Jeremy Dobler - August 26, 2020

```
 1              Without saying it out loud, do you have his --
 2   do you have his address?
 3      A.    It -- I think somebody in the office does, but
 4   I -- I don't personally.
 5              MR. KATZ:  Okay.  Amie, would you be able to
 6   get me that address as opposed to me asking a bunch of
 7   questions that might be of a -- of a nature that
 8   Mr. Hardey might not necessarily want in the -- you
 9   know, potentially in the record?
10              MS. McTAVISH:  I can -- I can inquire about his
11   contact information.
12              MR. KATZ:  Okay.  Thank you.
13      Q.    Okay.  And what did Officer Hardey tell you
14   about the 911 call?
15      A.    That he had heard from another retired officer
16   that there'd been a 911 call in El Dorado County
17   involving Brad and Mary.
18      Q.    Okay.  And would it be consistent with your
19   recollection that that was an instance on or about
20   August 2nd, very beginning of August, where he was
21   driving over there to where they were -- Mary and
22   Mr. Debeaubien were staying in -- you know, near
23   Georgetown to confront them?
24      A.    I would have no idea of the date.  It was --
25      Q.    Okay.
```

Dobler 08-26-2020

Jeremy Dobler - August 26, 2020

```
 1      A.      -- it was September 3rd or 4th two years ago.
 2  I --
 3      Q.      Sure.  I -- I appreciate your efforts to -- to
 4  remember what you've been able to so far, even.
 5              In general terms, was it your understanding,
 6  though, that the call was to El Dorado County, that he
 7  was going to -- that he was -- for some reason he was
 8  going -- there was some incident involving him in
 9  El Dorado County and his wife or deceased wife?
10      A.      That -- that's what I was told.
11      Q.      Okay.  And -- and why is it you decided to call
12  Chief Stonebraker and tell him that information?
13      A.      Because it was something that we hadn't heard
14  about, and I was shocked when I heard that.  I had no
15  idea if it was true, but I wanted to find out if it was
16  true.
17      Q.      So it struck you as important.
18      A.      Absolutely.
19      Q.      Okay.  And -- and something that should have
20  been -- that you thought should have been investigated.
21      A.      Yeah.  Like when it happened.
22      Q.      Okay.  Now, are those the two occasions you
23  recall speaking with Chief Stonebraker?
24      A.      Regarding Mr. Wheat?
25      Q.      Regarding -- thank you.  Regarding deceased --
```

Jeremy Dobler - August 26, 2020

1      A.    Yes.

2      Q.    -- Officer --

3      A.    Yes.  (Nodding head.)

4      Q.    Okay.  And then you mentioned another chief out

5    of the Valley Division you believe you spoke to.  And --

6      A.    I --

7      Q.    -- Chief Dowling?

8      A.    Just -- just for recollection, I did -- Chief

9    Stonebraker was here the morning of -- I think it was

10   the 3rd, so I did speak to him on scene here at the

11   office that morning.

12     Q.    Thank you very much.

13     A.    I -- now that I'm thinking about it, I did talk

14   to him.  I mean obviously, that morning was -- everybody

15   and their -- showed up, so I know he was here.

16     Q.    Okay.  And was it Chief Dowling, you said, sir?

17   Was that the name of the other individual?

18     A.    I believe it was.  I didn't speak to him

19   directly.  I spoke to my commander, who was speaking to

20   Dowling, so it was kind of indirectly that night.  But I

21   believe he was the one that was on call that my

22   commander was speaking to.

23     Q.    And when you say your commander, are you

24   referring to Lieutenant Brown?

25     A.    I am.

Jeremy Dobler - August 26, 2020

```
 1          Did he tell you -- was that after you had your
 2   conversation with him in which he disclosed to you that
 3   his wife was involved in a relationship with Trae?
 4      A.   I believe it was.  I don't remember if we had
 5   the discussion before, but I know we talked several
 6   times afterwards.
 7      Q.   Did you -- do you recall having any discussions
 8   with any other supervisors at the Amador office about
 9   Brad being distracted by personal issues he was having?
10      A.   I know we discussed it in the sergeant's office
11   with Reggie and Dan, and the commander at some point,
12   multiple times, I'm sure.
13      Q.   Were there ever any discussions as to whether
14   or not he should be referred for a department
15   examination to see if he was in okay shape at that time
16   to -- mentally, to continue serving as an officer?
17      A.   I know we had him evaluated because I was there
18   for that.
19      Q.   Okay.  And who -- who evaluated him?
20      A.   I don't recall her name.  I want to say it was
21   Kelly or -- it was somebody the department has on
22   contract or --
23      Q.   Okay.
24      A.   -- I don't remember her exact name.  I know
25   there was two psychologists.  I remember Joy's name
```

Jeremy Dobler - August 26, 2020

```
 1   because it's easy to remember.  The one that came out
 2   and talked to Brad initially, I want to say her name was
 3   Kelly, but it doesn't seem right in my head for some
 4   reason, so I think that's wrong.
 5       Q.   Okay.  Did -- and you're doing a great job of,
 6   you know, gen -- I mean I can just tell you're -- you're
 7   trying to find answers for things you haven't been
 8   necessarily thinking about recently.
 9            Did you write their names anywhere, do you
10   think, on any forms or anything?  Would you have made a
11   record of that?
12       A.   I didn't -- I don't have a record of that.
13       Q.   Okay.  But -- so you were there when he was
14   evaluated by a couple of department psych --
15   psychologists?
16       A.   I -- I was at his house with that one, and then
17   I was here with Joy when she talked to him for several
18   hours here.  And she also called -- talked to me on a
19   separate occasion when she talked to him on the phone
20   here for -- for an hour or so.
21       Q.   Okay.  Was there a period of time when Brad was
22   asked to surrender his fireman or not carry his gun?
23       A.   No.
24       Q.   Was he on any type of limited duty that you're
25   aware of?
```

Jeremy Dobler - August 26, 2020

1      A.      No.

2      Q.      Okay.  Do you have an understanding as to how

3   that evaluation that you were there -- that happened at

4   the office -- do you know who -- who was responsible for

5   setting that up or initiating that?

6      A.      That was -- Joy was here for another incident,

7   the one -- that was the second time I had him talked to,

8   and I don't remember if Reggie or I called in Brad

9   because I -- I had put Brad on vacation.  I said, "Hey,

10  Brad.  Take some time with your kids," so he went down

11  to Southern California.

12          But I said, "Hey, if you're back, would you

13  come in and talk to her?"  And he agreed, so I don't

14  remember if Reggie or I set that up, but I know we asked

15  him to come talk to Joy at that point again a second

16  time.

17     Q.      Okay.  Sorry.  I'm just -- you know, sometimes

18  you make notes, and then you sort of jump around a

19  little bit, and then you got to figure out where the

20  heck you are.

21          Are you familiar with the term

22  "fitness-for-duty" --

23     A.      Yes.

24     Q.      -- "examination"?

25          Was this a fitness-for-duty exam that had taken

Jeremy Dobler - August 26, 2020

1   place?

2       A.    With Joy?

3       Q.    With either of the folks.

4       A.    Well, when I called -- when we called out -- I

5   hate referring to her as "Kelly" because I think it's

6   wrong -- that -- that was more of "Hey, is he okay to go

7   to work."

8       Q.    Okay.  So -- okay.  Did it strike -- did it

9   seem to you that Brad was depressed in the latter part

10  of -- sort of the -- if you will, the summer of 2018?

11      A.    At what point?  I mean he -- I know he was

12  stressed and -- and upset.  I don't know if he was

13  depressed.

14      Q.    Okay.  Do you have an understanding -- so you

15  know that some folks went to his house and talked to

16  him.  Do you know who -- did any officers that you're

17  aware of from -- from the Amador office go to Brad's

18  house at that time?

19      A.    Yes.

20      Q.    Which officer or officers?

21      A.    Officer Ward and myself.

22      Q.    Okay.  So -- so you were at the house that time

23  as well.  And --

24      A.    Yes.

25      Q.    -- what's your understanding as to why Officer

Jeremy Dobler - August 26, 2020

```
 1           Did you ever learn what was in his car that --
 2   that night?
 3      A.    No.  But because of my personal relationship, I
 4   didn't involve myself or read or have anything to do
 5   with the sheriff's department's -- because --
 6      Q.    Totally understand.
 7      A.    -- a little too raw, so it wasn't -- wasn't
 8   something I went looking for information on.
 9      Q.    I don't -- I don't blame you.
10           Now, when did you learn your deposition was
11   going to be taken in this case?
12      A.    Was it a year ago?  I -- I --
13           MS. McTAVISH:  When this --
14           THE WITNESS:  Oh, when --
15           MS. McTAVISH:  -- deposition.
16           THE WITNESS:  I think we just got the -- the
17   request a month ago or so.  I don't -- I don't --
18      Q.    BY MR. KATZ:  Okay.
19      A.    -- remember.
20      Q.    You -- you realized or you thought in the
21   last -- so after the time that you learned you were
22   going to be deposed in this case, did you review any
23   documents to refresh your memory?
24           And by "documents" I mean like super broad.
25   You know, computer entries, logs, photos, audio.  Did
```

Jeremy Dobler - August 26, 2020

```
 1   you review anything concerning this incident?
 2        A.    No.   I don't have anything concerning this
 3   incident.
 4        Q.    Okay.  Did you look at any CHP policies in
 5   preparation for this?
 6        A.    No.
 7        Q.    Did you prepare any type of report?
 8        A.    No.
 9        Q.    And are you familiar with the term
10   "chronology"?
11        A.    Yes.
12        Q.    And is there a chronology report, or do you
13   view it as something different?
14        A.    I'm lost.  Is -- is there a chronology report?
15   That's what you're asking?
16        Q.    Did you -- did you prepare a chronology for
17   this?
18        A.    No.
19        Q.    Okay.  So if you did, you simply don't recall
20   what you -- what's in there?
21        A.    I don't -- I don't -- I didn't make a report,
22   so I don't know what --
23        Q.    Did you prepare a chronology?
24        A.    No.
25        Q.    Okay.  You indicated you'd been a -- with the
```

Dobler 08-26-2020

Jeremy Dobler - August 26, 2020

1   department for, what, about 20 years, or more than 20?

2      A.     22 years, I believe, since nine -- 1998.

3      Q.     Okay.  Could you tell us your history with the

4   department?  And if it's easier for you to start now --

5   and by "history" I mean sort of assignment, rank.

6           If it's easier for you to start now and go

7   back, that's fine, or if it's better for you to start at

8   the beginning and go forward, either direction's fine

9   with me.

10     A.     Just assignments or dates or approximate?  I

11  can give you approximate.

12     Q.     Oh, yeah.  Your best estimates as to those

13  things, yes.

14     A.     You want both, then?

15     Q.     Yes, please.

16     A.     Okay.  I graduated the academy October of 1998

17  and was assigned to the Santa Cruz area.  I believe I

18  transferred to Bridgeport around September of 2001.

19           Then I transferred to the San Andreas area in

20  mid -- maybe June of 2002, and I was there about a year,

21  transferred to the Amador area in 2003, around, I want

22  to say, September.  And I was an officer the whole time.

23           As an officer, I also then went to the Office

24  of Internal Affairs at headquarters in 2007, I believe,

25  probably around September.  And I was there for two

Jeremy Dobler - August 26, 2020

```
 1              Have you ever attended one, or been an
 2    initiator or reviewed the paperwork for one of those?
 3       A.    As a complaint officer, no, because that was
 4    done at a sergeant's level and I was an officer at the
 5    time.  Anything that was fitness for duty was at a
 6    higher level than officers.
 7       Q.    Okay.  Since you've been a sergeant, do you
 8    believe you've ever requested a fitness for duty for
 9    someone?
10       A.    I have not.
11       Q.    Okay.  In your experience, are those fairly
12    rare?
13              MS. McTAVISH:  Objection; that's vague.
14       Q.    BY MR. KATZ:  Well, let me ask you this.
15              Sometimes are fitness for duty regarding mental
16    health issues -- is that a rare occurrence, in your
17    experience with your 20-plus years with the department?
18       A.    I don't know.  I mean as far as rare?  They
19    happen.  I don't know what to compare it to.
20    Comparatively to what?
21       Q.    Okay.  Fair -- fair enough.
22       A.    I mean --
23       Q.    Did any -- now, my -- did anyone ever discuss
24    with you what the original disposition was going to be,
25    before -- before he died, of Brad's Internal Affairs
```

Jeremy Dobler - August 26, 2020

 1  investigation?

 2      A.    I don't remember what the penalty was going to

 3  be.

 4      Q.    Was it your understanding, though, there was

 5  going to be some sort of adverse action?

 6      A.    It was already initiated, yes.  I mean that's

 7  what the investigation's called, so --

 8      Q.    Yeah.  That's right.  There you go.

 9            Aside from yourself and Officer Bianchi, which

10  officers do you believe were closest to Brad?

11      A.    Hmm.  I don't -- I don't know.  I don't know of

12  anybody that disliked Brad.  I mean he was well liked by

13  everybody in the community and -- and in the office, so

14  I don't think you'd find anybody that was not a friend

15  of his.

16            So I don't know who was really close with him,

17  offhand.  I know -- yeah.  I think Bob probably was, and

18  myself, but like I said, over the last few years, we

19  weren't as close as we were back in the beginning.

20      Q.    At some point did you learn that Brad kept a

21  journal or diary?

22      A.    Yes.

23      Q.    When did you first learn that?

24      A.    When I saw him writing in it.  I asked him

25  about it.

Jeremy Dobler - August 26, 2020

```
 1      Q.     And what do you -- do you remember when that
 2   was?  A year, at least?
 3      A.     Well, it was when he had returned to work,
 4   because that's when I saw him writing in it, and I'd
 5   asked him, "Hey, what are you doing?"  And he had told
 6   me that his -- the counselor that he was seeing in -- in
 7   Rocklin was having him journal.
 8           So that's when I learned, and I said, "Okay."
 9   Because he was doing it sitting at the desk answering
10   phones, and I was -- I'm like, "Well, what are you
11   doing?  You're not working."
12           But I was like, "Hey, you know what?  If it
13   helps you, you know" --
14      Q.     And just for clarification -- mind you, I
15   follow what you're saying.  So that was after the period
16   of time that you suggest -- that you told him he should
17   take some time off to try to get sort of in a better --
18      A.     Yeah.
19      Q.     -- place?
20      A.     After I said, "Hey, go down south, take some
21   time with your family," because I guess his kids were
22   going down.  He had returned to work, and that's -- you
23   know, he'd already -- he'd already told me he'd seen the
24   counselor a couple times a week, and actually I was
25   letting him leave work to do it, leave early.
```

Jeremy Dobler - August 26, 2020

```
 1            And I had seen him writing in this journal, and
 2   I asked him about it.  I said, "Hey, what are you
 3   doing?"  He said, "Hey, the counselor said," you know,
 4   so they could discuss things throughout the day, I
 5   guess.  And I said, "Okay."  Just -- just some --
 6   something different that I noticed.
 7       Q.   And how was it that Brad was answering the
 8   phones?
 9       A.   I don't know what you're asking.  How what?
10       Q.   Normally he was a -- my understanding was he
11   was a patrol officer, road officer?
12       A.   Yes.
13       Q.   And so what was it -- or how -- how did it come
14   to be that after he came back, taking some time to try
15   to get his head squared away, that he was at the desk
16   answering phones?  And --
17       A.   Well, based on the fact that he had crashed two
18   patrol cars, we wanted to make sure that his head --
19   that's what initiated the adverse action.  Wanted to
20   make sure his head space was right, that -- because
21   obvious both crashes were complete distraction.
22            There was no -- anything outside of he was just
23   not paying attention, and we didn't want to put him back
24   into a patrol car until we were sure that he was able to
25   not be distracted.
```

Jeremy Dobler - August 26, 2020

```
 1       A.    I believe that's correct, yes.
 2       Q.    Okay.  And then the other name, would it -- was
 3    it Sabrena, S-a-b-r-e-a-n-a, Swain, S-w-a-i-n?
 4             Interruption in proceeding.)
 5       Q.    BY MR. KATZ:  The spelling is Sabrena,
 6    S-a-b-r-e-n-a; last name, Swain, S-w-a-i-n.
 7       A.    And yes, I believe that's correct.  Now that
 8    you say it, I believe it's -- I knew "Kelly" was wrong,
 9    but I think it was Sabrena that came out.  That sounds
10    correct.
11       Q.    Okay.  Now, so Brad's working.  So he's not in
12    a car with -- and you indicated there'd been discussions
13    as whether or not they thought it was safe to put him
14    back in a car, but no decision had been reached yet.
15             Is that a fair statement?
16       A.    I don't think so.  I think he was told he could
17    go back.
18       Q.    Okay.
19       A.    I think the decision was made, but I don't -- I
20    don't -- I would have to check with the boss on that,
21    but I -- my -- to the best of my recollection, he was
22    told he can go back starting in September, I believe.
23       Q.    Okay.  And that was something that had been --
24    am I correct that that was something that had been
25    discussed amongst the supervisors, whether he was ready
```

Jeremy Dobler - August 26, 2020

```
 1   to go back yet?
 2       A.    And the commander and --
 3       Q.    Correct.
 4       A.    -- and Brad himself.
 5       Q.    Now, when you say he was answering the phones
 6   there, just so I'm clear, he was in a -- the -- the
 7   office area in the back doing that; correct?  He wasn't
 8   in the front, public-counter position, was he?
 9       A.    He was in the front-counter -- counter
10   position, yes.
11       Q.    So he was -- he was at the front counter?
12       A.    He -- he was the front -- basically working as
13   the front desk officer, as much as we have one here,
14   yes.
15       Q.    Okay.  So that's where he was setting up.
16   Okay.
17           Do you have any understanding if there was any
18   paperwork associated with his temporarily being on
19   limited duty?
20       A.    He wasn't on limited duty, so there was no
21   paperwork.
22       Q.    Okay.  Do you have any understanding as to how
23   many firearms Brad had?
24       A.    I don't know.
25       Q.    Were you -- I believe it was during the --
```

Jeremy Dobler - August 26, 2020

1    well, I believe it was Officer Lopez.

2         Were you there when the Amador Sheriff's

3    Department searched Brad's locker at the Amador station?

4         A.    I remember them coming -- were going to come

5    in.  I couldn't tell you if I -- I wasn't present at

6    them searching, but I -- I might have been here that

7    day; I can't remember.  I remember they were setting it

8    up and when to come in.

9         Q.    Okay.  And do you have an understanding as to

10   who was setting that up?

11        A.    It would be their investigator from the

12   sheriff's department.

13        Q.    Okay.  And in your experience, was that sort of

14   an unusual event, that a outside -- even an agency comes

15   in and searches CHP lockers?

16        A.    In a criminal matter?  No.  It'd be kind of --

17   if there's a crime they committed, yeah, they're going

18   to come in and search wherever there can be fruits of

19   the crime.

20        Q.    Okay.

21        A.    I don't think that's unusual.  I think that's

22   pretty standard operating procedure.

23        Q.    All right.  Now, I know you talked about when

24   you graduated the academy.  Do you have any military

25   experience?

1              REPORTER'S CERTIFICATE

2                    --oOo--

3          I certify that the witness in the foregoing

4    deposition,

5                    JEREMY DOBLER,

6    was remotely administered the oath by me to testify to

7    the truth, the whole truth and nothing but the truth in

8    the within-entitled cause; that the deposition was taken

9    remotely at the time and place named; that the testimony

10   of the witness was reported by me, a duly certified

11   shorthand reporter; that it was thereafter transcribed

12   into typewriting, and that the transcript is a true

13   record of the testimony given.

14          Pursuant to Federal Rule 30(e), transcript

15   review was requested.

16          I further certify that I am not financially

17   interested in the action, nor a relative or employee of

18   any attorney or any party to the action.

19

20   Dated:  September 8, 2020

21

22   _____

23         DEBRA P. CODIGA, CSR No. 5647

24         State of California

25

```
 1                 UNITED STATES DISTRICT COURT

 2               EASTERN DISTRICT OF CALIFORNIA

 3

 4    PHILIP DEBEAUBIEN,

 5                 Plaintiff,

 6    vs.                          Case No. 2:19-cv-01329-WBS-DB

 7    STATE OF CALIFORNIA;
      CALIFORNIA HIGHWAY PATROL;
 8    TODD BROWN; SABRENA SWAIN;
      JOY GRAF; REGGIE
 9    WHITEHEAD; RYAN
      STONEBRAKER; BRENT NEWMAN;
10    JEREMY DOBLER,

11                 Defendants.

12    _____/

13

14                      Deposition of

15                    JEREMY DOBLER

16              Volume 2, Pages 104 - 217

17              Friday, June 25, 2021

18

19

20        REPORTER:  DEBRA P. CODIGA, CSR NO. 5647

21

22    _____

23

24            TENNELEY MICKEL REPORTING
                  P.O. Box 1107
              Arbuckle, California 95912
25        Tel 916-492-9021  Fax 916-922-3461
```

**CERTIFIED COPY**

Jeremy Dobler - Vol. II - June 25, 2021

1    in your locker?

2        A.    Until they go somewhere else.

3        Q.    Okay.  And was there any paper record created

4    of your decision to take -- to take possession of the

5    weapon and then put it in your locker?

6        A.    No.

7        Q.    Why not?

8        A.    Because I was doing that for Brad.

9        Q.    Well, when -- would it be a fair statement that

10   part of the reason that Officer Ward took possession of

11   Brad's gun was so Brad wouldn't hurt anybody else?

12       A.    Or himself, yes.

13       Q.    Okay.  Did your taking the gun to be returned

14   whenever Brad felt like it -- was that protecting anyone

15   else?

16            MS. McTAVISH:  Objection; misstates the

17   testimony.

18            You can go ahead and answer.

19            THE WITNESS:  I don't know what he's asking.

20       Q.    BY MR. KATZ:  Okay.

21       A.    I'm confused by the question, so --

22       Q.    All right.  So you give -- you decide to give

23   him back the weapon; correct?

24       A.    Several weeks later when he came back to work,

25   I gave him back his weapon.  I didn't decide.  It was

Dobler 06-25-2021

Jeremy Dobler - Vol. II - June 25, 2021

```
 1    his weapon.  I was holding onto it.
 2        Q.    Well, it was the CHP's weapon, wasn't it?
 3        A.    Correct.  Assigned to him.
 4        Q.    And the CHP wants to know where their weapons
 5    are, don't they?
 6        A.    (Nodding head.)  It's assigned to Brad.  That's
 7    where it is.
 8        Q.    Well, it was in your closet for how long?
 9        A.    Approximately two weeks.
10        Q.    Okay.  And you never told anyone that weapon
11    was in there with the highway patrol, did you --
12        A.    Yes, I did.
13        Q.    -- or did you?
14        A.    Yes, I did.
15        Q.    Who did you tell?
16        A.    My commander.
17        Q.    So Lieutenant Brown knew that it was being
18    kept, off the books, in your locker; correct?
19        A.    Yes.
20             MR. KATZ:  Okay.  Let me show you what will be
21    marked next in order.
22             (Exhibit 52 marked.)
23        Q.    BY MR. KATZ:  Do you recognize what Exhibit 52
24    is?
25        A.    Yes, sir.
```

Dobler 06-25-2021
121

Jeremy Dobler - Vol. II - June 25, 2021

```
 1       Q.   And can you tell us what it is?
 2       A.   Highway Patrol Evidence Manual.
 3       Q.   Okay.  And that sets forth the department's
 4   policy regarding evidence; is that correct?
 5       A.   Yep.
 6            MS. LEONARD:  Stewart, can you please share the
 7   exhibits?
 8            MR. KATZ:  Oh, I apologize.  Yes.
 9            MS. LEONARD:  We haven't seen the last two
10   exhibits.
11            MR. KATZ:  I'm sorry.  You actually need that
12   one.  My -- my error.  So the one that we're going on --
13   thank you for calling it to my attention.  I only wish
14   you'd done so sooner.
15            MS. LEONARD:  It's all right.
16            MR. KATZ:  The first one -- in fact, you can
17   send all -- you know something?  Why don't you send all
18   those to everyone.  Yeah.  Does that make sense?  And
19   then we'll get the one up if you need it up.
20            All the lettered ones.  Does that sound okay to
21   you folks?
22            MS. LEONARD:  Sure.  Thank you.
23            MR. KATZ:  Okay.  And the one we're talking
24   about has a letter "B" in front of it, and the first one
25   that we're looking at -- it wasn't named that way, so
```

Jeremy Dobler - Vol. II - June 25, 2021

```
 1   intention to hurt someone and you have -- and you have,

 2   at the same time, a deadly weapon, a gun?

 3       A.   I could have an intention and a gun and not --

 4   it's -- no, it's not a crime unless you actually do

 5   something with it.  You can intend things all day long.

 6       Q.   Okay.  We'll get to that in a little bit.

 7            And by the way, "until you actually do

 8   something," so at some point you learned that -- you

 9   knew where Brad lived; right?

10       A.   Yes, sir.

11       Q.   Okay.  And you understood that he had gotten

12   into his car to go to look for Trae; correct?

13       A.   That's what I was told, yes.

14       Q.   Okay.  And you understood he went -- and that

15   was a voluntary act on his part; right?

16       A.   Yes.

17       Q.   Okay.  And he went and he got in the car and he

18   drove off.  You understood he drove -- he didn't just

19   get in the car; he drove the car; correct?

20       A.   Yes.  Sorry.  I'm shaking my head again.  Sorry

21   about that.

22       Q.   And he drove the car with the intention of

23   finding Trae so he could shoot him.

24       A.   I was not told that, but yes, I'd assume so.

25       Q.   Okay.  Certainly at the very -- well --
```

Jeremy Dobler - Vol. II - June 25, 2021

```
 1      A.    Hindsight, I -- yes, I would say that.  But --
 2      Q.    And the reason he didn't shoot Trae that night
 3  because he couldn't find him, could he?
 4      A.    Well, yeah, I'd assume so.
 5      Q.    Okay.  Isn't that an attempted murder?
 6      A.    I don't see the attempt, but okay.  If you say
 7  so.  I'd say no.
 8      Q.    Okay.  Well, what would you call it?  No harm,
 9  no foul?
10      A.    No.  I'd say it's what we refer to commonly as
11  a -- a -- man, it just slipped my brain.  A mental
12  health crisis.  I was concerned about his mental health
13  at that time.
14      Q.    You --
15      A.    He hadn't done anything, so my concern was he
16  didn't do anything.
17      Q.    Would you have been concerned about his mental
18  health if he hadn't been a friend of yours for 18 years?
19      A.    Yes.  I'd be concerned because I do this for a
20  living, and I -- every time I stop with somebody on the
21  size of the road, I'm concerned about their mental
22  health and them not hurting themselves.
23      Q.    Okay.  Well, if someone who wasn't your friend
24  for 18 years had a weapon on their person and they said
25  they were looking for someone to kill them, would you
```

Jeremy Dobler - Vol. II - June 25, 2021

1   have different concerns if they weren't -- if they

2   hadn't been your friend for 18 years?

3        A.   Regardless of that, if they had the weapon on

4   them, that's a more immediate effect.  I mean he didn't

5   have a weapon on him when I talked to him.  It was all

6   stuff that didn't happen in my presence.

7             I don't have the authority to act on

8   misdemeanors not committed in my presence.  So I mean I

9   can't arrest him based on that.  I have to deal with the

10  immediate -- what I thought was the issue was a mental

11  health issue.

12       Q.   Well, was -- did you think it was an issue that

13  an armed -- and he's trained how to fire a gun, isn't

14  he?

15       A.   Yes, sir.

16       Q.   And whatever his failings may have been as a

17  highway patrolman in terms of, maybe, skill with

18  paperwork, no one ever doubted his ability to handle a

19  firearm, did they?

20       A.   I don't know.  I -- I don't -- I don't have an

21  answer for anybody doubting his ability to fire.  I know

22  he passed the course -- same course as I did.

23       Q.   Did you ever go shooting with him?

24       A.   No.

25       Q.   Okay.

Jeremy Dobler - Vol. II - June 25, 2021

```
 1      Q.   Okay.
 2      A.   -- if that's what you're asking, but he was
 3  proficient enough to be -- pass the academy, so --
 4      Q.   Okay.  And as a CHP officer you were issued or
 5  able to use ammunition that the general public couldn't
 6  use; isn't that correct?
 7      A.   I don't know what our -- our issued -- issued
 8  ammunition, if it's not available to public.  I couldn't
 9  tell you.
10      Q.   Okay.
11      A.   I --
12      Q.   Now, let me direct your attention back to 6-4.
13  Would you agree that the policy calls for every item to
14  be -- that comes into the possession of a highway patrol
15  officer to be both tagged and marked with the
16  appropriate category of what that -- the nature of that
17  possession of the weapon -- of the object is?
18      A.   Yes.
19      Q.   And just so we're clear, would it be correct
20  that on 6.5, it specifically indicates a category for
21  safekeeping, which would be nonevidentiary property
22  placed in the custody of the department for temporary
23  protection or holding.
24      A.   I'm sorry; you said 6-5?
25      Q.   Page 6-5 --
```

Jeremy Dobler - Vol. II - June 25, 2021

```
 1      A.    Okay.  Yep.

 2      Q.    -- 4.e.

 3      A.    I see it.  Nonevidentiary property placed in

 4    the custody of the department for temporary protection

 5    or holding.

 6      Q.    Okay.  And you didn't do that because you had

 7    taken it, not as a highway patrol officer, but as a

 8    favor?

 9      A.    Did it, yes, as a friend.

10      Q.    Okay.  And did you tell Lieutenant Brown that

11    you had the gun but you were only holding it as his

12    friend.

13      A.    Yep.  I'm sorry.  Yes.  Sorry, I did it again.

14      Q.    And how did Lieutenant -- did Lieutenant Brown

15    say that that's fine or okay, or did he say nothing,

16    or --

17      A.    I don't remember.

18      Q.    -- what did he say?

19      A.    I don't remember, to be honest with you at this

20    point three years later.

21      Q.    And, obviously, looking at 6-17, which

22    references Civil Code Section 2080.10 regarding the

23    safekeeping of property, would it be a fair statement

24    that you did not follow those procedures?

25      A.    I -- well, I didn't book anything, so I didn't
```

Jeremy Dobler - Vol. II - June 25, 2021

```
 1   follow any procedure, like I told you --

 2       Q.   Okay.

 3       A.   -- initially.

 4            MR. KATZ:  Now, let's go to -- do you have

 5   Exhibit 9, by any chance?  Ah, right here.

 6       Q.   Let me show you what's been previously marked

 7   as Exhibit 9.  I think you folks have all had this

 8   yesterday, but it's -- it's in there in the Brown file

 9   if you want it.

10            MS. LEONARD:  Stewart, you're -- you're going

11   to have to share the screen again for us to see it.

12            MR. KATZ:  Okay.  It's Brown Exhibit 9.

13            MS. LEONARD:  Thank you.

14            MR. KATZ:  So go to depositions.

15            MS. SONG:  Or Stewart, in the alternative,

16   maybe madam court reporter could email us the exhibit.

17   Because she has been sent new exhibits through chat, and

18   we cannot view in chat.  We have to save them.  Somehow

19   even after being saved, I can still cannot open it.

20            MR. KATZ:  Okay.  Well, I'll email all the new

21   ones from today.  We'll open that up for you.

22            MS. SONG:  Thank you.

23            THE COURT REPORTER:  Off the record?

24            MR. KATZ:  Off the record, I guess.

25            (Recess.)
```

Jeremy Dobler - Vol. II - June 25, 2021

```
 1      A.    Yes.
 2      Q.    Did you have a telephone conversation, either
 3  before or after she met with Brad Wheat?
 4      A.    No.   I've never talked to her on the phone.
 5      Q.    Okay.   So when you talked to her in person, did
 6  you tell her that Brad Wheat had told you that he was
 7  going to -- did you say "off"?   Is that --
 8      A.    I don't remember specifically what he said, but
 9  that's what I said, yes.
10      Q.    That he was going to off Trae and then kill
11  himself?
12      A.    Yes.   I believe I told her everything that I
13  knew.
14      Q.    So you told her that?
15      A.    I think so.
16      Q.    And how did she respond to you when she heard
17  that?
18      A.    I don't remember.   Like I said, I really
19  don't -- it was three years ago.   I don't remember much
20  of the conversation.
21      Q.    Did you hear her ask any -- did she ask you any
22  specific questions about Brad Wheat's work performance?
23      A.    I don't remember that.
24      Q.    Did you hear her ask Deputy Ward any questions
25  about Brad's work performance?
```

Jeremy Dobler - Vol. II - June 25, 2021

```
 1        A.   I don't know if she ever talked to Ward.

 2        Q.   Okay.  Did she ask you whether Brad had been

 3   involved in any harassing or stalking behavior involving

 4   his estranged wife?

 5        A.   I don't remember her asking me that

 6   specifically, no.

 7        Q.   Did you volunteer any such information?

 8        A.   I wouldn't have because I didn't have any

 9   information on any of that.

10        Q.   Well, sorry.  You know Officer Pacheco?

11        A.   No.

12        Q.   Peixoto?

13        A.   Oh, Peixoto?  Yes.

14        Q.   Okay.  Did Peixoto tell -- he told -- did he

15   tell you, after he did a ride-along with Brad, that --

16   that Brad's wanting to drive by Mary's business?

17             Did you hear that?

18        A.   That was several weeks later, I believe, when

19   he came back to work.

20        Q.   Oh, he did that after he came back to work?

21        A.   Yes.

22        Q.   Okay.  And had anyone told you that Brad had

23   been cautioned about harassing and -- and vulgar texts

24   he was sending his wife?

25        A.   No.  I just remember Peixoto saying he told him
```

Jeremy Dobler - Vol. II - June 25, 2021

```
 1    he wanted to go by the -- the gym, and he said, "No,
 2    it's not a good idea."  That's what I remember.
 3         Q.   Okay.
 4         A.   I don't remember anything -- other text
 5    messages or anything.
 6         Q.   And your recollection is that was after this
 7    incident?
 8         A.   I think so.  Yeah.
 9         Q.   Okay.  So after he got his gun back?
10         A.   Yes.
11         Q.   How many times have you had an officer on a
12    drive-along tell a sergeant that the guy I'm driving
13    along with wanted to do something really stupid, that I
14    wouldn't do it?
15         A.   Well, I guess I'm not sure what you're asking.
16    How many times?
17         Q.   Yeah.  How many times --
18         A.   Has somebody done something stupid in the
19    department?
20         Q.   No.
21         A.   Lots.
22         Q.   How many -- someone's going on a ride-along.
23    That would tell you that your behavior's being monitored
24    closely; correct?
25         A.   Yes.  His driving behavior, I think, is what
```

Jeremy Dobler - Vol. II - June 25, 2021

1    they were doing the ride-along for.

2        Q.   Okay.  Would you agree that it shows an

3    extraordinary lack of judgment to be engaged in that

4    type of action when you're essentially on probation for

5    screwing up?

6        A.   I don't think there was -- I guess I'm confused

7    on what action we're talking about.  Driving by his

8    wife's business, which he was financially a part of?

9    I -- I don't know.  I mean he was going through issues

10   with his wife, and --

11       Q.   So did you tell Peixoto to mind his own

12   business?

13       A.   No.

14       Q.   Did you tell Brad that, "Hey, don't do that"?

15       A.   I don't remember if I actually talked to Brad

16   about that specifically, but I talked to him about his

17   behavior at one point.

18       Q.   What -- what point was that?

19       A.   I don't remember.

20       Q.   What did you say about his behavior to him at

21   that point?

22       A.   Just actions like that, that "Hey, just stay

23   away from her."

24       Q.   Okay.

25       A.   I don't remember if that was before or after,

Jeremy Dobler - Vol. II - June 25, 2021

 1   department didn't do anything to keep -- as far as the

 2   department was concerned, he could have a gun that

 3   night; right?

 4        A.   Yes.

 5        Q.   Now, we talked a little about you said that you

 6   had a misunderstanding about whether you'd prepared a

 7   report.

 8             Do you remember that?

 9        A.   Because I'd never prepared a report, and you

10   were asking about reports.  So I was confused on those

11   questions, but to my knowledge of what you were asking

12   at the time, I answered correctly.

13        Q.   Well, let me go back to what I asked and what

14   you answered.

15        A.   Okay.  What page are we on?

16        Q.   We're on page 64.

17        A.   Okay.

18        Q.   So you were asked a question on line 7, "Did

19   you prepare any type of report?"

20        A.   Uh-huh.

21        Q.   And you answered "No."

22        A.   Correct.

23        Q.   And then you were asked, "Are you familiar with

24   the term 'chronology'?"  And you answered "Yes."

25        A.   (Nodding head.)

Dobler 06-25-2021

Jeremy Dobler - Vol. II - June 25, 2021

```
 1      Q.   Was that your answer?

 2      A.   Yes.

 3      Q.   And then on line 16 you were asked, "Did you --

 4  did you prepare a chronology for this?"  And you

 5  answered "No."

 6      A.   Uh-huh.

 7      Q.   And then you were asked, "So if you did, you

 8  simply don't recall what you -- what's in there?"

 9           And then you say, "I don't -- I don't -- I

10  didn't make a report, so I don't know what --

11           "Did you prepare a chronology?

12           "No."

13      A.   Uh-huh.  And I --

14           MS. McTAVISH:  Objection.  That leaves out key

15  testimony in the middle of the page, lines 12 through

16  15.

17      Q.   BY MR. KATZ:  Oh, I'm happy to read that too.

18           12.  "And is there a chronology report, or do

19  you view" that "as something different?

20           "I'm lost.  Is there a chronology report?

21  That's what you're asking?"

22      A.   Uh-huh.  And that's -- was -- I was lost in

23  your line of questioning, so --

24      Q.   Okay.  Well, you --

25      A.   Because I never made chronological report.  I
```

Jeremy Dobler - Vol. II - June 25, 2021

1   didn't write a report.

2        Q.    Okay.  Well, you told us you prepared this --

3   what you titled it, a Chronological Summary.

4        A.    Uh-huh.

5        Q.    How is that different from a chronology?

6        A.    Same word.  I just didn't do a report.  This

7   was communication with our departmental lawyer, so

8   that's where the confusion was.  Because you were asking

9   about reports, and the sheriff's department did all the

10  reports.  I didn't prepare a report for this incident.

11       Q.    Did you prepare a chronology?

12       A.    I did a chronological summary for our lawyers,

13  but I didn't prepare a report.  So that was where I was

14  confused on these questions, and that's why I said, "I'm

15  lost," because I was lost in your line of questioning.

16       Q.    Did you prepare a chronology?

17       A.    Yes.

18       Q.    Thank you.

19            MS. McTAVISH:  Stewart, after you finish with

20  this exhibit, can we take a break?

21            MR. KATZ:  Sure.

22       Q.    On page 78, at line 17, there's a question:

23  "Do you have any understanding if there was any

24  paperwork associated with his temporarily being on

25  limited duty?"

Jeremy Dobler - Vol. II - June 25, 2021

```
 1      A.   Uh-huh.

 2      Q.   Is that a yes?

 3      A.   Yes.

 4      Q.   And you responded, "He wasn't on limited duty,

 5   so there was no paperwork."

 6      A.   Correct.  Limited duty is for injuries.

 7      Q.   Well, Brad wasn't mentally able to be an

 8   officer on the street, was he?

 9      A.   Yes, he was.

10      Q.   Okay.  Let me direct your attention back to the

11   chronology that you prepared.

12      A.   Uh-huh.  Whoops.  Sorry.

13      Q.   And the second page of that chronology, item

14   line 7, the first line, said -- I quote you -- "On

15   August 20th, 2018, Officer Wheat returned to work on

16   limited duty as the front desk officer."

17      A.   Yeah.  It was a mis-term because limited duty's

18   specific, in my understanding, to when you're on

19   injuries.  So there was no limited-duty status as far as

20   I knew, but -- I did use that term, yes, but I used it

21   incorrectly in this Chronological Summary.

22      Q.   And --

23      A.   In my mind, at least.

24      Q.   Okay.  And that summary had been viewed by

25   other officers; correct?
```

1          REPORTER'S CERTIFICATE

2                  --o0o--

3          I certify that the witness in the foregoing

4     deposition,

5                    JEREMY DOBLER,

6     was administered the oath by me to testify to the truth,

7     the whole truth and nothing but the truth in the

8     within-entitled cause; that the deposition was taken at

9     the time and place named; that the testimony of the

10    witness was reported by me, a duly certified shorthand

11    reporter; that it was thereafter transcribed into

12    typewriting, and that the transcript is a true record of

13    the testimony given.

14          Pursuant to Federal Rule 30(e), transcript

15    review was requested.

16          I further certify that I am not financially

17    interested in the action, nor a relative or employee of

18    any attorney or any party to the action.

19

20    Dated:  July 5, 2021

21

22

23    _____

24          DEBRA P. CODIGA, CSR No. 5647

25          State of California

Exhibit J

1           UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF CALIFORNIA

3                  --oOo--

4

5      PHILIP DEBEAUBIEN,                    )
                                            )
6                Plaintiff,                  )
                                            )
7           vs.                              )    Case No.
                                            )    2:19-CV-01329-WBS-DB
8      STATE OF CALIFORNIA; CALIFORNIA       )
       HIGHWAY PATROL; CHP LIEUTENANT        )
9      TODD BROWN; SABRENA SWAIN; JOY        )
       GRAF; SERGEANT REGGIE                 )
10     WHITEHEAD; ASSISTANT CHP CHIEF        )
       RYAN STONEBRAKER; CHP CHIEF           )
11     BRENT NEWMAN; SERGEANT JEREMY         )
       DOBLER,                               )
12                                          )
                 Defendants.                 )
13                                          )

14

15                 --oOo--

16     Deposition Via Remote Videoconference of

17              JOY GRAF

18        Wednesday, December 9, 2020

19              Volume I
              Pages 1 - 135

20

21     REPORTER:  LISA KENNEDY, CSR 8927

22     _____

23

24            TENNELEY MICKEL REPORTING
                P.O. Box 1107
25          Arbuckle, California 95912
       Tel: (916) 492-9021   Fax: (916) 922-3461

CERTIFIED
COPY

Joy Graf - December 9, 2020

```
 1   A        It didn't change my recollection.

 2   Q        And the documents you read, did that refresh

 3   your recollection in any way?

 4   A        It did not change my recollection.

 5   Q        And just so we're clear.  When you read -- when

 6   you first talked about this, you didn't know when you

 7   talked to him at all date-wise.  Is that a true

 8   statement?  You didn't recall when it was that you spoke

 9   to him?

10            MS. SONG:  Objection.  Vague and ambiguous.

11   Counsel, could you please specify by whom you're

12   referring to when you say "him"?

13            MR. KATZ:  Certainly.

14   Q        Is it a correct statement that you had no

15   recollection as to when you spoke with Brad Wheat other

16   than that it followed what you refer to I believe as a

17   debriefing?

18   A        My recollection is not based on dates as much as

19   approximate time frames before and after things.

20   Q        Have you ever read the complaint that was filed

21   in this case in which you are named?

22   A        That might be the other document, that really

23   lengthy one.

24   Q        Well, and you have the document on your

25   computer?
```

Joy Graf - December 9, 2020

```
 1   A         I believe I do.
 2   Q         Now, let me see if I understand.  So you are a
 3   licensed marriage family therapist; is that correct?
 4   A         Correct.
 5   Q         And you held that license since 1999; is that
 6   correct?
 7   A         Yes.
 8   Q         And would it be correct that you've received no
 9   professional disciplines since then?
10   A         Correct.
11   Q         Have you ever served as a supervisor for any
12   intern or been the supervisor of anyone who was getting
13   experience towards their own licensure?
14   A         No.
15   Q         What is your understanding of the scope of
16   practice for an MFT in California?
17   A         Under that licensure that I practice
18   psychotherapy to the extent of my education and training.
19   Q         And is there a particular type of issue that you
20   deal with as a licensed marriage family therapist?
21   A         Personally or the licensure?  I'm confused.
22   Q         Well, is there a difference between what the
23   licensure allows and what you do?
24   A         Yes.
25   Q         How is it different?
```

Joy Graf - December 9, 2020

```
 1   A        The license would allow a clinician to see
 2   children and adolescents, as well as aging people,
 3   transitions, gender specific issues.  So it's a broader
 4   field than what I practice in.
 5   Q        And does your practice -- first of all, it's set
 6   out in statute, isn't it, what the scope of practice is
 7   for an LMFT?
 8   A        Yes.
 9   Q        And it concerns dealing with interpersonal
10   relationships for the purpose of achieving more adequate,
11   satisfying, and productive marriage and family
12   adjustments; correct?
13   A        Correct.
14   Q        Now, you mentioned your training.  Am I correct
15   that as a California LMFT, you're required to do 36 hours
16   of continuing education every two years?
17   A        Yes.
18   Q        And what year is your cycle run in?
19   A        I think I just am -- just got relicensed last
20   July, so I'm six months in, I believe.
21   Q        So you're an odd-year person for that?
22   A        Yeah.  I mean, I have to double-check.  I can't
23   see.  I see my license, but I can't read the date.  Want
24   me to run and check it?
25   Q        No.  It's fine for now.
```

Joy Graf - December 9, 2020

```
 1           Of your 36 hours, am I correct that at least
 2   eight hours is required to be in ethics?
 3   A        Yes.
 4   Q        And the last cycle that you did in continuing
 5   education, who was your ethics provider?
 6   A        Boy, I would have to pull that.  I do so many.
 7   It could have been PESI.  They do a lot.  P-E-S-I does a
 8   lot.  CAMFT does some.  I can't remember which one I
 9   took.
10   Q        Do you keep a copy of your continuing education
11   records?
12   A        Yeah.
13   Q        For how long have you kept a copy?
14   A        I probably have the copies through my whole
15   career.
16   Q        And I would ask you not to purge those between
17   now and getting some additional discovery requests.
18   Would you do that?
19   A        Absolutely.
20   Q        Great.  What's your best estimate as to how many
21   hours of professional ethics you've had in the course of
22   your career?
23   A        Well, when I started, I think it was -- it
24   wasn't a requirement.  So whenever it became a
25   requirement, it was six credits.  So if it's every two
```

Joy Graf - December 9, 2020

```
1    years, it would be ten.  So maybe close to 40, 45.
2    Q        Well, am I correct that you had to pass an
3    ethics exam once they introduced it?
4    A        No.  I don't think that's -- you mean at
5    licensure, the onset of licensure?  Or at the onset of
6    the requirement for every two years part of your CEUs?
7    Q        Once they introduced the requirement for ethics,
8    did you have to pass a test or not?
9    A        No.
10   Q        Are there occasions you've taken more than the
11   mandatory eight hours of ethics in your 36-hour
12   requirement?
13   A        Doubtful.
14   Q        You mentioned training.  Have you received any
15   training in doing fit-for-duty examinations?
16   A        None.
17   Q        Have you taken any training regarding threat
18   assessment?
19   A        Yes.  There's been some.  They coupled that with
20   suicide assessment.
21   Q        So you believe you took a combination of -- I'm
22   sorry.  Was this something that was part of the suicide
23   study topic, or was it a dual, or is it advertised, if
24   you will, as a dual topic of presentation?
25   A        I would have to look at the CEU certificates to
```

Joy Graf - December 9, 2020

```
 1    remember how they did that.

 2    Q        As you sit here today, what's your best estimate

 3    as to the last time you received any formal training

 4    regarding threat assessments?

 5    A        I would -- gosh, you're asking me a question

 6    that is a complete guess.  I'm not even sure if it's

 7    helpful.  In the last eight years?

 8    Q        Okay.  Do you believe you're qualified to give

 9    threat assessments?

10    A        I believe that as a combination of doing suicide

11    assessment, I typically will do a threat assessment to

12    self and others, yes.

13    Q        And on what do you base the content of that

14    assessment that you do?

15    A        On that combination training of suicide or harm

16    to others.

17    Q        Please describe for me what your typical

18    suicide, if you will, slash, threat assessment consists

19    of?

20    A        Yes.  So again, this would be a typical

21    conversation, so it's somewhat organic.  I can speak from

22    a basic template of if somebody is in some type of

23    emotional distress, I will ask them questions about do

24    they wish that they -- do they have a wish not to go on

25    living?  Or is it just they want out of this immediate
```

Joy Graf - December 9, 2020

```
 1   ordered not to stalk his estranged wife in his patrol
 2   car?
 3           MS. SONG:  I'm sorry.  Lisa, can you repeat that
 4   question.  I know the signal is really poor the last
 5   three minutes.
 6           (The reporter read back the last question.)
 7           MS. SONG:  Same.  Privileged and not to answer
 8   the question.
 9           MR. KATZ:  Okay.  So now would it be a fair
10   statement, any questions that I ask you about what Brad
11   Wheat told you during that first session the same
12   privilege claim will be asserted?
13           MS. SONG:  You're asking me?
14           MR. KATZ:  Well, yes.
15           MS. SONG:  Yes.  That is a fair statement.
16           MR. KATZ:  Okay.  Well, good.  I'm glad we're on
17   the same page on that.
18   Q       Now, I corrected -- before you spoke with Brad
19   Wheat, though, you spoke with Lieutenant Brown; is that
20   correct?
21   A       Yes.
22   Q       And is it correct, as you sit here today, you
23   don't recall whether that conversation took place before
24   the debriefing or after the debriefing but before you
25   went into this other room with Brad Wheat?
```

Joy Graf - December 9, 2020

```
 1   A        That is correct.

 2   Q        How long do you believe your pre-Brad Wheat

 3   conversation with Lieutenant Brown, how much time do you

 4   believe it took?

 5   A        To the best of my recollection, not more than

 6   ten minutes.

 7   Q        So I'm going to ask you about what he told you

 8   in that ten minutes.  Okay?

 9   A        Okay.

10   Q        Did he tell you that less than two weeks

11   earlier, Brad Wheat had driven with a loaded gun and with

12   a specific intent to murder my client Philip deBeaubien

13   and then kill his wife and then shoot himself?  Did he

14   tell you that?

15            MS. SONG:  You can answer.

16            THE WITNESS:  To the best of my memory, that is

17   not what he told me.

18   Q        BY MR. KATZ:  Did he tell you anything about an

19   incident that occurred that led to Mr. Wheat's guns being

20   taken away in early August?

21            MS. McTAVISH:  Objection.  Misstates the

22   testimony.  You can go ahead and answer.

23            THE WITNESS:  I -- he did not tell me that the

24   guns were taken away.

25   Q        BY MR. KATZ:  Did he tell you that Brad Wheat
```

Joy Graf - December 9, 2020

```
 1  had threatened to kill anyone?

 2  A        To the best of my recollection, no.

 3  Q        Did he tell you that Brad Wheat had threatened

 4  to shoot anybody?

 5  A        To the best of my recollection, no.

 6  Q        And when I say "anybody," just so we don't have

 7  any confusion, did Lieutenant Brown share with you that

 8  Brad Wheat had said he was going to kill himself after --

 9  kill himself?

10  A        To the best of my recollection, no.

11  Q        Had he told you that Brad Wheat was facing a

12  disciplinary action at work?

13  A        What I recall is he wanted to avoid that from

14  happening.  It had to do with a car.

15  Q        So I understood what you say, but I just want to

16  make sure it's clear.

17           So it's your recollection that he did not tell

18  you that there was a pending disciplinary action, adverse

19  action, against Brad Wheat; is that correct?

20  A        What I believe I remember is there was

21  potential, not pending.

22  Q        Okay.  Did he tell you that Brad Wheat had been

23  involved in two solo car accidents involving his patrol

24  vehicle in -- I'm trying to get my dates right -- say the

25  five weeks, six weeks before your meeting him in this
```

1              REPORTER'S CERTIFICATE

2          I certify that the witness in the foregoing

3    deposition

4                    JOY GRAF

5    was remotely administered the oath by me to testify to

6    the truth, the whole truth, and nothing but the truth in

7    the within-entitled cause; that said deposition was taken

8    remotely at the time and place therein named; that the

9    testimony of said witness was reported by me, a duly

10   certified shorthand reporter of the State of California;

11   that it was thereafter transcribed into typewriting; and

12   that the transcript is a true record of the testimony

13   given.

14         Pursuant to Federal Rule 30(e), transcript

15   review was requested.

16         I further certify that I am not financially

17   interested in the action, nor a relative or employee of

18   any attorney or any party to the action.

19

20   DATED:   December 17, 2020

21

22   _____
     LISA KENNEDY, CSR No. 8927

23

24                State of California

25                   --o0o--

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


PHILIP DEBEAUBIEN,

            Plaintiff,

vs.                      Case No. 2:19-cv-01329-WBS-DB

STATE OF CALIFORNIA;
CALIFORNIA HIGHWAY PATROL;
TODD BROWN; SABRENA SWAIN;
JOY GRAF; REGGIE
WHITEHEAD; RYAN
STONEBRAKER; BRENT NEWMAN;
JEREMY DOBLER,

            Defendants.

_____/




Deposition of

JOY GRAF

Via Zoom Remote Videoconference

Volume 2, Pages 136 - 357

Wednesday, August 11, 2021


REPORTER:  DEBRA P. CODIGA, CSR NO. 5647

_____


TENNELEY MICKEL REPORTING
P.O. Box 1107
Arbuckle, California 95912
Tel 916-492-9021   Fax 916-922-3461

Joy Graf - Vol. II - August 11, 2021

1     Q.    But you understand that for you to do proper

2   therapy and come up with a treatment plan, you need to

3   get information; correct?

4     A.    Correct.

5     Q.    Okay.

6     A.    And pretty broad.  I mean the information's

7   fairly broad as well.

8     Q.    And does the treatment plan -- does that

9   include suggestions for how people can deal with their

10  problems?

11    A.    It can.  It can.

12    Q.    Okay.

13    A.    It can include recommendations.

14    Q.    What does a treatment plan consist of?

15    A.    Well, if we're doing trauma treatment, it --

16  it's specific to trauma treatment, and the

17  recommendation might be to have a medication evaluation.

18  If it's about parent-child stuff, there may be a

19  recommendation to take a class, read a book.  So it's so

20  varied.

21    Q.    Okay.  So now, you indicate -- you've testified

22  that you saw Mr. -- that you were seeing Brad Wheat --

23  you were meeting with him as a critical incident

24  debriefer; is that true?

25    A.    Yes.

Joy Graf - Vol. II - August 11, 2021

```
1       Q.    What -- so a critical incident debriefer
2   would -- does that mean talking about a critical
3   incident?
4       A.    It's usual -- it's about talking about a
5   specific incident initially, yes.
6       Q.    Okay.  What critical incident were you there to
7   debrief Brad Wheat about?
8       A.    So what I was going to talk to him about, that
9   I was under the impression, is he had three single-car
10  accidents while on duty in a patrol car.  So not only is
11  that costly, there's a concern about is he too
12  distracted to be out in a patrol car.
13      Q.    So your understanding is that you were there
14  because Brad Wheat had had three car accidents?
15      A.    Yes.  And I'm sure that there -- that
16  Lieutenant Brown -- and I don't know where I learned
17  this; it might have been from Officer Wheat.  He was
18  separated and his wife was having an affair.
19            I don't know if they were living separate or
20  just, you know, emotionally separated, but she was
21  having an affair.  So the question is, how -- how is
22  home life impacting work and his work impacting home.
23      Q.    So -- and you understood these car accidents
24  were noninjury accidents; is that right?
25      A.    That's true.
```

Joy Graf - Vol. II - August 11, 2021

 1      Q.    And in terms of critical incident debriefing,
 2   you subscribe to the Mitchell Model; is that right?
 3      A.    That's right.
 4      Q.    The Mitchell Model gives examples of what are
 5   critical -- what are critical incidents; correct?
 6      A.    I don't know if it's in the curriculum or just
 7   in the training.
 8      Q.    Okay.  Well, have you ever been trained that a
 9   noninjury car accident constitutes a critical incident?
10      A.    That was the first.  That was the first.
11      Q.    I'm sorry; what do you mean, "That was the
12   first"?
13      A.    Yeah.  I hadn't -- that has not happened
14   before.
15      Q.    Okay.  And in fact, that is not one of the
16   enumerated items for a critical incident, is it?
17      A.    Well, so according to Magellan, who pays the
18   bill, their definition of critical incident is
19   determined by the agency and what they want to pay for
20   that service.
21      Q.    So the person who pays the bill determines --
22      A.    No.
23      Q.    -- what your professional diagnosis is?
24      A.    No.  Not the person who pays the bill.  The
25   person that requests the service determines if they --

Joy Graf - Vol. II - August 11, 2021

```
 1      A.   But I wasn't debriefing him.

 2      Q.   I understand that.  But --

 3      A.   So --

 4      Q.   -- what was the purpose -- I'm -- so you're

 5   there, though, to debrief the office concerning Officer

 6   Joslin.  Is that because -- because of why?  That was

 7   the critical incident you were there to debrief them on;

 8   correct?

 9      A.   The officers and their spouses; correct.

10      Q.   Okay.  And would you agree that had nothing to

11   do with Brad Wheat?

12      A.   I would.

13      Q.   Okay.  And before meeting with Brad Wheat, had

14   you ever done a group debriefing regarding the car

15   accidents that Brad Wheat had had?

16      A.   No.

17      Q.   Did you have an understanding as to when those

18   car accidents were?

19      A.   The -- I only can recall the third one that

20   happened.  They were all within a short period of time,

21   and I want to say within a few weeks, maybe three or

22   four weeks.

23      Q.   Okay.  And part of critical incident training

24   is that the critical incident debriefing is usually done

25   within a short period of time of the critical incident;
```

Joy Graf - Vol. II - August 11, 2021

```
 1   correct?

 2       A.   So -- right.  And that's what I was going to

 3   say is that third accident was within, I believe, a

 4   week -- within a week of me seeing him.

 5       Q.   Okay.

 6       A.   And I could be confused about that time.  I

 7   just remember it was far more recent.

 8       Q.   Okay.  And you didn't make any notes so you'd

 9   be able to recall any of these things; correct?

10       A.   Right.

11       Q.   Gosh.

12            Okay.  So you're there to see Joslin.  You --

13   you were called to do that as -- for -- you went there

14   with the purpose of doing a critical incident concerning

15   that; correct?

16       A.   Correct.

17       Q.   By the way, did you have any concerns that he

18   might have -- that there might be a ring of child

19   molesters working out of the Amador County CHP office?

20            MR. HERNANDEZ:  Objection; calls for

21   speculation, argumentative.

22            THE WITNESS:  No, I have no concern.

23       Q.   BY MR. KATZ:  Okay.  Now, you weren't called

24   out to meet with Brad Wheat, though, for a critical

25   incident stress debriefing for his car accidents;
```

Joy Graf - Vol. II - August 11, 2021

```
 1   correct?

 2       A.    Correct.

 3       Q.    Okay.  So that -- that happened when you were

 4   there.  They asked -- you were asked by Lieutenant Brown

 5   to meet with him; correct?

 6       A.    Correct.

 7       Q.    That was not the procedure to be followed for a

 8   critical accident stress debriefing that you went out to

 9   do; correct?

10       MS. SONG:  Objection; misstates facts,

11   misstates testimony.

12       MR. HERNANDEZ:  Join.

13       MS. SONG:  You can answer.

14       THE WITNESS:  I -- I'm not sure I understand

15   the question.

16       Q.    BY MR. KATZ:  Okay.  You told us how you would

17   be called or notified to do a critical accident stress

18   debriefing.  Yes?

19       A.    Yes.

20       Q.    That's not the way your interact -- your

21   meeting with Brad Wheat came about; correct?

22       A.    Well --

23       MS. SONG:  Same objection.

24       THE WITNESS:  Okay.  Being called out can

25   include being called on the phone, being contacted face
```

Joy Graf - Vol. II - August 11, 2021

```
 1    harm, he's not left alone.  He is taken to somebody, or
 2    somebody comes and gets him.
 3        Q.   Okay.  So then -- all right.  You introduced
 4    that, and then what's the first thing that -- so you --
 5    you give those introductory remarks; correct?
 6        A.   Correct.
 7        Q.   Okay.  And what's the next thing that's said,
 8    either by yourself or Brad Wheat?
 9        A.   So I tell him that Lieutenant Brown told me
10    about his car accidents, and -- and then I just
11    opened-ended it because I didn't know where it was going
12    to go.  I said, "So what's going on" -- (inaudible).
13        Q.   Okay.
14             (Interruption in proceeding.)
15        Q.   BY MR. KATZ:  The audio is dropping out, so,
16    I'm sorry, you need to repeat it or be closer to your
17    microphone.
18             MS. SONG:  Sorry.  Let me interject.
19             Joy, if you could be closer to your microphone
20    while you talk.
21             THE WITNESS:  Okay.
22             MS. SONG:  Sometimes I couldn't hear you
23    either.  Thank you.
24             THE WITNESS:  Okay.  And I'll try to be louder.
25    I'm not very good at being louder.
```

Joy Graf - Vol. II - August 11, 2021

```
 1          That I -- I told him that Lieutenant Brown had
 2  told me he'd had three car accidents while on duty in a
 3  patrol car, and -- and I think I'd also said to him that
 4  that -- that I was told that was unusual for him.
 5          And so I said, "Something's up.  What's going
 6  on," and wanted him to just begin to give me
 7  information.
 8      Q.   BY MR. KATZ:  Okay.  And what information -- so
 9  you tell him that Lieutenant Brown wanted you to see him
10  because he was concerned that he'd had three car
11  accidents on duty?
12      A.   Yes, basically.  Yes.
13      Q.   And were you -- were you wondering if it was
14  something else, or was it Lieutenant Brown wanted you to
15  find out if there was a reason for that?
16      A.   I -- I don't know what Lieutenant Brown wanted,
17  but I needed information.
18      Q.   Okay.  And so how did you -- and did you
19  attempt to get that information?
20      A.   I let him talk and tell what I would say is his
21  story.
22      Q.   And what was his story?
23      A.   His story -- his story was -- and let me just
24  say I'm going to do my best to remember all this, and it
25  may not be exactly in the order that he and I addressed
```

Joy Graf - Vol. II - August 11, 2021

```
 1   it; right?  It's in the order that my brain
 2   conceptualized it in.
 3          So his story was that they -- that he and his
 4   wife were separated -- and again, I was confused about
 5   that because it sounded like she was out of the house,
 6   then the house had two parts, and part of the time she
 7   was in the house and then out.  I don't know what
 8   "separated" exactly meant.
 9          And she was having an affair with somebody that
10   she and he both knew.  And that he -- first, he was
11   distraught and upset about that, and he was -- he kept
12   trying -- he wanted to have her give him a chance and
13   give the marriage a chance.
14          So that he had gone out -- and I don't remember
15   if this was on or off duty -- and went to, I want to
16   say, Placer County, which is out of his area to patrol,
17   to confront her.  He went to where he thought she was to
18   confront her and to talk with her and ask her to at
19   least try couples counseling.  That was his goal, to try
20   couples counseling.
21          And that if the affair individual was there,
22   that he would ask him to back off and give them a
23   chance.
24          I don't -- I want to say it might have been at
25   his wife's brother's house, some relative's house that
```

```
 1                    REPORTER'S CERTIFICATE

 2                         --o0o--

 3            I certify that the witness in the foregoing

 4       deposition,

 5                         JOY GRAF,

 6       was administered the oath remotely by me to testify to

 7       the truth, the whole truth, and nothing but the truth in

 8       the within-entitled cause; that the deposition was taken

 9       remotely at the time and place named; that the testimony

10       of the witness was reported remotely by me, a duly

11       certified shorthand reporter; that it was thereafter

12       transcribed into typewriting, and that the transcript is

13       a true record of the testimony given.

14            Pursuant to Federal Rule 30(e), transcript

15       review was not requested.

16            I further certify that I am not financially

17       interested in the action, nor a relative or employee of

18       any attorney or any party to the action.

19

20       Dated:  August 20, 2021

21

22                        _Debra P. Codiga_

23       _____

24       DEBRA P. CODIGA, CSR No. 5647

25       State of California
```

Exhibit K

**EPO-001**  ONE copy to court, ONE copy to restrained person, ONE copy to protected person, ONE copy to issuing agency

LAW ENFORCEMENT CASE NUMBER:

# EMERGENCY PROTECTIVE ORDER *(see reverse for important notices)*

1. **PROTECTED PERSONS** *(insert names of all persons protected by this Order):*
   _____
   _____

2. **RESTRAINED PERSON** *(name):* _____
   Sex: ☐ M ☐ F  Ht.: ____  Wt.: ____  Hair color: ____  Eye color: ____  Race: ____  Age: ____  Date of birth: ____

3. **TO THE RESTRAINED PERSON:**
   a. ☐ **YOU MUST NOT** harass, attack, strike, threaten, assault (sexually or otherwise), hit, follow, stalk, molest, destroy any personal property of, disturb the peace of, keep under surveillance, or block the movements of each person named in item 1.
   b. ☐ **YOU MUST NOT** contact, either directly or indirectly, by any means, including but not limited to by telephone, mail, e-mail or other electronic means, any person named in item 1.
   c. ☐ **YOU MUST** ☐ stay away at least: _____ yards from each person named in item 1.
      ☐ stay away at least: _____ yards from ☐ move out immediately from
      *(address):* _____
   d. ☐ **YOU MUST NOT** own, possess, purchase, receive, or attempt to purchase or receive any firearm or ammunition. If you have any firearms, you must turn them in to a law enforcement agency or sell them to, or store them with, a licensed gun dealer.
   e. ☐ **YOU MUST NOT** take any action, directly or through others, to obtain the addresses or locations of any person named in item 1.

4. ☐ *(Name):* _____ is given temporary care and control of the following minor children of the parties *(names and ages):* _____

5. **THIS ORDER WILL EXPIRE AT THE CLOSE OF THE COURT BUSINESS DAY ON:** _____

6. **TO THE PROTECTED PERSON:** If you need protection for a longer period of time, you must request restraining orders from the court in the county where you live:

   INSERT DATE OF FIFTH COURT DAY OR SEVENTH CALENDAR DAY, WHICHEVER IS EARLIER; DO NOT COUNT DAY THE ORDER IS GRANTED

   *(Name and address of court):* _____

   If you go to court to request restraining orders, take your copy of this form with you. If a juvenile petition is pending, file in that court.

7. Reasonable grounds for the issuance of this Order exist, and an emergency protective order is necessary to prevent the occurrence or recurrence of domestic violence, child abuse, child abduction, elder or dependent adult abuse, or stalking.

8. Judicial officer *(name):* _____ granted this Order on *(date):* _____ at *(time):* _____

## APPLICATION

9. The events that caused the protected person to fear immediate and present danger of domestic violence, child abuse, child abduction, elder or dependent adult abuse (except solely financial abuse), or stalking are *(give facts and dates; specify weapons):*
   _____
   _____
   _____

10. ☐ Firearms were: ☐ observed ☐ reported ☐ searched for ☐ seized

11. ☐ The person to be protected lives with the person to be restrained and requests an order that the restrained person move out immediately from the address in item 3c.

12. ☐ The person to be protected has minor children in common with the person to be restrained, and a temporary custody order is requested because of the facts alleged in item 9. A custody order ☐ does ☐ does not exist.

By: _____  ▶  _____
   (PRINT NAME OF LAW ENFORCEMENT OFFICER)        (SIGNATURE OF LAW ENFORCEMENT OFFICER)

Agency: _____  Telephone No.: _____  Badge No.: _____

## PROOF OF SERVICE

13. Person served *(name):* _____

14. I personally delivered copies of this Order to the person served as follows: Date: _____ Time: _____
    Address: _____

15. At the time of service, I was at least 18 years of age and not a party to this cause. ☐ I am a California law enforcement officer.

16. My name, address, and telephone number are *(this does not have to be server's home telephone number or address):*
    _____

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.
Date: _____

_____  ▶  _____
   (TYPE OR PRINT NAME OF SERVER)              (SIGNATURE OF SERVER)        **Page 1 of 2**

Form Adopted for Mandatory Use
Judicial Council of California
EPO-001 [Rev. January 1, 2014]
Approved by DOJ

**EMERGENCY PROTECTIVE ORDER (CLETS–EPO)**
**(Domestic Violence, Child Abuse, Elder or Dependent Adult Abuse, or Stalking)**

Family Code, §§ 6240–6275;
Penal Code, § 646.91
www.courts.ca.gov

# EMERGENCY PROTECTIVE ORDER
## WARNINGS AND INFORMATION

**TO THE RESTRAINED PERSON:** VIOLATION OF THIS ORDER IS A MISDEMEANOR PUNISHABLE BY A $1,000 FINE, ONE YEAR IN JAIL, OR BOTH, OR IT MAY BE PUNISHABLE AS A FELONY. <mark>THIS PROTECTIVE ORDER SHALL BE ENFORCED BY ALL LAW ENFORCEMENT OFFICERS IN THE STATE OF CALIFORNIA WHO ARE AWARE OF OR SHOWN A COPY OF THE ORDER.</mark> THE TERMS AND CONDITIONS OF THIS ORDER REMAIN ENFORCEABLE REGARDLESS OF THE ACTS OF THE PARTIES; IT MAY BE CHANGED ONLY BY ORDER OF THE COURT (PENAL CODE SECTION 13710(b)).

YOU ARE PROHIBITED FROM OWNING, POSSESSING, PURCHASING, RECEIVING, OR ATTEMPTING TO PURCHASE OR RECEIVE A FIREARM OR AMMUNITION. (PENAL CODE SECTIONS 29825(a), 30305(a).) A VIOLATION IS SUBJECT TO A $1,000 FINE AND IMPRISONMENT OR BOTH. WITHIN 24 HOURS OF RECEIPT OF THIS ORDER, YOU MUST TURN IN YOUR FIREARMS TO A LAW ENFORCEMENT AGENCY, SELL THEM TO A LICENSED FIREARMS DEALER, OR STORE THEM WITH A LICENSED FIREARMS DEALER UNTIL THE EXPIRATION OF THIS ORDER. (PENAL CODE SECTION 29830.) PROOF OF SURRENDER, SALE, OR STORAGE MUST BE FILED WITH THE COURT WITHIN 48 HOURS OF RECEIPT OF THIS ORDER.

---

**To the restrained person:** This order will last until the date and time in item 5 on the reverse. The protected person may, however, obtain a more permanent restraining order from the court. You may seek the advice of an attorney on any matter connected with this order. The attorney should be consulted promptly so that the attorney may assist you in responding to the order.

**A la persona bajo restricción judicial:** Esta orden durará hasta la fecha y hora indicada en el punto 5 al dorso. La persona protegida puede, sin embargo, obtener una orden de entredicho (restricción judicial) más permanente de la corte. Usted puede consultar a un abogado en conexión con cualquier asunto relacionado con esta orden. Debe consultar al abogado inmediatamente para que él o ella le pueda ayudar a responder a la orden.

---

**To the protected person:** This order will last only until the date and time noted in item 5 on the reverse. If you wish to seek continuing protection, you will have to apply for an order from the court at the address in item 6. You may apply for a protective order free of charge. In the case of an endangered child, you may also apply for a more permanent order at the address in item 6, or if there is a juvenile dependency action pending, you may apply for a more permanent order under section 213.5 of the Welfare and Institutions Code. In the case of a child being abducted, you may apply for a *Child Custody and Visitation Order* from the court. You may seek the advice of an attorney on any matter connected with your application for any future court orders. The attorney should be consulted promptly so that the attorney may assist you in making your application. You do not have to have an attorney to get the protective order.

**A la persona protegida:** Esta orden durará sólo hasta la fecha y hora indicada en el punto 5 al dorso. Si usted desea que la protección continúe, tendrá que solicitar una orden de la corte en la dirección indicada en el punto 6. La solicitud de la orden de protección es gratis. En el caso de que un niño o una niña se encuentre en peligro, puede solicitar una orden más permanente en la dirección indicada en el punto 6, o si hay una acción legal pendiente de tutela juvenil, puede solicitar una orden más permanente conforme a la sección 213.5 del código titulado en inglés **Welfare and Institutions Code.** En el caso del secuestro de un niño o una niña, usted puede solicitar de la corte una orden para la guarda del niño o de la niña *(Child Custody and Visitation Order).* Puede consultar a un abogado en conexión con cualquier asunto relacionado con las solicitudes de órdenes de la corte que usted presente en el futuro. Debe consultar un abogado inmediatamente para que él o ella le pueda ayudar a presentar su solicitud. Para obtener la orden de protección no es necesario que un abogado le represente.

---

**To law enforcement:** The emergency protective order shall be served upon the restrained party by the officer, if the restrained party can reasonably be located, and a copy shall be given to the protected party. A copy shall be filed with the court as soon as practicable after issuance. Also, the officer shall have the order entered into the computer database system for protective and restraining orders maintained by the Department of Justice. The availability of an emergency protective order shall not be affected by the fact that the endangered person has vacated the household to avoid abuse. A law enforcement officer shall use every reasonable means to enforce an emergency protective order. A law enforcement officer who acts in good faith to enforce an emergency protective order shall not be held civilly or criminally liable.

---

**If a child is in danger of being abducted:** This order will last only until the date and time noted in item 5 on the reverse. You may apply for a child custody order from the court.

**En el caso de peligro de secuestro de un niño o de una niña:** Esta orden será válida sólo hasta la hora y fecha indicada en el punto 5 al dorso. Usted puede solicitar de la corte una orden para la guarda del niño o de la niña *(Child Custody and Visitation Order).*

---

*This emergency protective order is effective when made. This order shall expire on the date and time specified in item 5 on the reverse. The provisions of this emergency protective order take precedence in enforcement over provisions of other existing protective orders between the same protected and restrained persons to the extent the provisions of this order are more restrictive. In other words, the provisions in this emergency protective order take precedence over the provisions in any other protective order, including a criminal protective order, if (1) the person to be protected is already protected by the other protective order, (2) the person to be restrained is subject to that other order, and (3) the provisions in this emergency protective order are more restrictive than the provisions in that other order. The provisions in another existing protective order remain in effect and take precedence if they are more restrictive than the provisions in this emergency protective order.*

---

**EMERGENCY PROTECTIVE ORDER (CLETS–EPO)**
**(Domestic Violence, Child Abuse, Elder or Dependent Adult Abuse, or Stalking)**

Exhibit L

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF CALIFORNIA

 3                    SACRAMENTO DIVISION

 4                       --oOo--

 5   PHILIP DEBEAUBIEN,            )
                                   )
 6              Plaintiff,         )
                                   )
 7          v.                     )   No. 2:19-cv-01329-WBS-DB
                                   )
 8                                 )
     STATE OF CALIFORNIA;          )
 9   CALIFORNIA HIGHWAY PATROL;    )
     TODD BROWN; SEBRENA SWAIN;    )
10   JOY GRAF; REGGIE WHITEHEAD;   )
     RYAN STONEBRAKER; BRENT       )
11   NEWMAN; JEREMY DOBLER,        )
                                   )
12              Defendants.        )
     _____)

13

14

15                       --oOo--

16           VIDEOCONFERENCE DEPOSITION

17                       OF

18              MATTHEW HOOPER

19                       --oOo--

20           Thursday, April 1, 2021

21                  CERTIFIED

22                  TRANSCRIPT

23

24   21-079
     Stenographically Reported By:
25   JULIE C. ROZELL, CSR 14107
```

1  that guy," or I don't -- it didn't come out quite like

2  that.  But just anger that "I could, like, you know,

3  hurt him" or, like, you know.  But it did have that

4  sense of, like -- it was anger that was -- that would

5  kind of express itself in a violent way and that, you

6  know, there was that sense in what he was expressing in

7  August.  But it did not -- it was more an expression of

8  anger.

9          It didn't seem like "I'm going to go do that"

10 until in the beginning of August when we had that

11 incident, the incident when he drove to Amador County --

12 from Amador County to Placer County.  And as I

13 understand -- and that -- that moment kind of, you know,

14 at least woke me up to, "Okay.  There needs to be a

15 different level of intervention here.  If you're willing

16 to go do that, there needs to be" -- which then started

17 the intervention, as I understand it, with the CHP and

18 that coming to light and what began to happen there.

19     Q.    So on -- let me back up a little bit

20 because -- and talk to you about the August 3rd

21 incident.

22          Was there a family home in -- off of Bear

23 Creek Road?

24     A.    Yeah.  So the family home was off of Fair

25 Pines Court, and then -- in Garden Valley.  And then

1   there's a Black Oak Mine Road and then 193.  Right

2   there, there's this parking lot.

3           And I -- my understanding is -- I've heard the

4   story, like, at least from my niece who was living there

5   along with my older brother in that property on Fair

6   Pines Court, that that's where they -- Mary and Trae --

7   were, and Brad found out about that through him talking

8   to Philip's wife.  There was some kind of communication

9   happening there where they -- it came to light that Brad

10  knew they were there in that area and they were

11  together.  I think it was through Life360.  And so

12  that's when he proceeded to, you know, drive over there.

13      Q.    And that was the evening that you actually

14  called law enforcement as well?

15      A.    Yeah.  Yeah.  Yep.  That's what --

16      Q.    What was your reason for making that call?

17      A.    Well, I -- Warren was there, and he came and

18  got me.  And he's like, "My dad's left the house.  He's

19  angry," or, "He's in a" -- "and I" -- "and he's going

20  over there to confront them.  And," you know -- "And I

21  need to know what to do."  This was Warren.

22          So at that point, I went with Warren into the

23  other house -- their part of the house, and I started

24  trying to call Brad.  And I was texting him and calling

25  him.  And we could see him, on Life360, driving that

1   way; so we knew where he was.  And I was just saying,

2   "Hey, if you don't pick up or if you don't text me back,

3   I'm going to call 911."

4           And I was choosing to do that because, you

5   know, Warren informed me, like, "He's angry," and I

6   think he knew he had his firearm in the car -- Warren

7   did.  And he's like, "I'm" -- "I'm not sure what he's

8   going to do," you know.  And so I was like, "Okay.  I

9   need to get involved here."

10          And -- and so we just started a process.  And

11  that led to me calling 911 because I wasn't able to

12  reach him.  And I'm like, "Well, I can't just not do

13  anything."  You know, a reasonable person -- I don't

14  know what Brad's going to do.  Do I think he's going to

15  shoot someone or -- I don't know what he's going to do.

16  But he's angry.  He's going over to confront them.

17          And we knew that, too, because he was driving

18  fast, and we could tell on Life360 that he was moving

19  quickly, you know, to -- from where we were to there.

20  We knew he was -- he was angry.  I think Warren -- I

21  don't know what interaction they had, but Warren knew

22  that Brad was angry and -- and that he was going over

23  there to confront them being together.

24      Q.    So backing up a little bit, you did not

25  directly speak to Brad before he left the house; is that

1   right?

2        A.    No.  I didn't.

3        Q.    It was Warren who did.

4        A.    It was Warren.

5        Q.    And at this time, how old was Warren?

6        A.    Warren was, I think, 19 -- 18.  19.

7        Q.    The Life360, were you in the -- in their

8   group, or is it just the immediate family who was in the

9   Life360?

10       A.    It was the immediate family.  So I knew

11  through Warren's that that was happening.  And so -- so

12  what happened was -- is this what you want to know?  The

13  details of this?

14       Q.    Yeah.

15       A.    So what happened specifically was -- so Warren

16  comes and gets me.  I start to try to contact Brad.  I'm

17  unable to contact him.  I call 911, and I tell them,

18  "This is what's going on.  I think they're going to this

19  place, and I'm concerned.  I don't know what he's going

20  to do, but I don't think this will end well.  And

21  there" -- "someone needs to be dispatched to that

22  location" -- the best that we can know that, you know --

23  "Black Oak Mine and 193 junction," there's a parking lot

24  right there.

25            But I didn't know how long that was going to

1   take to dispatch a -- and I'm concerned for Mary, and at

2   that -- you know, and Trae at that point.  I don't want

3   something to happen there.

4           So we contacted my niece and brother -- and my

5   niece in particular -- and said, "Hey, we know Mary and

6   Trae are over there -- or we think that's the case.

7   Here's where we think they are.  Would you go tell them

8   that Brad's on his way over there, and he's not in a

9   good state of mind.  And we don't know what, you know,

10   that means, but they need to leave.  They need to leave.

11   That's not -- you know, it's not safe, you know, for

12   them to stay there."

13       Q.   What is your niece's name?

14       A.   Madison.

15       Q.   Madison.  And is it Hooper?

16       A.   Yes.  And so she then went and spoke to -- do

17   I say "Philip" or "Trae," or does it matter?

18       Q.   Philip is the name on the lawsuit; so it makes

19   it a little easier.

20       A.   So she went -- my understanding -- this is her

21   reporting to me now that she went and said -- went to

22   the vehicle and said, "You guys need to leave."  That's

23   my understanding from her report of what happened.  And

24   what she said was sufficient enough that that happened

25   so that when Brad did arrive there, Philip was not

Case 2:19-cv-01329-WBS-DB   Document 124-1   Filed 02/08/22   Page 278 of 500

1    present.

2          And then Brad and Mary, you know, engaged in a

3    conversation that was heated.  And then I think,

4    eventually, my brother -- that was at my -- they went

5    back to -- so I think what happened was Brad went to the

6    Black Oak Mine area.  They weren't there.  He went to

7    the house, had a heated interaction with Mary, and my

8    older brother came down and said, "Brad, you need to

9    leave."

10         And then it was that event that, as that came

11   to light, that led to my understanding -- and I don't

12   know a lot of the details of this, because Brad didn't

13   share a lot of this with me -- but I know that he was --

14   that did come to light with the CHP that led to a

15   different kind of action on their part with him.

16   Q.    Your understanding of this confrontation that

17   Brad had with Mary at your brother's house, did Brad

18   threaten Mary with a gun that night?

19   A.    Not that I -- no.  No.  Now, this is, you

20   know -- not that I'm aware of.  That was not ever a part

21   of that conversation -- that interaction as reported

22   from Madison, my niece, and Monty, my older brother.

23         I mean, the involvement of a gun or that kind

24   of violent -- like, violent action was not a part of

25   that -- that from -- again, from my -- them reporting to

1   him"?

2       A.    Yeah.  No.  There was no -- there was no

3   communication at that time about that.  It was more

4   about his feeling humiliated.  It was more about that.

5   And, you know -- and then, you know, that -- he stayed

6   in that kind of space of just feeling just broken and

7   humiliated throughout that day and that night.

8           He was talking about, at one point, he read a

9   journal from -- or he referred to a journal entry that

10  night of -- just that Mary had written about, you know,

11  doing -- acting in a way that was going to hurt their

12  family or something like that.  He was just pulling

13  these pieces together.

14          But I did not -- between that event on the 3rd

15  of September and then the event on -- I'm sorry -- the

16  3rd of August and then the 3rd of September, especially

17  those latter two weeks, I did not have a sense that he

18  was harboring these thoughts in his mind, that that

19  would -- that that was strong enough there that he was

20  going to act on that.  He was not verbalizing that to me

21  like he was earlier on in the -- you know, around the

22  time when things first happened and then around the

23  August 3rd event.

24          So -- which was why the September 3rd event

25  was so shocking.  I mean, I was shocked because he was

1   not -- I was walking with him so closely, you know.   And

2   he wasn't even owning his, you know, potentially -- I

3   think it was him breaking windows.   He wasn't giving any

4   hint that that was him.   So his capacity to

5   compartmentalize his thoughts and, in a sense, not take

6   ownership of them in such a way that he would

7   communicate them in a relationship, like, with me, his

8   closest confidant at the time, really was significant.

9   So --

10      Q.   Did you see him increase in any alcohol use

11   during this month?

12      A.   Not -- not really, actually.   I did not see

13   that.   I saw him exercising more, eating less.   He

14   got -- he kind of was getting in shape.

15           And, I mean, he was active in his movement

16   toward resources like the counselors.   I think there was

17   two that he was meeting with that -- I mean, this is

18   what I would direct anyone to be doing who was going

19   through what he was going through.   And I've had one

20   other close friend who had a very similar situation

21   happen, who also vocalized violent responses and had to,

22   you know, give -- you know, give someone his firearm,

23   and, you know, so Brad's behavior was consistent with

24   another friend of mine who went through a very similar

25   situation.

1            And so I wasn't surprised by him vocalizing

2     those thoughts.  But it's just, you know, how consistent

3     are they, how intent are you in doing that.  I just was

4     not getting that from Brad.  I wasn't hearing his intent

5     to harm.  I was hearing periodic -- like, periodically,

6     some ideation, like him thinking -- thinking that but

7     not verbalizing, "That's what I'm going to go do."  I

8     just think he just hid -- he hid those thoughts from me.

9     And that's consistent with him hiding, I think, his

10    actions of, you know, throwing rocks at windows --

11    breaking windows where Mary was staying.  But in

12    hindsight, looking back, it makes sense that he would do

13    that because he was angry -- hurt and angry; so --

14        Q.    During that -- that month, really, between

15    August 3rd and September 3rd, did it seem to you that

16    Brad was utilizing the resources that he had of

17    counseling and exercise, worship music?

18        A.    Absolutely.  He totally was.  Yes.  Relational

19    support, family support, reaching out, communicating,

20    asking for help.  Even to the point where I'm like,

21    "Brad, we've got to" -- "if we're going to talk about

22    these things, we need to move it outside of our family

23    space."  Because he would come over to our house on

24    Badger Street almost daily, and we kept having meals

25    with him just to keep supporting him.  And at one point,

1      Q.    Can you share that?

2      A.    I could give you her number.  I don't

3  actually -- I don't know if I have her email address,

4  but I could give you her cell number.  I actually --

5  with both her and Monty, who were present that night of

6  the 3rd, before having this deposition, I contacted them

7  and just let them know, "Hey, this is what's happening.

8  This is where they're taking" -- "what they're wanting

9  to know about, and they might be contacting you."  So

10  she's aware --

11      Q.    Okay.  Good.

12      A.    -- that she might be contacted.  So you want

13  me to give you her number?

14      Q.    Her and Monty's, if you don't mind.

15      A.    Sure.  I'll give it to you right now.

16      Q.    Thank you.

17      A.    Okay.  Madison.  So Madison's number is

18  (918) 406-1096.

19      Q.    Okay.

20      A.    And then Monty, who goes by -- he goes by

21  Monty, but his name's Montgomery is (530) 333-7136.

22      Q.    Great.  Thank you.

23      A.    You're welcome.

24      Q.    So what I'd like to do now, Mr. Hooper, is

25  draw your attention back to the evening and earlier

1   morning hours of August the 3rd of 2018.

2       A.    Sure.

3       Q.    And at some point, I'll play and confirm, but

4   you called 911 at about 12:20 a.m.  Had you seen Brad

5   that evening at all or spoken with him?

6       A.    I don't recall.  I mean, we could have had a

7   meal together, but it -- but after we had kind of

8   separated, after -- if we did have a meal, this was what

9   usually would happen.  They'd do their thing; we'd do

10  ours.  So I don't -- I didn't have interaction with

11  him -- it would have been since dinnertime, if we did

12  have dinner that night together.

13      Q.    So Mary's son, Warren, contacts you because

14  he's afraid of what his father may do?  Is that a fair

15  way to put it?

16      A.    Yeah.  I think he -- he was, like -- he came

17  and got me, because we were, I think, in bed at the

18  time.  So he came, knocks on the door, and he's like,

19  "Hey, my dad just left.  I'm concerned.  I'm" -- "and so

20  what do we do?"  So then I just -- we just started

21  walking through, "Okay.  What do we do?"

22      Q.    And I assume that -- I assume -- my

23  understanding is Warren felt very close to -- close to

24  his father; is that true?

25      A.    Yeah.  I would say so.  And -- yeah.  I would

1  say so.  I think that's true.

2      Q.    And at least from your perception, he loved

3  his mother as well?

4      A.    Absolutely.  Yeah.

5      Q.    And so sometime around midnight, he knocks on

6  the door to your sort of wing of the house?

7      A.    Right.

8      Q.    Had he ever done that before?

9      A.    No.  Not to my recollection.  No.

10      Q.    And is your best recollection that you -- were

11  you -- do you think you were asleep at the time you hear

12  his knocking, or were you just in bed relaxing?

13      A.    Yeah.  I wasn't asleep.  I was just in bed

14  and -- yeah.

15      Q.    Was your wife awake as well at that point, if

16  you remember?

17      A.    I think she was.  But I don't -- yeah.  I

18  think she was.

19      Q.    Okay.  So Warren knocks on the door.  Does he

20  open the door after knocking, or do you let him in or --

21      A.    No.  I just get up and go to the door, and

22  then -- then I went with him into Mary and Brad's part

23  of the house and their bedroom.  And then we started

24  trying to contact Brad.

25      Q.    Okay.  And the best of your -- and some of

Hooper 04-01-2021

1  these questions, quite frankly, Mr. Hooper, is to try to

2  sort of put you back in the moment to see if that helps

3  sort of bring some of these memories up.

4          So what do you recall Warren telling you once

5  you joined him in the Wheat part of the home?

6      A.    Yeah.  It's a little fuzzy, but it was, like,

7  along the lines of, "Hey, my dad left.  He's not in a

8  good state of mind.  He's going there to confront them.

9  I'm concerned."  I think he mentioned the firearm at

10  that time, and -- and so it's, like, kind of like, "Oh,

11  shit.  This" -- "who knows where this could go."  And so

12  we need to get involved and -- which, you know, he was

13  concerned enough that it made me concerned enough to

14  call 911; so --

15      Q.    And did -- sorry.  I cut you off.

16      A.    Yeah.  No.  That's it.  That's it.

17      Q.    Was Brad someone who would leave his firearm

18  in his car, or did -- was it your impression that Warren

19  saw him leave the houses with the gun in hand or in a

20  holster type thing?

21      A.    Yeah.  That part, I don't -- I don't know what

22  happened there, if -- what his pattern of action was.

23  If he, like, grabbed the firearm, and that triggered

24  Warren to say something, or, you know, Brad's in a --

25  you know, a kind of an action state of mind -- "I'm

1    going to go confront them" -- and that was enough to

2    trigger Warren to be like, "Oh, this is not going to end

3    well."  Whether it, you know, was lethal -- potentially

4    lethal or not, it was enough to -- for Warren to come

5    get me, which, to me, is significant.  So I don't know

6    what triggered him.

7        Q.    Okay.  So you called 911.  Had you ever made a

8    911 call before?

9        A.    Yes.  But not -- not for something like this.

10       Q.    When had you previously made a 911 call?

11       A.    Because of -- you know, for a driver --

12   someone who is driving recklessly or, you know,

13   obviously, in an emergency situation.  I've had a few of

14   those where I called 911.  But nothing quite like --

15   like this where there was potential for a domestic, you

16   know, dispute or potential for violence or something

17   like that.  I was like -- no.  I had not done that

18   before.

19       Q.    Okay.  And is it your understanding that you

20   expressed your concern for both your sister as well as

21   Trae's safety?

22       A.    Yeah.  Absolutely.  On the call to 911?

23       Q.    Yes.

24       A.    To my recollection, I think yes, I did.  That

25   I was concerned for their safety -- I think something

1   along those lines is what I was communicating.

2       Q.   Sure.  Am I correct that you shared that your

3   concern was in part the fact that -- that you understood

4   that he was heading there with a firearm?

5       A.   I don't -- I don't think I mentioned -- I

6   don't think I spoke to the firearm.  I mean, you could

7   look at the recording directly for that.  I don't know

8   if I mentioned that in particular.

9       Q.   Okay.

10      A.   Yeah.

11      Q.   You know, just before I forget, I'm going to

12  play your voice on this.  If you can confirm --

13          MR. KATZ:  We'll have this marked as the next

14  exhibit in order, which is going to be -- move this out

15  of the way -- I want to say 34 is our next exhibit

16  number.

17          (Plaintiff's Exhibit 34 was marked for

18          identification.)

19  BY MR. KATZ:

20      Q.   So let me play this audio file just for the

21  purpose of if you can confirm if this is your voice on

22  there.  And then I'll ask you a couple of -- actually,

23  I'll ask you a number of questions regarding that --

24  that early morning and the following day.

25      A.   Uh-huh.

1        Q.    Way too many files on my desktop.

2        A.    While you're searching, I do have a

3   recollection.  Like, this is -- talking about it more is

4   opening up the window of that full day the next day.  I

5   do -- I think I -- I wasn't involved in the interaction

6   with the CHP officers and Brad the next day, but I have

7   a recollection of seeing them that day.  So I don't know

8   to what -- I don't recall interacting much with them

9   around that, but I do have a memory of seeing them that

10  next day, which meant I was around that next day, just

11  to -- I think in the previous part of the deposition, I

12  said I didn't see them.  But that -- a memory like that

13  is coming to mind that I had a couple interactions with

14  CHP.  Well --

15       Q.    While we're on that subject, Mr. Hooper, did

16  anyone from the CHP ever contact you before the

17  September 3rd fatal shootings to discuss Brad with you?

18       A.    Uh-uh.  I don't recall.

19       Q.    Okay.

20       A.    That's why I said I think there was some

21  interaction -- I don't recall.  I -- I don't know.  They

22  may recall that better than I would if I did.  And then

23  I could -- if I had a window into that conversation, it

24  would trigger my memory, probably, like talking about

25  this has.  And that next day, I remember seeing the two

1   officers, I think, that next day, but I don't recall

2   them calling me.

3       Q.    Did you ever call or initiate any contact with

4   anyone in the highway patrol about Brad before the

5   September 3rd shooting?

6       A.    No -- no.  Because I -- I think my interaction

7   was with Brad, "If you don't contact the CHP, like, your

8   team there, I'm going to contact them."  And I think

9   after that -- I don't know what -- what he did that

10  triggered their response that next -- that very day, the

11  3rd of August, but something happened.  I didn't ask him

12  what he did.  But I -- at some point, I had a

13  conversation in that time -- I don't know if it was that

14  morning or that next -- very next morning, but I did

15  have an interaction along those lines with Brad, that

16  "If you don't contact them, I will."  Like, "You have to

17  communicate."

18      Q.    After the fatal incident, did you ever speak

19  with anyone from the CHP regarding what had happened or

20  the events leading up to what happened?

21      A.    I spoke with -- I think it was Patrick Weart

22  from -- I think he's a -- I think he's a sheriff.

23      Q.    Sergeant with the Amador County Sheriff's

24  Department?

25      A.    Yeah.  I think that's who I spoke with --

1  Life360 is or was?

2      A.    Yeah.  Life360 is an app where you can just

3  track where someone is, you know, via their cell phone.

4  And so -- which is how I think -- what I think happened

5  was -- how Brad and Philip's wife surmised that they

6  were there together.  There was some communication,

7  which I'm not aware of, that precipitated Brad going

8  there.

9      Q.    Was it your understanding that the Life360

10 application was installed on Mary's cell phone?

11     A.    Yes.  Yeah.  I believe so, yeah.

12     Q.    Did Mary ever tell you she -- before August

13 the 3rd, did she tell you that she knew that application

14 was installed on her phone?

15     A.    I -- I think -- I think so.

16     Q.    Okay.

17     A.    But I'm -- I'm not clear on that if that

18 was -- if she knew that.  If she -- I don't know.

19     Q.    Did Warren -- was Brad's phone -- was the

20 application installed on his phone?

21     A.    I believe so.  I believe so.

22     Q.    And was it -- that's not something that you

23 had access to directly; is that a fair statement?

24     A.    Yeah.  None of their -- they had their, you

25 know, little family group like we have.  So we weren't a

1    part of their group.  So I was just learning about this

2    through -- through Warren.  And then after the fact, I

3    think through -- through -- first through Warren and

4    then through Brad, like, how did -- how did he know that

5    they were there together.

6         Q.    And just so I have the timeline clear, so

7    Warren gets you.  Then is the next thing you do is try

8    to reach Brad directly; is that correct?

9         A.    I think so.  Yeah.  That's sounds right.  I

10   tried to reach Brad directly.  I think I leave a message

11   with him.  Can't make contact.  Call 911.  They start

12   their process.  But again, not knowing their response

13   time, who is closest there, I call Madison.  And I

14   think -- I can't remember.  Maybe I called both Monty

15   and Madison.  And Madison went down to that -- drove

16   down to that space and had a direct interaction with

17   Philip and Mary.

18        Q.    Was it your recollection -- well, maybe not

19   your recollection.  But do you have an understanding as

20   to whether or not Madison was awake when you called her?

21        A.    I think she was awake, because she was

22   clearheaded and -- so I think -- I think she was.  But I

23   don't know.  I don't know for sure.

24        Q.    And it's your understanding that Madison, in

25   fact, made contact with Trae and Mary?

1        A.     Yes.

2        Q.     When did you learn that she had been able to

3   make contact and warn them?

4        A.     I believe it was that night.  I think she

5   reported back to us that she had said, "Hey, you guys

6   need to split up.  Both of you need to split because,

7   you know, Brad is on his way over here to confront" --

8   "to engage with you guys at some couple" -- not knowing

9   what that could be, but -- "You need to" -- yeah.

10            I was just thinking -- I think part of that

11   place -- that house -- that property was where Mary and

12   Brad were married.  So there was an additional -- my

13   hunch is -- I mean, just put the pieces together, just

14   how painful that would be.  Trae and -- or Philip and

15   Mary are there now.  The violation of that to him and --

16   to Brad.  And just -- yeah.  Painful.  Very hard,

17   painful.

18        Q.     By the way, were you at their wedding?

19        A.     I was.

20        Q.     When you spoke with the 911 dispatch people,

21   did you tell them that Brad was a CHP officer?

22        A.     I don't recall doing that -- telling them

23   that.  I don't think I did.

24        Q.     Did you think about telling them that, or

25   that's just not something that --

1      A.    You know, I did.  I did think about telling

2   them that.  I think, at the time, I was like -- well, I

3   was in kind of like trauma -- kind of like a crisis

4   response state.  Because it was like I just got pulled

5   out of bed and, "Okay.  This is what's going on."

6           I think I was concerned at the time for, you

7   know, the impact that Brad's choices would have on his

8   work and on him and their family and -- so I think I

9   was -- I didn't mention that at the time.  I don't

10  recall that.

11          And of course, you've got the recordings; so

12  you know what I already said better than I do,

13  perhaps -- better than I can recall, but I don't recall

14  that.

15     Q.    In general terms, were you trying to balance,

16  number one, of course, your concern for people's safety,

17  but at the same time not wanting to unnecessarily

18  jeopardize his career?

19     A.    Yeah.  I mean, I just didn't know what that

20  would mean for him.  And so -- so I would say yes.  My

21  number one concern was for Mary and Philip's safety,

22  number one, and Brad's safety, number two.  And so I was

23  trying to act in such a way that would protect them all.

24          And then I think in the next -- you know, as

25  things unfolded that next day, just, I think,

1      A.    Yeah, I didn't recall that.  I was not aware
2   of that.
3      Q.    Okay.  Did you ever see Brad sort of writing
4   notes to himself or writing things down?
5      A.    I don't know if I did see him, like, with a
6   journal or something like that.  He --
7      Q.    Oh, I interrupted you.  I apologize.
8      A.    I don't recall that.  I don't recall.
9      Q.    Okay.  I'm going to show you what's been
10  marked previously as Exhibit 24, and I'd like you to be
11  able to tell us if you recognize that handwriting or
12  not.
13          MR. KATZ:  And this is actually the
14  proprietary system of the Attorney General's office
15  where -- as opposed to Zoom, which I'm a little more
16  familiar with.  Can someone tell me what to do to screen
17  share with that, or does that have to be initiated at
18  your end, or how does that work?
19          MS. McTAVISH:  You are way beyond my
20  knowledge.  There is a share screen icon at the top.  If
21  you go all the way to the top of your screen, kind of
22  push a little bit, and you'll see a video camera and
23  microphone and then a "share screen."  Do you see it?
24          MR. KATZ:  I do.
25          MS. McTAVISH:  Okay.  That should be the

1  golden button.

2          MR. KATZ:  So I can click -- so let's see

3  if -- and let me see if it's showing what I'm sharing on

4  this thing.  So apparently -- you are sharing.

5          MS. McTAVISH:  We can see it.  I can see it.

6          MR. KATZ:  I need to rotate that, I think.

7  Let me --

8          MS. McTAVISH:  Yeah.

9          THE WITNESS:  I can see it.  You don't have to

10  rotate it.

11  BY MR. KATZ:

12      Q.    Do you recognize that handwriting?

13      A.    I wouldn't be surprised if Brad had written

14  that.

15      Q.    Okay.

16      A.    I'll say that.  I wasn't keeping tabs on

17  his -- his writing.  Yeah.

18      Q.    Now, did you ever have any direct conversation

19  with Trae about the fact that Brad had expressed a -- at

20  least at various times, the desire to kill him?

21      A.    No.

22      Q.    Did you ever have a direct conversation with

23  Mary in which she discussed the fact that Brad had

24  expressed either the thought or desire to kill her?

25      A.    No.

1      Q.    And was part of what you're sort of internally

2   balancing -- were you personally -- were you hoping they

3   would get back together, or what was -- or is that

4   something you can answer?

5      A.    No.   You know, I mean, of course, I was hoping

6   they would be able to restore their relationship.   But

7   at that point, I was not seeing movement that that was

8   gonna happen on -- especially on Mary's behalf.   So --

9   so yeah.

10     Q.    You know, I realize hindsight is whatever

11  hindsight is, but do you -- do you have a recollection

12  as to why or whether it was a conscious thought even on

13  your part to not directly discuss Brad's evil intentions

14  with her after the August 3rd incident?

15     A.    I don't -- I think from my point of view, that

16  was -- it was being addressed by the CHP.

17            And I think I was assuming, too -- based on

18  what had happened that night with Madison talking to

19  them and then Mary and Brad's interaction at the house,

20  that I made an assumption that that was -- Mary was

21  aware of that.   And with Madison talking to Philip and

22  Mary that day, that they needed to get out of there, it

23  wasn't safe for them, that I -- I guess from my point of

24  view, it wasn't -- in hindsight, it wasn't clear that --

25  well, I made some assumptions that that was -- it wasn't

Case 2:19-cv-01329-WBS-DB   Document 124-1   Filed 02/08/22   Page 297 of 500

```
1                    REPORTER'S CERTIFICATE

2    State of California          )
                                  ) ss.
3    County of Sacramento         )

4            I, JULIE C. ROZELL, a Certified Shorthand

5    Reporter of the State of California, duly authorized to

6    administer oaths, do hereby certify:

7            That I am a disinterested person herein; that

8    the witness, MATTHEW HOOPER, named in the foregoing

9    deposition, was by me duly sworn to testify the truth,

10   the whole truth, and nothing but the truth; that the

11   deposition was reported in shorthand by me, JULIE C.

12   ROZELL, a Certified Shorthand Reporter of the State of

13   California, and thereafter transcribed using

14   computer-aided transcription and is a true and correct

15   record of the testimony so given.

16           Further, that if the foregoing pertains to the

17   original transcript of a deposition in a Federal Case,

18   before completion of the proceedings, review of the

19   transcript was requested.

20           IN WITNESS WHEREOF, I hereby certify this

21   transcript at my office in the County of Sacramento,

22   State of California, this April 23, 2021.

23

24           _____
             JULIE C. ROZELL, CSR NO. 14107
25           Certified Shorthand Reporter of
             the State of California
```

D&B DEPOSITION REPORTERS
(916) 649-1060 | rose@dbreporters.com

Exhibit M

1              UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF CALIFORNIA

3                      --oOo--

4

5      PHILIP DEBEAUBIEN,                    )
                                            )
6              Plaintiff,                    )
                                            )
7         vs.                                )   Case No.
                                            )   2:19-CV-01329-WBS-DB
8      STATE OF CALIFORNIA; CALIFORNIA       )
       HIGHWAY PATROL; TODD BROWN;           )
9      SABRENA SWAIN; JOY GRAF; REGGIE       )
       WHITEHEAD; RYAN STONEBRAKER;          )
10     BRENT NEWMAN; JEREMY DOBLER,          )
                                            )
11             Defendants.                   )
                                            )
12

13

14                     --oOo

15              Deposition of

16            ELLIOTTE JOHNSON

17          Tuesday, July 27, 2021

18

19

20     REPORTER:  LISA KENNEDY, CSR 8927

21     _____

22              TENNELEY MICKEL REPORTING
                   P. O. Box 1107
23             Arbuckle, California 95912
           Tel: (916) 492-9021   Fax: (916) 922-3461
24

25

CERTIFIED COPY

Elliotte Johnson - July 27, 2021

1   Q       From either Mitchell or Powers?

2   A       One of the other, yeah.

3   Q       So your recollection is not that Newman received

4   a phone call or email from someone else?

5   A       I don't remember that.

6   Q       And what were you told?

7   A       We had an officer that was having some marital

8   issues, some stress issues, and was possibly, you know,

9   possibly suicidal, that was having suicidal ideations or

10  thoughts.

11  Q       So just so I'm clear --

12  A       You know what?  It was Frank.  I'm sorry.  It

13  was Frank.

14  Q       Okay.

15  A       It was Frank.

16  Q       Did Lieutenant Newman tell you that in addition

17  or apart from Wheat having suicidal thoughts that he had

18  told Dave Ward that he'd driven from Amador County to

19  El Dorado County and Georgetown with the intention of

20  murdering two people?

21  A       I don't know nothing about that.  That doesn't

22  sound familiar to me.

23  Q       So when you --

24          MR. HELFAT:  Excuse me.  Objection.  There's no

25  foundation the way it's phrased, but he answered.

Elliotte Johnson - July 27, 2021

1    Q         BY MR. KATZ:  Okay.  So when Lieutenant Newman
2    told you to get on the phone, he didn't tell you anything
3    about Brad Wheat telling Officer Ward that he'd gone to
4    kill some people?
5    A         No.
6    Q         Would you have done anything differently if
7    that's what he told you?
8    A         Yes.
9    Q         What would you have done differently?
10   A         "We need to call law enforcement.  A person is
11   trying to kill somebody."
12   Q         So you would think.  So you would think.
13             So you get this request from Newman.  Who do you
14   call?
15   A         I think it was a text message.  I don't think --
16   I don't remember talking to Frank like on the phone going
17   back and forth.
18   Q         So you receive a text message.  What do you do
19   after receiving this text message with information over
20   someone being -- having suicidal ideation or that type of
21   thing?
22   A         Procedures for my role and responsibility as a
23   supervisor is to notify one of our short-list counselors.
24   When I mean short-list counselors, these counselors are
25   certified through Magellan as law enforcement specific

Elliotte Johnson - July 27, 2021

1  counselors, that they deal strictly with law enforcement,

2  understand law enforcement, you know, mind-set and

3  everything else.

4        From the radius of where Amador is at, I need to

5  get assistance to that person immediately.  When I looked

6  at my list, Sabrena Swain was the closest.  I believe she

7  was in Elk Grove.  So I notified Sabrena Swain regarding

8  the situation and what was going on, and we asked her if

9  she could respond to the Amador area.

10 Q       And when you say "the short list," what is the

11 short list?

12 A       The short list is what we have in our unit at

13 the time, OESA, where we have specific counselors located

14 in a geographical region per our divisions that we have

15 in our department.  These counselors are certified law

16 enforcement counselors.

17       Now, we have hundreds of counselors on the EAP

18 Magellan network, but these particular counselors have

19 been certified, verified by OESA that they are law

20 enforcement, that they work well with law enforcement,

21 and they are willing to respond when needed, when called

22 upon.

23 Q       And my understanding is that -- I'm speaking

24 loud for the microphone's benefit.

25 A       That's fine.

REPORTER'S CERTIFICATE

1

2     I certify that the witness in the foregoing

3  deposition

4          ELLIOTTE JOHNSON

5  was administered the oath by me to testify to the truth,

6  the whole truth, and nothing but the truth in the

7  within-entitled cause; that said deposition was taken at

8  the time and place therein named; that the testimony of

9  said witness was reported by me, a duly certified

10  shorthand reporter of the State of California; that it

11  was thereafter transcribed into typewriting; and that the

12  transcript is a true record of the testimony given.

13     Pursuant to Federal Rule 30(e), transcript

14  review was requested.

15     I further certify that I am not financially

16  interested in the action, nor a relative or employee of

17  any attorney or any party to the action.

18

19  DATED:  August 9, 2021

20

21      _____

      LISA KENNEDY, CSR No. 8927

22

23      State of California

24          --oOo--

25

Exhibit N

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| PHILIP DEBEAUBIEN, | No. 2:19-cv-01329-WBS-DB |
| Plaintiff, | |
| v. | **DECLARATION OF STEWART KATZ IN SUPPORT OF PLAINTIFF'S OPPOSITION TO STATE OF CALIFORNIA'S AND CHP DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| STATE OF CALIFORNIA, et al., | |
| Defendants. | |
| | Date:        February 22, 2022<br>Time:        1:30 p.m.<br>Courtroom: 5 (14th Floor)<br>Judge:       Hon. William B. Shubb |

I, Stewart Katz, declare as follows:

1.     I am one of the counsel for Plaintiff in this action.  I make this declaration in support of Plaintiff's opposition to the motion for summary judgment filed by the State of California and the CHP Defendants.  I make the statements of fact in this declaration of my own personal knowledge.  If called as a witness in this action, I could and would testify competently to the facts set forth herein.

2.     I am personally familiar with all of Plaintiff's exhibits in this matter.

3.     Except for the declarations, all of the exhibits listed in the Index of Exhibits and attached to Plaintiff's Separate Statement (to which this declaration is attached) are true and correct copies of what they purport to be.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 8, 2022.

*/s/ Stewart Katz*
Stewart Katz

Counsel for Plaintiff Philip Debeaubien

Exhibit O

1        UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF CALIFORNIA

3

4  PHILIP DEBEAUBIEN,         )  No. 2:19-cv-01329-WBS-DB

5        Plaintiff,        )

6      v.           )  **DECLARATION OF DR. KRIS MOHANDIE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO STATE OF**

7  STATE OF CALIFORNIA, et al.,  )  **CALIFORNIA'S AND CHP DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

8        Defendants.    )

9              )  Date:     February 22, 2022

10            )  Time:     1:30 p.m.

11            )  Courtroom: 5 (14th Floor)
                Judge:    Hon. William B. Shubb

12

13      I, Kris Mohandie, Ph.D., declare as follows:

14      1.    I make this declaration in support of Plaintiff's opposition to the motion for summary judgment filed by the State of California and the CHP Defendants. I make the statements of fact in this declaration of my own personal knowledge. If called as a witness in this action, I could and would testify competently to the facts set forth herein.

18      2.    I received my doctorate in May of 1989 from the California School of Professional Psychology, Los Angeles Campus. I am a California licensed psychologist (PSY12105) trained in clinical, police, and forensic psychology. I am also a Board-Certified Specialist in Police and Public Safety Psychology through the American Board of Professional Psychology. A fuller statement of my expertise and qualifications are set forth on Pages 1–3 of my report dated September 10, 2021, a copy of which is attached hereto.

24      3.    The statements and opinions in this declaration are intended to summarize and to crystallize the statements and opinions in that report and in my two days of deposition testimony given on November 10 and 19, 2021. I have not changed any of my opinions since my report or my testimony.

28  ///

4.      I refer herein to the evaluations of Brad Wheat conducted in August of 2018 by Defendant Sabrina Swain and by Defendant Joy Graf at the behest of Defendant California Highway Patrol ("CHP"), as more fully described in my report.

5.      Regardless of whether the evaluations undertaken by Defendants Swain and Graf were formally designated "Fitness for Duty Evaluations" by the CHP, they functionally and in fact evaluated Wheat's "fitness for duty" as a CHP officer, as that term is used in Penal Code § 832.05.

6.      Moreover, Swain and Graf functionally and in fact evaluated Wheat's "emotional and mental condition" to determine if that condition "might adversely affect [his] exercise of the powers of a peace officer," as those terms are used in Government Code § 1031(f).

7.      Neither Swain nor Graf met the various requirements set forth in Government Code § 1031(f)(2)(B).  That is to say, neither was a "psychologist licensed by the California Board of Psychology who has at least the equivalent of five full-time years of experience in the diagnosis and treatment of emotional and mental disorders, including the equivalent of three full-time years accrued postdoctorate."  And neither had "met any applicable education and training procedures set forth by the California Commission on Peace Officer Standards and Training designed for the conduct of preemployment psychological screening of peace officers."

8.      Given their lack of experience, education, and training and otherwise, both Swain and Graf were unqualified and not competent to conduct the evaluations of Wheat that the CHP asked them to conduct.  Their lack of qualification and competence led Swain and Graf to render erroneous opinions and advice, and to their failure to even remotely approximate or approach the standard of care.

9.      In particular, a qualified and competent evaluator would have categorically recommended that Brad Wheat be removed from duty — and had all of his weapons confiscated — until both (1) the favorable resolution of a thorough investigation into his criminal conduct and (2) a favorable formal "Fitness for Duty Evaluation."

10.     A qualified and competent evaluator would likewise have categorically recommended that both Mary Wheat and Plaintiff Philip Debeaubien be warned about Brad Wheat's attempted murder on August 2–3, 2018.  The *Tarasoff* and *Goldstein* decisions underscore this obligation.

1   11. Wheat's actions on August 2–3, 2018 constituted the crime of attempted murder

2 under California Penal Code §§ 187 and 664, as well as the crime of possession of a deadly weapon

3 with intent to assault under California Penal Code § 17500.

4   12. As stated in my report, CHP management and supervision should, first and fore-

5 most, have appropriately investigated Officer Wheat's actions related to these two crimes after it

6 became known to them that he had gone hunting for Mary Wheat and Plaintiff Philip Debeaubien

7 on August 2–3, 2018.  Officer Wheat should have been removed from duty and arrested, all of his

8 guns should have been taken pending an investigation, and these potential victims should have been

9 notified by the CHP about Officer Wheat's threats.  Only after resolution of the criminal issues

10 should the CHP have given consideration to evaluating his fitness for duty by competent and quali-

11 fied mental health professionals.  CHP management and supervision failed in this duty to investigate.

12   13. CHP management and supervision had a duty to know the appropriate mental health

13 professionals that were qualified and competent to conduct a fitness for duty evaluation.  It is clear

14 that they did not properly discharge their law enforcement duties, did not appreciate the criminal

15 code issues discussed in Paragraph 11 above, and did not properly understand the appropriate pro-

16 cedures or process for using qualified and competent mental health professionals to evaluate fitness

17 for duty.

18   I declare under penalty of perjury under the laws of the United States of America that the

19 foregoing is true and correct.  Executed on February 6, 2018.

20           */s/ Kris Mohandie*

            Kris Mohandie

21           (original signature retained by

            attorney Stewart Katz)

22

23

24

25

26

27

28

KRIS MOHANDIE, PH.D., ABPP
LICENSED PSYCHOLOGIST
P.O. BOX 88
PASADENA, CALIFORNIA 91102-0088
(626) 627-8388

September 10, 2021

Stewart Katz
555 University Avenue, Suite 270
Sacramento, CA 95825

**Re:  Philip Debeaubien v. CHP et al.**


Dear Mr. Katz:

Pursuant to your request, this is a report of my findings and opinions in the matter of
**Debeaubien v. CHP et al.** It is noted that any information not available at the time of this report
might alter the opinions included herein.  A copy of my resume and forensic fees statement is
attached.


**EXPERTISE AND QUALIFICATIONS**
I am a California licensed psychologist (PSY12105) trained in clinical, police, and forensic
psychology.  I am a Board-Certified Specialist in Police and Public Safety Psychology through
the American Board of Professional Psychology.  The following experience, training, and skills
qualify me to offer testimony in this particular case (Please see a copy of my curriculum vitae
which has been attached):

a.   Board-Certified Specialist in Police and Public Safety Psychology through the American
Board of Professional Psychology (ABPP).

b.   Clinical and Consulting Work Related to Police Officers, Including On-Duty and Off-Duty
Behavioral Concerns, Intervention, and Appropriate Referral
-   Assessment and intervention to hundreds of police officers, including numerous
officers directed for evaluation and intervention by their supervisors and
commanding officers.
-   Consultation and training with hundreds of supervisors and commanding
officers regarding appropriate intervention and referral for potentially
problematic officers.
-   Work fitness evaluations and referrals for work fitness evaluations.
-   Assessment, consultation, and intervention with numerous officers related to
potential dangerousness to self and others.

c.   Threat Assessment Expertise in Consultation and Training Activities
-   Regular consultation on threat issues in the public and private sector.

1

- Past consultation to the City of Los Angeles Workplace Violence Task Force, as well as LAPD's Internal Workplace Violence Task Force, contributing to developing policies and procedures, as well as consultation to active cases of concern.
- Editorial board of the Journal of Threat Assessment and Management.
- Consultation to various public safety agencies related to employees of concern.
- Invited guest reviewer to various peer reviewed journals including Journal of the American Academy of Psychiatry and the Law, Homicide Studies, Journal of Police and Criminal Psychology, Journal of Forensic Sciences, Criminal Justice and Behavior, Behavioral Sciences and the Law, Journal of Interpersonal Violence, Psychological Medicine, and Health Policy.
- LAPD Threat Management Unit 1994 thru 2003.
- Professional presentations pertaining to threat assessment in many venues including the annual Association of Threat Assessment Professional Training Conferences (1997-2015, 2017-19), California District Attorneys' Association, International Criminal Investigative Analysis Fellowship Seminar, California Homicide Investigators' Conference (2002), National Center for the Analysis of Violent Crime Seminar (2001, 2002), Alberta Crown Attorney's Association Annual Conference (1999).

d. Forensic and Operational Consultation to Homicide Cases
- Operational and forensic psychological consultation to numerous homicides and attempted homicides, including those perpetrated by ex-intimates, police officers, and murder-suicides.

e. Peer Reviewed Publication Pertaining to Officer Violence Risk & Stalking
- Mohandie, K. & Hatcher, C. (1999). Suicide and violence risk in law enforcement: Practical guidelines for risk assessment, prevention, and intervention. *Behavioral Sciences and the Law, 17, 357-376.*
- Mohandie, K., Meloy, J.R., Green McGowan, M., & Williams, J. (2006).  The RECON Typology of Stalking: Reliability and Validity Based Upon a Large Sample of North American Stalkers. *Journal of Forensic Sciences*, 51, 147-155.
- Mohandie, K. (2004).  Stalking: A 21st Century perspective.  In CDAA (Ed*), Investigation and Prosecution of Stalking and Related Crimes Manual.*  California District Attorney's Association.

f. Reviews of Shooting and Use of Force Incidents
- Dozens of pre- and post-conviction interviews and reviews of individuals and witnesses to police involved shooting events, on and off duty.

g. Demonstrated Crisis Management Expertise in Consultation and Training Activities
- Helped establish the LAPD's initial Crisis Response Team, facilitating debriefings, which included program development, training in the Mitchell Model, as well as other models of critical incident stress debriefing.
- LAPD crisis/hostage negotiation and SWAT team from 1990-2003- On-site response to hostage and barricade incidents, assessing hostage taker/hostages/victims,

assessing for high risk, including violence, subject precipitation, and suicide potential, interviewing and assessing witnesses to these events and crimes, and offering input to reduce risk and lead to safe apprehension/capture of suspects, and safe rescue of any hostages.   Many of these incidents involved subjects who had relationship problems, mental disorders, substance dependence problems, were potential homicide-suicides in progress, and under the influence of intoxicants, including alcohol.

- Consultation with other domestic and federal law enforcement agencies to present day.
- Pre-event consultation regarding strategy and threat assessment for potentially high-risk law enforcement interventions, including pending arrests of armed individuals (including sworn police personnel).
- Forensic consultation and review of numerous cases involving police shootings, use of force, suicide by cop, subject-precipitation, and victimology issues.
- Professional presentations in the arena of suspect aggression, mental disorders and behavior among subjects, suicide by cop, hostage and barricade incidents, and victim-perpetrator dynamics for the National Tactical Officers Association.
- Editorial board of the International Journal of Police Crisis Negotiations since 1995.

h.  General Clinical Work and Assessment of Individuals
  - Assessment of, and intervention to, hundreds of individuals related to suicidal thinking and impulses, violence, personality disorder, and other issues that can lead to high-risk circumstances.

i.  Relevant Training
  - Attendance to Association of Threat Assessment Professionals training conferences from 1997 through 2015, 2017-2019.
  - Critical Incident Stress Management: Basic Program and Current Issues Program- Trained by Dr. Jeffrey Mitchell in critical incident stress debriefing in 1992
  - LAPD Crisis Negotiation Training in 1989.
  - FBI two-week Crisis Negotiation Training in 1994.
  - Attendance to California Association of Hostage Negotiator's training conference in 1992-1999, 2001, 2007, 2009, and 2018.

j.  Membership in Relevant Professional Organizations
  - Member of Society of Police and Criminal Psychology since 1995.
  - Association of Threat Assessment Professionals since 1995. Distinguished Achievement Award 2010.
  - California Association of Hostage Negotiators since 1992, Honorary Lifetime Member since 2008.

k.  Forensic consultation/testimony in other use of deadly force cases, including:
  - State of Oklahoma v. Betty Jo Shelby.
  - Lam v. City of Los Banos
  - Ngo v. County of Riverside et al.

**DATABASE**

*Court Documents*
- Complaint, dated 5/29/19
- First Amended Complaint, dated 11/21/20
- Stipulation for Protective Order, dated 3/18/20
- Notice to Plaintiff and Clerk of Court of Removal to Federal Court, dated 5/29/19
- Defendant Responses to Interrogatories, Set Two, dated 4/9/21
- Declaration of Brent Newman, dated 5/25/21
- Defendant CHP Responses to Interrogatories, Set Four, dated 2/25/21
-

*Police Reports*
- Civil Litigation Report, dated 9/3/18
- Amador County Report

*Emails and Other Materials*
- Brown Emails (Exhibits 9&10)
    o Email from Sergeant Brown to assistant Chief Stonebreaker, dated 8/3/18 @ 1133 pm
    o Email from Sergeant Brown to Chief @ 2257
    o Email from Assistant Chief to Sergeant Brown @ 1053
    o Email from Sergeant Brown to Chief, dated 8/3/18 @ 2236
    o Email from Sergeant Dan Lopez, dated 8/23/18, Exhibit 53
    o Email from Sergeant Dan Lopez, dated 8/24/18, Exhibit 54
- Brown email, dated 8/3/18 @ 1037 pm (Exhibit 9)
- Try Not To Kill You note, undated (Exhibit 12)
- Assistant Chief Stonebraker email, dated 8/3/18 @ 1053 pm, Exhibit 49
- Assistant Chief Steve Dowling email, dated 8/4/18, Exhibit 61
- Captain Craig Root email, dated 9/3/18, Exhibit 58
- Magellan Agreement
- Injury/accident record

*Police Reports*
- Amador County Report

*CHP Discovery*
- Amador Area, Daily Schedule
- Lieutenant Todd Brown, Chronological Summary, written 10/2/18, Exhibit 62
- Sergeant Dan Lopez, Chronological Summary
- Sergeant Jeremy Dobler, Chronological Summary, Exhibit 51
- CHP Risk Management Manual
- CHP Critical Incident Investigation Team Manual
- Valley Division Internal Investigation (accidents)
- CHP General Law Enforcement Policy Manual
    o Chapter 3, Domestic Violence Policy
    o CHP Critical Duty Capability, General Order 10.5, dated September 1985
    o CHP Evidence Manual

  o CHP Peer Support Program
  o CHP Employee Assistance Program

*Video/Audio*
- 911 calls by brother-in-law, Matthew Cooper, dated 8/3/18
- 911 Call Audio from victim PD, dated 9/3/18
- 911 Call Audio from victim PD, dated 9/3/18
- Interview of Brad Wheat regarding accidents
- Cell phone videos of violent attack, homicide/suicide

*Depositions*
- Brown, Lieutenant Todd, Volume I, dated 9/29/20
- Brown, Lieutenant Todd Volume II, dated 6/28/21
- Debaubien, Philip, dated 10/21/20
- Dobler, Sergeant Jeremy, Volume I, dated 8/26/20
- Dobler, Sergeant Jeremy, Volume II, dated 6/25/21
- Duryee, Chief Sean, dated 6/24/21
- Graf, Joy Volume I, dated 12/9/20
- Graf, Joy Volume II, dated 8/11/21
- Hooper, Matthew, dated 4/1/21
- Johnson, Sergeant Elliotte, dated 7/27/21
- Johnson, Captain Robin, dated 6/23/21
- Newman, Chief David, Volume I, dated 6/25/21
- Newman, Chief David, Volume II, dated 7/16/21
- Root, Captain Jeffrey, dated 6/28/21
- Swain, Sabrena Volume I, dated 12/11/20
- Swain, Sabrena, Volume II, dated 7/30/21
- Ward, Officer David, dated 12/21/20

*Other Materials*
- Fitness for Duty Policies
- EAP Policy
- POST Commission Code of Ethics
- Various Press Releases

*References*
- American Psychiatric Association.  (2013). Diagnostic and statistical manual of mental disorders, fifth edition, text revision (DSM-5).  *American Psychiatric Association*: Washington, DC.
- Spilberg, S.W. & Corey, D. M.  (2020, 2014, 2017, 2018, 2019, 2020).   Peace officer psychological screening manual.  *California Peace Officer Standards and Training (POST).*
- *Ewing v. Goldstein, 15 Cal Rptr. 3d 864 (Cal. Ct. App. 2004)*
- International Association of Chiefs of Police (IACP) Police Psychological Services

Section (2018).  Psychological Fitness-For-Duty Guidelines.
https://www.theiacp.org/sites/default/files/201905/Fitness%20for%20Duty%20Ev
aluation%20Guidelines%202018.pdf

- Mohandie, K. & Hatcher, C. (1999). Suicide and violence risk in law enforcement: Practical guidelines for risk assessment, prevention, and intervention. *Behavioral Sciences and the Law, 17, 357-376.*
- Mohandie, K. & Hoffman, J. (2014).  Legal issues in threat management. In J.R.  Meloy & J. Hoffman (Eds.), *The International Handbook of Threat Assessment*.  New York: Oxford University Press.
- Mohandie, K., Meloy, J.R., Green McGowan, M., & Williams, J. (2006).  The RECON Typology of Stalking: Reliability and Validity Based Upon a Large Sample of North American Stalkers. *Journal of Forensic Sciences*, 51, 147-155.
- Mohandie, K. (2004).  Stalking: A 21ˢᵗ Century perspective.  In CDAA (Ed*), Investigation and Prosecution of Stalking and Related Crimes Manual.*  California District Attorney's Association.
- *Tarasoff v. UC Board of Regents (1976) 17 Ca.3d 425*

**FINDINGS AND OPINIONS**

1. **Officer Brad Wheat engaged in stalking behavior and attempted to murder the victims, Mary Wheat and Philip Debaubien, on 8/3/18.  These crimes should have been recognized and addressed by CHP supervisors and command staff prior to this preventable violent tragedy.  Instead, they chose to view it as a mental health crisis, significantly under-responding to the threat posed by Officer Wheat.**

   **Foundation for Opinion:**

   a. Given the known information and admissions by Officer Wheat that he had tracked and hunted his wife and Mr. Debaubien, while armed and with the intent of killing them and himself, he should have been immediately relieved of duty pending an investigation into this serious crime, weapons formally removed, and potentially arrested for attempted murder and other related charges, including stalking.  If not immediately arrested, he should have been 5150'd.  My knowledge and experience

      i. When Officer Ward was helping Officer Wheat in his peer counseling role, it was the first time he'd ever heard of an officer threatening to kill someone and it caused him considerable concern.  "At that point I had to switch from peer support over to a law enforcement role and notify my supervisors… got in a car and headed to Amador County...I knew that was my job."  He notified Sergeant Dobler.  Ward, Officer David depo, dated 12/21/20, 25-27

         1) Note: Officer Ward was the rare exception among the CHP personnel who recognized the need for role transition.

      ii. Officer Ward asked Officer Wheat specifically what he had said, to rule out that it was an exaggeration and "based on his statements he led me to believe it was an actual act" of wanting and going to kill them.  Ward, Officer David depo, dated 12/21/20, 34

      iii. "So I couldn't tell you what he told Sabrena, but at some point in their conversation is when I was questioning Brad.  He said he was -- went to look -

6

-look for Trae and hurt him, and then I said, 'Well, what were you going to do?' And he said, 'I was going to take him out and then kill myself.'" Dobler, Sergeant Jeremy, Volume II depo, dated 6/25/21, 140

      1) "Brad confided in officer at work (Dave Ward) that he drove to location where he thought his wife and her lover were last night to murder the lover and then commit suicide." Email from Lieutenant Brown to Chief, dated 8/3/18 @ 2236, 2

      2) Lieutenant Brown opined-incorrectly-that there were no criminal acts, despite Officer Wheat admitting to Officer Ward he had hunted for his wife and Mr. Debaubien with the intent of killing them and himself. At best this reflects negligent training. Email from Lieutenant Brown to assistant Chief Stonebreaker, dated 8/3/18 @ 1133 pm, 1

   iv. Sergeant Johnson recognized it for what it was. "Q BY MR. KATZ: Okay. So when Lieutenant Newman told you to get on the phone, he didn't tell you anything about Brad Wheat telling Officer Ward that he'd gone to kill some people? A No. Q Would you have done anything differently if that's what he told you? A Yes. Q What would you have done differently?
A "We need to call law enforcement. A person is trying to kill somebody." Johnson, Sergeant Elliotte depo, dated 7/27/21, 16

   v. Lieutenant Brown was asked the purpose of the evaluation of 8/3/18 and if it was a fitness for duty and stated: "What his state of mind was and how he was doing and if there was anything to this story." Brown, Lieutenant Todd, Volume I depo, dated 9/29/20, 45

      1) Note: this claim by Lieutenant Brown that they wanted to "see if there was anything to this story" seems illogical and at best reflects poor training: Officer Ward had heard it directly from Officer Wheat, had clarified the intent, and it defies logic that a mental health professional would amplify "if there was anything to this story" better than a thorough investigation of the attempted murder.

   vi. There was no investigation of the facts of the 8/3/18 incident, and no consideration even given to opening one. Brown, Lieutenant Todd Volume II, dated 6/28/21, 304

  b. Stalking behavior included harassing phone calls that Officer Wheat reportedly made, the tracking of Mary Wheat with the Life360 app, telephone calls and harassing text messages, drive-bys and attempted drive-bys of the gym that his wife and Mr. Debaubien had, and possible vandalism. This behavior obviously culminated in him showing up at the same time they were there on that fateful day, which is consistent with lying in wait.

   i. Sometime before 8/2/18, Officer Wheat was allowed to go on a ride along, and had asked Officer Peixoto to drive by the gym where his wife and Mr. Debaubien were, and Officer Peixoto refused. Officer Peixoto then told Sergeant Dobler, who then-based upon Lieutenant Brown's order-instructed Officer Wheat not to go by there. Lieutenant Todd Brown, Chronological Summary, written 10/2/18, Exhibit 62

ii.  Mr. Cooper reported that Officer Wheat was using the Life360 app to track Mary Wheat so he could report them to law enforcement with false claims of drunk driving.  This is a form of stalking behavior.  "He's calling to report them as a drunk driver."  911 calls by brother-in-law, Matthew Cooper, dated 8/3/18

iii.  "My understanding is -- I've heard the  story, like, at least from my niece who was living there  along with my older brother in that property on Fair  Pines Court, that that's where they -- Mary and Trae --  were, and Brad found out about that through him talking  to Philip's wife.  There was some kind of communication  happening there where they -- it came to light that Brad  knew they were there in that area and they were  together.  I think it was through Life360.  And so that's when he proceeded to, you know, drive over there."  Hooper, Matthew depo, dated 4/1/21, 20

iv.  "An issue came up with some windows being broken on -- on a house in  Sutter Creek where Mary was staying.  And we were  talking about that and trying to figure out who would do  that.  And would Warren do something like that?  You  know, but he wasn't owning anything like that. And I think through multiple kind of piecing things together, we surmised that that was probably Brad who had done that, probably, most likely.  And so we talked to the kids about, you know, making it right to pay for those windows." Hooper, Matthew depo, dated 4/1/21, 31

v.  There is evidence that Officer Wheat's obsession with his marital situation was affecting him while on desk duty: "After just telling Brad Wheat yesterday to be up front at all times if possible, I located Wheat in the debrief room sitting in the chair looking at his phone and not doing any other type of work."   He gave it five minutes, to see if he'd get back to front and he was still looking at his phone.  He had to tell him after another five minutes, at which point he apologized and went.  Email from Sergeant Dan Lopez, dated 8/24/18, Exhibit 53

vi.  Mr. Debaubien reported classic intimate stalker behavior by Officer Wheat.  Had the CHP investigated the 8/3/18 incident-or if they were not capable of doing so, the Sheriff's Department did, they would have been able to intervene on these behaviors as well:

1)  When Officer Wheat found out on 7/8/18 about the affair, he called and texted Mr. Debaubien: "A. Just that he was aware what happened and that I needed to end the relationship.  Q. Did he text you afterwards? A. Yes.  Q. What did the text message say? A. Very similar.  Just that it was very difficult  for his family; so he'd appreciate it if I would -- I  don't remember the exact verbiage he used -- stay away  or something along those lines."  August he called on his phone again, and asked where Mary was, and he said no, and he said, 'yes you do, She's with you."  Debaubien, Philip depo, dated 10/21/20, 22, 25

2)  "Q. When she would put you on speaker so you could  hear what Brad Wheat was saying, do you recall the things he would

8

say during these conversation. A. A lot of name-calling a lot of times. Q. When they were texting each other, did she ever show you the text messages? A. Yeah. I would say I saw more texts than I heard conversations on speakerphone. Q. And what was the content of these text messages? A. He would go through very many phases. So hewould have texts where he would tell her he would change and, you know, he wanted a chance to get her back. And then, you know, if he didn't get the necessary response he was wanting, he would, you know, get upset and make some -- he'd call her names and that type of stuff. That was kind of a pretty common type of thing, where he would have moments where he would, you know, say he would change and try to be better and all these things. And then if she didn't -- you know, obviously, she never did. But if she didn't respond the way he wanted, he kind of got upset and resorted to name-calling and stuff. Debaubien, Philip depo, dated 10/21/20, 26

3) "The phone call in Placerville when he knew where we were, he said he knew she was with me, it just kind of became odd that he seemed to know where she was a lot. So she ended up getting a different phone. Debaubien, Philip depo, dated 10/21/20, 30

4) July 2018: "Q. Okay. And what type of stalking activities did you see at this Spanish Street house? A.Well, it started one morning, probably the next morning or the morning after we first arrived, that we were both leaving for work in the morning early. It was probably 5:00 a.m. And I saw somebody in a gray jogging outfit. And they stared at me as I was kind of pulling onto the main street there in Sutter Creek. I couldn't really see who it was because they had a hoodie on and it was dark, but it was a very weird stare. And then I left. And then Mary should have been right behind me, and she showed up about 15 minutes later and let me know that Brad had stopped her. And I asked her, actually, "Was he wearing a gray jogging suit?" And she said yes. And he stopped her and asked her where she was living and what she was doing and then asked her if she lived in the house that we actually were and pointed at it. And she said, 'No, we're not living there,' and kind of had a little argument. And then she left." Debaubien, Philip depo, dated 10/21/20, 36-37

5) "And then Friday afternoon of the Labor Day weekend, we left. And we actually never went back to that place. But we left. And then Saturday morning we received a phone call from the person that was letting us stay there saying that the garage window had been broken. And the way the house works is the garage was below the house. So the garage

window had been broken. And immediately Mary thought it might have been Brad, and she asked the person if they wanted us -- or if she wanted us to notify anyone.  And the person said no, they weren't sure it was Brad and didn't  want to cause any issues or whatnot. And so we went on with our day. The next morning, which was Sunday morning, we  received -- or she received another phone call from the  same person letting them know that all the windows in  the house had been broken.
Q. Did Mary, to your knowledge, call Brad and ask  him if he had done this? A. I believe she did make a call or text. I'm  not sure which.  I just remember the answer, because it  was very weird.  He said, 'Which house?'  Q. So, to your recollection, he just -- he  replied, 'Which house?' when she asked him about -- A. Yes.  Which I found odd.  What do you mean,  which house?  So you threw rocks at more than one house or did you throw rocks?  It was just a very odd response."
Debaubien, Philip depo, dated 10/21/20, 58-59, 61

c.  The intended victims should have been notified and offered an EPO based upon the information known to the CHP at the time.  My knowledge and experience

d.  Instead, after improperly viewing this situation as a mental health crisis, they brought in an unqualified LMFT, Sabrena Swain, who conducted an inadequate assessment that fell far below the standard of care, and who ultimately reported that Officer Wheat was not a danger.

**2.  As noted above, given the nature of his attempted murder behavior of 8/3/18, a criminal investigation into Officer Wheat's criminal behavior should have been initiated and he should have been removed from duty until the resolution of that investigation.  If he were cleared of this through an appropriate investigation, then and only then, should there have been a formal fitness-for-duty evaluation of Officer Wheat prior to returning his weapons or bringing him back to any police work.**

**Foundation for Opinion:**

a.  POST and IACP both indicate the role, function, qualifications, and methodologies for fitness-for-duty evaluations and the process of psychological screening and fitness-for-duty evaluations in addressing problem officers like Officer Wheat.

i.  Publication of the 2014 POST psychological screening "manual marked an important milestone in POST's mission by helping to ensure that, as stipulated in California Government Code § 1031(f) and POST Commission Regulation 1955, every peace officer is 'free from any emotional or mental condition that might adversely affect the exercise of the powers of a peace officer and to otherwise ensure that the candidate is capable of withstanding the psychological demands of the position.' There is no more important goal than this." Spilberg & Corey, 9

1)  Much of the Manual's guidance is targeted to those who conduct psychological screening evaluations. Per GC § 1031(f), these

evaluations must be conducted by licensed psychologists or psychiatrists. However, in practice, qualified psychologists conduct the overwhelming majority of psychological screenings. Therefore, the term "psychologist" is used throughout the Manual to denote those who are qualified to conduct peace officer psychological evaluations per GC § 1031(f). Spilberg & Corey, 19

2) Government Code § 1031(f) mandates that peace officers be free of any physical, emotional or mental condition that might adversely affect the exercise of their powers. It further stipulates that the evaluation of emotional and mental condition must be conducted by a licensed psychologist or psychiatrist who has a minimum of five years of experience and has met the POST education and training standards. Spilberg & Corey, 24

3) Penal Code § 832.05 requires departments that hire peace officers to ensure that their screening psychologists and fitness for duty evaluators meet the requirements outlined in GC § 1031(f). Spilberg & Corey, 24

4) Penal Code Section 832.05 (a) Each state or local department or agency that employs peace officers shall utilize a person meeting the requirements set forth in subdivision (f) of Section 1031 of the Government Code, applicable to emotional and mental examinations, for any emotional and mental evaluation done in the course of the department or agency's screening of peace officer recruits or the evaluation of peace officers to determine their fitness for duty. (b) This section shall become operative on January 1, 2005. Spilberg & Corey, 39

ii. "A psychological FFDE is a formal, specialized examination of an incumbent employee that results from (1) objective evidence that the employee may be unable to safely or effectively perform a defined job and (2) a reasonable basis for believing that the cause may be attributable to a psychological condition or impairment. As such, an FFDE is considered a "medical" examination under the terms of the Americans with Disabilities Act.1 The central purpose of an FFDE is to determine whether the employee is able to safely and effectively perform his or her essential job functions…Referring an employee for an FFDE is indicated whenever there is an objective and reasonable basis for believing that the employee, as a result of a psychological condition or impairment, (1) may be unable to perform one or more essential job functions or (2) poses a direct threat to him-, herself, or others. An objective basis is one that is not merely speculative but derives from direct observation, credible third-party report, or other reliable evidence." IACP Police Psychological Services Section (2018), 2

1) "Qualifications: 5.1.1 licensed as a psychologist or psychiatrist with education, training, and experience in the diagnostic evaluation of mental and emotional disorders; 5.1.2 competent in the evaluation of law enforcement personnel; 5.1.3 familiar with the essential job functions of the employee being evaluated and the literature pertinent

to FFDEs, especially that which is related to police and public safety psychology; 5.1.4 familiar with, and act in accordance with, relevant state and federal statutes and case law, as well as other legal requirements related to employment and personnel practices (e.g., disability, privacy, third-party liability); 5.1.5 familiar with, and be guided by, other applicable professional guidelines, including, but not limited to, the Specialty Guidelines for Forensic Psychology; 3 5.1.6 satisfies any other minimum requirements imposed by local jurisdiction or law; 5.1.7 demonstrates ongoing efforts to maintain and develop their areas of competence based on his/her education, training, supervised experience, consultation, study, and professional experience; and 5.1.8 seeks appropriate consultation, supervision, and/or specialized knowledge to address pertinent issues outside his/her areas of competence that may arise during an FFDE." IACP Police Psychological Services Section (2018), 3

b.  The CHP, instead of using qualified mental health professionals to assess Officer Wheat's fitness-for-duty, consulted with two unqualified mental health professionals (LMFT's) who did not meet the minimum qualifications for fitness-for-duty evaluations.  They were not only unqualified, but not competent in this area of practice, and their actions and inactions as documented throughout the body of these opinions fell far below the standard of care for fitness-for-duty, as well as threat assessment.  They rendered fitness-for-duty opinions (dangerousness), did not seek collateral data, failed to document their work, and their work product transmitted to the CHP was not in the form of a written report.

    i.  "I know we had him evaluated because I was there for that."  But according to Sergeant Dobler, Officer Wheat was never asked to surrender his gun or be on limited duty.  All was handled *informally,* which given the undeniable serious nature of Officer Wheat's admissions on 8/3/18, was simply unacceptable.  It is disturbing that the CHP put Officer Wheat on a formal interim reporting plan for car accidents, but did little or nothing for the attempted murder suicide.  Dobler, Sergeant Jeremy, Volume I depo, dated 8/26/20, 57-58

        1)  When asked whether the evaluation of 8/4/18 was a fitness for duty exam, he responded, "hey is he okay to go to work?" was what it was, which is, a fitness for duty exam.  Dobler, Sergeant Jeremy, Volume I depo, dated 8/26/20, 59

        2)  "I advised the commander, Lieutenant Todd Brown, who called out a department 'phychologist,' Sabrina Swain."  Sergeant Jeremy Dobler, Chronological Summary, Exhibit 51, 1

            1.  Note: Sabrina Swain is not a psychologist.  This represents a CHP negligent training and supervision issue that department supervisors and commanders were not trained to differentiate the professions, nor know which professional was appropriate for a high risk, dangerousness, fitness for duty evaluation situations.

    ii.  Lieutenant Brown ultimately testified that part of the purpose of the evaluation of 8/3/18 was to determine if Officer Wheat was fit to work.

Because if he was a danger to others, he would not be fit.  "I requested the psychologist or psychiatrist." Brown, Lieutenant Todd, Volume I depo, dated 9/29/20, 45, 164

iii. "The psychologist has completed her evaluation of Officer Wheat. It is her opinion he is NOT a threat to himself or others.  Additionally, she relayed that if this situation had been self-initiated by Officer Wheat it would not have met threshold requirement for her to notify law enforcement as she does not believe there is a future threat."  Assistant Chief Steve Dowling email, dated 8/4/18, Exhibit 61

    1) Note: evaluator was not a psychologist, did not rely upon proper methodology, nor did she apply relevant statute pertaining to Duty To Warn (Tarasoff and Goldstein).  Further, the CHP itself should have unilaterally notified and acted based upon the investigatory information they had related to Officer Wheat's attempted homicides.

iv. "Mental health professionals refrain from rendering fitness-for-duty opinions when they are not conducting an FFDE." IACP Police Psychological Services Section (2018), 2

    1) Ms. Swain recommended he take a few days off and did not have any concerns about him being able to fulfill his law enforcement duties. While she said, "it wasn't a recommendation, it was a suggestion," it was in fact a de-facto fitness-for-duty assessment, including her assessment of whether he was a danger to others and himself.  Being at work, and whether he was safe as a police officer with peace officer powers is indeed within the province of a fitness-for-duty evaluation. Swain, Sabrena, Volume II depo, dated 7/30/21, 269, 273

    2) "I talked to the guys that were there, told them that he could benefit from a good night's sleep. It was like 3:00 in the morning. I think they said they were going to be staying with him. I said, 'Okay.'" "When I left his house, I did not believe at that point in time he was a danger to himself or anyone else, and that is what I relayed to the man on the phone." Swain, Sabrena Volume I depo, dated 12/11/20, 126, 140

    3) Similarly, Ms. Graf attempted to label her interactions with Officer Wheat as debriefing activity, claim he was not her client, and ignored that her evaluation did indeed cover fitness-for-duty issues and was a de-facto fitness for duty evaluation:

        1. Ms. Graf had no training in fitness for duty evaluations.  Graf, Joy Volume I depo, dated 12/9/20, 43

        2. When asked to meet with Officer Wheat by Lieutenant Brown, Ms. Graf claims she was doing a "one on one debrief": "Q. When you're entering this room, what is your understanding as to what your relationship is between yourself and Brad Wheat professionally? A. I am there as a -- a trained incident debriefer. Critical incident stress debriefer."  Graf, Joy Volume II depo, dated 8/11/21, 166-167, 186

        3. "A. So what I was going to talk to him about, that I was under the impression, is he had three single-car accidents while on

13

duty in a patrol car. So not only is that costly, there's a concern about <u>is he too distracted to be out in a patrol car.</u> Q. So your understanding is that you were there because Brad Wheat had had three car accidents? A. Yes. And I'm sure that there -- that Lieutenant Brown -- and I don't know where I learned this; it might have been from Officer Wheat. He was separated and his wife was having an affair. I don't know if they were living separate or just, you know, emotionally separated, but she was having an affair. So the question is, how -- how is home life impacting work and his work impacting home."  Graf, Joy Volume II depo, dated 8/11/21, 175

4. Note: She apparently defined her role by how she was being paid: "A. Well, so according to Magellan, who pays the bill, their definition of critical incident is determined by the agency and what they want to pay for that service." Graf, Joy Volume II depo, dated 8/11/21, 176

5. "Q. Yes. In other words, you met with him. Did you have him sign an authorization for you to discuss your meeting with him with anyone else? A. No. Q. Why not? A. He wasn't a patient or a client, so I didn't have need to do that unless it was a legal issue. Graf, Joy Volume II depo, dated 8/11/21, 192

6. "Q. What did you tell Lieutenant Brown? A. To the best of my ability, I told him that we're done, I was done with meeting with Officer Wheat, that <u>based on our conversation, I was not concerned at that point in time for his safety, for his -- his, umm – I wasn't concerned about his doing anything harmful, whether it to be to him or to his I thought ex-wife</u> but maybe wife, and that he had good resources and good coping strategies, and that he was -- had already been utilizing them in different ways, and that's about all I can recall."  Graf, Joy Volume I depo, dated 12/9/20, 72

    a) "On August 21, 2018, Joy Graf called and talked to Officer Wheat for an extended time. She then talked to me and advised she had called to check on Officer Wheat and the rest of the office.  She again stated that Officer Wheat was coping well and was fine to be working."  Sergeant Jeremy Dobler, Chronological Summary, Exhibit 51, 2

v. These mental health professionals did not seek appropriate collateral data. "When conducting the FFDE, it may be necessary for the examiner to receive background and collateral information regarding the employee's past and recent performance, conduct, and functioning. The information may include, but is not limited to, job class specifications and/or job description, performance evaluations, previous remediation efforts, commendations, testimonials, internal affairs investigations, formal citizen/public complaints,

use-of-force incidents, reports related to officer-involved shootings, civil claims, disciplinary actions, incident reports of any triggering events, health care records, prior psychological evaluations, and other supporting or relevant documentation related to the employee's psychological fitness for duty. In some cases, an examiner may ask the examinee to provide relevant medical or mental health treatment records and other data for the examiner to consider. It is important that all collected information be related to job performance issues and/or the suspected job impairing mental condition. Where possible and relevant, it may prove helpful to gather information from other collateral sources." IACP Police Psychological Services Section (2018), 4

    1) At the same time, some important data was not shared proactively at different points by CHP personnel with these responding mental health professionals. For example, the day prior to the 8/3/18 incident, Lieutenant Brown noted that Officer Wheat was back at the wash shed and appeared upset.  It was concerning because officers didn't usually go back there.  So even though claims he wasn't really concerned about suicidality, he had the sergeant ask.  Brown, Lieutenant Todd Volume II depo, dated 6/28/21, 241

    2) When Lieutenant Brown spoke with Sabrina Swain, he did not relay to her he had to tell Officer Wheat not to drive by gym.  He was also aware that Officer Wheat had a way to follow Mary Wheat, but did not know what it was.  Brown, Lieutenant Todd Volume II depo, dated 6/28/21, 237, 258-259

vi. "10. Report and Recommendations 10.1 Customarily, the examiner will provide a written report to the employer that contains a description of the rationale for the FFDE and the methods employed and addresses the referral question(s). 10.1.1. The content of the report should be guided by the referral question(s), the employer's written policies and procedures, the applicable terms of any labor agreement, relevant law, the terms of informed consent, and the employee's authorization. 10.1.2. Because FFDEs may become part of an adjudicative process, examiners are encouraged to maintain detailed records that allow scrutiny of their work by others. 10.1.3. Examiners attempt to present findings and opinions in ways that promote understanding and to present their conclusions in a fair, nonpartisan, and thorough manner. 10.1.4. FFDE examiners consider and seek to make known that evaluation results can be affected by factors unique to, or differentially present in, FFDE contexts including response style, voluntariness of participations, and situational stress associated with involvement in labor and/or legal matters." IACP Police Psychological Services Section (2018), 6

vii. "On August 20, 2018, Officer Wheat returned to work on a limited duty basis as the front desk officer.  I returned his duty weapon to him so he could return to work, but still had possession of his long guns."  Sergeant Jeremy Dobler, Chronological Summary, Exhibit 51, 2

    1) Note: this return of Officer Wheat's firearm was done without the required and necessary fitness-for-duty evaluation by a qualified mental health professional using an accepted methodology.

3. **The threats of violence and danger posed by Officer Wheat on 8/3/18, known to the CHP supervisors and managers, as well as the responding therapist, Sabrena Swain, should have been conveyed by Ms. Swain and the CHP to Mr. Debeaubien and Mary Wheat per Tarasoff/Goldstein case law duty to warn obligations.**

**Foundation for Opinion:**

a. Mr. Debaubien testified that he and Ms. Wheat were *never* informed by the CHP or Ms. Swain of the threat and danger he posed when he sought them out to commit murder/suicide.

b. The CHP was aware of these same statements; indeed, Officer Ward did his peer counselor obligation to break confidentiality to inform the CHP of Officer Wheat's homicidal and suicidal intentions and threat.
   i. When Officer Ward was at Officer Wheat's house, his brother-in-law was there, but he did NOT tell him about the threat to kill.  Ward, Officer David depo, dated 12/21/20, 43

c. Ms. Swain testified that she had been informed of Officer Wheat's immediate threat. Note: This information met the duty to warn obligation from Tarasoff/Goldstein.
   i. "I was told that Brad went out looking for -- and I don't remember now if it was just his wife or just the boyfriend or both -- with the intent to kill them and kill himself and that he hadn't found them."  Swain, Sabrena, Volume I depo, dated 12/11/20, 112

d. She was also told directly by Officer Wheat that he had done so, affirming the threat. "I know the people that I talked to on the phone told me that the employee had gone out looking for his wife, and the fear was that he was planning to kill her and then kill himself."  Swain, Sabrena, Volume II depo, dated 7/30/21, 178
   i. Ms. Swain recalled that Officer Wheat had told her: "that he had gone out and he was -- had gone out looking for -- and I don't remember now if he said just Mary and/or Mary and her boyfriend, about he had gone out looking for Mary, and he hadn't found them and said that he had come home."  Swain, Sabrena depo, Volume II, dated 7/30/21, 175

e. Ms. Swain testified that despite the above facts (the threat posed had just happened), she did not find that there was imminent danger and thus did warn the intended victims and the police, per her mandated obligation under Tarasoff/Goldstein.
   i. "I never discussed with anybody if anybody had been warned because nothing -- that evening there hadn't already been learned by law enforcement or learned by me that there was an imminent threat or a danger to anybody. So, no, I would not have asked if Trae had been warned or Mary had been warned."  Swain, Sabrena, Volume I depo, dated 12/11/20, 119
      1) Note: this is a gross failure in her clinical judgment failing to see the obvious imminent threat and need to honor duty to warn obligations. My knowledge and experience

16

**4. Aside from the opinions noted above, both Ms. Swain and Ms. Graff did not adhere to the standard of care for their mental health profession.**

**Foundation for Opinion:**

a. Practicing outside area of competence in what was a de-facto fitness-for-duty as well as threat assessment.
   i. "I don't have any particular training in the threats within the therapeutic context, meaning suicide and homicide, or threat, like Tarasoff warnings, that's suicide or threat to others. I don't have additional training in that besides the law and ethics we're required to do every two years for licensure." Swain, Sabrena Volume I depo, dated 12/11/20, 49
   ii. In her professional career, Ms. Swain had never been called to assess for a potential murder suicide.  Swain, Sabrena Volume I depo, dated 12/11/20, 114
   iii. Ms. Swain was not trained for fit for duty evaluations.  Swain, Sabrena Volume I depo, dated 12/11/20, 47
b. Failure to ask basic questions of Officer Wheat that were directly germane to assessing Officer Wheat's danger to himself and others.
   i. Ms. Swain indicated that Officer Wheat did not tell her he went looking for his wife with a firearm *nor did she ask him.* Her clinical reasoning for this was highly flawed: "It's about what their mental state is right then. So I was focusing on what his mental state is and what the potential for further risk is." Swain, Sabrena depo, Volume II, dated 7/30/21, 202-203
   ii. Note: by doing so she ignored the best predictor of future behavior-which is past behavior:  "Q. Okay. And in terms of determining what type of future risk Brad Wheat provided at that moment, wouldn't you want to consider what it was he had done in the past, in the recent past? A. No." Swain, Sabrena, Volume II depo, dated 7/30/21, 204
c. They did not seek information from other sources or prior treatment providers. Nor did they seek other collateral information.
   i. "Q. Okay. And did you find out who these people were he was seeing? A. I think it was lay counseling through his church or something, and I don't -- I don't remember now if he said that they were currently or had recently done marriage counseling."  Swain, Sabrena depo, Volume II, dated 7/30/21, 213
   ii. Never bothered to reach out to his existing therapists to confirm he had one, make arrangements for follow-up, and make sure these professionals were aware of the serious issues with their client. Swain, Sabrena, Volume II depo, dated 7/30/21, 215-216
   iii. Ms. Swain did not seek any collateral information about work performance or any other concerning behaviors that night, nor did she reach out to other treatment providers. Swain, Sabrena, Volume II depo, dated 7/30/21, 233-234
   iv. When Ms. Graf evaluated Officer Wheat on August 14, 2018, she failed to obtain essential collateral information that would have informed her of his prior violent impulses.  "So his story was that they -- that he and his wife were separated -- and again, I was confused about that because it sounded like she was out of the house, then the house had two parts, and part of the time she

17

was in the house and then out. I don't know what "separated" exactly meant. And she was having an affair with somebody that she and he both knew. And that he -- first, he was distraught and upset about that, and he was -- he kept trying -- he wanted to have her give him a chance and give the marriage a chance. So that he had gone out -- and I don't remember if this was on or off duty -- and went to, I want to say, Placer County, which is out of his area to patrol, to confront her. He went to where he thought she was to confront her and to talk with her and ask her to at least try couples counseling. That was his goal, to try couples counseling. And that if the affair individual was there, that he would ask him to back off and give them a chance. But he said -- he, Officer Wheat, said he was -- he was upset. The couple was not there. He was upset, and as a safeguard, he had given his firearm -- I don't know if it was personal or duty -- to Officer -- Sergeant Dobler. And he -- he was embarrassed and ashamed and had a lot of remorse about how he had gone through this thing to try to find her. He felt like he'd embarrassed his -- himself and his family, and then he kind of went into his commander, his friends, his church. He embarrassed a lot of people, and he had tremendous regret Q. A. about that." He told her "no" when she asked about prior suicidal thinking, which was clearly a lie given what was known about the 8/3/18 events.  Graf, Joy Volume II depo, dated 8/11/21, 195-196, 212-215

  i. Ms. Graf's excuse for not seeking collateral information was "No. Because those things you just asked me were about clients, and he was not a client." This was also her excuse for not maintaining any documentation or notes.  Graf, Joy Volume II depo, dated 8/11/21, 242, 283

v. Talking with family members could have further illuminated the depth of the threat (not that there was not enough already).  "Q. When he was telling you about his anger in reaction to his wife having an affair, did you feel that  he was going to actually go and harm either Mary or  Philip? A.Yeah.  Initially, I did not.  You know, I did not think that he was going to do that.  It was more  like I -- he would make statements like, "I could," you  know -- you know, "take," you know, like -- I don't know  if he ever said, "I could just, like, kill." Hooper, Matthew depo, dated 4/1/21, 18

  i. "There was one other time -- one or two other times  where Brad voiced, like, his -- like, "I could just kill  them and kill myself," kind of that -- I think there was  one other time -- one or two other times that he voiced  that as part of what -- processing his pain and his --  it's so painful.  Especially because Mary was staying in Sutter  Creek…And as he's processing his pain and his anger about that, I  think there was a few other times that he would say,  like, "I could just" -- "I want to just end it all.  You  know, it's so painful." Hooper, Matthew depo, dated 4/1/21, 33

  ii. "Q. Did he mention -- did he mention that he was -- that he'd been contemplating killing himself  after killing them? A. Yes.  He did mention that.  Along the lines of  just him saying, "I won't be going" --

"if I did  something like that," something lethal -- harmful,  lethal, "I'm not going to jail." Hooper, Matthew depo, dated 4/1/21, 65

d.  They did not address whether he indeed had follow-up care.

    i.  "But at the time that I finished with him, I did not have any immediate concerns, and he had the ability to continue to get the help that he needed. He had support around him. So I did not feel there was any need for me to do more follow-up." Swain, Sabrena, Volume II depo, dated 7/30/21, 276

e.  Failure to seek consultation for issues beyond the scope of their practice.

    i.  It did not cross Ms. Swain's mind in route that this case was beyond her competence.  Ms. Swain did not seek consultation about whether she should issue a Tarasoff warning or to help her with her clinical decision making with this very dangerous case she'd never dealt with before.  Swain, Sabrena, Volume II depo, dated 7/30/21, 180, 198

    ii.  In 19 years of practice, Ms. Swain had never issued a Tarasoff warning. Swain, Sabrena, Volume I depo, dated 12/11/20, 33

    iii.  "I don't have any particular training in the threats within the therapeutic context, meaning suicide and homicide, or threat, like Tarasoff warnings, that's suicide or threat to others. I don't have additional training in that besides the law and ethics we're required to do every two years for licensure." Swain, Sabrena, Volume I depo, dated 12/11/20, 49

f.  Failure to document their work consistent with both the laws and ethics governing clinical encounters by therapists who are LMFT's.

    i.  Ms. Swain did not document her evaluation of Officer Wheat.  She offered an inaccurate reason for why she did not have any notes. She has tried to frame a clear evaluation, including fitness-for-duty issues as a "one on one debrief," which this clinical encounter was not: "THE WITNESS: No notes were kept that night. Q BY MR. KATZ: Why not? A It is in our training for these types of situations that we don't keep notes; and the only information that we provide to the department is the time of travel and the time on scene, and we get paid for our time."  Swain, Sabrena Volume I depo, dated 12/11/20, 77

        i.  "THE WITNESS: In the Mitchell model training that we did, and under the capacity that the CHP called us out, the training says no notes are kept, that the process is still confidential, and we tell that to the people when we're meeting with them: "Everything you say is kept confidential, except by law I have these reporting requirements." She further justified this by indicating that was the capacity in which the CHP called her out, as if that changed the fact it was a threat assessment as well as a de-facto fitness-for-duty evaluation.  We call these one-on-one debriefs."  Swain, Sabrena Volume I depo, dated 12/11/20, 77-80

        ii.  "And in that capacity when they call me out for that, the billing is done under this code that you see on my billing, S9484, and that's what's billed to Magellan. That's the capacity in which I was out there. So it's not a debrief, but that's the heading or the capacity that they had me there."  Swain, Sabrena Volume I depo, dated 12/11/20, 80, 91

       1)     Note: the justification offered by Ms. Swain that her 8/4/18 evaluation was some sort of "critical incident debriefing" for which it was acceptable not to take notes and complete clinical documentation is not applicable.  She clearly knew or should have known this was not a "debriefing." This was not any kind of debriefing by any stretch of the imagination.  My knowledge and experience

       2)     Ms. Graf's excuse for not documenting or keeping notes was similar. "No. Because those things you just asked me were about clients, and he was not a client." Graf, Joy Volume II depo, dated 8/11/21, 242, 283

  g.  As a note, Ms. Swain responded to conduct a CISD after the homicide suicide.  This was poor clinical judgement since the offender was someone she had evaluated.  Swain, Sabrena Volume I depo, dated 12/11/20, 23

**5.**  **I plan to provide general teaching knowledge about suicide and violence risk in law enforcement, including murder suicide by police officers.  This will be based on my 32 years consulting to law enforcement, advising command staff, conducting evaluations, including making decisions about work fitness and referral for work fitness evaluations, reviews of completed law enforcement suicides and murder-suicides perpetrated by police officers, and assessing and treating thousands of police officers during my career.**

Thank you for the opportunity to review this case.

Sincerely,

Kris Mohandie, Ph.D., ABPP
Licensed Psychologist

# Exhibit P

1               UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF CALIFORNIA

3

4     PHILIP DEBEAUBIEN,

5                   Plaintiff,

6     vs.                         Case No. 2:19-cv-01329-WBS-DB

7     STATE OF CALIFORNIA;
      CALIFORNIA HIGHWAY PATROL;
8     TODD BROWN; SABRENA SWAIN;
      JOY GRAF; REGGIE
9     wHITEHEAD; RYAN
      STONEBRAKER; BRENT NEWMAN;
10    JEREMY DOBLER,

11                  Defendants.
      _____/
12

13

14                    Deposition of

15              DAVID BRENT NEWMAN

16            Volume 1, Pages 1 - 110

17            Friday, June 25, 2021

18

19        REPORTER:  DEBRA P. CODIGA, CSR NO. 5647

20

21    _____

22

23            TENNELEY MICKEL REPORTING
                    P.O. Box 1107
              Arbuckle, California 95912
24      Tel 916-492-9021   Fax 916-922-3461

25

**CERTIFIED COPY**

David Brent Newman - Vol. I - June 25, 2021

1   indicate, apply to, I'll -- let's assume, if you will,

2   because I don't want to get into a "it misstates the

3   evidence" thing.

4         But let me just ask you, as a good-faith

5   question, if all of those things applied to Brad Wheat,

6   what impact would that information have for you, had you

7   been made aware of it?

8      A.   Then it would have -- it would have been

9   included in my deliberative process as to whether or not

10  to move forward.

11        But again, the -- the piece -- the first piece

12  that starts that is the commander.  Because the

13  commander's there.  It's their assessment and then their

14  initiation of that and a recommendation.

15     Q.   Okay.  And when we say "commander," you're

16  talking about, as to Brad Wheat, Lieutenant Todd Brown;

17  is that correct?

18     A.   In this case, yes.

19     Q.   Okay.

20     A.   Uh-huh.

21     Q.   Now, we talked about domestic violence.  And

22  it's your understanding that the laws -- again,

23  realizing the danger of -- of these sudden -- sometimes

24  sudden escalation of domestic violence incidents, that

25  weapons -- that it's a good idea to make sure the people

David Brent Newman - Vol. I - June 25, 2021

```
 1  involved in domestic violence-type situations not have
 2  access to firearms.
 3      A.   That's very vague.  I mean if there's a
 4  specific cause, there's a specific set of facts,
 5  there -- we have the law on our side, then yes, we would
 6  use the tools of law, then, to separate that.
 7          But it can't be a hunch; it can't be a feeling.
 8  We -- we would need a really specific fact pattern that
 9  applied to the law that we would then --
10      Q.   All right.  Well, again -- and, you know,
11  actually, there weren't any reports prepared concerning
12  this August incident, were there?
13      A.   Regarding his referral to the counselor or --
14      Q.   Regarding the actions that led to you being
15  notified that there was a potential -- do you agree this
16  was at least potentially a huge problem?
17      A.   Yes.
18      Q.   Okay.  Were there any reports generated
19  regarding this potentially huge problem?
20      A.   There -- I don't know of a report.  There was a
21  contemporaneous email, which I believe you've -- you've
22  referred to, and -- but I don't know of other reports
23  per se.
24      Q.   And just so we're on the same page, if you
25  will, a contemporaneous email does not qualify as a
```

David Brent Newman - Vol. I - June 25, 2021

```
 1   report as far as the CHP's concerned.  Is that true?
 2      A.   I -- I think that's correct.  Yeah.
 3      Q.   Was there any indication created in any CHP
 4   record that would notify any officer who had not -- or
 5   supervisor or commander or executive staff member who
 6   was not privy to the conversations or contemporaneous
 7   emails, that Brad Wheat was potentially a danger to
 8   himself and others?
 9      A.   There -- there was not information that would
10   have supported such a report.
11      Q.   Well, at any point, did you learn that Mary
12   Wheat's brother had placed a 911 call because she was
13   afraid -- he was afraid of what Brad Wheat would do
14   when -- if he -- if he was able to -- that same night?
15           Did you know about that?
16      A.   No.
17      Q.   Never?
18      A.   As of that night?
19      Q.   Did you ever know about that.
20      A.   I learned that there was a 911 call after the
21   shooting had occurred.  I believe we had a dispatcher in
22   one of our communication centers that she -- she
23   remembered -- she connected because of the public nature
24   of the shooting and the news and so on.  And she
25   reported something up, and we turned that over to the
```

Newman 06-25-2021

David Brent Newman - Vol. I - June 25, 2021

1   sheriff's department right away.

2          But prior to that, no.  I -- I had no

3   information or reference to what you're talking about.

4      Q.   Okay.  And the night of the incident, the

5   August incident, if you will, do you have any

6   information any officer had -- had attempted to contact

7   the subjects who Brad Wheat had expressed a desire to

8   kill to find out, first of all, if they were still

9   alive?

10     A.   I don't -- I don't follow the question.

11     Q.   Okay.  So Brad Wheat tells Dave Ward, as

12  relayed to you, that he'd driven -- he'd gone to kill

13  his estranged wife and Trae; correct?

14     A.   Yes.  That's what he told Dave.  Dave Ward,

15  yes.

16     Q.   Yes.

17     A.   Yes.

18     Q.   Did anyone, to the best of your knowledge, from

19  the CHP ever check on the welfare of Mary Wheat?

20     A.   I don't -- I don't believe so.

21     Q.   Did anyone ever check with Trae deBeaubien on

22  his welfare?

23     A.   I don't believe so.

24     Q.   Did anyone from the CHP ever alert Trae

25  deBeaubien that, heads up, someone you know who, at

1  you were nodding your head.  That's the only reason I
2  spoke up.
3      A.   Actually, I don't know when, if it was
4  August 3rd or 4th, depending on time.  And I'm not
5  trying to mince words, but I don't know exactly when
6  that occurred, but it occurred somewhat contemporaneous
7  to all of this activity going on.
8      Q.   Fair enough.
9           So sometime around August 3rd or 4th, the
10  weapon comes into the possession of the highway patrol
11  for safekeeping in a manner that Brad Wheat would not
12  have access to simply pick the gun up; correct?
13      A.   That's my understanding, yes.
14      Q.   Okay.  And the shooting -- the fatal shooting
15  happens either exactly or within a -- essentially one
16  month later, September 3rd; correct?
17      A.   Roughly, yes.
18      Q.   Okay.  And you understood at the time of the
19  shooting, or within, certainly, the day of the shooting,
20  that he'd used that -- his service weapon to shoot those
21  people, didn't you?
22      A.   Yes.
23      Q.   Okay.  And am I correct that you stated you
24  still don't understand how it was or what the
25  circumstances were under which his weapon was returned

David Brent Newman - Vol. I - June 25, 2021

```
 1    to him?
 2        A.   I don't know the precise who -- who did what.
 3    So I know, generally speaking.  I'm trying to be very --
 4        Q.   Sure.
 5        A.   -- accurate for you.
 6             I know, generally speaking, based upon the
 7    observations, the progression that he was making, the
 8    observations of his commander, the acting commander, the
 9    office staff, and his -- and a couple of counselors,
10    that he was making good progress.
11             And that it was well understood -- that was my
12    understanding at the time -- that he -- he had
13    essentially moved beyond that acute moment and at some
14    point the gun was -- was returned.
15        Q.   Well, now -- so was there any documentation --
16    contemporaneous documentation indicating his weapon was
17    returned.
18        A.   I don't know.
19        Q.   That you're aware of.
20        A.   I don't -- I'm not aware.
21        Q.   Do you know who made the decision to return the
22    weapon to him?
23        A.   I don't know.
24        Q.   Do you know what that was -- that decision was
25    based upon?
```

David Brent Newman - Vol. I - June 25, 2021

```
 1       A.    I don't specifically know that.
 2       Q.    Well, as the commander of the Valley Division,
 3   would you agree this was a significant incident?
 4       A.    The -- the August --
 5       Q.    The shooting.
 6       A.    Yes, absolutely.
 7       Q.    Okay.  And would it be a -- a very safe
 8   statement to say that's not a situation that you ever
 9   wanted to see repeated?
10       A.    The -- the shooting that night?
11       Q.    Yes.
12       A.    Oh, of course.
13       Q.    Okay.  So did you attempt to find out what
14   could be learned from the shooting --
15       A.    In --
16       Q.    -- to avoid another similar tragedy?
17       A.    Yes.
18       Q.    What steps did you take to learn what could be
19   learned from this shooting to avoid a similar tragedy in
20   the future?
21       A.    So we evaluated the -- the facts in this case
22   and what we -- what we knew, and the -- the thing about
23   this particular shooting is that it was -- it was a
24   great outlier from anything that we had known.
25             Because as much as we have the full intent to
```

```
 1              (Pause in proceeding.)
 2      Q.   BY MR. KATZ:  Are you familiar with Exhibit --
 3  on the record.
 4           Are you familiar with Exhibit 45?
 5      A.   Yes.
 6      Q.   And this was an Internal Affairs investigation
 7  regarding Brad Wheat?
 8      A.   Correct.  This is -- I'm looking at the CHP 7,
 9  which is the -- essentially a transmittal form for an
10  internal investigation.
11      Q.   Right.  And attached to that transmittal is the
12  investigation -- or the investigation documents;
13  correct?
14           I'll give you a moment or two to go through it.
15      A.   I'm just making sure I'm not seeing anything --
16      Q.   Certainly.
17      A.   Yes.
18      Q.   And just so we're clear, there were, for
19  example, recorded witness statements that were not --
20  that are not on these pages, but referenced.
21      A.   Recorded -- I'm not following.
22      Q.   So when I said this is the complete
23  investigation, this is the paper part of the
24  investigation.  In other words, reading the
25  investigation, it says there was a recorded statement
```

David Brent Newman - Vol. I - June 25, 2021

```
 1   summarized here with both Wheat and a deputy -- I mean,
 2   sorry, Officer Archer, and I believe those were the two
 3   recorded statements.
 4        A.   I'm -- I'm just getting back up to speed.
 5        Q.   Sure.
 6        A.   But I get what you're saying, yes.  The
 7   recordings aren't here, just the paper.  Yeah.
 8        Q.   Okay.  And why was it important -- why is it
 9   important for the CHP to investigate -- and would it be
10   a fair statement that these were two single-vehicle
11   fender benders involving Mr. Wheat?
12        A.   Yes.
13        Q.   And why was it important for the CHP to have a
14   formal investigation regarding those fender benders?
15        A.   Two -- we had two accidents in a short period
16   of time, and Lieutenant Brown felt that, along with the
17   concurrence from Chief Stonebraker, that this warranted
18   us to look into it.
19        Q.   And yourself too; correct?
20        A.   Based upon their advice, yes.
21        Q.   Okay.
22        A.   Uh-huh.
23        Q.   And this involved some of the resources to
24   conduct an investigation; correct?
25        A.   Yes.
```

David Brent Newman - Vol. I - June 25, 2021

```
 1        Q.    Okay.  And was part of the reason because of

 2   the concern that that might lead to a worse accident

 3   later?

 4        A.    Not necessarily.  We're -- we're addressing the

 5   behavior that we see.  It can have some preventive, but

 6   what we're doing is we're addressing the now and

 7   what's -- what's happened.

 8        Q.    Okay.  And so there's, at least for written

 9   documents, 60 -- 68 pages.

10        A.    It's a pretty big stack.  I'll take your word

11   for it.

12        Q.    How many pages are there of the investigation

13   involving the August incident?

14        A.    There's 60 pages of an internal

15   investigation --

16        Q.    Yes.

17        A.    -- and there's no internal investigation on

18   Officer Wheat.

19        Q.    How many pages are there to any investigation

20   regarding the August incident of Officer Wheat?

21        A.    None.

22        Q.    How many are there regarding -- how many CHP

23   investigation pages are there regarding the September

24   shooting involving Officer Wheat?

25        A.    None.
```

1      Q.    Now, you indicated that Officer Wheat was asked
2    to surrender his fire -- his service weapon?
3      A.    I don't know the mechanics.  I know that the
4    result of the interaction was that he voluntarily
5    surrendered.  That is my information and belief.
6      Q.    Why wasn't he simply told to "Give me the gun."
7    To turn the gun over?
8      A.    I wasn't there.
9      Q.    Okay.  And -- and why was -- do you have an
10   understanding -- I mean you were involved in the thought
11   process -- that they were asking him to give his fire --
12   his private weapons up instead of simply taking them.
13     A.    Largely because, at that point, we probably did
14   not have a cause to take away a weapon.  As you -- I'm
15   sure you're aware, we immediately called for -- there's
16   information contemporaneously, we immediately called for
17   an evaluation, psychological evaluation.
18          That was conducted, and as a result of that
19   evaluation, we had -- the weapon had been secured, out
20   of abundance caution, and we got further information
21   from the psychologist that he was not a danger to
22   himself or others.
23     Q.    Okay.  And this -- and by the way, when you say
24   "Just got off the phone," when you say, "We're all on
25   the same page," what was your understanding as to what

David Brent Newman - Vol. I - June 25, 2021

```
 1      Q.   -- to see --
 2           And you know Sabrena Swain?
 3      A.   I know of her, yeah.
 4      Q.   Is she a Facebook friend of yours?
 5      A.   I don't believe so.  I know -- I know her, but
 6  I don't know that -- yeah.
 7      Q.   How many Facebook friends do you have?
 8      A.   Hundreds.
 9      Q.   Like --
10      A.   Probably a thousand.  I'm -- I'm rarely on
11  Facebook.
12      Q.   Okay.
13      A.   So I -- for example, now I -- I travel the
14  country.  I teach cop trauma classes.  People will
15  friend me on Facebook, and sometimes I -- I've literally
16  had a contact with them, and it's, to me -- it's a large
17  number, and I don't really interact a lot with Facebook.
18      Q.   I'm sorry.  What is it you do now?  You say
19  "cop drama"?
20      A.   Yeah.  Law enforcement trauma.  So I'm involved
21  in teaching about line-of-duty death, cop trauma, and
22  suicide.
23           MS. McTAVISH:  That's "trauma," not "drama."
24           THE WITNESS:  T-r-a-u-m-a.  Yes.
25           MS. McTAVISH:  Thank you.
```

David Brent Newman - Vol. I - June 25, 2021

```
 1            THE WITNESS:  Posttraumatic stress and so on.
 2      Q.   BY MR. KATZ:  And suicide.
 3      A.   (Nodding head.)
 4      Q.   Okay.  So when you -- what was your
 5  understanding as to what the mental health evaluation of
 6  Mr. Wheat consisted of?
 7            MS. McTAVISH:  Vague as to time.
 8      Q.   BY MR. KATZ:  On August 3rd, August 4th, when
 9  you're on board with what they're going to do.
10      A.   You mean what -- what methods were used or
11  what -- are you talking the outcome?
12      Q.   What did you think the evaluation was going to
13  consist of.  What was your understanding, when you were
14  signing on to saying this seems like a good approach --
15  first of all, did -- did you think it was going to be
16  done by someone who was qualified to determine whether
17  or not someone was fit for duty?
18      A.   I was -- yes.  Absolutely.  Our Employee
19  Assistance folks, Captain Craig Root, Lieutenant Frank
20  Newman, they were notified on, I think, one of the
21  initial emails you showed me, Exhibit 9.
22      Q.   Okay.
23      A.   Exhibit 9.  And -- well, look -- yeah.  They're
24  both -- they're both cc'd.  And their role, if -- if
25  requested, would be to find a qualified, culturally
```

David Brent Newman - Vol. I - June 25, 2021

 1    competent law enforcement therapist -- and I -- I
 2    distinguish that from just any therapist -- to respond
 3    and conduct an evaluation.
 4         Q.   Okay.  Well, were you aware that the therapy --
 5    that the person they called had never performed a law
 6    enforcement fit-for-duty examination?
 7         A.   I -- I wouldn't -- I wouldn't know either way.
 8         Q.   Okay.  Would -- would you have an understanding
 9    as to whether or not the person who they had evaluate
10    Mr. Wheat said that they weren't qualified to do a law
11    enforcement fit-for-duty examination?
12         A.   We were -- I don't know that either way.
13         Q.   Well, did you assume that the person who they
14    were calling was qualified to do a law enforcement
15    fit-for-duty examination?
16         A.   Was qualified to, no.  Because it was not a
17    fitness-for-duty evaluation.  So that's not what would
18    have been requested.
19              What would have been requested is to evaluate
20    his current mental state as to the statements that he
21    gave the peer and then provide us whatever information
22    that we need either to escalate this or deescalate it.
23         Q.   Okay.  So it's the information you need.
24              Did you have any understanding as to whether or
25    not there was going to be any testing administered?

David Brent Newman - Vol. I - June 25, 2021

```
 1   are.
 2       Q.   Okay.  And did you have an understanding that
 3   Ms. Swain was qualified to do a 5150 evaluation?
 4       A.   I believe that she was qualified to perform the
 5   evaluation that we asked, which was to determine if he
 6   was -- he was safe to himself or others.
 7       Q.   And so that was what she was requested to do?
 8       A.   She was responded -- she was requested to
 9   respond to deal with what we knew as potentially an
10   acute mental health issue.
11       Q.   Okay.  So my question maybe is a little
12   different.
13       A.   Okay.
14       Q.   Was it your understanding at the time that --
15   and I understand you did not communicate directly --
16       A.   Right.
17       Q.   -- with Ms. Swain; correct?
18       A.   Absolutely not.
19       Q.   Okay.  But was it your understanding that they
20   were having -- and I believe your testimony is that you
21   didn't know at that point it was Ms. Swain; correct?
22       A.   No.  I was -- I wasn't involved --
23       Q.   We have a double negative, so I think --
24       A.   I wasn't involved in any of the call-out
25   mechanisms.
```

David Brent Newman - Vol. I - June 25, 2021

```
 1        Q.   Right.  And I -- I get that, so just let me
 2   just keep the record clean.
 3        A.   Okay.
 4        Q.   Or less dirty.
 5             Would it be a correct statement that you didn't
 6   know who they had called to see Brad Wheat that evening?
 7        A.   Correct.
 8        Q.   Am I also correct, though, it was your
 9   understanding that the purpose of having a mental health
10   professional see Brad Wheat was to determine whether or
11   not he was a danger to himself or others?
12        A.   In part, yes.  Absolutely.
13        Q.   Okay.  Now, at some point -- by the way, did
14   you ever receive any -- did the CHP ever receive any
15   written communication from the mental health
16   professional who saw Mr. Wheat that evening?
17        A.   I -- I'm not aware of such communication.
18        Q.   In your experience as an administrator officer
19   and supervisor, what are the advantages to having
20   information put on paper or on a computer, recorded?
21             What are the advantages of doing that?
22        A.   Of having --
23        Q.   If any.
24        A.   -- of having things documented?
25        Q.   Yes.
```

David Brent Newman - Vol. I - June 25, 2021

```
 1      A.   It generally helps with recollection and it
 2  helps with consistent communication.
 3      Q.   Okay.  Do you have any understanding why there
 4  was no record regarding that evaluation?
 5      A.   I believe there was a record through Lieutenant
 6  Brown.  He created an email, which is a form of a
 7  record.
 8           And the reason that there wouldn't have been,
 9  which there never is with a -- a therapist, is because
10  you have the confidentiality of the therapist with --
11  with the client.
12      Q.   Right.  But she was seeing Mr. Wheat because he
13  had been ordered to talk to her, hadn't he?
14      A.   I don't know that he had been ordered to talk
15  to her.
16      Q.   The purpose was to report to you folks, though,
17  how he was; correct?
18      A.   The purpose -- well, the purpose was to get him
19  help --
20      Q.   Okay.
21      A.   -- because he was expressing signs of acute
22  trauma, and then the therapist then has -- in their
23  scope of practice, they have an obligation that if there
24  are certain thresholds that are -- that are met, then,
25  in their professional opinion, they would notify us.
```

```
 1                    REPORTER'S CERTIFICATE

 2                         --o0o--

 3           I certify that the witness in the foregoing

 4    deposition,

 5                     DAVID BRENT NEWMAN,

 6    was administered the oath by me to testify to the truth,

 7    the whole truth and nothing but the truth in the

 8    within-entitled cause; that the deposition was taken at

 9    the time and place named; that the testimony of the

10    witness was reported by me, a duly certified shorthand

11    reporter; that it was thereafter transcribed into

12    typewriting, and that the transcript is a true record of

13    the testimony given.

14           Pursuant to Federal Rule 30(e), transcript

15    review was requested.

16           I further certify that I am not financially

17    interested in the action, nor a relative or employee of

18    any attorney or any party to the action.

19

20    Dated:  July 5, 2021

21

22

23    _____

24           DEBRA P. CODIGA, CSR No. 5647

25           State of California
```

```
1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF CALIFORNIA

3                             --oOo--

4

5     PHILIP DEBEAUBIEN,                    )
                                            )
6                     Plaintiff,            )
                                            )
7              vs.                          )   Case No.
                                           )   2:19-CV-01329-WBS-DB
8     STATE OF CALIFORNIA; CALIFORNIA       )
      HIGHWAY PATROL; TODD BROWN;           )
9     SABRENA SWAIN; JOY GRAF; REGGIE       )
      WHITEHEAD; RYAN STONEBRAKER;          )
10    BRENT NEWMAN; JEREMY DOBLER,          )
                                            )
11                    Defendants.           )
                                            )
12

13

14                            --oOo

15                      Deposition of

16                   DAVID BRENT NEWMAN

17                 Friday, July 16, 2021

18                       Volume II
                      Pages 111 - 266
19

20

21    REPORTER:  LISA KENNEDY, CSR 8927
      _____

22

23                 TENNELEY MICKEL REPORTING
                       P. O. Box 1107
24                  Arbuckle, California 95912
           Tel: (916) 492-9021   Fax: (916) 922-3461
25
```

CERTIFIED
COPY

David Brent Newman - Vol. II - July 16, 2021

```
 1   get them to think about what it would be like with --
 2   like a Wheat incident with a murder-suicide versus a
 3   different kind versus a line-of-duty death and how --
 4   just to get the agency to think how would that be
 5   different or the same in terms of response.
 6   Q        So you have used it for that purpose?
 7   A        In a very peripheral sense, yes.
 8   Q        And so you deal with -- the aftereffects in this
 9   course is the portion that you teach; is that correct?
10   A        Correct.
11   Q        And then either Mr. Green or Dr. Douglas deal
12   with the preventative steps?
13   A        Yes.
14   Q        Have you ever discussed the Wheat situation with
15   either of those two men?
16   A        No.
17   Q        When you're presenting, do you hear the other
18   folks do their presentations?
19   A        Generally, yes.  But as I'm -- as they're
20   presenting, if there's people in the class that we've
21   previously identified or in the moment identify as
22   needing a peer support, which happens pretty often, we
23   will step out and be with that person for as long as they
24   need, typically 45 minutes to two hours.
25            So sometimes I miss almost all the presentation.
```

David Brent Newman - Vol. II - July 16, 2021

```
 1    Sometimes I get to hear most of it.
 2    Q        Okay.  And so since you've been doing this,
 3    you've heard most or portions of about a dozen; is that
 4    right?
 5    A        Yes.
 6    Q        Did you ever hear anything that when you heard
 7    it, you'd think to yourself, "That would have been a good
 8    thing to have attempted to do when Brad Wheat was still
 9    alive"?
10    A        No.
11    Q        There's nothing that you've heard that makes you
12    believe that things could have been approached
13    differently regarding Brad Wheat's situation?
14    A        No.  In fact, it's to the contrary that when
15    we've -- when I've heard this -- these presentations --
16    and they're -- each is a little different.  Each person
17    has a different approach or emphasis, and it's not so
18    much on acute suicidal ideation.  It's on the longer
19    term, how to keep officers from getting that.
20             There's nothing I've ever heard that causes me
21    to reflect on what happened and think, you know, "Well,
22    we should have thought of that or done something
23    different."
24    Q        So would it be a fair statement that the effect
25    of participating in these classes has reinforced your
```

David Brent Newman - Vol. II - July 16, 2021

1    belief that the CHP handled the situation as well as it

2    could have been handled?

3    A        It has not caused me any doubt as to any actions

4    that I took or others.

5    Q        Well, apart from those classes -- we talked

6    about how a deposition differs from testifying in a

7    criminal trial.  But in hindsight, is there any things

8    that you think could have been handled better by the CHP?

9    And "by the CHP," I mean anyone working for the CHP

10   whether sworn or unsworn.

11   A        I think that any time that you evaluate an

12   incident post fact, you can always look at everybody who

13   was involved and not -- of course, CHP wasn't -- wasn't

14   the only players involved here -- the parties, the

15   stakeholders.

16            When you look at all the various stakeholders

17   involved from the community to the local office, to the

18   division, to the family and friends, you could look at

19   any one of those and everyone naturally asks, which I see

20   after line-of-duty death suicide, they naturally ask,

21   "Could I have done something different?"  So I think it's

22   very natural to ask that question.

23   Q        Okay.  And you asked that question, didn't you?

24   A        Uh-huh.

25   Q        Is that a "yes"?

David Brent Newman - Vol. II - July 16, 2021

```
 1   A        What was the first part of it?

 2   Q        Sure.  Is there any written recognition that

 3   it's acceptable to the CHP to have an officer let someone

 4   in the department indefinitely hold a weapon that the

 5   department thinks was issued to a particular officer?

 6   A        I think that will fall under the many, many

 7   things that we do that there's no policy, but it would

 8   be -- there's no specific policy for that situation, but

 9   it would be deemed acceptable.

10   Q        Okay.  And is there any specific policy

11   regarding giving the weapon, say, to me for safekeeping?

12   A        You as a citizen or you as a nonmember of the

13   department?

14   Q        Or both.  Yes.

15   A        I don't -- I don't believe there's any policy

16   like that.

17   Q        Okay.  So nothing would prevent it?

18            MS. McTAVISH:  Objection.  Misstates the

19   testimony.

20            THE WITNESS:  Well, we wouldn't do that, to my

21   knowledge.  But in terms -- I'm trying to reference a

22   policy that would do that.  I don't know.

23   Q        BY MR. KATZ:  Well, when you say "we wouldn't do

24   that," could an officer do that?

25   A        Could an officer?
```

David Brent Newman - Vol. II - July 16, 2021

```
 1   Q        In other words, consistent with his obligations
 2   to follow CHP policy, could -- let's be specific.  Could
 3   Brad Wheat have given me his department-issued weapon for
 4   safekeeping?
 5   A        No.
 6   Q        Why not?
 7   A        I would presume -- I'm not -- again, I'm out of
 8   practice with the policy, but I would presume there's a
 9   policy that would prohibit that because I've not known
10   anyone to have that done.
11   Q        Okay.  Now, you indicated some weapons are
12   issued to command, some aren't.  So if someone is in a
13   patrol car, there's typically a rifle, a shotgun, and
14   handguns in the car; correct?
15   A        Correct.
16   Q        So if the car is driven by a patrol officer as
17   opposed to a sergeant -- so let me use this as
18   hypothetical examples, so if I can gain some
19   understanding.
20            So would a sergeant be able to walk up to that
21   car and say, "Officer Jones, please hand me the shotgun"?
22   A        Yes.
23   Q        And would the officer be obligated to comply
24   with that?
25   A        If the supervisor makes a request, yes.
```

David Brent Newman - Vol. II - July 16, 2021

```
 1   Q       Okay.  Could he say, "Officer, hand me the
 2   rifle"?
 3   A       Yes.
 4   Q       Could he say, "Officer, hand me your service
 5   weapon"?
 6   A       Yes.
 7   Q       Could he say, "Officer, hand me a backup, your
 8   backup weapon"?
 9   A       I don't know.  I mean, he could say it, but I
10   don't know -- I don't know if the officer would be
11   obligated.
12   Q       Okay.  But be obligated to hand over the service
13   weapon; correct?
14   A       Correct.
15   Q       Okay.  And a lieutenant could ask a subordinate
16   officer to hand over any department weapon to him as
17   well; correct?
18   A       Correct.
19   Q       And an assistant chief could order anyone to
20   hand over a -- someone of rank lower than him to hand
21   over a service weapon?
22   A       Yes.
23   Q       And you could?
24   A       Yes.
25   Q       And am I correct that under the chain of command
```

David Brent Newman - Vol. II - July 16, 2021

1  of the highway patrol, it would be the obligation of the

2  officer to comply with that order?

3  A       Correct.  I want to clarify one thing.  Your

4  hypothetical was a request and you just said "order."

5  Q       Well --

6  A       There's a --

7  Q       Well, if you're required to -- if you're

8  obligated to respond to a request, isn't that the same

9  thing as responding to an order?

10 A       It's in practice how that would happen.  Because

11 when you -- when you say "order," that takes on a

12 different meaning to me.

13         I think in practice, the officer would comply

14 with any request because they would recognize that as a

15 supervisor.  But when you said an "order," that's very

16 rare and that would be something formal.

17 Q       Okay.  Let me put it differently then.  So

18 given the choice of words, would a sergeant have the

19 ability to order a subordinate officer to hand him a

20 department weapon?

21 A       Yes.

22 Q       Would a lieutenant have the authority to order

23 an officer to hand him a weapon, department weapon?

24 A       Yes.  But in both the caveat would be there

25 would be an expectation that there's a specific reason to

David Brent Newman - Vol. II - July 16, 2021

1    provide that order.

2    Q        Okay.  Well, but that aside, would you agree

3    that it's the obligation of an officer to follow orders?

4    A        Yes.

5    Q        And then if there's an issue with an order that

6    was given, to address that later in an appropriate form?

7    A        Yes.

8    Q        Am I correct there was nothing preventing, for

9    example, Sergeant Dobler from ordering Brad Wheat to turn

10   over his department-issued weapon?

11   A        There was nothing that would have -- in that

12   sense, there was nothing that would have prevented

13   Sergeant Dobler from giving him orders in a whole variety

14   of different issues.

15   Q        But whether he was ordered or requested to

16   provide the weapon, you would agree that Brad Wheat was

17   obligated to turn over his department-issued weapon;

18   correct?

19            MS. McTAVISH:  Objection.  Incomplete

20   hypothetical.

21            THE WITNESS:  Well, if in this case that was a

22   mutual -- that was a mutual arrangement or agreement

23   within the context of what was happening, so whether it

24   was an order or request --

25   Q        BY MR. KATZ:  Let me word it hypothetically in

David Brent Newman - Vol. II - July 16, 2021

```
 1    the sense we don't have to quibble over how we're going

 2    to characterize it.

 3            So let me ask it this way:  Am I correct that

 4    Sergeant Dobler could have either ordered or requested

 5    Brad Wheat to physically hand him the weapon that was

 6    later used to commit a murder and that Brad Wheat would

 7    have been obligated to comply with that request or order?

 8            MS. McTAVISH:  Objection.  Compound.

 9            THE WITNESS:  So a supervisor, any supervisor,

10    could, with a reason, direct, order, or request a

11    departmentally-issued weapon to be handed over.

12    Q       BY MR. KATZ:  Is that correct?

13    A       Yes.

14    Q       Okay.  And if a supervisor had either requested

15    or ordered that a subordinate officer physically

16    relinquish a department-issued firearm, would it be a

17    correct statement that that subordinate officer does not

18    have a right to retake that weapon whenever they feel

19    like it?

20            MS. McTAVISH:  Objection.  Compound.

21            THE WITNESS:  So the manner in which the weapon

22    transfers from the officer to the sergeant, it would

23    matter in the sense that there are cases in which we may

24    order if we had cause, and that might be a more formal

25    process.
```

David Brent Newman - Vol. II - July 16, 2021

```
 1              But what -- the manner in which this type of
 2   incident was handled and this incident matters because it
 3   is a difference to the command and other officers as to
 4   whether or not it's -- and in my evaluation, even of the
 5   incident, as to whether or not the officer voluntarily
 6   surrendered it or there was -- there was, you know, an
 7   order.
 8   Q      I'm not asking you at this point regarding your
 9   interpretation of this incident.
10              Just so we're clear, you never investigated the
11   circumstances under which the weapon was returned in this
12   case; correct?
13   A      Correct.
14   Q      So you wouldn't know anyway, would you?  I mean,
15   you'd just be speculating; right?
16   A      No.
17   Q      Well, if you didn't try to find out what
18   happened, how would you be doing something other than
19   speculating in terms of the circumstances under which the
20   weapon was returned?
21   A      Well, I'm generally aware through I think this
22   entire process and some information outside of an
23   investigation just in terms of, you know, at least I
24   think I do, but I don't know.
25   Q      Okay.  Well, but let me separate your
```

David Brent Newman - Vol. II - July 16, 2021

 1  understanding from these non-investigatory sources of

 2  information to just get to the general situation that

 3  we're trying to establish.

 4          So, one, would you agree that a superior officer

 5  has the right to order or request a subordinate to

 6  physically turn over a department-issued firearm, and

 7  that that subordinate officer would be obligated to do

 8  so?

 9          MS. McTAVISH:  Objection.  Compound and asked

10  and answered.

11          THE WITNESS:  Given direction, the officer would

12  be complied -- "obligated," is the word I'm looking for,

13  to comply.

14  Q       BY MR. KATZ:  Okay.  So then let's take a step

15  further.

16          The department or someone in the department, in

17  other words, the department now has, as a result of the

18  superior's action, taken physical possession of a

19  department firearm.

20          Can we agree we're at that stage whether it was

21  from a request or an order?

22  A       In the hypothetical?

23  Q       In our hypothetical.

24  A       Yes.

25  Q       In that hypothetical, would the subordinate

David Brent Newman - Vol. II - July 16, 2021

1  officer have the right to simply decide to countermand

2  that and retake possession of that, or would it require

3  an approval of a supervisor to do so?

4          MS. McTAVISH:  Objection.  Compound.  Vague.

5          THE WITNESS:  So what's the hypothetical?  That

6  it's ordered?

7  Q       BY MR. KATZ:  Yeah, sure.  First of all, yes,

8  let's start with ordered.  So I order you to -- let's

9  pretend this phone is a department-issued firearm, serial

10  number and everything else.

11         So if I -- I want to do this, if you would.  So

12  order me to give you the weapon.

13         ALEX KATZ:  I order you to hand me your phone.

14  Q       BY MR. KATZ:  Okay.  So I've now handed that to

15  that person.  If that has been ordered, do I now -- am I

16  just able to take the phone back from him, from the

17  sergeant?

18  A       In that moment?

19  Q       Yes.

20  A       No.

21  Q       And at what point can I simply take it back from

22  him?

23  A       That would depend upon what particular

24  circumstances that caused the sergeant to give you that

25  direction and whether or not those circumstances had been

David Brent Newman - Vol. II - July 16, 2021

 1   addressed.

 2   Q        Okay.  And would you agree they have to be

 3   addressed to the supervisor's satisfaction?

 4   A        As opposed to the officer?

 5   Q        Yes.

 6   A        Yes.

 7   Q        Okay.  Now, if you would say -- would you

 8   request that I hand me my service weapon, please?

 9            ALEX KATZ:  I am requesting that you hand me

10   your service weapon.

11   Q        BY MR. KATZ:  And then the officer hands over

12   the service weapon; correct?

13   A        In your hypothetical, yes.

14   Q        In my hypothetical.  In my hypothetical, would

15   the officer have the right to simply say, "I'm taking

16   that gun back -- weapon back now"?  Or would again the

17   supervisor have to decide that it was appropriate to do

18   so?

19   A        Well, again, in your hypothetical, that would

20   depend upon the motivation by the supervisor and why that

21   was occurring.

22   Q        Right.  But it would be on the supervisor, not

23   on the person -- not on me who says, "Give me that gun

24   back"; right?

25            MS. McTAVISH:  Objection.  Incomplete

David Brent Newman - Vol. II - July 16, 2021

 1   hypothetical.

 2   Q        BY MR. KATZ:  It would be up to the supervisor

 3   to determine whether or not the circumstances would be

 4   appropriate to relinquish back the firearm?

 5   A        Not necessarily.

 6   Q        Okay.  Well, when you say "not necessarily,"

 7   under which circumstances under this hypothetical could

 8   the officer simply say, "I comply with your request and

 9   now I'm taking it back"?

10          MS. McTAVISH:  Objection.  Incomplete

11   hypothetical.  Calls for speculation.

12          THE WITNESS:  So if the -- for example, we gave

13   a vacation example.  So the person's going on vacation,

14   they ask the supervisor to safeguard the weapons, "I'm

15   going to be out of town, indisposed," it wouldn't

16   necessarily be that the supervisor would have to get

17   permission -- in fact, I wouldn't expect that to -- for

18   that officer to get those weapons back.

19   Q        BY MR. KATZ:  Okay.  But you've actually

20   changed, as we both know, the hypothetical.  Because the

21   hypothetical is that the supervisor requested, as opposed

22   to calling it a formal order, that the subordinate

23   relinquish or give that supervisor the weapon.  That's

24   our hypothetical.

25          So with that being the hypothetical, under what

1  circumstances could the person who relinquished the

2  weapon to the supervisor simply take that weapon back?

3          MS. McTAVISH:  Objection.  Calls for

4  speculation.  Incomplete hypothetical.

5          THE WITNESS:  I would believe that that would be

6  a -- because it was given voluntarily, it would be -- the

7  reverse transaction would also take place on a voluntary

8  basis.

9  Q       BY MR. KATZ:  So then the order is not the same

10 as -- or a request then.  Is that what you're saying?

11 That if there's only a request, then it's -- so then --

12 I'm sorry.

13         If it's a voluntary thing, as you described it

14 either way, then an officer would have no obligation to

15 turn the firearm over to begin with; correct?

16 A       If a request was made?

17 Q       Yes.  If a request was made by a supervisor to a

18 subordinate to hand over a department firearm.

19 A       Correct.

20 Q       And you indicated previously that an officer was

21 obligated to comply with that request.

22 A       I made a distinction between a request and an

23 order.

24 Q       Well, you indicated that one was more formal,

25 but you also indicated it was a distinction.  Are you

David Brent Newman - Vol. II - July 16, 2021

```
1    familiar with the term "a distinction without a

2    difference"?

3    A        Yes.  But I think there's a big difference.

4    Q        Then explain to us what the big difference is.

5    A        I think we've covered what an order is.  That's

6    a specific direction that has an air of formality.

7             When we're talking about giving an order -- or I

8    would -- I would term it more in the parlance of what

9    we'd say direction.  "I'm giving you direction to do

10   this."  And that is a different mind-set and set of

11   circumstances versus a request.

12   Q        Okay.  So it's your understanding that a

13   supervisor requesting that a subordinate hand over a

14   department weapon is not something that a subordinate

15   officer would have to comply with?

16   A        I didn't say that.

17            (Exhibit No. 66 was marked for identification.)

18   Q        Now, in this case, do you recall -- first of

19   all, let me have marked -- actually, it is marked

20   already.  This is Exhibit 56 -- 65, rather.  I had a

21   dyslexic moment.

22   A        66?

23   Q        65 -- 66.  I'm having multiple -- thank you for

24   clarifying that.  How embarrassing.

25            So you recall testifying previously in this
```

David Brent Newman - Vol. II - July 16, 2021

```
 1   case; correct?
 2   A       Yes.
 3   Q       And you recall testifying that there was a
 4   decision made, a conscious decision made, not to
 5   investigate the circumstances of the Wheat shooting; is
 6   that correct?
 7           MS. McTAVISH:  Objection.  Referring to a page
 8   of the deposition?
 9           MR. KATZ:  I'm asking whether -- I'm happy to
10   get to the page, but I just want to be clear.  I'm not
11   trying to impeach someone when I don't have to impeach
12   him.  I just want to make sure we're where we are here.
13   Q       So am I correct that you testified previously
14   that there was a conscious decision made by yourself to
15   not investigate circumstances surrounding Brad Wheat's
16   murder-suicide and assault with a firearm?
17   A       I don't remember what I testified specifically.
18   What I remember is that I made a conscious decision that
19   we would not do the critical incident investigation.
20   Q       Well, did you make the decision to do any type
21   of investigation?
22   A       Not at that time.
23   Q       And you never decided to investigate; correct?
24   A       No.
25   Q       That's incorrect?  We have a double negative
```

David Brent Newman - Vol. II - July 16, 2021

1   here.

2   A          Correct.

3   Q          So let me try to rephrase the question.

4              Did you ever direct that this incident or its

5   circumstances be investigated?

6   A          No.

7   Q          Thank you.  Now, referring to your testimony, am

8   I correct that that decision was made in consideration of

9   the totality of the issues that you were dealing with at

10  the time?

11  A          Yes.

12  Q          And one of the issues that you were dealing with

13  was a desire not to interfere with the Amador County

14  investigation; is that correct?

15  A          Correct.

16  Q          So if I might ask you, sir, how was it that a --

17  and I think we used the term "parallel investigation" is

18  one you're familiar with?

19  A          Yes.

20  Q          So how was that a parallel investigation of the

21  circumstances surrounding the shooting by Brad Wheat

22  would interfere with the Amador County's Sheriff

23  Department's investigation?

24  A          So the form and manner of conducting the

25  critical investigation, as I understand it, as I was

```
 1                    REPORTER'S CERTIFICATE

 2           I certify that the witness in the foregoing

 3   deposition

 4                    DAVID BRENT NEWMAN

 5   was administered the oath by me to testify to the truth,

 6   the whole truth, and nothing but the truth in the

 7   within-entitled cause; that said deposition was taken at

 8   the time and place therein named; that the testimony of

 9   said witness was reported by me, a duly certified

10   shorthand reporter of the State of California; that it

11   was thereafter transcribed into typewriting; and that the

12   transcript is a true record of the testimony given.

13           Pursuant to Federal Rule 30(e), transcript

14   review was requested.

15           I further certify that I am not financially

16   interested in the action, nor a relative or employee of

17   any attorney or any party to the action.

18

19   DATED:   July 26, 2021

20

21                    _____

22                    LISA KENNEDY, CSR No. 8927

23                    State of California

24                          --o0o--

25
```

Exhibit Q

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

PHILIP DEBEAUBIEN,            )   No. 2:19-cv-01329-WBS-DB
                                   )
        Plaintiff,           )
                                   )   **DECLARATION OF JEFFREY J. NOBLE IN**
    v.                       )   **SUPPORT OF PLAINTIFF'S OPPOSITION**
                                   )   **TO STATE OF CALIFORNIA'S AND CHP**
STATE OF CALIFORNIA, et al.,   )   **DEFENDANTS' MOTION FOR SUMMARY**
                                   )   **JUDGMENT**
        Defendants.     )
                                   )
                                   )
                                   )   Date:        February 22, 2022
                                   )   Time:       1:30 p.m.
                                   )   Courtroom: 5 (14th Floor)
                                   )   Judge:     Hon. William B. Shubb

I, Jeffrey J. Noble, declare as follows:

1.    I make this declaration in support of Plaintiff's opposition to the motion for summary judgment filed by the State of California and the CHP Defendants. I make the statements of fact in this declaration of my own personal knowledge. If called as a witness in this action, I could and would testify competently to the facts set forth herein.

2.    I was a police officer in the City of Irvine for 28 years, rising to the position of Deputy Chief of Police prior to my retirement. I then served as an interim Deputy Chief of Police at the Westminster Police Department for nine months. I have a Juris Doctor degree, with honors, from Western State University College of Law, and I am admitted to practice in all courts of the State of California. I have a Bachelor's degree in Criminal Justice with an emphasis on Administration from California State University at Long Beach. A fuller statement of my expertise and qualifications are set forth on Pages 1–4 of my report dated September 9, 2021 a copy of which is attached hereto.

3.    The statements and opinions in this declaration are intended to summarize and crystallize the statements and opinions in that report and in my deposition testimony on November 4, 2021. I have not changed any of my opinions since my report or my testimony.

4. Based on my review of the record, I understand that on August 2–3, 2018, Officer Brad Wheat drove to El Dorado County, armed with a handgun, searched for Plaintiff Philip Debeaubien, admitted that he intended to murder Mr. Debeaubien, and only abandoned his plan when he could not locate Mr. Debeaubien.

5. Knowing such conduct and intent, any reasonable police officer would believe that Officer Wheat had committed attempted murder and would have prepared a report documenting the facts and circumstance and would have forwarded that report to the prosecutor's office for consideration of criminal charges.

6. Knowing such conduct and intent, any reasonable police officer would also believe that Officer Wheat had committed a misdemeanor by possessing a firearm with the intent to assault another and would have prepared a report documenting the facts and circumstance and would have forwarded that report to the prosecutor's office for consideration of criminal charges.

7. Based on my review of the record, I understand that the California Highway Patrol and its officers did not conduct a criminal investigation of Officer Wheat's conduct on August 2–3, 2018, did not prepare a report, and did not refer the matter to the prosecutor's office.

8. Based on my review of the record, I understand that the California Highway Patrol did not relieve Officer Wheat of his peace officer powers, place him on administrative leave, or conduct a fitness for duty examination prior to returning his duty weapon or allowing him to work as a peace officer.

9. Any reasonable police officer would have known that Officer Wheat's conduct on August 2–3, 2018 was an "incident of domestic violence" under the California Penal Code.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 6, 2018.

*/s/ Jeffrey J. Noble*
Jeffrey J. Noble
(original signature retained by
attorney Stewart Katz)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

PHILIP DEBEAUBIEN,                    )
                                      )
                    Plaintiff,        )
                                      )
        v.                            )
                                      )        No. 2:19 cv 01329 WBS DB
STATE OF CALIFORNIA; CALIFORNIA       )
HIGHWAY PATROL; TODD BROWN;           )
SABRENA SWAIN; JOY GRAF; REGGIE       )
WHITEHEAD; RYAN STONEBRAKER;          )
BRENT NEWMAN; JEREMY DOBLER,          )
                                      )
                    Defendants.       )

**EXPERT REPORT OF JEFFREY J. NOBLE**

1.      My name is Jeffrey J. Noble, and I make this report at the request of plaintiff's counsel.

2.      I was a police officer in the City of Irvine for 28 years rising to the position of Deputy
        Chief of Police prior to my retirement.  I served as an interim Deputy Chief of Police at
        the Westminster Police Department for nine months.

        a.      I was a police officer for 28 years and retired in July 2012 as the Deputy Chief of
                Police with the Irvine Police Department, located in Southern California.  As a
                Deputy Chief, I was directly responsible for all police operations including Patrol,
                Traffic, Criminal Investigations, Emergency Management, Crime Prevention,
                DARE, K9s, Training, and SWAT.  The City of Irvine encompasses over 70 square
                miles with a population of over 218,000.  I served in a wide range of assignments
                as an Officer, Senior Officer, Sergeant, Lieutenant, Commander and Deputy
                Chief, including Patrol, Traffic, Detective, SWAT, Training, Internal Affairs,
                Emergency Management and Crime Prevention.  The Irvine Police Department
                had over 200 police officers and over 100 civilian employees during my
                employment with the department.

        b.      In April 2014, I was hired by the Westminster, California Police Department as an
                interim Deputy Chief of Police.  My employment with the Westminster Police
                Department was by means of a temporary contract, and I was asked to review
                the department's Internal Affairs unit; department policies relating to Internal
                Affairs investigations, discipline and police officer conduct; conduct department

1

audits and inspections; and act as a liaison with a civilian oversight monitor who was hired during the same period.  My employment was at the request of the Chief of Police, was ratified by the City Council and was sought due to the arrest of a police officer for an off-duty criminal sexual assault, the arrest of an on-duty officer for extortion and a lawsuit filed by three Latino officers alleging discrimination and retaliation.  I concluded this interim position in January 2015.  The Westminster Police Department had 87 police officers and 40 civilian employees during my temporary contracted employment.

c.      As a police supervisor and manager, I have extensive experience conducting internal administrative investigations on a wide range of issues including use of force, vehicle pursuits, officer misconduct, criminal interrogations and interviews, harassment and sexual assaults.

4.      I have a Juris Doctor degree, with honors, from Western State University College of Law and I am admitted to practice law in the State of California.  I have a Bachelor's degree in Criminal Justice with an emphasis on Administration from California State University at Long Beach.

5.      As a police consultant and expert witness, I have extensive experience on matters involving police investigative procedures, misconduct and corruption.  For example:

a.      In 2014, I was part of a Carnegie Institute of Peace Think Tank for addressing police use of force in developing countries.

b.      I have consulted with other police organizations on a wide range of police practices, procedures, including criminal and administrative investigations.  For instance, I was retained in 2004 as an expert to review and evaluate the internal investigation conducted by the San Francisco, California, Office of Community Complaints of the case widely known as "Fajitagate" involving the indictment of seven command staff members and three officers of the San Francisco Police Department.  In 2007 and again in 2009, I was retained by the City of Austin, Texas to review the police department's internal homicide and Internal Affairs investigation of two officer involved fatal shootings.

c.      I have been retained as both a defense and a plaintiff's expert in over 300 cases and have testified as an expert in state court in California, Washington, Tennessee, Connecticut, Minnesota, Illinois and New Mexico and in federal court in Illinois, Tennessee, Georgia, South Carolina, North Carolina, Virginia, Texas and California.

2

d.      I have prepared expert reports for cases in the states of California, Washington, Pennsylvania, Georgia, Illinois, Tennessee, Idaho, Arkansas, Texas, Colorado, New York, Oklahoma, Connecticut, Florida, New Mexico, Minnesota, Ohio, Kentucky, Louisiana, Indiana, Wisconsin, Virginia, Delaware, Oregon, Arizona, New Mexico, New Jersey, Mississippi, North Carolina, South Carolina, Wyoming, Kansas and Missouri.

e.      I have been retained in criminal cases involving allegations of criminal uses of force by police officers in the states of New Mexico, Delaware, Minnesota, Pennsylvania, California, Georgia, Washington, and Florida.

f.      I served as an independent policy advisor to the Large City Internal Affairs Project, which was funded by the United States Department of Justice.  This group consists of the 12 largest police agencies in the United States as well as a select group of independent policy advisors and academics.  The project was an effort to develop national best practices in internal investigations for police agencies.  I was the chair of a sub-committee whose efforts were focused on the investigation of allegations of officer misconduct.  Because of this project the COPS Office published a document entitled, "Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice."

g.      I have given presentations at the International Association of Chiefs of Police conference in 2004, 2009, 2012, and 2014; the national COPS conference on Internal Affairs issues and the Academy of Criminal Justices Sciences annual meeting on tactical reckless decision making in 2009; the American Psychological Association annual conference in 2013; and National Tactical Officers' Association annual conference in 2004.

h.      In 2013, I gave a presentation in Mexico at the request of the Mexican government on preventing corruption in police institutions.

i.      I have published 21 articles on policing which discussed the subject matters of: Internal Affairs, personnel issues, pursuits, use of force issues and investigative procedures.  Those articles are listed in my attached resume.

j.      I have published two chapters for policing textbooks on tactical recklessness and the code of silence.

k.      I have co-authored, along with Geoffrey Alpert, Ph.D., a textbook on police Internal Affairs investigations titled, "Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight."

3

l.      As evidence that the opinions in our book (k. above) are accepted by other experts of police administrative investigations, the book was cited extensively in the COPS 2009 publication, "Building Trust Between the Police and the Citizens They Serve: An Internal Affairs Promising Practice Guide for Local Law Enforcement."

m.      In 2020, I co-authored a textbook, "Evaluating Police Uses of Force," with Seth Stoughton and Geoffrey Alpert.

6.      My experience, training and background are more fully described in my attached resume.

7.      My areas of expertise in policing include, but are not limited to: police use of force; pursuits; police administration; training; police operations; criminal investigations; interviews and interrogations; civil rights violations and investigations; internal/administrative investigations; criminal investigations; police discipline; citizen complaints; and police policies and procedures.

8.      I reviewed the following material in making my opinions:

- First Amended Complaint
- Exhibit 1 – Amador Area Daily Schedule August 2018
- Exhibit 2 – Amador Area Daily Schedule July 2018
- Exhibit 3 – Defendant California Highway Patrol's Amended Response to Request for Production of Documents, Set Two
- Exhibit 4 – Potential Civil Litigation Report – Exemplar
- Exhibit 5 – CHP Form 271 – Critical Incident Risk Management Response protocol
- Exhibit 6 – Amador Beat Schedule July 2018
- Exhibit 7 – Amador Beat Schedule August 2018
- Exhibit 8 – Amador Beat Schedule September 2018
- Exhibit 9 – Todd Brown August 3, 2018, 10:37 PM email
- Exhibit 10 – Todd Brown August 3, 2018, 11:33 PM email
- Exhibit 11 – Todd Brown August 4, 2018, 12:01 AM email
- Exhibit 12 – Handwritten Note, "I will try not to kill u."
- Exhibit 13 – Amador Beat Schedule, September 2018
- Exhibit 14 – Wheat Internal Investigation – on duty collisions
- Exhibit 15 – Audio of 911 Tape - Debeaubien
- Exhibit 16 – Audio Tape 911 call #2 – Debeaubien
- Exhibit 17 – Copy of CD Deposition of Janelle Leon
- Exhibit 18 – CAD Report
- Exhibit 19 – Photograph of Wine Bottle
- Exhibit 20 – Photograph of Badge Holder
- Exhibit 21 – Photograph of Corkscrew and Bloody Floor

4

- Exhibit 22 – Photograph of Wallet and Pocket Knife
- Exhibit 23 – Supplemental Report Regarding Wheat Text Messages
- Exhibit 24 – Handwritten Note, "I will try not to kill u."
- Exhibit 25 – Graf – Magellan Service Report Sample
- Exhibit 26 – Swain Consultation Note, September 5, 2018
- Exhibit 27 – Swain Consultation Note, September 4, 2018
- Exhibit 28 – Swain Consultation Note, September 3, 2018
- Exhibit 29 – Swain Website
- Exhibit 30 – Sergeant Lopez Summary Report
- Exhibit 31 - September 4, 2018, 12:51 PM email from Asnicar regarding search warrant needed to search Wheat's locker
- Exhibit 32 – September 6, 2018, 12:35 PM email from Lopez
- Exhibit 33 – Consolidated Timeline
- Exhibit 34 – Amador Daily Schedule, August 3, 2018
- Exhibit 36 – September 5, 2018, 7:50 AM email from Johnson
- Exhibit 37 – September 5, 2018, 1:12 PM email from Johnson
- Exhibit 38 – September 4, 2018, 11:34 PM, email from Schick
- Exhibit 39 – Incident Detail Report
- Exhibit 40 – Copy of CD Deposition of Robin Johnson
- Exhibit 41 – CHP Risk Management Manual
- Exhibit 42 – CHP Critical Incident Investigation Team Manual
- Exhibit 43 – CHP Critical Incident Investigation Team Manual
- Exhibit 44 – August 3, 2018, 10:58 PM email from Stonebraker
- Exhibit 45 – Internal Investigation - Traffic Collisions
- Exhibit 47 – CHP Policy Manual
- Exhibit 48 – Penal Code Section 17500
- Exhibit 49 – Stonebraker August 3, 2018, 10:57 PM email
- Exhibit 50 – General order 10.5 – Critical Duty Capability
- Exhibit 51 – Sergeant Dobler's Chronological Summary
- Exhibit 52 – CHP Evidence Manual
- Exhibit 53 – Dan Lopez August 23, 2018, email
- Exhibit 54 – Todd Brown August 24, 2018, email
- Exhibit 55 – Dobler Partial Deposition Transcript
- Exhibit 56 – Code of Ethics
- Exhibit 57 – Partial Deposition Transcript Ward
- Exhibit 58 – Root Chronology
- Exhibit 59 – CHP Peer Support Manual
- Exhibit 60 – Employee Assistance Program Manual
- Exhibit 61 – Steve Dowling August 4, 2018, 3:45 AM, email
- Exhibit 62 – Todd Brown Chronological Summary
- Exhibit 63 – Todd Brown August 23, 2018 1:56 PM email
- Exhibit 64 – Excerpts of Brown September 29, 2020, deposition

- Exhibit 66 – Deposition of David Newman
- Exhibit 67 – Press Release
- Exhibit 68 – Sacramento Bee Article
- Exhibit 69 – Media Statement Inside Edition
- Exhibit 70 – Defendant California Highway Patrol's Amended Response to Interrogatories, Set Two
- Exhibit 71 – CHP Internal Investigations Manual: Peace Officer Powers
- Exhibit 73 – Declaration of Brent Newman
- Deposition of Todd Brown June 28, 2021
- Deposition of Todd Brown September 29, 2020
- Deposition of Jeremy Dobler August 26, 2020
- Deposition of Jeremy Dobler June 25, 2021
- Deposition of Sean Duryee
- Deposition of Robin Johnson June 23, 2021
- Deposition of Elliotte Johnson July 27, 2021
- Deposition of Jeffrey Root
- Deposition of David Newman June 25, 2021
- Deposition of David Newman July 16, 2021
- Deposition of David Ward
- Deposition of Ryan Stonebraker

9.  At this point in the development of this case, I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such aid, I will ensure that they are made available for review, if requested, prior to their use.

10. My professional charges for this litigation work is an hourly fee of $345 plus expenses including all travel time. My fees for deposition and trial testimony are $3,450 per calendar day or any portion thereof, plus travel time and expenses.

11. The opinions that follow are made within a reasonable degree of certainty within the field of police practices based on over 35 years of professional law enforcement experience and scholarship.

### Summary of Incident

12. On August 3, 2018, CHP Officer Wheat told Officer Ward, that he had driven about an hour from his home in Sutter Creek, Amador County, to a residence where his wife was staying in Garden Valley/Georgetown, El Dorado County. Officer Wheat told Officer Ward that he drove to his wife's residence, armed with his CHP issued handgun, with the intention of murdering Mr. Debeaubien with whom his wife had been dating. Officer Ward knew that Officer Wheat was separated from his wife and that his wife was dating Mr. Debeaubien. Officer Ward served as a peer counselor within the CHP and

6

said he had been speaking with Officer Wheat regularly about his personal issues and his separation in the weeks prior to August 3rd.

13.   Prior to August 3, 2018, other CHP supervisors and managers were also aware of Officer Wheat's personal issues.  Sergeant Lopez said he was advised of the affair on July 8, 2018.  In addition to his personal issues, Officer Wheat's work was suffering.  He was placed on an "interim reporting" which is the CHP term for a performance improvement plan on June 1, 2018.  Supervisors were concerned about Officer Wheat's lack of enforcement action due to a low number of traffic citations and his failure to complete collision reports within the required 8-day period.

14.   Officer Peixoto was assigned to ride with Officer Wheat during one of his shifts in August 2018 as a peer support officer to assist him with his interim reporting requirements.  During that shift, Officer Wheat asked to drive by a gym where Mr. Debeaubien worked without any legitimate business purpose.  Officer Peixoto told him no and Officer Peixoto, who was aware of the personal issues Officer Wheat had with Mr. Debeaubien, notified Sergeant Dobler.  Lieutenant Brown learned of the incident and warned Officer Wheat not to have any contact with Mr. Debeaubien.

15.   Officer Wheat was involved in two minor single vehicle collisions on June 20, 2018 and July 19, 2018.  As a result of the collisions, Officer Wheat was assigned to desk duty. Even while working at the desk, Officer Wheat was not performing well and was counseled by Sergeant Lopez on August 23, 2018 about arriving to work late and not performing his tasks appropriately.

16.   On August 3, 2018, Officer Ward was very concerned about Officer Wheat's statements and convinced Officer Wheat to meet him at the CHP station.  Officer Ward wanted to make certain he understood Officer Wheat correctly and that Officer Wheat was not exaggerating or embellishing what he perceived to be a homicidal threat.  Officer Wheat met with Officer Ward and Officer Ward became convinced that Officer Wheat intended to murder Mr. Debeaubien and that he had acted on his intention by driving to a location where he believed Mr. Debeaubien would be located while armed with a handgun and the only reason Officer Wheat did not murder Mr. Debeaubien was because he could not find him.

17.   Officer Ward convinced Officer Wheat to secure his department issued handgun inside his locker.  Officer Wheat complied and Officer Wheat provided Officer Ward with the combination.  Officer Wheat told Officer Ward he had to leave as he was discussing his personal issues with family members.

18.   Once Officer Wheat left the police station, Officer Ward took Officer Wheat's handgun from Officer Wheat's locker and secured it inside his own locker so Officer Wheat could not access the gun.  Officer Ward then notified Sergeant Dobler and Lieutenant Brown of Officer Wheat's statements.

7

19.     Sergeant Dobler responded to the police station and then he and Officer Ward went to Officer Wheat's home where they spoke with Officer Wheat.  Sergeant Dobler notified Lieutenant Brown, who in turn notified Assistant Chief Stonebraker, Chief Dowling and Lieutenant Frank Newman.  Over the next several hours there were a series of emails documenting the steps taken by the CHP.

20.     Lieutenant Brown informed his commanders that Sergeant Dobler, who was a long-time family friend of Officer Wheat, did not believe that Officer Wheat was a threat to himself or others.  Lieutenant Brown informed the command staff that a department "psychiatrist" who was sent by Lieutenant Newman was responding to evaluate Officer Wheat.  In fact, Lieutenant Newman referred Ms. Swain, a licensed therapist, to the scene.  Ms. Swain determined that Officer Wheat was not currently a danger to himself or others and thus did not qualify for a 5150 WIC hold.

21.     Sergeant Dobler took several rifles and a shotgun from Officer Wheat's home for safekeeping and claimed that he did so as a friend and not as a CHP supervisor.  Sergeant Dobler secured the rifles and the shotgun at the CHP police station.  Sergeant Dobler later returned Officer Wheat's department issued handgun to him, but he did not return the rifles.

22.     While Officer Wheat was working desk duty, Ms. Graf came to the police station to engage in counseling on an unrelated issue.  While at the Station, Lieutenant Brown asked Ms. Graf to evaluate Officer Wheat.  Ms. Graf determined that Officer Wheat could continue working as a police officer.

23.     While Officer Wheat was evaluated by both Ms. Swain and Ms. Graf, neither was a psychologist or psychiatrist.  Instead, both were licensed therapists.  The CHP did not conduct a fitness-for-duty evaluation on Officer Wheat to determine if he was fit for duty and in his deposition Chief Newman acknowledged that if an officer was having homicidal thoughts, he would not be fit for duty.

24.     The attempt murder of Mr. Debeaubien was never investigated.  Neither Mr. Debeaubien nor Ms. Wheat were ever notified by the CHP of Officer Wheat's homicidal intentions.

25.     On September 3, 2018, Officer Wheat shot Mr. Debeaubien and his wife with his department issued handgun, then committed suicide.  Ms. Wheat died from her wounds but Mr. Debeaubien survived.

**Background**

26.     Emails

        a.      Todd Brown, August 3, 2018, 10:37 PM email, "Officer Brad Wheat is currently on interim and has had two collisions in less than a month.  We initiated an

8

adverse action and conducted a Form 8 yesterday.  He's been going through some personal issues and recently found out his wife has been cheating on him with a work colleague.  I just learned this evening that Brad confided in officer (Dave Ward) tonight that he drove to a location where he thought his wife and her lover were last night to murder them and then commit suicide.  Officer Ward was able to secure his duty weapon and we had a sergeant (Jeremy Dobler) in route to Brad's location to get a hold of him.  I have notified Assistant Chief Stonebraker and Lieutenant Frank Newman from OESA. We have a psychiatrist on standby waiting for us to locate Brad.  We will make a determination as to whether or not we are going to put him on a psychiatric hold and whether or not we have anything at this point.  That is the latest.  I will keep you updated once we get a hold of Brad."[1]

b.      Assistant Chief Stonebraker, August 3, 2018, 10:53 PM email, "Chiefs just spoke with Lt. Brown and they are attempting to locate Officer Wheat.  If not located shortly an emergency protective order will be sought and notifications to the other party's will be made with the involvement of the Sheriff's Department and so forth."

c.      Assistance Chief Dowling, August 3, 2018, 10:55 email, "Copy.  Thanks Stoney.  That sounds like the most prudent course of action based upon the info we have right now."

d.      Todd Brown, August 3, 2018, 10:57 PM email, "Sergeant Dobler is with Brad at his house.  They are code-4 and assessing the situation.  I asked them to ensure they get all other guns.  I'll advise as I get further."

e.      Assistant Chief Stonebraker, August 3, 2018 at 10:57 PM email, "Great new thanks Todd!"

f.      Todd Brown, August 3, 2018, 11:33 PM email, "Update.  Sergeant Dobler and Officer Ward are with Brad at his residence.  He is code-4 and has given them permission to secure his shotgun.  I just spoke to the psychiatrist that OESA provided.  She is in route to Brad's house from Elk Grove to do an assessment.  At this point, Sergeant Dobler does not feel as though Brad is a threat to himself or the other two. We do not believe that any crime has been committed that we've identified. I'll keep you posted after she evaluates Brad."[2]

g.      Todd Brown, August 4, 2018, 12:01 AM email, "Chiefs, if this is a duplicate email, I apologize.  Update.  Officer Wheat has given permission to secure his remaining

---

[1] Exhibit 9.
[2] Exhibit 10.

weapons.  Sergeant Dobler advised he does not believe he is a threat to himself or the other two parties.  I have a psychiatrist in route to Brad's residence to do an evaluation and make that determination.  ETA 0030 hours.  I'll keep you updated following the evaluation.  As far as we can tell, there had been no criminal acts committed (threats, etc.).  More to follow…"[3]

h.   Steve Dowling, August 4, 2018, 3:45 AM email, "The psychologist has completed her evaluation of Officer Wheat.  It is her opinion he is NOT a threat to himself or others.  Additionally, she related if this session would have been self-initiated by Officer Wheat, the situation would not have met the threshold requirements for her to notify law enforcement as she does not believe there is a future threat.  Based on this information, we agreed, Sergeant Dobler will continue contact over the weekend with Wheat.  Guns will continue to be secured over the weekend and reassessed on Monday, Wheat's next workday."[4]

27.   Sergeant Lopez Chronological Summary

a.   On June 1, 2018, Officer Wheat was placed on interim reporting for 60 days for low activity, substandard performance and excessive time use for report writing/not getting collisions completed within the 8-day requirement.

b.   On June 16, 2018, Sergeant Lopez conducted a ride-along with Officer Wheat and mentored Officer Wheat to successfully complete his interim reporting.

c.   On June 27, 2018, Sergeant Lopez gave Officer Wheat a letter of discipline for a single vehicle collision on June 20, 2018.

d.   On June 20, 2018, Lopez conducted a ride along with Officer Wheat for mentoring and counseling.

e.   On July 8, 2018, Officer Wheat called Sergeant Whitehead and advised him his wife was having an affair.

f.   On July 14, 2018, Sergeant Lopez conducted a ride along with Officer Wheat as part of the interim reporting process.

g.   On July 19, 2018, Officer Wheat was involved in a second preventable collision.  Sergeant Lopez did an adverse action against Officer Wheat regarding the two collisions.  Officer Wheat "was authorized to work inside the office at this point

---

[3] Exhibit 11.
[4] Exhibit 61.

for as long as it took to get his head together."

    h.    On August 23, 2018, Sergeant Lopez counseled Officer Wheat about his expectations while working at the front office.  Officer Wheat was arriving at work late and hanging out in the back office.[5]

    i.    On August 24, 2018, Sergeant Lopez directed Officer Wheat to return to the front desk as he was spending time in the back office.[6]

28.    Sergeant Lopez Consolidated Timeline

    a.    August 2, 2018 – Officer Wheat is given a Form 842 preventable collisions.

    b.    Unknown date – Ride along with Officer Peixoto for peer support.  Officer Wheat asked to drop by the gym where is wife's boyfriend works.  His request was denied and reported to Sergeants.

    c.    August 3, 2018 – Officer Wheat told Officer Ward that he went looking for Debeaubien with the intent of hurting him.  Officer Ward took Officer Wheat's duty weapon from his locker and then he and Sergeant Dobler called a psychologist and responded to Officer Wheat's home.  Officer Wheat's family talked him out of his anger and then he spent 2-3 hours with a psychologist who advised he was coping well and did not pose a threat to himself or others.  Officer Wheat gave three of his rifles to Sergeant Dobler.

    d.    August 4-19, 2018 – Officer Wheat took vacation and advised during that time he was getting counseling twice a week.  On August 14, Officer Wheat spoke with psychologist Joy Graf for several hours.  Graf advised that Officer Wheat was doing well, had good coping skills and he was good to continue working.[7]

29.    Sergeant Dobler

    a.    Deposition August 26, 2020

        1.)    Sergeant Dobler said three weeks after the shooting he heard from Officer Hardey that there had been a 911 call in El Dorado County involving Ms. Wheat and Mr. Debeaubien and he told Chief Stonebraker.[8]  Sergeant Dobler said he believed the call should have been investigated

---

[5] See also, Exhibit 53 – email re expectations of Brad.
[6] Exhibit 30.  See also, Exhibit 54.
[7] Exhibit 33.
[8] Dobler deposition at 9-10.

11

when it happened.[9]

2.)     Sergeant Dobler said he met Officer Wheat 16 or 17 years ago and Officer Wheat was the then associate pastor of the church he was attending.[10]

3.)     Sergeant Dobler said he referred Officer Wheat to EAP, but Officer Wheat was seeing a counselor in Roseville twice a week whom he was happy with.[11]

4.)     Sergeant Dobler said there was never a period of time when Officer Wheat was asked to surrender his firearm or to not carry his gun.[12]

5.)     Sergeant Dobler said he did not create a chronology report regarding this matter (in his subsequent deposition, Sergeant Dobler claimed he was confused over the word "report" and that he did create a summary of events for department attorneys).[13]

6.)     Sergeant Dobler said when Officer Wheat was working the front desk he was not on limited duty, so there was no paperwork.[14]

b.     Deposition June 25, 2021

1.)     Sergeant Dobler said the adverse action initiated against Officer Wheat was omitted from his chronology because he was not involved.[15]

2.)     Sergeant Dobler said on August 3, 2018, he was called by Officer Ward who told him he had a conversation with Officer Wheat and Officer Wheat said he had gone looking for is wife's boyfriend with the intention of hurting him.  Sergeant Dobler said he does not recall Officer Ward telling him that Officer Wheat had the intention of killing Mr. Debeaubien.[16]

3.)     Officer Ward did tell him that Officer Wheat took his gun and was looking for Mr. Debeaubien.  Sergeant Dobler said he does not recall why he did

---

[9] Dobler deposition at 10.
[10] Dobler deposition at 45.
[11] Dobler deposition at 55.
[12] Dobler deposition at 57.
[13] Dobler deposition at 64.
[14] Dobler deposition at 78.
[15] Dobler deposition at 110.
[16] Dobler deposition at 111.

not include the information in his chronology.  Sergeant Dobler said Officer Ward told him he was concerned about Officer Wheat having guns at that point.[17]

4.)   Sergeant Dobler said he was not aware that Officer Wheat was tracking his wife on her cell phone.[18]

5.)   Sergeant Dobler said Officer Ward took Officer Wheat's handgun from his locker and gave it to him.  Sergeant Dobler said he was on duty when he received the gun.  Sergeant Dobler said under CHP policy he was not required to book the gun into the evidence room.[19]

6.)   Sergeant Dobler said his taking of Officer Wheat's guns had nothing to do with the department and instead he took them due to his personal relationship with Officer Wheat.[20]  Sergeant Dobler said it was a friendly gesture and that is why he did not book the guns into property.[21]

7.)   Sergeant Dobler said Officer Ward took Officer Wheat's firearm so Officer Wheat wouldn't harm anyone.[22] Sergeant Dobler said Lieutenant Brown told him the night of the incident not to take Officer Wheat's guns.[23] Sergeant Dobler said he felt more comfortable taking the guns because of the statements that Officer Wheat made that he wanted to hurt people.[24]

8.)   Sergeant Dobler said it was his understanding that Officer Wheat got into his car and went to look for Mr. Debeaubien with the intention of finding him so he could shoot him.[25]  Sergeant Dobler said he assumes the reason that Officer Wheat did not shoot Mr. Debeaubien that night was because he could not find him.  Sergeant Dobler said he does not believe Officer Wheat committed attempted murder.[26]

9.)   Sergeant Dobler said he was present for a portion of the conversation

---

[17] Dobler deposition at 113-114.
[18] Dobler deposition at 114.
[19] Dobler deposition at 116.
[20] Dobler deposition at 117.
[21] Dobler deposition at 123.
[22] Dobler deposition at 119.
[23] Dobler deposition at 124.
[24] Dobler deposition at 125.
[25] Dobler deposition at 126.
[26] Dobler deposition at 127.

13

between Ms. Swain and Officer Wheat, and he heard Officer Wheat say that he was looking for Mr. Debeaubien, intending to hurt him, and that he "was going to take him out and kill myself."[27]  Sergeant Dobler said he does not recall Ms. Swain asking him about Officer Wheat's work performance or if Officer Wheat had been involved in any harassing or stalking behavior involving Ms. Wheat, nor did he volunteer the information.[28]

10.) Sergeant Dobler said several weeks after the August 3 incident, Officer Peixoto told him that Officer Wheat asked to drive by Ms. Wheat's business and Officer Peixoto told him that would not be a good idea.[29]

11.) Sergeant Dobler said he took two rifles and a shotgun from Officer Wheat and kept them in a closet at the police department.  Sergeant Dobler said he gave the firearms to Officer Wheat's father after Officer Wheat's death.[30]

12.) Sergeant Dobler said Lieutenant Brown spoke with Ms. Graf before he met with Officer Wheat and he did not provide her with any information.[31]

13.) Sergeant Dobler said he returned Officer Wheat's duty weapon to him when he returned to work and he told Lieutenant Brown.[32]

14.) Sergeant Dobler said Officer Wheat was given desk duty because of concerns over his two traffic accidents and not because he wanted and tried to kill someone.[33]

15.) Sergeant Dobler said he reviewed the transcript of his prior deposition, and he did not note any errors.  Sergeant Dobler said he did not make a correction regarding the chronological report because he believed he was answering the question he was asked.[34]  Sergeant Dobler said it was not a "report," but a summary intended for the CHP lawyers.[35]

---

[27] Dobler deposition at 140.
[28] Dobler deposition at 141-142.
[29] Dobler deposition at 143.
[30] Dobler deposition at 145-146.
[31] Dobler deposition at 148.
[32] Dobler deposition at 150.
[33] Dobler deposition at 159.
[34] Dobler deposition at 160-161.
[35] Dobler deposition at 176.

14

16.) Sergeant Dobler said the 911 call shocked him because he did not know that it went to the level that someone called 911.[36]

17.) Sergeant Dobler said there was no investigation about when Officer Wheat admitted he was going to look for Mr. Debeaubien to kill him and look for his wife and kill her and then shoot himself because it was a misdemeanor not committed in their presence and because it happened the day before.[37]  Sergeant Dobler said he did not know what type of misdemeanor it would have been and that Officer Wheat did not try to kill Mr. Debeaubien as there was no attempt.[38]

18.) Sergeant Dobler said the fact that Officer Wheat drove around because he was upset would not be an attempt because if he were going to rob a bank and didn't go in the bank it would not be in an attempt.  Sergeant Dobler acknowledged that Officer Wheat got into his car and drove to where he thought Mr Debeaubien and his wife were located and said, "That's driving."[39]

c.    Sergeant Dobler Chronological Timeline

1.) Sergeant Dobler has known Officer Wheat since 2003 and had spent time with his family outside of work.

2.) June 1, 2018, Officer Wheat was placed on a 60-day interim reporting for low activity, substandard performance and excessive report writing time. Sergeant Dobler was on vacation, but Officer Wheat advised him of his marital issues.

3.) July 8, 2018, Officer Wheat called Sergeant Whitehead and told him his wife was having an affair.  Sergeant Dobler had multiple conversations with Officer Wheat over the next several weeks regarding his marriage.

4.) July 15, 2018, Sergeant Dobler rode along with Officer Wheat as part of the interim reporting process.

5.) August 2, 2018, Officer Wheat stated he was having a "rough time" and his wife was not willing to work on their marriage.

---

[36] Dobler deposition at 162.
[37] Dobler deposition at 165.
[38] Dobler deposition at 165-166.
[39] Dobler deposition at 166.

6.)    August 3, 2018, Officer Ward notified Sergeant Dobler that Officer Wheat told him he had gone looking for his wife's boyfriend with the intention of hurting him.  Officer Ward took Officer Wheat's duty weapon after his conversation.  Sergeant Dobler and Officer Ward went to Officer Wheat's home.  Officer Wheat told Sergeant Dobler he looked for his wife's boyfriend, but did not find him and he wanted to hurt the boyfriend.  A psychologist spoke with Officer Wheat and concluded that Officer Wheat was not a danger to himself or others and he could return to work. Sergeant Dobler said he asked Officer Wheat "as a friend" if he would surrender all of his guns even though he was not required to do so. Officer Wheat agreed and he surrendered three rifles.

7.)    August 4-19, 2018, Officer Wheat was on vacation.  Officer Wheat said he attended counseling twice a week.  Officer Wheat also spoke with Psychologist Graf on August 14 who said he could continue working.

8.)    August 20, 2018, Officer Wheat returned to work at the front desk.

9.)    August 21, 2018, Graf again spoke with Officer Wheat and again approved his continued working.

10.)    September 3, 2019, Officer Wheat's shooting.[40]

30.    Lieutenant Todd Brown

a.    Deposition – September 29,2020

1.)    Lieutenant Brown said "interim reporting" is a Highway Patrol term that is the equivalent of the performance improvement plan.  Lieutenant Brown said Officer Wheat was placed on interim reporting due to a lack of activity and report writing.  Lieutenant Brown said he believes Officer Wheat was involved in two traffic collisions after he was placed on interim reporting.[41]  Lieutenant Brown said there was a lack of motivation by Officer Wheat to produce activity relative to the issuance of citations.[42]

2.)    Lieutenant Brown said prior to August 3, 2018, he had approximately 50

---

[40] Exhibit 51.
[41] Brown deposition at 26.
[42] Brown deposition at 71.

16

conversations with Officer Wheat regarding his personal situation.[43] Lieutenant Brown said he was aware that Officer Wheat's wife was having an affair with Mr. Debeaubien.[44]

3.)   Lieutenant Brown said Sergeant Dobler relayed the information to him that he learned from Officer Ward that Officer Wheat drove to a location where he believed his wife and lover were the night prior to murder the lover and then commit suicide.[45]

4.)   Lieutenant Brown said he was not aware of a telephone call made by Mary Wheat's brother to law enforcement concerning Officer Wheat on August 2, 2018.[46]

5.)   Lieutenant Brown said he was aware that Officer Ward was able to secure Officer Wheat's duty weapon and that Sergeant Dobler went to Officer Wheat's home to try to locate him.[47]   Lieutenant Brown said Officer Ward did not have the authority to take Officer Wheat's firearm, but asked Officer Wheat if he was willing to leave the firearm at the police station and lock it up which he did.[48]   Lieutenant Brown said the gun was secured in a locker, but he does not know whose locker.[49]

6.)   Lieutenant Brown said he notified Assistant Chief Stonebraker and Lieutenant Newman from the Office of Employee Safety and Assistance (OESA).[50]

7.)   Lieutenant Brown said Officer Ward and Sergeant Dobler went to Officer Wheat's home and had a long conversation relative to the events of the prior evening and his current state of mind.   Lieutenant Brown said Officer Ward and Sergeant Dobler determined that Officer Wheat was not a threat to himself or anyone else.   Lieutenant Brown said in an "abundance of caution," he requested that the psychologist or psychiatrist continued to get a professional evaluation.[51]

---

[43] Brown deposition at 28.
[44] Brown deposition at 29.
[45] Brown deposition at 30.
[46] Brown deposition at 37.
[47] Brown deposition at 38.
[48] Brown deposition at 39.
[49] Brown deposition at 40.
[50] Brown deposition at 40.
[51] Brown deposition at 45.

8.)     Lieutenant Brown said he did not, nor did he direct anyone, to contact anyone at the El Dorado County Sheriff's Department or to speak with Ms. Wheat to find out what happened.[52]  Lieutenant Brown said he did not, nor did he direct anyone to contact Mr. Debeaubein regarding what had happened.[53]

9.)     Lieutenant Brown said he did not believe that Officer Wheat had any intention or wanted to kill Ms. Wheat or Mr. Debeaubien "at that time or any other time." Lieutenant Brown said he is aware that Officer Wheat shot Ms. Wheat and Mr. Debeaubien.[54]

10.)    Lieutenant Brown said he believes Officer Ward to be reliable and truthful and he had never heard before from a reliable source that someone expressed an intention to murder someone.[55]

11.)    Lieutenant Brown said he was told Officer Wheat had driven to a location where he believed Ms. Wheat and Mr. Debeaubien were located with the intention of murdering them.[56]  Lieutenant Brown said he does not recall if he asked someone if Officer Wheat actually drove to the location, but said he does believe that Officer Wheat had driven somewhere.[57]

12.)    Lieutenant Brown said it was his understanding that the psychologist was going to conduct an evaluation of Officer Wheat to determine whether or not he was a danger to himself or others.[58]

13.)    Lieutenant Brown said he did not tell the psychologist that Ms. Wheat had moved out sometime prior, that Officer Wheat was being disciplined for poor work performance, or that he had just been involved in two traffic accidents involving Highway Patrol vehicles.[59]

14.)    Lieutenant Brown said the psychologist told him that Officer Wheat was not a threat to himself or anyone else, he had good coping skills, he was very religious, he understood the difference between right and wrong,

---

[52] Brown deposition at 45-46.
[53] Brown deposition at 47.
[54] Brown deposition at 48.
[55] Brown deposition at 49-50.
[56] Brown deposition at 56.
[57] Brown deposition at 56.
[58] Brown deposition at 59.
[59] Brown deposition at 60.

and he did not want to go to jail.[60]

15.)     Lieutenant Brown said he does not recall if he had a discussion with the psychologist as to whether or not Officer Wheat was mentally able to perform his duties as a police officer, but said he did not believe there was any concern.[61]

16.)     Lieutenant Brown said he assigned Officer Wheat to desk duty because he had been involved in two collisions and a third collision in close proximity to the other two may cost him his job.[62]

17.)     Lieutenant Brown said between August 3, 2018, and September 3, 2018, the August 3, 2018, incident was not documented in any way by the CHP other than the emails.[63]

18.)     Lieutenant Brown said he prepared a chronology of events on October 2, 2018.[64]

19.)     Lieutenant Brown said there was no reason for the CHP to conduct an administrative investigation concerning Officer Wheat's death. Lieutenant Brown acknowledged that the CHP policy requires an administrative investigation concerning an off-duty, intentional shooting by a CHP officer, but said it does not apply when the officer is deceased and the Sheriff's office was handling the criminal portion of the investigation.[65]

b.     Deposition – June 28, 2021

1.)     Lieutenant Brown said he never attempted to determine how Officer Wheat's firearm came back into Officer Wheat's possession after it was secured by Officer Ward.[66]  Lieutenant Brown said he believes Sergeant Dobler returned Officer Wheat's weapon to him.[67]

2.)     Lieutenant Brown said Officer Wheat volunteered his weapon to the

---

[60] Brown deposition at 71.
[61] Brown deposition at 75.
[62] Brown deposition at 116.
[63] Brown deposition at 125.
[64] Brown deposition at 127.
[65] Brown deposition at 149.
[66] Brown deposition at 188.
[67] Brown deposition at 189.

department in an unofficial capacity and the department stored it.[68]

3.)     Lieutenant Brown said Sergeant Dobler took possession of Officer Wheat's rifles as a friend of Officer Wheat rather than as a sergeant with the Highway Patrol.[69]  Lieutenant Brown acknowledged that Sergeant Dobler was on duty with the Highway Patrol at the time he took possession of Officer Wheat's rifles.[70]

4.)     Lieutenant Brown acknowledged he wrote in an email that he asked Sergeant Dobler to ensure they get all of Officer Wheat's guns, but said he had an earlier telephone conversation with Sergeant Dobler where he told Sergeant Dobler if Officer Wheat was cooperative and willing to give up his weapons, then make sure he took them.[71]  Lieutenant Brown denied that he gave Sergeant Dobler an order to take Officer Wheat's firearms.[72]

5.)     Lieutenant Brown said he did not believe any crime had occurred on August 3, 2018, involving Officer Wheat.[73]

6.)     Lieutenant Brown said he does not recall if he had any role in the decision to return Officer Wheat's firearms to him.[74]

7.)     Lieutenant Brown said, contrary to Assistant Chief Dowling's email that stated Officer Wheat's guns will be held to Monday and then they would reassess, that Officer Wheat could have picked up his firearms over the weekend.[75]

8.)     Lieutenant Brown said he was aware that Officer Wheat was on a ride-along with Officer Peixoto and during the ride-along Officer Wheat requested to go by Mr. Debeaubien's gym.  Officer Peixoto refused and reported the incident to Sergeant Dobler.[76]  Lieutenant Brown said he directed Officer Wheat not to go to the gym because Officer Wheat did not need other issues and it was inappropriate for him to use the time to go by the gym.[77]  Lieutenant Brown denied that he was concerned that

---

[68] Brown deposition at 191.
[69] Brown deposition at 192.
[70] Brown deposition at 193.
[71] Brown deposition at 194.
[72] Brown deposition at 186.
[73] Brown deposition at 210.
[74] Brown deposition at 214.
[75] Brown deposition at 221.
[76] Brown deposition at 235.
[77] Brown deposition at 236.

Officer Wheat was engaged in stalking behavior.[78]

9.)   Lieutenant Brown said he was aware that Officer Wheat had some type of tracking device on Ms. Wheat prior to the shooting.  Lieutenant Brown denied that he was concerned that Officer Wheat was stalking his wife based on the device.[79]

10.)   Lieutenant Brown said he did not prepare a report addressing the incident on August 3.[80]

11.)   Lieutenant Brown said he did not tell Ms. Swain that Officer Wheat wanted to drive by the gym for nonbusiness reasons where one would expect to find Mr. Debaeubien and Ms. Wheat,[81] or that he directed Officer Wheat not to go by the gym.[82]

12.)   Lieutenant Brown said he did not get into details with Ms. Swain and instead asked if he was a threat to himself or anyone else, and she said no.[83]

13.)   Lieutenant Brown said Officer Ward told him that Officer Wheat said he had driven to somewhere in El Dorado County to look for Mr. Debeaubien and that he had gone there with the intent to kill Mr. Debeaubien and to commit suicide.[84]  Lieutenant Brown said he does not recall if he was told that Officer Wheat was armed with his service weapon at the time he went to El Dorado County.[85]  Lieutenant Brown said he believed that Officer Ward believed Officer Wheat went to El Dorado County to kill Mr. Debeaubien.[86]

14.)   Lieutenant Brown agreed that Officer Wheat told him he sent text messages to his wife that were not nice, but Officer Wheat said sometimes he gets emotional.[87]

15.)   Lieutenant Brown said Officer Wheat expressed the intent to murder, he had the ability to use a firearm, he was trained in the use of a firearm,

---

[78] Brown deposition at 236.
[79] Brown deposition at 237-238.
[80] Brown deposition at 257.
[81] Brown deposition at 258.
[82] Brown deposition at 259.
[83] Brown deposition at 265
[84] Brown deposition at 266.
[85] Brown deposition at 267.
[86] Brown deposition at 269.
[87] Brown deposition at 276.

and he drove some distance with the intent, with a weapon for the purpose of finding someone to kill them. Lieutenant Brown said he agrees that Officer Wheat took a step, but he does not agree that it would meet the elements of attempted murder.[88]

16.) Lieutenant Brown said he is not familiar with Penal Code section 17500. Lieutenant Brown was shown Penal Code section and stated he did not believe that Officer Wheat's actions constituted a violation because it was a misdemeanor not committed in the presence of an officer and said it was thus not a chargeable offense. Lieutenant Brown said someone cannot be charged with a misdemeanor unless an officer saw it happen.[89]

17.) Lieutenant Brown said part of the reason emergency protective orders exist is because domestic violence situations can escalate rapidly and lead to tragic consequences. Lieutenant Brown agreed that what happened in this case was domestic violence.[90]

18.) Lieutenant Brown said he told Ms. Graf about the interim reporting of Officer Wheat, the pending adverse action against Officer Wheat, and the August 3 incident where Officer Wheat drove to El Dorado County.[91] Lieutenant Brown said he does not have a specific recollection of telling her that Officer Wheat had the intent to kill someone.[92]

31. Chief David Brent Newman – Deposition

a. Chief Newman said he was in charge of the Valley Division of the CHP between September 2017 and when he retired in November 2019.[93] Chief Newman said he supervised Assistant Chief Stonebraker and Lieutenant Brown.[94]

b. Chief Newman said the CHP did not conduct an investigation of the shooting by Officer Wheat.[95]

c. Chief Newman said it was reported to him that Officer Wheat went to a location where he believed he would find his wife and his wife's boyfriend and that he intended to shoot them and kill himself. Chief Newman said he was told that Officer Wheat was unsuccessful in locating his wife and his wife's boyfriend.

---

[88] Brown deposition at 291-292.
[89] Brown deposition at 300.
[90] Brown deposition at 302.
[91] Brown deposition at 319-320.
[92] Brown deposition at 324.
[93] Newman deposition at 6.
[94] Newman deposition at 8.
[95] Newman deposition at 10.

Chief Newman said he did not believe this action constituted a crime as there was no overt action and attempted murder.[96]

d.    Chief Newman said the CHP policy defines domestic violence as intentionally or recklessly causing or attempting to cause bodily injury or placing another person in reasonable apprehension of imminent serious bodily injury to themselves or another.[97]  Chief Newman said the CHP takes a domestic violence seriously because of the known risk for all involved.[98]

e.    Chief Newman said if an officer was actively having homicidal thoughts that officer would not be fit for duty.  Chief Newman said the first step would be to collect facts to build a case and make a determination of whether or not a fitness for duty examination should be conducted.[99]

f.    Chief Newman said the officer's commander would prepare a report, his office would make a recommendation and ultimately a fitness for duty examination would be at the discretion of the Commissioner.[100]

g.    Chief Newman said factors supporting a fitness-for-duty examination could include: an officer who was acting in a distracted manner; an officer sending inappropriate text messages to their estranged spouse; while in uniform flipping the person off who was the target of homicidal thoughts; and, driving by the person's workplace in a patrol car without professional reasons.[101]

h.    Chief Newman said there were not any contemporaneous reports regarding the information that Officer Wheat was having homicidal thoughts, but said there were emails.  Chief Newman acknowledged that an email does not qualify as a report by the CHP.[102]

i.    Chief Newman said he does not believe that anyone from the CHP ever checked on Mr. Debeaubien or notified either Mr. Debeaubien or Ms. Wheat that Officer Wheat told Officer Ward that he had homicidal thoughts regarding them.[103]

---

[96] Newman deposition at 38-39.
[97] Newman deposition at 47.
[98] Newman deposition at 48.
[99] Newman deposition at 53-54.
[100] Newman deposition at 54.
[101] Newman deposition at 54-55.
[102] Newman deposition at 57-58.
[103] Newman deposition at 59-60.

j.    Chief Newman said he was notified of the threats on August 3, 2018.[104]

k.    Chief Newman said he was aware that Officer Wheat's service weapon was taken away from him that evening and officers wanted to take all of Officer Wheat's guns.[105]  Chief Newman said if they had any concern whatsoever, they would ask the officer for their firearms to eliminate any possible risk.[106]

l.    Chief Newman said CHP policy requires any item taken for safekeeping to be booked into evidence, but the policy would not apply to CHP property.[107]  Chief Newman said he is not aware of any report documenting the receipt of Officer Wheat's firearms.[108]

m.    Chief Newman said a police officer needs to have a firearm in order to work and he is aware that Officer Wheat's firearm was returned to him, but he does not have a clear understanding of why the firearm was returned.[109]  Chief Newman said he does not know who made the decision to return a weapon.[110]

n.    Chief Newman said there were two formal CHP investigations into single vehicle collisions involving Officer Wheat.[111]  Chief Newman said those investigations consisted of approximately 60 pages of documentation, but there was no internal investigation regarding the August incident involving Officer Wheat.[112]

o.    Chief Newman said the purpose of the psychologist speaking with Officer Wheat at the time of the August incident would be to evaluate his current mental status, the statements he gave his peer and provide the Department with information as to whether they need to escalate or de-escalate the investigation. Chief Newman said the purpose of the psychologist speaking with Officer Wheat was not intended to be a fitness-for-duty examination.[113]

p.    Chief Newman said there was no investigation that determined or documented if Officer Wheat had done what he told Officer Ward.[114]

---

[104] Newman deposition at 62.
[105] Newman deposition at 63-64.
[106] Newman deposition at 64.
[107] Newman deposition at 65-66.
[108] Newman deposition at 67-68.
[109] Newman deposition at 69.
[110] Newman deposition at 72.
[111] Newman deposition at 82.
[112] Newman deposition at 83.
[113] Newman deposition at 88.
[114] Newman deposition at 104.

24

q.      Captain Newman said he has not had a conversation with Lieutenant Brown or Sergeant Dobler about what they knew of Officer Wheat's situation prior to the shooting.[115]

r.      Captain Newman said officers are supposed to act the same in conducting a criminal investigation regardless if the suspect is a police officer or a citizen.[116]

s.      Chief Newman said it was his understanding that Sergeant Dobler took possession of Officer Wheat's firearms as a protective move in support of the overall safety of Officer Wheat.[117]

t.      Captain Newman said he is aware of other cases where officers' firearms were taken for safekeeping and there was no documentation regarding that fact.[118]

u.      Captain Newman said there was nothing preventing a sergeant from ordering Officer Wheat to turn over his department issued firearm.[119]

v.      Captain Newman said he made a conscious decision that the department would not conduct a critical incident investigation into the Wheat matter.[120]  Captain Newman said he believed that a CHP parallel administrative investigation would interfere with the sheriff's department criminal investigation.[121]  Captain Newman said he also believed that initiating an administrative investigation would have a harmful and emotional effect on other CHP officers.[122]

w.      Captain Newman said he doesn't know if the sheriff's department was ever informed that Officer Wheat told Officer Ward that he had looked for Mr. Debeaubien and Ms. Wheat in August with the intent to kill Mr. Debeaubien, or that the department had asked Officer Wheat to relinquish his firearm.[123]

x.      Captain Newman said his role in a fitness-for-duty would be to bring the issue to the attention of the Commissioner's office and the Commissioner's office would either grant or deny the request.[124]  Captain Newman said a fitness-for-duty

---

[115] Newman deposition at 128.
[116] Newman deposition at 151.
[117] Newman deposition at 156.
[118] Newman deposition at 161.
[119] Newman deposition at 178.
[120] Newman deposition at 187.
[121] Newman deposition at 190.
[122] Newman deposition at 204.
[123] Newman deposition at 195.
[124] Newman deposition at 222.

examination is to evaluate in a formal setting, by a qualified medical professional, whether the person is able to perform their job duties.[125]

32. Captain Sean Duryee – Deposition

    a. Captain Duryee said the CHP did not investigate the September 3, 2018, shooting involving Officer Wheat.[126]

    b. Captain Duryee said the shooting involving Officer Wheat was a "threshold incident" as defined in the CHP critical incident policy.[127] Captain Duryee said CHP policy states, "The department should conduct in-depth investigations of all critical incidents through the use of the critical incident investigation team."[128]

    c. Captain Duryee said concurrent or parallel investigation occurs when one group of investigators is working on a criminal investigation and another group of investigators will work on the administrative investigation at the same time.[129] Captain Duryee said the fact that the Amador County Sheriff was conducting a criminal investigation involving the September shooting did not bar the CHP from conducting their own investigation.[130]

    d. Captain Duryee said at some point a decision was made that his team was not going to be conducting an administrative investigation.[131] Captain Duryee said the decision was made at the chiefs' level, but he does not recall who made the decision.[132]

    e. Captain Duryee said he had a telephone conversation with Lieutenant Johnson and was told that one of Lieutenant Johnson's employees made a connection between the murder suicide and the incident which happened in August.[133] Captain Duryee said that information was shared with the sheriff's office.[134]

33. Lieutenant Johnson – Deposition

    a. Lieutenant Johnson said on August 5, 2018, she sent an email to Captain Duryee

---

[125] Newman deposition 227.
[126] Duryee deposition at 9.
[127] Duryee deposition at 28.
[128] Duryee deposition at 33.
[129] Duryee deposition at 41.
[130] Duryee deposition at 42.
[131] Duryee deposition at 56 and 62.
[132] Duryee deposition at 63.
[133] Duryee deposition at 57.
[134] Duryee deposition at 58.

regarding a log incident from August 3, 2018, involving the Wheats.[135]

b.   Lieutenant Johnson said at that time, Captain Duryee was the captain who oversaw the Special Services command within the Valley Division that included the Investigative Services Unit, which she assumed would be taking part in the investigation.[136]

c.   Lieutenant Johnson said is her experience that when the CHP has this type of critical incident, typically the Critical Incident Investigation Team conducts an investigation.[137]

d.   Lieutenant Johnson said she received an email (dated 9/5/2018) from Sergeant Asnicar and she forwarded a copy of the audio of 911 call.[138]

34.   Captain Jeffrey Root – Deposition

a.   Captain Root said in August 2018 he was the commander of the Office of Employee Safety and Assistance (OESA).[139]

b.   Captain Root said a "fit-for-duty" would be a determination if an employee was able to meet all the critical tasks that were required.  Captain Root said fitness for duty examinations did not fall under OESA and instead was under Internal Affairs.[140]

c.   Captain Root said OESA does not provide people for fitness for duty or 5150 examinations.  But if a particular command would like either peer support or a therapist to respond to talk to an officer, that would be through his office.[141]

d.   Captain Root said the therapist would provide input and advice to the officer's chain of command on whether the officer was safe to be acting as a police officer and the command would decide how to proceed.[142]

e.   Captain Root said Officer Wheat did not make a request for a mental health professional to speak with him.[143]  Captain Root said command personnel

---

[135] Johnson deposition at 24.
[136] Johnson deposition at 27.
[137] Johnson deposition at 32.
[138] Johnson deposition at 33.  See also Exhibit 37.
[139] Root deposition at 12.
[140] Root deposition at 27.
[141] Root deposition at 31.
[142] Root deposition at 32.
[143] Root deposition at 41.

requested a therapist to respond, assess, and assist the immediate needs of the employee.[144]

f.      Captain Root said it is the policy of the CHP that no information on identity, diagnosis, or treatment will be disclosed the department or anyone else unless the individual accessing EAP services authorized such a release in writing.[145]  The only exceptions are when the records are lawfully subpoenaed, when a person expresses a desire to harm themself or others, if child or elder abuse is suspected, or if the individual confesses to a crime.[146]

g.      Captain Root said he is not aware of any written authorization by Officer Wheat.[147]

h.      Captain Root said he does not recall speaking with Ms. Swain regarding Officer Wheat.[148]

35.   Sergeant Elliotte Johnson – Deposition

a.      Sergeant Johnson worked in OESA and he contacted Ms. Swain for the purpose of speaking with Officer Wheat.[149]

b.      Sergeant Johnson said he was informed that an officer was having some marital issues, stress issues and was possibly suicidal.  Sergeant Johnson said he does not recall being told that Officer Wheat had driven from Amador County to El Dorado County with the intention of murdering two people.[150]

c.      Sergeant Johnson said if he were told that Officer Wheat had attempted to kill someone, he would have contacted law enforcement to conduct an investigation.[151]  OESA does not send counselors to speak with officers who have tried to kill people.[152]

36.   Officer David Ward – Deposition

a.      Officer Ward said he was a member of the CHP peer support program and he

---

[144] Root deposition at 44.
[145] Root deposition at 47.
[146] Root deposition at 47-49.
[147] Root deposition at 54.
[148] Root deposition at 64.
[149] Johnson deposition at 12.
[150] Johnson deposition at 15.
[151] Johnson deposition at 16.
[152] Johnson deposition at 24.

attended a 32-hour peer support training session at the academy.[153]  Officer
Ward said the peer support program provided officers with the ability to provide
a peer-to-peer communication with employees who may be experiencing
something difficult in their life.[154]

b.      Officer Ward said on August 3, 2018, he spoke with Officer Wheat either on the
phone or in person.[155]

c.      Officer Ward said Officer Wheat sounded normal and during the conversation he
related what he had done the previous night.[156]  Officer Ward said Officer Wheat
told him he had gone looking for his wife and Mr. Debeaubien with the intention
of killing them.[157]  Officer Ward said he does not recall if Officer Wheat said he
was going to kill himself.[158]  Officer Wheat said he went to the cabin that Officer
Ward knew to be in Georgetown.  Officer Ward said he knew that Officer Wheat
lived in Sutter Creek which is about an hour drive from Georgetown.[159]

d.      Officer Ward said Officer Wheat told him he took his service pistol.  Officer
Wheat said he was unable to locate his wife or Mr. Debeaubien.[160]

e.      Officer Ward said the statements by Officer Wheat caused him considerable
concern.[161]

f.      Officer Ward said he had to switch from a peer support role to a law
enforcement role and notified his supervisors and he began driving toward
Amador County to look for Officer Wheat.[162]  Officer Ward said he notified
Sergeant Dobler and Lieutenant Brown and spoke with each of them by
phone.[163]

g.      Officer Ward said he was able to contact Officer Wheat by telephone and told
him they needed to meet at the police station and Officer Wheat agreed.[164]

---

[153] Ward deposition at 12.
[154] Ward deposition at 14.
[155] Ward deposition at 19.
[156] Ward deposition at 21.
[157] Ward deposition at 22.
[158] Ward deposition at 23.
[159] Ward deposition at 23.
[160] Ward deposition at 25.
[161] Ward deposition at 25.
[162] Ward deposition at 26.
[163] Ward deposition at 27-28.
[164] Ward deposition at 29-30.

h.  Officer Ward said he spoke with Officer Wheat in a Police Department conference room and told him that unfortunately he had been placed in a position where he had to act more as a police officer and needed to speak with him directly about his prior statement.[165]

i.  Officer Ward said he asked Officer Wheat specifically about his statement that he had gone to the cabin to kill his wife and Mr. Debeaubien to make certain that Officer Wheat wasn't exaggerating.  Officer Ward said based on Officer Wheat's statements, he believed Officer Wheat had gone to the cabin to look for his wife and Mr. Bebeaubien with the intent of killing them.[166]

j.  Officer Ward asked Officer Wheat where his gun was located and told him he had to notify the chain-of-command.  Officer Wheat said Officer Ward could get his gun that was in his car, but he did not want him to notify the chain-of-command until Monday.[167]  Officer Ward went with Officer Wheat and retrieved the gun from his car.[168]

k.  Officer Ward said they returned inside the police station and Officer Wheat placed the gun inside his locker.  Officer Wheat gave Officer Ward his locker combination in case he needed to access the gun.  Officer Wheat said he needed to return to his family as they had been in the middle of talking about the situation.[169]  Officer Ward said after Officer Wheat left, he opened Officer Wheat's locker, took the gun, and locked it in his locker.[170]

l.  Officer Ward said Sergeant Dobler responded to the police station and he told Sergeant Dobler what occurred.  Officer Ward said he and Sergeant Dobler then drove to Officer Wheat's residence.[171]  When they arrived, Officer Wheat and his brother-in-law (Mary's brother) were at the residence.[172]  Officer Ward said he did not tell the brother-in-law or ask the brother-in-law if he was aware that Officer Wheat had gone to kill his sister.[173]

m.  Officer Ward said a department counselor responded to the home.[174]  Officer

---

[165] Ward deposition at 33.
[166] Ward deposition at 34.
[167] Ward deposition at 35-36.
[168] Ward deposition at 37.
[169] Ward deposition at 38.
[170] Ward deposition at 53.
[171] Ward deposition at 41.
[172] Ward deposition at 43.
[173] Ward deposition at 45.
[174] Ward deposition at 46-47.

Ward said he and Sergeant Dobler went to another room so they could talk.[175] Officer Ward said he does not recall if he informed the counselor of what he had observed.[176]

n.    Officer Ward said while they were at the house the subject of guns came up and they took several rifles from the home.[177]

o.    Officer Ward said no one asked him to document what happened and he assumed that somebody else would be preparing a report.[178]

p.    Officer Ward said Officer Wheat told him he wanted to kill his wife and Mr. Debeaubien, that he had driven there to do it, armed with a handgun, and he didn't commit the murder because he could not locate them.[179]

37.    Chief Ryan Stonebraker – deposition

a.    Chief Stonebraker said he was aware that Officer Wheat was having marital issues, that he was involved in a vehicle collision and he was noticeably under performing his duties.[180]  Chief Stonebraker said there was concern about Officer Wheat's psychological state and believes two different therapist spoke with him.[181]

b.    Chief Stonebraker said one purpose of an administrative investigation is to learn how to do things differently in the future.  Chief Stonebraker said an administrative investigation was not conducted in this matter.  Chief Stonebraker said he would have liked to have seen an investigation.[182]

c.    Chief Stonebraker said you do not have to shoot someone for a crime to be committed regarding wanting to do violence against the person.[183]  Chief Stonebraker said it would be unlawful to drive to a location with a firearm where you believe a person will be located with the intent to kill them.[184]  chief Stonebraker said if the mindset of the individual is to kill two people, it would be attempted murder and even driving with a weapon with the intent to do harm is

---

[175] Ward deposition at 47.
[176] Ward deposition at 48.
[177] Ward deposition at 51-52.
[178] Ward deposition at 55.
[179] Ward deposition at 71.
[180] Stonebraker deposition at 46.
[181] Stonebraker deposition at 47.
[182] Stonebraker deposition at 73.
[183] Stonebraker deposition at 85.
[184] Stonebraker deposition at 85.

a crime.[185]

    d.      Chief Stonebraker said he does not know why the weapons taken from Officer Wheat were not booked into evidence and said they probably should have been.[186]

    e.      Chief Stonebraker said if you are a sergeant and you are being put in official contact with a subordinate officer, your first obligation is to act as a sergeant, not as a friend.[187]

    f.      Chief Stonebraker said a CHP officer who is acting on intent to commit murder is psychologically unfit for duty.[188]

    g.      Chief Stonebraker said in hindsight he believes a fitness-for-duty examination should have been ordered.[189]

**Opinions**

**1.)    A Reasonable Police Officer Would Have Believed That Officer Wheat Committed a Crime When He Drove to El Dorado County, Armed with a Handgun, Searched for Mr. Debeaubien, Admitted He Intended to Murder Mr. Debeaubien, and Only Abandoned His Plan When He Could Not Locate Mr. Debeaubien**

38.    Officer Ward said Officer Wheat sounded normal during the conversation when he related what he had done the previous night.   Officer Wheat told him he had gone looking for his wife and Mr. Debeaubien with the intention of killing them.   Officer Ward was aware that Officer Wheat was separated from his wife, that Ms. Wheat was in a relationship with Mr. Debeaubien, and that Officer Wheat was upset over his marriage ending.   Officer Ward said he does not recall if Officer Wheat said he was going to kill himself.   Officer Wheat said he went to the house that Officer Ward knew to be in Georgetown.   Officer Ward said he knew that Officer Wheat lived in Sutter Creek which is about an hour drive from Georgetown.   Officer Wheat said he took his service pistol and that he was unable to locate his wife or Mr. Debeaubien.   Officer Ward asked Officer Wheat specifically about his statement that he had gone to the house to kill his wife and Mr. Debeaubien to make certain that Officer Wheat wasn't exaggerating. Officer Ward said based on Officer Wheat's statements he believed Officer Wheat had

---

[185] Stonebraker deposition at 86.
[186] Stonebraker deposition at 96-97.
[187] Stonebraker deposition at 98.
[188] Stonebraker deposition at 100.
[189] Stonebraker deposition at 108.

gone to the house to look for his wife and Mr. Bebeaubien with the intent of killing them.

a.    Sergeant Dobler

1.)    Sergeant Dobler said it was his understanding that Officer Wheat got into his car and went to look for Mr. Debeaubien with the intention of finding him so he could shoot him.   Sergeant Dobler said he assumes the reason that Officer Wheat did not shoot Mr. Debeaubien that night was because he could not find him.  Additionally, Sergeant Dobler said he was present for a portion of the conversation between Ms. Swain and Officer Wheat, and he heard Officer Wheat say that he was looking for Mr. Debeaubien intending to hurt him and that he "was going to take him out and kill myself."   Yet, Sergeant Dobler said he does not believe Officer Wheat committed attempted murder.

2.)    Sergeant Dobler said there was no investigation about when Officer Wheat admitted he was going to look for Mr. Debeaubien to kill him and look for his wife and kill her and then shoot himself because it was a misdemeanor not committed in their presence and because it happened the day before.   Sergeant Dobler said he did not know what type of misdemeanor it would have been and that Officer Wheat did not try to kill Mr. Debeaubien as there was no attempt.

3.)    Sergeant Dobler said the fact that Officer Wheat drove around because he was upset would not be an attempt because if he were going to rob a bank and didn't go in the bank it would not be in an attempt.  Sergeant Dobler acknowledged that Officer Wheat got into his car and drove to where he thought Mr Debeaubien and his wife were located and said, "That's driving."

b.    Lieutenant Brown

1.)    Lieutenant Brown testified in his deposition that he did not believe that Officer Wheat had any intention or wanted to kill Ms. Wheat or Mr. Debeaubien "at that time or any other time." Yet Lieutenant Brown said he is aware that Officer Wheat shot Ms. Wheat and Mr. Debeaubien.

2.)    Lieutenant Brown said he believes Officer Ward to be reliable and truthful and he had never heard before from a reliable source that someone expressed an intention to murder someone.

3.)   Lieutenant Brown said he did not believe any crime had occurred on August 3, 2018, involving Officer Wheat.

4.)   Lieutenant Brown said Officer Wheat expressed the intent to commit murder, he had the ability to do so and was armed with a firearm, he was trained in the use of a firearm, and he drove some distance with the intent and with a weapon for the purpose of finding someone to kill them.  While Lieutenant Brown said he agrees that Officer Wheat took a step, he does not agree that he actions would meet the elements of attempted murder.

5.)   Lieutenant Brown said he is not familiar with Penal Code section 17500. Lieutenant Brown was shown the Penal Code section and stated he did not believe that Officer Wheat's actions constituted a violation because it was a misdemeanor not committed in the presence of an officer and said it was thus not a chargeable offense.  Lieutenant Brown said someone cannot be charged with a misdemeanor unless an officer saw it happen.

c.   Chief Newman

1.)   Chief Newman said it was reported to him that Officer Wheat went to a location where he believed he would find his wife and his wife's boyfriend and that he intended to shoot them and kill himself.

2.)   Chief Newman said he was told that Officer Wheat was unsuccessful in locating his wife and his wife's boyfriend.  Chief Newman said he did not believe this action constituted a crime as there was no overt action and attempted murder.

39.   The California Penal Code defines an attempted crime as "An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission,"[190] and murder is "the unlawful killing of a human being."[191]

40.   To prove that the defendant is guilty of attempted murder, the People must prove that: 1. The defendant took at least one direct but ineffective step toward killing another person; and, 2. The defendant intended to kill that person.  A *direct step* requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step

---

[190] Penal Code Section 21a.
[191] Penal Code section 187(a).

indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt.

41.   A person who attempts to commit murder is guilty of attempted murder even if, after taking a direct step toward killing, he or she abandons further efforts to complete the crime, or his or her attempt fails or is interrupted by someone or something beyond his or her control. On the other hand, if a person freely and voluntarily abandons his or her plans before taking a direct step toward committing the murder, then that person is not guilty of attempted murder.[192]

42.   Moreover, "Every person having upon the person any deadly weapon, with intent to assault another, is guilty of a misdemeanor."[193]

43.   Any reasonable police officer would believe that Officer Wheat had committed attempted murder and would have prepared a report documenting the facts and circumstance and would have forwarded that report to the prosecutor's office for consideration of criminal charges.

    a.   Here, Officer Wheat told a fellow officer that he intended to murder Mr. Debeabien.  Upon hearing these statements on the phone, Officer Ward wanted to ensure that Officer Wheat was not exaggerating or embellishing so he spoke with him in person where Officer Wheat repeated his statement that he intended to murder Mr. Debeaubien.

    b.   Officer Wheat had a motive as Mr. Debeaubien was in a relationship with Officer Wheat's wife.

    c.   Officer Wheat took a direct step toward committing the homicide.  He drove for approximately an hour, while armed with a handgun and looked for Mr. Debeaubien in a location where Officer Wheat expected to find him.

    d.   Officer Wheat said the homicide did not occur because he did not locate Mr. Debeaubien.

44.   Even if one did not believe Officer Wheat committed an attempt homicide, any reasonable police officer would have believed that he committed a misdemeanor by possessing a firearm with the intent to assault another.

---

[192] California Criminal Jury Instructions, CALCRIM 600. https://www.courts.ca.gov/partners/documents/calcrim-2021.pdf  See also, POST Learning Domain 5 at 3-8, "A crime of attempt is possible whenever the circumstances make accomplishment of the objective apparently possible, even though in fact, it was not accomplished."
[193] Penal Code section 17500.

a. Both Sergeant Dobler and Lieutenant Brown demonstrated an utter lack of knowledge of criminal law by stating that Officer Wheat could not be charged with a crime because it did not occur in the presence of a police officer.

b. Police officers are trained that a person may indeed be charged with a misdemeanor crime that did not occur in the presence of an officer, but they cannot be immediately arrested for a misdemeanor not committed in the officer's presence.[194]  There was nothing that would have prevented officers from filing a report with the prosecutor's officer for filing consideration.

45. The fact that a reasonable police officer would believe that Officer Wheat was a threat to Mr. Debeaubien and Ms. Wheat and committed an attempt murder or possessed a firearm with the intent to harm another is supported by the actions of the officers in taking Officer Wheat's firearms.

a. As soon as Officer Wheat left the station, Officer Ward removed Officer Wheat's gun from Officer Wheat's locker and secured it inside his locker, so Officer Wheat could not access the gun.

b. Sergeant Dobler said Officer Ward took Officer Wheat's firearm so Officer Wheat wouldn't harm anyone.  Although Sergeant Dobler claims Lieutenant Brown told him the night of the incident not to take Officer Wheat's guns, he felt more comfortable taking the guns because of the statements that Officer Wheat made that he wanted to hurt people and his taking of Officer Wheat's guns had nothing to do with the department and instead he took them due to his personal relationship with Officer Wheat.

c. Lieutenant Brown said Sergeant Dobler took possession of Officer Wheat's rifles as a friend of Officer Wheat rather than as a sergeant with the Highway Patrol. Lieutenant Brown acknowledged that Sergeant Dobler was on duty with the Highway Patrol at the time he took possession of Officer Wheat's rifles.

d. Chief Newman said it was his understanding that Sergeant Dobler took possession of Officer Wheat's firearms as a protective move in support of the overall safety of Officer Wheat.

e. Sergeant Dobler and Lieutenant Brown claim that Sergeant Dobler took the firearms as a "friend" and not as part of his duties as a police officer is contradicted by the fact that Sergeant Dobler responded to Officer Wheat's home in his capacity as a police officer accompanied by Officer Ward; Sergeant Dobler facilitated a CHP therapist's interview of Officer Wheat and claims to

---

[194] See, POST Learning Domain 15 at 4-8.

have relied on her assessment; Lieutenant Brown sent an email that stated to "ensure" the firearms were to be taken; Sergeant Dobler's statement that he took the guns because Officer Wheat expressed he wanted to hurt people; and the weapons were taken and were secured at the police facility.

f.   Finally, Sergeant Dobler was duty bound to seize the weapons possessed by Officer Wheat, along with Officer Wheat's department issued handgun.  Any reasonable police officer would have known this was a domestic violence incident and Penal Code section 18250 mandates firearms be seized, "If any of the following persons is at the scene of a domestic violence incident involving a threat to human life or a physical assault, that person shall take temporary custody of any firearm or other deadly weapon in plain sight or discovered pursuant to a consensual or other lawful search as necessary for the protection of the peace officer or other persons present."[195]

46.   Any reasonable police supervisor, manager, or chief of police would have believed that Officer Wheat committed a serious crime, would have ensured the crime was documented and forwarded to the prosecutor's office for review, would have removed Officer Wheat's police officer powers, would have taken his department issued firearms, and would have ensured a thorough investigation was conducted.

47.   It is apparent that the CHP's sole interest was to protect Officer Wheat from criminal prosecution as they claim he did not commit a crime, they took his firearms as an act of friendship and in support of Officer Wheat's safety without regard for the duties of a police officer to investigate serious crimes, document and report those crimes to the prosecutor, and to protect the citizens whom they serve.  Not only did these supervisors and manager turn a blind eye to Officer Wheat's criminal conduct, but they even failed to warn Mr. Debeaubien or Ms. Wheat of the threat posed to their lives.

**2.     A Reasonable Supervisor Would Have Immediately Relieved Officer Wheat of His Police Officer Powers, Placed Him on Administrative Leave, and Conducted a Fitness for Duty Examination Prior to Returning His Department Issued Firearm or Allowing Him to Work**

48.   Any reasonable supervisor upon learning of the criminal act of Officer Wheat would have immediately placed him on administrative leave, relieved him of his police powers, and confiscated his police badge, identification and firearm.  Should a determination be made that Officer Wheat could return to work, any reasonable supervisor under these circumstances, would have ensured that Officer Wheat undergo a fitness for duty examination.

49.   A Fitness for Duty Evaluation is a specialized inquiry conducted by a specially qualified psychologist or psychiatrist in response to an officer's reported inability to perform

---

[195] *See also*, POST Learning Domain 25 at 3-18.

official duties in a safe and effective manner because of mental illness or significant deterioration in cognitive abilities.

50.     CHP policy states, "all uniformed members of the California Highway Patrol shall be physically and emotionally capable of performing the complete range of official duties administrated by the Commissioner."[196]

51.     Captain Newman said a fitness for duty examination is to evaluate in a formal setting, by a qualified medical professional, whether the person is able to perform their job duties.

52.     Chief Newman said if an officer was actively having homicidal thoughts, that officer would not be fit for duty.  Chief Newman said the first step would be to collect facts to build a case and make a determination of whether or not a fitness-for-duty examination should be conducted.  Chief Newman said factors supporting a fitness-for-duty examination could include: an officer who was acting in a distracted manner; an officer sending inappropriate text messages to their estranged spouse; while in uniform, flipping the person off who was the target of their homicidal thoughts; and, driving by the person's workplace in a patrol car without professional reasons.

53.     Chief Newman said the purpose of the psychologist speaking with Officer Wheat at the time of the August incident would be to evaluate his current mental status, the statements he gave his peer and provide the Department with information as to whether they need to escalate or de-escalate the investigation.  Chief Newman said the purpose of the psychologist speaking with Officer Wheat was not intended to be a fitness-for-duty examination.

54.     Here, Officer Wheat spoke with two therapists, neither of whom was a psychologist or a psychiatrist.  There is no dispute that a fitness-for-duty examination was not conducted and if one were to have been conducted, it required the approval by the Commissioner.

55.     While it is my opinion that criminal charges should have been sought against Officer Wheat for attempted murder, preventing the need for a fitness-for-duty, it is also my opinion that any reasonable police supervisor, manager, or chief of police, would have placed Officer Wheat off-duty and relieved him of his police powers pending a fitness-for-duty absent criminal charges.  CHP supervision and management were aware of the following prior to the homicide:

a.      Officer Wheat's performance fell below an acceptable standard requiring that he be placed on interim reporting.

b.      It was known that Officer Wheat was undergoing emotional issues due to the separation form his wife.

---

[196] Exhibit 50.

c.      Officer Wheat was involved in two minor on-duty traffic collisions.

d.      Officer Wheat tried to go to the gym while on-duty while riding with Officer Peixoto and had to be counseled to not go near Mr. Debeaubien.

e.      While assigned to the desk, Officer Wheat could not perform his duties and was counseled by his sergeant.

f.      Officer Wheat told Officer Ward that he drove approximately one-hour to locate Mr. Debeaubien, while armed with a handgun, intending to murder Mr. Debeaubien.

g.      Officer Ward was so concerned, he removed Officer Wheat's handgun from his locker and secured it so Officer Wheat could not possess the firearm.

h.      It was known that Officer Wheat had placed a tracking device on his wife's phone so he could locate her.

56.      In these circumstances, no reasonable police manager, or chief of police, would allow Officer Wheat to maintain his police powers and be issued a firearm until he had been evaluated by a professional by means of a fitness-for-duty examination to determine if he was capable of performing his job duties.

**3.      Any Reasonable Police Officer Would Have Ensured that Mr. Debeaubien and Ms. Wheat Were Notified of Officer Wheat's Homicidal Intentions**

57.      Although CHP police supervisors and managers were aware of Officer Wheat's intent to murder his wife, Mr. Debeaubien and then to commit suicide, no one from the CHP advised Ms. Wheat or Mr. Debeaubien so they could seek a restraining order or other means of intervention to prevent the eventual murder of Ms. Wheat and the attempted murder, shooting and injuries to Mr. Debeaubien.

58.      Reasonable CHP police officers know and are trained in domestic situations that violence can occur and that they should notify the victims of crimes as to the possible threats that they may face.[197]

**4.      The CHP Failed to Conduct an Internal Investigation, Contrary to Its Own Policies, to Identify Supervisor and management Misconduct**

59.      The CHP did not conduct a criminal or administrative investigation after the August incident or an administrative investigation after the September shooting.

---

[197] *See*, POST Learning Domain 25.

60.     Whenever there is an allegation of criminal misconduct by a police officer, two separate investigations must be conducted.  The first investigation involves the criminal allegation as it pertains to potential criminal liability, and the second involves the allegation as it relates to administrative misconduct.  These investigations should be conducted concurrently as the standards of proof are different and while an action may not rise to the level of criminal misconduct, it may be a violation of department policy.  There are limitations on the sharing of evidence between the two investigations due to *Garrity* protections, but those procedures do not prevent or require a delay of the administrative investigation.[198]

61.     Here, the CHP did not conduct a criminal investigation of Officer Wheat's statements that he intended to murder Mr. Debeaubien, that he took steps to carry out the murder, and the only reason he did not murder Mr. Debeaubien was because he could not locate him.  The CHP should have conducted a criminal investigation or notified the appropriate law enforcement agency for the appropriate jurisdiction.  Indeed, Chief Newman said officers are supposed to act the same in conducting a criminal investigation regardless if the suspect is a police officer or a citizen.

62.     Concurrently, the CHP should have conducted an administrative investigation of the attempted murder to determine if Officer Wheat had violated department policies.

63.     After Officer Wheat murdered his wife, shot Mr. Debeaubien and committed suicide, the sheriff's department conducted a criminal investigation.  Chief Newman said he made a conscious decision that the department would not conduct a critical incident investigation into the Wheat matter.   Chief Newman said he believed that a CHP parallel administrative investigation would interfere with the sheriff's department criminal investigation.   Chief Newman said he also believed that initiating an administrative investigation would have a harmful and emotional effect on other CHP officers.

64.     Any reasonable chief of police/police commissioner would have conducted an administrative investigation concurrently with the sheriff's department criminal investigation.  Those investigations are very different and should have focused on different issues.  While the sheriff's department criminal investigation was focused on the culpability of Officer Wheat and a determination if others were involved, the CHP investigation should have been focused on the actions of CHP supervisors and managers who were aware of the August incident and their actions.

65.     Here, the failure of the supervisors and managers after the August incident, as described above, resulted in Officer Wheat's department handgun being returned to him and that handgun was the murder weapon.  A reasonable administrative investigation would

---

[198] *See,* "Managing Accountability Systems for Police Misconduct: Internal Affairs and External Oversight," Jeffrey J. Noble and Geoffrey P. Alpert (2009).

have determined that Officer Wheat had engaged in a crime in August, that he should have been referred for prosecution, that he should have been relieved of duty and his police powers should have been rescinded.  The failure of the CHP to hold the supervisors and managers accountable who committed obvious misconduct after the August incident, sent a message to CHP officers that they could cover up the criminal misconduct of other officers and engage in serious misconduct with impunity.


_____          _____

Jeffrey J. Noble                                                                    Date

41

Exhibit R

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

PHILIP DEBEAUBIEN,

        Plaintiff,

vs.                    Case No. 2:19-cv-01329-WBS-DB

STATE OF CALIFORNIA;
CALIFORNIA HIGHWAY PATROL;
TODD BROWN; SABRENA SWAIN;
JOY GRAF; REGGIE
WHITEHEAD; RYAN
STONEBRAKER; BRENT NEWMAN;
JEREMY DOBLER,

        Defendants.

_____/



Deposition of

JEFFREY CRAIG ROOT

Monday, June 28, 2021

REPORTER:  DEBRA P. CODIGA, CSR NO. 5647

_____

TENNELEY MICKEL REPORTING
P.O. Box 1107
Arbuckle, California 95912
Tel 916-492-9021   Fax 916-922-3461

Jeffrey Craig Root - June 28, 2021

1  who did most of the interaction between yourself and

2  that assistant commissioner's office?

3      A.   Correct.

4      Q.   Okay.  So are you head of the OE -- OESA for

5  the entire state or just for the Valley Division?

6           I shouldn't say "just," but --

7      A.   For the entire state.

8      Q.   Okay.  And does the OESA have sub-offices

9  anywhere else in the state, or is the only OESA office

10  in Sacramento?

11      A.   The only -- the only OESA office is in

12  Sacramento.  We have part of our peer program, so we

13  oversee the peer program.  We've got individuals who are

14  in OESA that do this full time, and then we have peers,

15  and there's over 200 of them statewide, that do it on a

16  volunteer basis.

17           So they -- not report -- or they work when --

18  when they're in that role, they work for OESA, but

19  normally their -- their normal role is whatever their

20  normal role is.

21      Q.   And in your capacity, do you interact -- or I

22  guess still to be determined if it's -- if it's -- in

23  general, I'm talking about the time -- the time of this

24  incident, so maybe I should keep that in mind as our

25  default, if you will --

```
 1        A.    Uh-huh.

 2        Q.    -- time period.

 3              At the time of these incidents, did you have

 4  any regular interaction with the administration of

 5  Magellan employee services?

 6        A.    I'm not -- can you rephrase or re -- did I have

 7  any interaction with Magellan, or --

 8        Q.    Let me -- let me rephrase it.

 9              So am I correct that the CHP, as part of a

10  master contract the state had, arranged to have certain

11  medical or mental health services provided through --

12  I'll just call them Magellan.  And I believe it's

13  Magellan Employee Services of California, LLC, or

14  something, but through Magellan.

15        A.    Again, I'm not -- I'm just trying -- I'm trying

16  to -- I'm trying to follow the question.

17              Magellan, so that I -- as you stated,

18  Magellan's a master service contract that's done by

19  CalHR, which writes the master services contract.

20        Q.    Right.

21        A.    So all the -- the therapists for the general

22  EAP services are done through Magellan, and those

23  therapists that are brought on to Magellan are through

24  their vetting process, their -- you know, they --

25  their -- their process for putting therapists on there.
```

Jeffrey Craig Root - June 28, 2021

```
 1              We, as the CHP, also have certain therapists
 2    that we will use because we have a subcontract with
 3    Magellan that allows us to use certain therapists for
 4    training purposes, for critical incident stress
 5    debriefings or one-on-one -- one-on-one sessions.
 6         Q.   Okay.
 7         A.   So with the big -- the master service contract,
 8    no.  I -- I -- that's CalHR, and we have -- we've --
 9    I've had meetings, and I can't -- I don't know if it was
10    before or after, during.  You know, I've had meetings
11    with CalHR regarding the master service agreement, but
12    not Magellan directly.
13         Q.   Okay.  Thank you.  And actually, it's helpful.
14         A.   I don't know if that makes sense.
15         Q.   No, it actually does, and it's a good reminder
16    that a lot of times we don't understand or know what we
17    think we know.
18              So through the OESA, am I correct that there
19    are mental health services that are obtained or provided
20    to CHP employees?
21         A.   Through OESA or through Magellan.
22         Q.   Through some of the programs that OESA
23    administers, are there mental health services that are
24    provided or directed to employees?
25         A.   We are -- we, through OESA, are able to assist
```

Root 06-28-2021

Jeffrey Craig Root - June 28, 2021

1    employees get those services.

2         Q.   So you're the conduit.

3         A.   Yes.

4         Q.   Okay.  Let me ask it this way.

5              So in terms of being the conduit, are you a

6    conduit between a CHP officer and one of ten different

7    sort of master providers, or are all the mental health

8    folks you provide conduit to in some relationship with

9    Magellan pursuant to the CHP subcontract?

10        A.   Yes.  All -- all of -- all the therapists that

11   we're able to use for -- for our subcontract for the

12   main EAP contract all come through Magellan.

13        Q.   Okay.  And the contract that I've seen at least

14   sort of references the possibilities of numerous

15   addendums and modifications.

16             Are there addendums or modifications that

17   you're aware of to that subcontract between the CHP and

18   Magellan?

19             MS. McTAVISH:  Objection; vague as to time.

20        Q.   BY MR. KATZ:  At the time of this incident.

21        A.   When you say "addendums," I mean I -- going on

22   my memory of what that -- that looks like and then

23   what's -- what's passed through is you've got the main

24   contract, and then the subcontract is kind of an

25   addendum to that main contract based on that contract.

Jeffrey Craig Root - June 28, 2021

```
 1          We did not have a psychiatrist.  It might have
 2   been a therapist.  So I don't know the -- the context of
 3   what was discussed, what was said, what he actually said
 4   to determine whether it was a crime or -- or not a
 5   crime.
 6      Q.   Okay.  And you know, as an -- as an experienced
 7   officer, that peace officers don't have the burden of
 8   making the ultimate determination as to whether or not
 9   something's a crime; correct?
10      A.   Well, that's ultimately up to the courts.  Yes.
11      Q.   Okay.  And officers take actions on a -- what's
12   your understanding as to the standard by which an
13   officer takes an action -- to take further action if --
14   in terms of possible crimes?
15      A.   Well, you've got a reasonable suspicion; you
16   got probable cause; you got totality of the
17   circumstances.
18      Q.   Okay.  And can you tell us what reasonable
19   suspicion is?
20      A.   Oh, you're drawing back to -- it's been a long
21   time since I -- I've had to do that.
22          Yeah.  It -- it's a reasonable suspicion, and
23   in my memory, it's going to be a lesser cause than
24   probable cause.
25      Q.   Okay.  All right.  Well, I don't want to put
```

Jeffrey Craig Root - June 28, 2021

```
 1   you in a spot where I'm -- I understand you've been in

 2   this sort of indirect law enforcement position, maybe

 3   we'll call it, for a number of years, so that's fine.

 4           Now, am I correct that throughout the email

 5   chain that you saw, Todd Brown communicated the belief

 6   that OE -- OESA was sending a psychiatrist to evaluate

 7   Brad Wheat?

 8      A.   My -- my assumption -- and that's all it is is

 9   an assumption -- is that he used the word synonymous --

10   synonymously with just a therapist because we don't have

11   psychiatrists on standby.  We don't have psychiatrists

12   as part of the Magellan contract.

13           So like I said, my assumption would be he used

14   that term as a general term for a therapist, but

15   that's -- that's an assumption.

16      Q.   Okay.  And you were receiving copies of this

17   email chain.  To the best of your knowledge, did either

18   you or Frank Newman ever communicate to Lieutenant Brown

19   that in fact Sabrena Swain was not a psychiatrist?

20      A.   Personal knowledge of either me and Todd having

21   that conversation, or Frank, I do not.  It doesn't mean

22   it didn't happen.  I know, with instances like this,

23   most of it is over-the-phone or in-person conversation.

24   So what the context of those conversations, I don't -- I

25   don't recall nor remember.
```

Jeffrey Craig Root - June 28, 2021

1      Q.   Okay.  And what happens if it's determined that

2  someone does needs to see a psychiatrist?  How does that

3  work?

4      A.   Well, with -- with the -- the resources or the

5  processes we would have as a department, you have two

6  courses of action:  That you either go and have them

7  voluntary or involuntarily committed under a 5150 hold,

8  or you do a fitness for duty, in which they would see

9  someone of that nature.

10      Q.   Okay.

11      A.   Which, again, I'm assuming, because that's a

12  different -- different office, that they use

13  psychiatrists or psychologists, someone with a higher

14  level to do the fitness for duty.  But I'm not -- I

15  don't know for sure what their level of -- of training

16  is, the ones that they use.

17      Q.   Let's go to Exhibit 58, which has been

18  previously marked.  And give me just a moment.  I

19  will --

20           (Pause in proceeding.)

21      Q.   BY MR. KATZ:  And Exhibit 58 is an email and

22  Word attachment dated September 4th, 2018, at 10:35 a.m.

23           First of all, is this a document that you

24  reviewed?

25      A.   No.  The -- well, I'm not sure the -- the

```
 1                    REPORTER'S CERTIFICATE

 2                         --o0o--

 3           I certify that the witness in the foregoing

 4   deposition,

 5                    JEFFREY CRAIG ROOT,

 6   was administered the oath by me to testify to the truth,

 7   the whole truth, and nothing but the truth in the

 8   within-entitled cause; that the deposition was taken at

 9   the time and place named; that the testimony of the

10   witness was reported by me, a duly certified shorthand

11   reporter; that it was thereafter transcribed into

12   typewriting, and that the transcript is a true record of

13   the testimony given.

14           Pursuant to Federal Rule 30(e), transcript

15   review was requested.

16           I further certify that I am not financially

17   interested in the action, nor a relative or employee of

18   any attorney or any party to the action.

19

20   Dated:  July 6, 2021

21

22

23   _____

24           DEBRA P. CODIGA, CSR No. 5647

25           State of California
```

Exhibit S

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

PHILIP DEBEAUBIEN,

       Plaintiff,

    v.

STATE OF CALIFORNIA, et al.,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 2:19-cv-01329-WBS-DB

**DECLARATION OF DEBRA SALVO IN SUPPORT OF PLAINTIFF'S OPPOSITION TO STATE OF CALIFORNIA'S AND CHP DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Date:     February 22, 2022
Time:     1:30 p.m.
Courtroom: 5 (14th Floor)
Judge:    Hon. William B. Shubb

I, Debra Salvo, declare as follows:

1.    I make this declaration in support of Plaintiff's opposition to the motion for summary judgment filed by the State of California and the CHP Defendants. I make the statements of fact in this declaration of my own personal knowledge. If called as a witness in this action, I could and would testify competently to the facts set forth herein.

2.    I have worked as a domestic violence advocate, correctional officer and police officer in the last 28 years. I was a police officer for 23 of those years. I have encountered, counseled, advocated and reviewed well over a thousand domestic violence cases. A fuller statement of my expertise and qualifications are set forth on Pages 1–3 of my report prepared on September 10, 2021, a copy of which is attached hereto.

3.    The statements and opinions in this declaration are intended to amplify and crystallize the statements and opinions in that report and my deposition testimony given on November 9, 2021. I have not changed any of my opinions since my report or my testimony.

4.    The conduct of Officer Brad Wheat on August 2–3, 2018 constituted an "incident of domestic violence" under the California Penal Code both as to Plaintiff Philip Debeaubien and as to Mary Wheat, and any reasonable CHP officer would have so understood.

1    5.    As such, the CHP had a statutory obligation to prepare a report of that incident.

2    6.    As such, the CHP had a statutory obligation to notify Plaintiff Philip Debeaubien

3   and Mary Wheat of their right to request an emergency protective order against Officer Wheat.

4    7.    Had Plaintiff sought an emergency protective order, the aforementioned incident

5   report would have made obtaining such order much easier.

6    8.    Even in the absence of such a report, however, a court more likely than not would

7   have issued an emergency protective order against Officer Wheat.

8    9.    In addition, a court more likely than not would have issued a more permanent order

9   against Officer Wheat had one been sought.

10    I declare under penalty of perjury under the laws of the United States of America that the

11   foregoing is true and correct.  Executed on February 6, 2018.

12                                              */s/ Debra Salvo*
                                               Debra Salvo
13                                             (original signature retained by
                                               attorney Stewart Katz)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Debra Salvo
4220 Gailey Circle
Cameron Park,Ca. 95682
debra.salvo@yahoo.com
916-955-4249

Mr. Stewart Katz
The Law Office of Stewart Katz
555 University Ave. Suite 270
Sacramento,Ca. 95825

Re: Philip Debeaubien  VS. State of California; California Highway
Patrol;Todd Brown; Sabrina Swain;Joy Graf; Reggie Whitehead; Ryan
Stonebaker; Brent Newman;Jeremy Dobler.

<u>Professional Qualifications</u>

<u>Associate's Degree- Criminal Justice</u>

<u>Current Status- Retired Police Officer as of May 2021</u>
<u>Committee Member Sacramento County Domestic Violence Prevention</u>
<u>Collaboration, Sacramento Valley Domestic Violence Strangulation</u>
<u>Conference Committee</u>
1993-1995 Domestic Violence Advocate- Casa de Esperanza Yuba City,
Ca.
1995-1998 Reserve Correctional Officer/ Bailiff/ Transportation Officer-
Sutter County Sheriff
1998-2004 Police Officer- Sacramento State University Police
2004-2021 Police Officer- Folsom Police Department
Folsom Police Department Ancillary Duties; Crisis Negotiator, Lead Crime
Scene Investigator, Scene  Field Training Officer, Mounted Police Officer,
Peer Support Officer, Detective, Domestic Violence Liaison,Training
Manager responsible for all department records and training.

2012- Assigned as a persons crimes detective with emphasis in Domestic Violence. Assigned as liaison to work with Domestic Violence Advocacy Groups.

2012-Became a member of the Sacramento County Domestic Violence Prevention Collaboration

2012-2020 Over 300 hours of formal training related to Domestic Violence. I have several POST ( Peace Officer Standards and Training) certified classes and several non POST Certified classes.
I received training in Domestic Violence Investigation POST 40 Hours, Domestic Violence for First Responders POST 8 Hours, Interview and Interrogation POST 74 hours, Officer Involved Domestic Violence POST 24 Hours, Sexual Assault Investigation POST 48 Hours, Homicide Investigation POST 80 Hours, Accidental Death and Drowning 24 Hours , Gun Violence Restraining Orders 4 Hours, Training Manager POST 24 Hours, Advanced Peer Support POST 24 Hours and Crisis Negotiations POST 40 Hours and negotiations related to Domestic Violence POST 24 Hours. I also attended and planned multiple Domestic Violence Conferences in the county of Sacramento.

The Sacramento County Domestic Violence Prevention Collaboration is a multi-disciplinary collaborative, which consists of any discipline who deals with domestic violence. We have members from Sacramento County District Attorney, Child protective Services, Advocacy groups such as The Family Justice Center, My Sister's House and Weave. We also have NorCal Services for Deaf and Hard of Hearing, Man Alive, medical professionals, local police officers and detectives.We meet once a month.

The Sacramento County Domestic Violence Prevention Collaboration was started in order to bring the above groups together to help educate and end domestic violence. The collaborative hosts a yearly conference to educate multiple disciplines about domestic violence. The conferences offer education for every discipline in attendance. I have assisted with the

planning and curriculum of these conferences and have taught domestic violence investigation in the law enforcement break out sessions.

2016-2019 I held the position of Co-Chair for The Sacramento Domestic Violence Prevention Collaboration
2019-2021 I held the position of Chair for The Sacramento Domestic Violence Prevention Collaboration.

I have taught multiple classes within The Folsom Police Department and the community related Domestic Violence. Between 2012 and 2020 I taught The Folsom Police department Explorers, Police Officers, Detectives and citizen volunteers. I taught the definition of domestic violence,  the cycle of violence,dynamics, related laws, lethality assessment, strangulation, gun violence restraining orders, emergency protective orders, domestic violence restraining orders, evidence collection, advocacy and investigation of domestic violence cases.

I have worked as a domestic violence advocate, correctional officer and police officer in the last 28 years. I was a police officer for 23 of those years.  I have encountered, counseled, advocated and reviewed well over a thousand domestic violence cases.

As a domestic violence detective I was the primary detective for domestic violence and I reviewed all of the domestic violence cases within our agency from 2012-2016, as part of my assignment. I assisted numerous patrol officers and fellow detectives with domestic violence victims, suspects and their investigations. I have conducted over a thousand interviews with victims of domestic violence. I have also negotiated with suspects and interviewed several hundred domestic violence suspects. As a police officer, domestic violence advocate  and correctional officer who encountered many suspects and victims of domestic violence, I learned a great deal about the victimology related to domestic violence.

Domestic Violence is a pattern of abusive behavior committed by an intimate partner with the intent to dominate and control a victim. Domestic

violence can occur in many forms including physical, sexual, emotional, psychological and economic abuse. Acts of Domestic violence can be overt or covert.

Domestic violence can happen to anyone. Domestic violence impacts victims, abusers, family members, friends and entire communities.
In my experience, most cases of domestic violence are never reported. The hidden nature of the crime makes it difficult for others to recognize and instances of domestic violence are often excused, denied, concealed or overlooked by the victim.

Many people who are being abused do not see themselves as victims and tend to minimize the abuse. Even those victims who recognize abuse have a difficult time getting out of the relationships and away from their abuser. People stay in domestic violence relationships for many reasons, which is difficult for most to understand.

Abusers are not easy to spot in public, they may appear friendly and loving to their partner and family. They often only abuse behind closed doors.

It does not happen because someone is stressed out, drinking, or using drugs. Abuse is an intentional act that one person uses in a relationship to control the other. Abusers have learned to abuse in order to get what they want.

In my experience, victims of domestic violence often stay in domestic violence relationships because leaving can be dangerous. The most dangerous time for a victim who is being abused is when they try to leave the relationship.

Domestic violence rarely ends at the time of separation from an abuser. Abusers do not want to let go of their victims and they continue to try and control and manipulate victims. Some of the reasons victims choose to stay in toxic relationships include:

4

Fear of being fatally harmed by the abuser

Belief that they will not be taken seriously by family, friends, or law enforcement.

The abuser has ties to law enforcement

Threats to harm or take away their children.

Shame or guilt over the failure of a marriage/relationship

Economic dependency

Lack of housing options

Emotional impairment (confusion, feeling trapped or helpless)

Belief the abuser will change because of their remorse or promises

Lack of emotional support

Economic dependency

Based on my training and experience, domestic violence cripples victims and they are often mentally unable to file charges against the abuser, which is why the State of California allows police officers to make an arrest without the victim requesting charges be filed. This takes the pressure and blame away from the victim. This is also why we have gun violence restraining orders and domestic violence restraining orders. The restraining orders are tools for law enforcement to help protect victims when they are unable to protect themselves.

A gun violence restraining order is a court order that prohibits someone from having a gun, ammunition or magazine or buying a gun, ammunition

or magazine. The order can direct the person to turn their weapons over to law enforcement or sell them to a gun store.

Police officers initiate the gun violence restraining order to protect potential victims from gun violence, which is very common in domestic violence cases, especially when a victim tries to escape the abusive relationship. The time that a victim is in the greatest danger is when they leave the relationship. This is when most victims are killed.

Based on my training and experience, gun violence restraining orders are a very useful tool to protect victims from abusers who have guns or have access to guns. Police officers are able to immediately seize a suspect's guns and prevent them from getting them back until a court decides it is safe to return the guns.

An emergency protective order (EPO) can be issued 24 hours a day by a law enforcement officer who believes that a domestic violence victim is in danger of their abuser. The EPO will force the abuser to leave and order them to stay away from the victim, their children, home and pets.

In my experience an EPO is an effective tool during an initial domestic violence call because it's immediate and gives the victim time to escape a violent situation. Officer's can call a judge while on scene of a domestic violence call and ask them for the order. The orders are rarely denied.

Officers often ask for EPO's and Gun Violence Orders to protect victims when they are in danger of being murdered by their abuser. Domestic violence situations can turn deadly in a rapid time frame. In my experience abusers who are not incarcerated after a crime has been committed become desperate to control their victim and avoid going to jail. They will go to extreme measures to find the victim and potentially threaten and use deadly force.

Police Officers are not immune to Domestic Violence and are just as likely to be involved in a  Domestic Violence Relationship as the average citizen.

6

When a police officer is involved in a Domestic Violence incident and they have verbalized their desire to commit murder and suicide, the policies regarding Domestic Violence should be followed by the investigating agency.

Mr. Katz, at your request I have reviewed the following materials concerning this case:

*Amended and First Amended Complaint for Violation of Civil Rights and State Law

*Deposition Todd Brown
*Deposition Mathew Hooper
*Deposition Philip Debeaubien
*Deposition  Jeremy Dobler
*Deposition Dave Ward
*California Highway Patrol Policy Regarding Domestic Violence HPM 100.69 Chapter 3

I also reviewed noted sections of The California Penal Code, The California Welfare and Institutions Code and The Power and Control Wheel Published by The National Center on Domestic and Sexual Violence.

Based on my review of these materials and my training and experience, I reached the following opinions:

It is my opinion that this is a case of  Domestic Violence. I base my opinion on the following information:

A. Brad Wheat shot and wounded Philip Debeaubien, who was involved in an intimate relationship with Brad's estranged wife Mary Wheat. Brad then shot and killed Mary Wheat and then shot and killed himself.

B. One month prior to the fatal shootings, Brad admittedly went looking for Mary Wheat and Philip Debeaubien in order to kill them and himself. Mary and Philip were at a family residence in Garden Valley, but were warned by Mary's niece Madison Hooper that Brad was coming to confront them. Philip left the area prior to Brad's arrival. Brad confronted Mary. He called her names and took her cell phone charger and then left the home.

C. Brad Wheat was tracking Mary Wheat through the Life360 App. This App is a family social networking app which provides location based services, including sharing and notifications, to consumers.  The app was installed on Mary Wheat's phone, but it is unknown whether she was aware of the installation. If the app is installed on someone's phone, the phone owner doesn't have the ability to know when someone is checking their location.

D. Warren Wheat, the son of Mary and Brad Wheat contacted his uncle Mathew Hooper and told him that Brad Wheat left their home to go and confront Mary Wheat and Philip Debeaubien in Garden Valley. Warren told Mathew that Brad was angry and had his gun with him. Mathew Hooper tried to call and text Brad, but they were unable to contact him and then called 911. Warren looked at Brad's location on the LIfe360 App, and could see that Brad was driving at a high rate of speed toward the family home in Garden Valley.

E.  Brad Wheat confided in California Highway Patrol Officer Ward, that he went to confront Mary Wheat and Philip Debeaubien in Garden Valley. Brad told Ward that he had planned to kill Philip, Mary and himself.

F. Mary Wheat and Philip Debeaubien relocated to a house in Sutter Creek owned by a friend of Mary Wheat. One morning they were getting ready to leave for work and Philip left before Mary. Philip saw a male dressed in jogging attire with a hood on near the house. The male stared at him. Mary came to work a short time later and said that Brad Wheat was outside the house when she left and he confronted her. Mary did not know how Brad knew where she was.

8

G. The windows are broken out in the Sutter Creek house on two occasions. Brad Wheat was suspected to be the person who vandalised the home based on his contact with Mary at the home and he appeared to be stalking Mary and Philip outside the home in the early morning hours.

H. According to Philip, Mary did not report the broken windows to the police. Mathew Hooper, Mary's brother, said that Brad denied breaking the windows in the house, but Mathew believed Brad was the person responsible for the vandalism.

I. The night of the murders, Brad found Mary and Philip at Philip's store. They came home from a weekend in Tahoe and decided to stay there for the night. It appears that Brad tracked them using the Life360 app.

J. Brad Wheat texted Philip and told him he was coming and soon after there was pounding at the back door and then Brad came to the front of the store and shot out the windows.

K. While Brad Wheat was partnered with another officer due to performance issues. Brad asked his partner to drive by Mary and Philip's business. The officer refused. Brad had also been warned about driving by their business in the past while on duty.


Brad Wheat tried to intimidate Mary Wheat with text messages. He sent her texts telling her he wanted her back and that he would be a better husband and when Brad did not receive the response he was looking for, he called her names and talked down to her.

- Brad Wheat drove by Mary and Philips businesses, which were essentially next to each other, while on duty in a fully marked California Highway Patrol Unit.
- Brad Wheat Deprived Mary and Philip of their rights under color of authority by using his department resources.
- Brad Wheat is suspected of breaking out the windows of the home where Mary and Philip were staying in Sutter Creek.

- Brad Wheat waited in the dark outside of the Sutter Creek home until Philip and Mary left for work and then confronted Mary. Brad was dressed in workout attire with a hood.
- Brad Wheat asked a fellow officer to drive by Mary and Philips businesses while on duty in a fully marked California Highway Patrol Unit.
- Brad Wheat expressed to Mathew Hooper and Officer Ward that he wanted to kill Mary and Philip and then kill himself in order to avoid going to jail.
- Brad used intimidation and fear to try and control Mary and Philip.
- Brad used department resources to stalk and intimidate Mary and Philip.
- Brad used technology to stalk Mary and Philip.
- Brad allegedly vandalised property to intimidate and control Mary and Philip.
- Brad was verbally abusive through electronic communication and in person in order to control Mary.
- Brad took his California Highway Patrol Duty Weapon to confront Mary and Philip with the intent to kill them.
- Brad murdered Mary and Philip with his California Highway Patrol Duty Weapon and ammunition. These murders were committed with malice aforethought. Murder is the ultimate crime related to Domestic Violence.

There are multiple crimes related to Domestic Violence and in reviewing the information from Items A-K above, I noted multiple crimes cited in The California Penal Code (PC).

1. Stalking 646.9 PC- Any person who willfully, maliciously, and repeatedly follows or harrasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety is guilty of the crime of stalking.

2. Criminal Threats 422 PC- Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement made verbally, in writing, or by means of electronic communication device is to be taken as a threat even if there is no intent of actually carrying out the threat.

3. Vandalism 594(a) PC -Every person who maliciously commits any of the following acts with respect to any real property not his or her own, in cases other than those specified in state law, is guilty of vandalism.

4. Possession Deadly Weapon 17500 PC- Every person having upon the person any deadly weapon with intent to assault another person.

5. Corporal Injury Domestic Violence 273.5 PC- Any person who willfully inflicts corporal injury resulting in a traumatic condition upon a victim described in subdivision (b) is   guilty of a felony. (#1 of subdivision b-The offender's spouse or former spouse)

6. Attempted Murder 664/187 PC- The attempted unlawful killing of another person or fetus with malice aforethought.

7. Murder 187(a) PC- The unlawful killing of a human being or fetus with malice aforethought.

Based on testimony in the depositions presented, Brad Wheat told Peer Support Officer Dave Ward that he went to the house in Garden Valley with the intent to kill Mary Wheat, Philip Debeaubien and himself on August 3rd, 2018.

Officer Dave Ward asked Brad Wheat to respond to The California Highway Patrol Office and after speaking with Brad Wheat in person, Officer Dave Ward asked for Brad's assigned California Highway Patrol (CHP) duty weapon. Brad gave Officer Ward his weapon, which they secured temporarily in Brad's locker at the CHP office.

11

Officer Ward then allowed Brad to leave the CHP office without consequence. Brad was admittedly suicidal and homicidal and admitted that he needed help. Brad also had other weapons besides his duty weapon.

I am prepared to testify to these opinions in deposition or at trial; if called upon to do so. If I am provided other materials to review, I may have additional opinions. If I do review other materials and formulate additional opinions, I will submit a supplemental report.

/S/ Debra Salvo

Exhibit T

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF CALIFORNIA

3                  --oOo--

4

5    PHILIP DEBEAUBIEN,                    )
                                           )
6              Plaintiff,                  )
                                           )
7         vs.                              )    Case No.
                                           )    2:19-CV-01329-WBS-DB
8    STATE OF CALIFORNIA; CALIFORNIA       )
     HIGHWAY PATROL; TODD BROWN;           )
9    SABRENA SWAIN; JOY GRAF; REGGIE       )
     WHITEHEAD; RYAN STONEBRAKER;          )    **CERTIFIED**
10   BRENT NEWMAN; JEREMY DOBLER,          )    **COPY**
                                           )
11             Defendants.                 )
                                           )
12

13

14                  --oOo

15          Deposition of

16        RYAN STONEBRAKER

17       Tuesday, July 27, 2021

18

19

20   REPORTER:  LISA KENNEDY, CSR 8927
     _____

21

22          TENNELEY MICKEL REPORTING
                P. O. Box 1107
23          Arbuckle, California 95912
       Tel: (916) 492-9021   Fax: (916) 922-3461

24

25

Ryan Stonebraker - July 27, 2021

```
 1   they get all other guns," what did that mean to -- what
 2   does that mean to you?
 3   A        It's good.
 4   Q        Well --
 5   A        I don't know what you mean by that.
 6   Q        Well, what did you -- so you're monitoring this
 7   situation, weren't you?
 8   A        Right.
 9   Q        As you're monitoring the situation and you read
10   or hear in a conversation Lieutenant Brown saying "I
11   asked them to ensure they get all other guns," did you
12   understand that Lieutenant Brown was giving an order for
13   his subordinates to --
14   A        Yes.  To get -- to retrieve his weapons if they
15   could, yes.
16   Q        Okay.  It wasn't like it might be a nice idea.
17   He said do that; right?
18   A        I don't know what he said to the individuals,
19   but my assumption is that he recommended them to get
20   weapons from him.
21            MR. HELFAT:  Objection.  It calls for
22   speculation.  No foundation.  You can answer.  But you
23   did.
24   Q        BY MR. KATZ:  Now, I'd like to ask a question
25   about an email that you wrote.  If you could direct your
```

Ryan Stonebraker - July 27, 2021

```
 1    attention, please, to Exhibit 10 on the top of the second

 2    page.  Do you have that in front of you?  Actually you

 3    don't.  Well, you have it in front of you, but I'd like

 4    to have it -- if you don't mind, you can look at it just

 5    so...

 6    A        The one that says, "Great news.  Thanks, Todd"?

 7    Q        No.  Actually the second page, sir.

 8    A        Okay.

 9    Q        It says, "Chiefs just spoke to Lieutenant Brown,

10    and they are attempting to locate Officer Wheat," period.

11    "If not located shortly, an emergency protective order

12    will be sought and notifications to the other parties

13    will be made with the involvement of the sheriff's

14    department and so forth."

15             You recall sending that email?

16    A        I don't remember, but I did apparently.

17    Q        Okay.  And do you remember why what caused you

18    to write this email?

19    A        I think out of concern for Officer Wheat for the

20    situation.  That's what I recall.

21    Q        And what was your understanding as to what an

22    emergency protective order would be?

23    A        An emergency protective order would be something

24    that would protect Brad Wheat's spouse, or whoever's

25    involved, based on the circumstances, and maybe even
```

Ryan Stonebraker - July 27, 2021

1     protect Officer Wheat from having weapons.

2     Q        And it said, "if not located shortly."  Do you

3     have an understanding in your mind as to how long shortly

4     would be?

5     A        Soon.  That's all.

6     Q        And then it says, "and notifications to other

7     parties will be made."  Do you mean provide a warning to

8     Mary Wheat and Brad Wheat -- Mary Wheat and Trae

9     deBeaubien?

10    A        I don't remember what I was thinking when I --

11    as far as -- that could be done through the EPO process,

12    the notifications because they would be notified.

13    Q        Okay.  And you're familiar with emergency

14    protective orders; correct?

15    A        Yes.

16    Q        And what's the purpose of an emergency

17    protective order?

18    A        It could be all kinds of purposes.

19             MR. HELFAT:  Objection.  It's overbroad.

20    Q        BY MR. KATZ:  In this situation, when you wrote

21    this email, what would the purpose have been to obtain an

22    emergency protective order?

23    A        To protect Brad Wheat, to protect anybody else

24    that might be a concern.

25    Q        And based upon your experience and knowledge,

Ryan Stonebraker - July 27, 2021

1    that would have been a step that would have protected

2    those folks; correct?

3    A       Yes.  If he wasn't located, yes.

4    Q       And did you have an understanding it was

5    important that the notifications be made to people who

6    Brad Wheat posed a threat to?

7            MR. HELFAT:  Objection.  Calls for speculation

8    based on his prior answer.  You can answer.

9            THE WITNESS:  One more time, please.

10   Q       BY MR. KATZ:  Did you have an understanding it

11   was important to provide a notification to any individual

12   who Brad Wheat was specifically a threat to?

13   A       I don't think in my mind-set then I was -- that

14   that was definitive, but I certainly wished I had, yeah,

15   now knowing what I know.

16   Q       Let me direct your attention back to Exhibit

17   Number 9, if I might.  Do you have that still in front of

18   you, sir?

19   A       Yes, sir.

20   Q       Did you have an understanding that Officer Ward

21   was a peer support officer?

22   A       Yes.

23   Q       Did you ever attempt to speak to Officer Ward

24   that night to get any further clarification on what and

25   how Brad Wheat conveyed to him his intentions regarding

Ryan Stonebraker - July 27, 2021

1    A        I don't remember.

2    Q        Show you what's been previously marked Exhibit

3    49.

4    A        Okay.

5    Q        Does that refresh your recollection as to

6    whether or not you spoke with Chief Newman that night?

7    A        I obviously did.  I don't remember all the

8    conversation or if it was multiple conversations.  I

9    don't remember -- it must have been a conversation.  I do

10   remember having conversations with Brent throughout,

11   Chief Newman.

12   Q        Do you recall having conversations the evening

13   and/or early morning hours -- the evening of August 3rd

14   2018 or the early morning hours of August 4th, 2018?

15   A        I remember we must have had conversations.  I

16   don't remember probably discussing what was going on.

17   That's common in situations like this to have dialogue

18   and to figure our courses of action and keeping my boss

19   apprised.

20   Q        Well, we talked about that the shooting was a

21   situation you'll never forget; correct?

22   A        Yes.

23   Q        Well, how many other occasions were there that

24   you became aware of a highway patrol officer who had

25   admitted to driving to a location with a weapon with the

Ryan Stonebraker - July 27, 2021

```
 1   intent of murdering two people and not doing so only
 2   because they weren't where he thought they would be?
 3   A        I've never heard that before.
 4            MR. HELFAT:  Objection.  No foundation.  You can
 5   answer.
 6   Q        BY MR. KATZ:  Had you ever heard of a CHP
 7   officer, apart from Mr. Wheat, admitting to seriously
 8   wanting to commit murder?
 9   A        No.
10   Q        You agree that's a fairly significant
11   confession?
12   A        Yes.
13            MR. HELFAT:  Objection.  Vague.  And it calls
14   for an opinion.  You can answer.
15   Q        BY MR. KATZ:  Are you familiar with the term
16   "fit for duty"?
17   A        Yes.
18   Q        What's your understanding as to what fit for
19   duty means?
20   A        If they're physically or psychologically fit to
21   perform the performance of their duties.
22   Q        Is a California Highway Patrol officer who is
23   acting upon an intent to commit murder psychologically
24   fit for duty?
25   A        I would say no.
```

Ryan Stonebraker - July 27, 2021

```
 1   Q        Now, are you familiar with the term "fit for

 2   duty" or "fitness-for-duty examination"?

 3   A        Yes.

 4   Q        What is a fitness-for-duty examination?

 5   A        To determine that process, to determine if

 6   someone's fit and able to perform their duties.

 7   Q        And what's the purpose of that process?

 8   A        It's probably more common used in the physical

 9   aspect, if somebody has a physical ailment to see if

10   they're -- but it can also be used in a psychological and

11   a fitness-for-duty evaluation.

12            Mind if I take a quick break?

13   Q        That would be fine.

14            (Off the record at 12:01 p.m. to 12:14 p.m.)

15   Q        BY MR. KATZ:  Going back on the record, let me

16   direct your attention to what's been previously marked as

17   Exhibit 41 --

18   A        Okay.

19   Q        -- which is -- so first of all, are you

20   generally familiar with the California Highway Patrol's

21   risk management policies?

22   A        Yes.

23   Q        And as you indicated, this was a case that you

24   instantly recognized had a high potential for civil

25   litigation; correct?
```

Ryan Stonebraker - July 27, 2021

1   the understanding that that weapon -- we know that weapon

2   had been, at one point, taken away from Brad Wheat;

3   correct?

4   A       I don't know which weapon.

5   Q       The weapon that was used for the murder.

6   A       I don't know that.

7   Q       Well, do you have an understanding that he used

8   his service weapon for the murder; correct?

9   A       Which I learned later, yes.

10  Q       So you learned he used a service weapon later.

11  And it was your understanding, am I correct, based upon

12  the emails we looked at, that that service weapon had

13  been taken away from Wheat a month earlier?

14  A       I don't remember if I was aware of that.  Which

15  weapon was taken from him, I don't remember.

16  Q       Well, did you have any questions in your mind

17  what Brad Wheat was doing with weapons a month after he's

18  confessed to an attempted murder?

19          MR. HELFAT:  Objection.  No foundation.  You can

20  answer.

21          THE WITNESS:  I don't remember.

22  Q       BY MR. KATZ:  Did it cross -- any point prior to

23  today did it cross your mind as to how it was Brad Wheat

24  had weapons on that date?

25  A       I know he was interviewed by two therapists, and

Ryan Stonebraker - July 27, 2021

```
 1  we were confident that he was fine after that.  There was

 2  some discussions but I don't -- my mind-set then versus

 3  now are obviously very different.

 4  Q       Now, did you have any knowledge as to whether or

 5  not -- actually, so you are aware, first of all, that

 6  Brad Wheat had a disciplinary or adverse action pending?

 7  A       Yes.

 8  Q       And were you aware that he was put on vacation

 9  after this August 3rd incident?

10  A       I don't remember.

11  Q       Do you have an understanding that he was off

12  work for a period of time?

13  A       It sounds familiar.  I don't --

14  Q       Did you have an understanding as to whether or

15  not his confession of attempted murder was ever

16  reported -- it was incorporated in any report authored by

17  any member of the California Highway Patrol?

18  A       I don't think so.

19  Q       Why not?

20  A       I don't know.

21  Q       Did anyone, best of your knowledge, ever contact

22  the Amador County Sheriff's Department concerning Brad

23  Wheat's actions on or about August 3rd?

24  A       I do not know.

25  Q       Best of your knowledge, did anyone ever contact
```

Stonebraker 07-27-2021

Ryan Stonebraker - July 27, 2021

```
 1   the Amador County District Attorney's Office concerning
 2   Brad Wheat's actions on or about August 3rd, 2018?
 3   A        I'm not aware.
 4   Q        Did anyone, best of your knowledge, from the
 5   California Highway Patrol ever contact the California
 6   Attorney General's Office for any guidance as to how to
 7   respond to learning of Brad Wheat's confession of
 8   attempted murder on August 3rd, 2018?
 9   A        I'm not aware.
10   Q        And you're familiar with the term "parallel" or
11   "concurrent" investigations; correct?
12   A        Correct.
13   Q        And that's actually more commonly done when an
14   incident's investigated for both criminal and noncriminal
15   purposes; correct?
16   A        Correct.
17   Q        Did you ever have any discussion with anyone as
18   to whether or not a fitness-for-duty examination should
19   be ordered for Brad Wheat?
20   A        I don't remember.
21   Q        In hindsight, do you think such an examination
22   should have been ordered?
23   A        In hindsight, yes.
24            MR. HELFAT:  Objection.  Calls for an opinion.
25   Calls for speculation.  You can answer.
```

Ryan Stonebraker - July 27, 2021

```
 1              THE WITNESS:   My opinion is yes.

 2    Q        BY MR. KATZ:  Okay.  Now, during your term --

 3    and I understand you've had a number of different -- some

 4    very unusual assignments during your career.

 5              But have there been any occasions where you've

 6    asked for a fitness-for-duty examination be conducted for

 7    psychological reasons of an officer?

 8    A        Yes.

 9    Q        How many times do you recall having done that?

10    A        As far as like when I was an assistant

11    commission field, that was the process came through, so

12    what made me requesting it, it might come from the

13    division chief.  I might be facilitating a component of

14    that.

15              A few.  A few.  I don't have an exact number.  I

16    remember -- and I'm probably missing some in my mind

17    somewhere that I probably did, but both for physical and

18    psychological that I can remember.

19    Q        Do you recall whether or not any of those

20    psychological requests for a fit-for-duty examination

21    were turned down or denied?

22    A        No.  I know that we're very concerned.  It's a

23    very challenging thing for an officer to go through

24    because -- not because of the process, but the stigma

25    that goes along with it, so we don't do those delicately.
```

Stonebraker 07-27-2021

Ryan Stonebraker - July 27, 2021

1   But I don't remember one being turned down per se.

2   Q        Okay.

3   A        There might have been -- you know, I'm not

4   saying that as a captain or somewhere in my career I

5   didn't have a discussion where that wasn't the way we

6   went.

7   Q        Okay.  And are you familiar with the term

8   "suspension of peace officer powers."

9   A        Yeah.  We call that "removal of peace officer

10  powers."

11  Q        Yes.

12  A        Yes.  That's the process that I indicated

13  earlier that I facilitated when I was in the

14  Commissioner's Office.

15  Q        And do they sometimes call it a POP?

16  A        RPOP.

17  Q        RPOP.

18  A        Which I think is odd.  RPOP, removal of peace

19  officer powers.  So sometimes it could just be like RPOP,

20  like that would be the request, the acronym of it.

21  Q        That doesn't mean a person is going without a

22  paycheck; correct?

23  A        That is correct.

24  Q        And it's not an irrevocable decision; correct?

25  A        Correct.

Stonebraker 07-27-2021

Ryan Stonebraker - July 27, 2021

1   or interim reporting prior to July of 2018?

2   A       No.  And that was -- you know, that was my

3   interactions with Todd Brown is that -- and

4   communications with my chief that we were at that point,

5   and that's why this process started.  Yeah.

6   Q       Was it your understanding that when Officer

7   Wheat returned to work after the August incident where he

8   confessed wanting or attempting to murder Trae deBeaubien

9   that he was placed on limited duty?

10  A       I remember --

11          MR. HELFAT:  Objection.  Foundation.

12          THE WITNESS:  I remember him working in the

13  office, yes, being on desk duty.

14  Q       BY MR. KATZ:  And he was working on a desk

15  because they did not consider him to be fit to be working

16  out of the office -- correct? -- as a patrol officer?

17  A       I don't know if it was fit.  I think they were

18  concerned, and his work was not doing well, and he was in

19  kind of an emotional issue; right?

20  Q       And they were concerned that he would get into

21  another accident as well; correct?

22  A       Yes.  He broke the gate.

23  Q       That was the second?

24  A       Yes.

25  Q       Second accident?

Ryan Stonebraker - July 27, 2021

1    A       Yes.

2    Q       And though not in here, do you recall having

3    lunch with Lieutenant Brown about a week before -- went

4    on vacation August 23rd, 2018?

5    A       I remember having lunches with Todd today a

6    couple of times, yeah.  I don't remember if it was a week

7    before.  I remember meeting with Lieutenant Brown.

8    Q       Do you remember a lunch meeting when he gave you

9    the hard copy of the finished adverse action report

10   regarding Brad Wheat?

11   A       Sounds familiar.

12   Q       Am I correct that you were getting some updates

13   on Brad Wheat in August?

14   A       Yes.

15   Q       Did Lieutenant Brown share with you that on

16   August 23rd and 24th one of his -- Sergeant Lopez had

17   documented problems with Wheat's performance even working

18   in a limited duty?

19   A       I don't remember if that was part of that

20   dialogue.

21   Q       Did you have an understanding as to whether or

22   not there was deficient performance by Wheat even while

23   on limited duty?

24   A       I don't remember, but it wouldn't surprise me.

25   Q       You ever discuss this matter with Sergeant

Ryan Stonebraker - July 27, 2021

1    Dobler?

2            MR. HELFAT:  Objection.  Vague.

3    Q       BY MR. KATZ:  Did you ever discuss the Wheat

4    shooting with Sergeant Dobler?

5    A       I remember being -- so Dobler, if I remember,

6    was acting commander during Lieutenant Brown's absence.

7    So there were some discussions there.  I don't remember

8    the context of all of them.

9            I remember also checking on him and his well

10   being like that night that I responded, and some

11   discussions after like, "How's everybody doing?"

12   Q       Did you have an understanding as to who was able

13   to conduct a psychological fit-for-duty examination

14   legally?

15   A       I believe the departmental --

16           MR. HELFAT:  Excuse me.  Calls for a legal

17   opinion.  Calls for speculation.  You can answer.

18           THE WITNESS:  The department would have to

19   manage that process through the departmentally

20   contracted -- I'm not sure if it's a psychiatrist or

21   psychologist or therapist.

22           MR. KATZ:  Okay.  Now we'll see if anyone else

23   has any questions.  I don't have any right now, but

24   something may be triggered or occur to me.  Have the

25   other folks been given all the exhibits, Alex?

```
 1                   REPORTER'S CERTIFICATE

 2          I certify that the witness in the foregoing

 3    deposition

 4                   RYAN STONEBRAKER

 5    was administered the oath by me to testify to the truth,

 6    the whole truth, and nothing but the truth in the

 7    within-entitled cause; that said deposition was taken at

 8    the time and place therein named; that the testimony of

 9    said witness was reported by me, a duly certified

10    shorthand reporter of the State of California; that it

11    was thereafter transcribed into typewriting; and that the

12    transcript is a true record of the testimony given.

13          Pursuant to Federal Rule 30(e), transcript

14    review was requested.

15          I further certify that I am not financially

16    interested in the action, nor a relative or employee of

17    any attorney or any party to the action.

18

19    DATED:  August 5, 2021

20

21    _____
      LISA KENNEDY, CSR No. 8927

22

23                   State of California

24                        --oOo--

25
```

Exhibit U

1           UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF CALIFORNIA

3                     --oOo--

4

5    PHILIP DEBEAUBIEN,                     )
                                            )
6              Plaintiff,                    )
                                            )
7         vs.                               )    Case No.
                                            )    2:19-CV-01329-WBS-DB
8    STATE OF CALIFORNIA; CALIFORNIA        )
     HIGHWAY PATROL; CHP LIEUTENANT         )
9    TODD BROWN; SABRENA SWAIN; JOY         )
     GRAF; SERGEANT REGGIE                  )
10   WHITEHEAD; ASSISTANT CHP CHIEF         )
     RYAN STONEBRAKER; CHP CHIEF            )
11   BRENT NEWMAN; SERGEANT JEREMY          )
     DOBLER,                                )
12                                          )
               Defendants.                  )
13                                          )

14

15                     --oOo--

16      Deposition Via Remote Videoconference of

17             SABRENA SWAIN

18        Friday, December 11, 2020

19                  Volume I
                 Pages 1 - 159

20

21   REPORTER:  LISA KENNEDY, CSR 8927

22   _____

23

24             TENNELEY MICKEL REPORTING
                  P. O. Box 1107
25            Arbuckle, California 95912
         Tel: (916) 492-9021   Fax: (916) 922-3461

**CERTIFIED COPY**

Sabrena Swain - December 11, 2020

```
 1          MR. CASTRICONE:  Objection.  Incomplete
 2  hypothetical.  Vague and ambiguous.
 3  Q        BY MR. KATZ:  I'm sorry.  Do you do psychiatric
 4  evaluations?
 5          MR. CASTRICONE:  Same objection.
 6          THE WITNESS:  I don't understand what you are
 7  terming as psychiatric evaluation.
 8  Q        BY MR. KATZ:  You make diagnoses of mental
 9  illness?
10  A        Yes.
11  Q        And do you treat mental illness?
12  A        Yes.
13  Q        What's your understanding as to what the scope
14  of your practice is as a marriage family therapist?
15          MR. CASTRICONE:  Objection.  Vague and
16  ambiguous.  Are you asking her what her understanding of
17  what an LMFT is authorized to do or what she does as an
18  LMFT?
19  Q        BY MR. KATZ:  What an LMFT is authorized to do
20  under the law.
21  A        Authorized to do as far as what?  You mean what
22  type of therapy or --
23  Q        Do you know what your scope of practice is --
24  ma'am, as a licensee, you're responsible to know the
25  applicable regulations that govern your profession,
```

Sabrena Swain - December 11, 2020

```
 1    aren't you?

 2            MR. CASTRICONE:  Objection.  Argumentative.

 3            THE WITNESS:  Yes.

 4    Q       BY MR. KATZ:  Okay.  And is one of those

 5    regulations that tells you what the scope of your

 6    practice is, what it can be?

 7            MR. CASTRICONE:  Calls for speculation and legal

 8    conclusion, but you can answer as to your understanding.

 9            THE WITNESS:  I understand that I have a scope

10    of practice that I have to work within and a scope of

11    competence.

12    Q       BY MR. KATZ:  What is your scope of practice?

13    A       I'm a licensed marriage and family therapist.

14    Q       And what does that mean?

15    A       I diagnosis and provide therapy to clients.

16    Q       In what areas?

17    A       Children, marriage, families, individuals.

18    Q       And you indicated you have a scope of practice

19    and a scope of expertise.  What is the difference?

20    A       Scope of competence is --

21    Q       Competence.  Pardon me.  What is the difference

22    between scope of practice and scope of competence?

23    A       There are certain populations that people get

24    additional training to treat.  And if you don't feel like

25    you are competent to treat that population, then you're
```

Sabrena Swain - December 11, 2020

```
 1    either required to obtain the necessary training or refer

 2    out.

 3    Q        Are you trained to do fit-for-duty evaluations?

 4            MR. CASTRICONE:  Objection.  Vague and

 5    ambiguous.  Incomplete hypothetical.  You can answer if

 6    you can.

 7    Q        BY MR. KATZ:  And fit for duty for law

 8    enforcement officers.

 9            MR. CASTRICONE:  Same objection.

10            THE WITNESS:  No, I am not.

11    Q        BY MR. KATZ:  You do some sort of professional

12    competence -- I'm sorry.  I want to use the words that

13    you use.  Is that the word you use, ma'am?

14    A        Scope of competence, yes.

15    Q        What do you believe is your scope of competency?

16            MR. CASTRICONE:  Objection.  Vague and

17    ambiguous.

18            THE WITNESS:  Children, managements,

19    individuals.  I have additional training in trauma

20    treatment utilizing EMDR and critical incident stress

21    debriefings, and I specialize in the first responder

22    population.  High-conflict divorce population, mediation,

23    co-parenting.

24    Q        BY MR. KATZ:  And does first responder include

25    law enforcement officers?
```

Sabrena Swain - December 11, 2020

1    psychiatric or fit-for-duty evaluation?

2            MR. CASTRICONE:  Objection.  Argumentative.

3    Lacks foundation.  Argumentative.  Assumes facts not in

4    evidence.

5            THE WITNESS:  Nobody ever expressed to me that

6    they were upset with me about anything.

7    Q        BY MR. KATZ:  Okay.  So now let me get back to

8    what you were told between a phone call -- correct? --

9    and someone who was in the house about the background

10   information on Brad before you talked to him.  You

11   received information -- correct? -- about Brad before you

12   spoke with him?

13           MR. CASTRICONE:  Objection.  Asked and answered.

14           THE WITNESS:  Yes, I did.

15   Q        BY MR. KATZ:  Okay.  Now, let me ask you about

16   what you were told.  And how long -- by the way, how long

17   did your conversations last in total between the time you

18   arrived at the house and started receiving information

19   about Brad and the time you sat down and started, without

20   interruption, other than his daughter being introduced,

21   to speak with Brad?

22   A        Very limited discussion.

23   Q        How long would you estimate the time to be?

24   A        Ten, 15 minutes.

25   Q        How many times did you talk to Ms. Graf prior to

Sabrena Swain - December 11, 2020

```
 1   today?

 2   A        Three or four maybe.

 3   Q        And did you initiate all those phone calls?

 4   A        No, I don't think so.

 5   Q        How long would you estimate the longest of those

 6   conversations was?

 7   A        Twenty, 30 minutes.

 8   Q        And was the purpose of calling her to try to

 9   coordinate a defense between you and her?

10            MR. CASTRICONE:  Objection.  Lacks foundation.

11            MS. SONG:  Join.  Argumentative as well.

12   Q        BY MR. KATZ:  Let me get to the specifics you

13   were told.  First of all, were you told Brad Wheat was on

14   limited duty at the time you saw him?

15   A        No.

16   Q        Were you told that he'd been placed on a desk

17   job?

18   A        No.

19   Q        Were you told that he'd been in two solo --

20   there were single car accidents involving cell phone and

21   a patrol vehicle in the previous 30 days?

22   A        No.

23   Q        Were you told that his wife -- and if I refer to

24   her as Mary, you'll know who I'm talking about; correct?

25   A        Yeah.
```

Sabrena Swain - December 11, 2020

```
 1   Q        Were you told that Mary had just returned from
 2   an extended visit with her father and when she returned
 3   made clear to Brad that, one, she was seeking a divorce,
 4   two, she didn't want to work her marriage out and, three,
 5   she didn't want to interact with him or engage with him?
 6           MR. CASTRICONE:  Objection.  Compound.  Vague
 7   and ambiguous.  Lacks foundation.
 8           THE WITNESS:  No.
 9   Q        BY MR. KATZ:  Were you told Brad had, without
10   Mary's consent, placed a tracking device on her cell
11   phone?
12   A        No.
13   Q        Were you told that Brad had driven by Mary's
14   place and Trae's place of business while on duty for no
15   apparent duty-related purpose?
16           MR. CASTRICONE:  You're talking about what's --
17   not excluding what came from Officer Wheat, right?
18           MR. KATZ:  That's right.
19           MR. CASTRICONE:  Okay.
20           THE WITNESS:  No.
21   Q        BY MR. KATZ:  Had you been told that he had
22   asked, when he had an officer along for a ride-along,
23   Officer Pixoto, which is P-i-x-o-t-o, that drop by the
24   gym and that Officer Pixoto refused?
25   A        No.
```

Sabrena Swain - December 11, 2020

1    Q        Had you been told that as a result of that,
2    Sergeant Dobler had ordered Brad to not do that?
3    A        No.
4    Q        Are these things you'd like to have known --
5             MR. CASTRICONE:  Objection.  Incomplete
6    hypothetical.
7    Q        BY MR. KATZ:  -- before talking to Brad, doing
8    your assessment of him?
9             MR. CASTRICONE:  Same objection.
10            THE WITNESS:  It would have been helpful to know
11   any pertinent information prior to meeting with Brad.
12   However, prior acts don't necessarily play into whether
13   or not somebody could be placed on a hold.
14   Q        BY MR. KATZ:  Let me continue, though, with
15   other information.  Did they tell you that Brad had
16   admitted to sending inappropriate text messages to his
17   estranged wife?
18   A        No.
19   Q        Did they tell you that Mary's brother had placed
20   a 911 call the night of the 3rd because he was afraid of
21   what Brad might do in El Dorado County if he -- when he
22   came in contact with his sister Mary and her companion
23   lover boyfriend, or whatever you want to call it, Trae
24   Philip deBeaubien?
25   A        I don't know if they told me that he called 911.

Sabrena Swain - December 11, 2020

1   They did tell me that they had been made aware of Brad's

2   situation because the brother was concerned, and that's

3   what kind of got the ball rolling that night.

4   Q       Well, isn't what got the -- first of all, did

5   they tell you that Brad Wheat had told a fellow officer

6   that he had driven from his house -- let's get more

7   general.

8           Were you told that Brad Wheat had told a fellow

9   officer that he had gone to where he thought he would

10  find my client, Trae, or Philip deBeaubien, whether you

11  were told by name or not, in other words, the person with

12  whom his wife was involved, and his wife and at that time

13  kill my client, Mr. deBeaubien, and then to kill himself

14  to avoid going to jail?  Were you told any of that

15  information prior to seeing him?

16  A       I was told that Brad went out looking for -- and

17  I don't remember now if it was just his wife or just the

18  boyfriend or both -- with the intent to kill them and

19  kill himself and that he hadn't found them.

20  Q       Okay.  So they told you he had gone to hunt them

21  down, and he didn't find who he was looking for; correct?

22          MR. CASTRICONE:  Objection.  Mischaracterizes

23  her testimony.  Argumentative.  And we're still confined

24  to what was told.

25          MR. KATZ:  Of course.  Absolutely, that's what

Sabrena Swain - December 11, 2020

```
 1   Q        BY MR. KATZ:  Okay.  Were you aware that Officer
 2   Ward, who was a highway patrol officer, had taken his
 3   service weapon?
 4   A        I'm losing sounds.  Say that again.
 5   Q        From me?
 6   A        Yeah.
 7   Q        Can you hear me now?
 8   A        Yeah.
 9            MR. CASTRICONE:  Were you told that Officer
10   Ward -- didn't catch the rest of it.
11   Q        BY MR. KATZ:  Had taken Brad Wheat's service
12   weapon prior to your meeting with him?
13            MS. McTAVISH:  Objection.  Misstates prior
14   testimony.
15            MR. CASTRICONE:  Join.
16            THE WITNESS:  I was told there were no weapons
17   in the home.
18   Q        BY MR. KATZ:  I'm sorry.  I cut you off.  I'm
19   sorry.
20   A        I asked if there were any weapons in the home,
21   and the gentleman that walked me in said, no, they had
22   Brad's gun or guns.  I don't know if it was singular or
23   plural.
24   Q        Were you aware that on August 2nd -- I'm sorry.
25   I shouldn't ask whether you were aware.
```

Sabrena Swain - December 11, 2020

```
 1              Did they tell you that Brad had a formal
 2   interview regarding an adverse action that was pending
 3   against him on August 2nd of 2018?
 4   A       No.
 5   Q       Did they tell you there was a pending
 6   disciplinary action ongoing at that time?
 7   A       No.
 8   Q       Were there any discussions prior to you speaking
 9   with Brad Wheat as to whether or not there was --
10   regarding an emergency protective order?
11              MR. CASTRICONE:  It got garbled.  Could you
12   repeat it?
13              MR. KATZ:  Hopefully.  Hopefully less garbly.
14   Q       Prior to you speaking to Brad Wheat, were there
15   any discussions about whether an emergency protective
16   order was being considered?
17   A       Never at any time did I discuss an emergency
18   protective order with anyone.
19   Q       Okay.  Was there any discussion as to whether or
20   not anyone had contacted Trae deBeaubien, in other words,
21   the boyfriend, if you will, of his estranged wife, who
22   Brad had gone to kill earlier that day?
23              MR. CASTRICONE:  Objection.
24              MR. KATZ:  The day before, depending upon how
25   you want to look at the time.
```

Sabrena Swain - December 11, 2020

```
 1          MR. CASTRICONE:  Objection.  Lacks foundation.
 2          THE WITNESS:  Again, I don't know at what point
 3   I learned this information, but I'm pretty sure it was
 4   before I met with Brad that they said in the same context
 5   of the brother had let them know that the brother had let
 6   Mary and her boyfriend know.
 7   Q       BY MR. KATZ:  So who is it that told you that?
 8   A       I don't know.
 9   Q       And they told you that they thought that Mary's
10   sister -- I'm sorry -- that Mary's brother had told her
11   that Brad was looking to kill either him and/or her
12   boyfriend?
13          MR. CASTRICONE:  Objection to the extent it
14   mischaracterizes prior testimony.  Asked and answered,
15   but you can verify.
16          THE WITNESS:  That Brad was out looking for
17   them.
18   Q       BY MR. KATZ:  Would you agree, though, that it
19   would have a significance to you as a mental health
20   professional whether someone is looking for someone to
21   have harsh words or whether they're looking for someone
22   to kill them?
23          MR. CASTRICONE:  Objection.  Vague and
24   ambiguous.  Is there a question there?
25          MR. KATZ:  Yes.  I asked it.
```

Sabrena Swain - December 11, 2020

```
 1   instruction.

 2   Q        BY MR. KATZ:  Did you ask Brad Wheat questions

 3   as to whether or not he should be working as a uniformed,

 4   armed law enforcement officer?

 5           MR. CASTRICONE:  Same objection.  Also compound.

 6   Same instruction.

 7   Q        BY MR. KATZ:  Did you ask Brad Wheat about

 8   whether or not he engaged in stalking behavior?

 9           MR. CASTRICONE:  Same objection.  Same

10   instruction.

11   Q        BY MR. KATZ:  Did you ask Brad Wheat about

12   whether he started drinking alcohol to an extent he had

13   never drunk alcohol?

14           MR. CASTRICONE:  Same objection.  Same

15   instruction.

16   Q        BY MR. KATZ:  Did you ask Brad Wheat about how

17   he intended to deal with the fact that his wife was

18   seeking a divorce from him?

19           MR. CASTRICONE:  Same objection.  Same

20   instruction.

21   Q        BY MR. KATZ:  Did Brad Wheat tell you that he

22   was tracking and stalking his wife?

23           MR. CASTRICONE:  Same objection.  Same

24   instruction.

25           MR. KATZ:  Is that going to be the situation for
```

Sabrena Swain - December 11, 2020

```
 1   any of those questions regarding what was said between
 2   the two of them?
 3           MR. CASTRICONE:  It is.
 4           MR. KATZ:  Okay.  And is that objection going to
 5   be as to the thoughts she had during that portion of the
 6   session --
 7           MR. CASTRICONE:  It is.
 8           MR. KATZ:  -- said to him?
 9           MR. CASTRICONE:  Yes.
10   Q       BY MR. KATZ:  Now, after you finished with Brad
11   Wheat, did you speak with anyone from the California
12   Highway Patrol?
13   A       Yes.
14   Q       Where were you when you spoke to the person,
15   other than Brad Wheat, from the highway patrol after you
16   finished with Brad Wheat?
17   A       I talked to the guys that were there, told them
18   that he could benefit from a good night's sleep.  It was
19   like 3:00 in the morning.  I think they said they were
20   going to be staying with him.  I said, "Okay."
21           And then I called back whoever was the person in
22   charge of the incident who I was supposed to report back
23   to when I was done, and I don't know who that is.
24   Q       Okay.  So when you say "report back," you mean
25   to tell them what your conclusions were based on your
```

Sabrena Swain - December 11, 2020

1    assessment; right?

2    A        Whether or not they needed to take any further

3    immediate action.

4    Q        And you told them they did not need to; correct?

5    A        Correct.

6    Q        And is it your understanding that people go to

7    sleep -- and have you been taught that that takes care of

8    homicidal and suicidal intentions?

9            MR. CASTRICONE:  Objection.  Incomplete

10   hypothetical.  Vague and ambiguous.  Argumentative.

11   Lacks foundation.

12   Q        BY MR. KATZ:  Do you understand the question?

13   A        Do I think that going to sleep takes care of

14   homicidal and suicidal ideations?

15   Q        Whether you've been taught that, first of all.

16   A        I've been taught that sleep deprivation can

17   increase and exacerbate symptoms; and sometimes when

18   people get a good night's sleep, their outlook changes.

19   Q        So you believe that -- I'm sorry.  Before you

20   believe, have you been trained that that's an appropriate

21   way to counteract homicidal intentions?

22           MR. CASTRICONE:  Objection.  Argumentative.

23   Mischaracterizes her testimony.

24   Q        BY MR. KATZ:  Do you understand the question?

25   A        Are you asking me if I told his friends he

Sabrena Swain - December 11, 2020

1   needed a good night's sleep and then he would wake up and

2   not be homicidal anymore?

3   Q       No.  I'm asking what you thought a good night's

4   sleep would do in regards to those homicidal and suicidal

5   intentions.

6           MR. CASTRICONE:  Your first question was in

7   general.  Are you now asking about Mr. Wheat?

8           MR. KATZ:  I asked both questions.  She hasn't

9   answered any of them, honestly.

10  Q       Let's ask about Mr. Wheat:  Did you tell the

11  individual on either the phone or the person there from

12  the CHP, other than Brad Wheat, that a good night's sleep

13  would help alleviate -- that a good night's sleep would

14  help the problem?

15          MR. CASTRICONE:  Lacks foundation.  Assumes

16  facts not in evidence.  Argumentative.  Vague and

17  ambiguous.

18  Q       BY MR. KATZ:  Did you tell anyone that he needed

19  a good night's sleep?

20          MR. CASTRICONE:  I think we all do.  But same

21  objection.

22          MR. KATZ:  Okay.  But let's have this question

23  answered too, please.

24  Q       Ms. Swain, did you tell the person on the phone?

25  A       When I left the guys that were there with him, I

```
 1                    REPORTER'S CERTIFICATE

 2           I certify that the witness in the foregoing

 3   deposition

 4                       SABRENA SWAIN

 5   was remotely administered the oath by me to testify to

 6   the truth, the whole truth, and nothing but the truth in

 7   the within-entitled cause; that said deposition was taken

 8   remotely at the time and place therein named; that the

 9   testimony of said witness was reported by me, a duly

10   certified shorthand reporter of the State of California;

11   that it was thereafter transcribed into typewriting; and

12   that the transcript is a true record of the testimony

13   given.

14           Pursuant to Federal Rule 30(e), transcript

15   review was requested.

16           I further certify that I am not financially

17   interested in the action, nor a relative or employee of

18   any attorney or any party to the action.

19

20   DATED:  December 21, 2020

21

22           _____

23             LISA KENNEDY, CSR No. 8927

24             State of California

25                      --oOo--
```

Exhibit V

```
 1                 UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF CALIFORNIA

 3

 4      PHILIP DEBEAUBIEN,

 5                      Plaintiff,

 6      vs.                          Case No. 2:19-cv-01329-WBS-DB

 7      STATE OF CALIFORNIA;
        CALIFORNIA HIGHWAY PATROL;
 8      CHP LIEUTENANT TODD BROWN;
        CHP SABRENA SWAIN; JOY
 9      GRAF; SERGEANT REGGIE
        WHITEHEAD; ASSISTANT CHP
10      CHIEF RYAN STONEBRAKER;
        CHP CHIEF BRENT NEWMAN;
11      SERGEANT JEREMY DOBLER,

12                      Defendants.
        _____/
13

14

15          Deposition Via Remote Videoconference of

16                      DAVID P. WARD

17               Monday, December 21, 2020

18

19

20      REPORTER:   DEBRA P. CODIGA, CSR NO. 5647

21

22      _____

23

24             TENNELEY MICKEL REPORTING
                      P.O. Box 1107
               Arbuckle, California 95912
25          Tel 916-492-9021  Fax 916-922-3461
```

**CERTIFIED COPY**

David P. Ward - December 21, 2020

1     Q.     BY MR. KATZ:  Okay.  It's not okay, but I -- I

2  got your correction.  So let me just --

3     A.     Yes, sir.

4     Q.     -- let me just restate it.

5           So he told you, in essence, that he'd gone

6  looking for Trae and Mary with the intention of killing

7  them and then killing himself?

8     A.     And I don't remember him stating he was going

9  to kill himself.  I don't -- I can't say for certain he

10 said that.

11    Q.     Okay.  Did he tell you where he'd gone to look

12 for them?

13    A.     He stated he went to the cabin.

14    Q.     Okay.  And from your having spoken, both in

15 this conversation and the previous conversations you'd

16 had, did you understand that that was in El Dorado

17 County near Georgetown?

18    A.     Georgetown was the only thing I knew about the

19 location of it.

20    Q.     Okay.  And he lived in Amador County.  I

21 believe Sutter Creek, I think.

22           Is -- does that sound about right?

23    A.     Sutter Creek, yes.

24    Q.     Okay.  And that's -- is that about an hour's

25 drive from Georgetown?

David P. Ward - December 21, 2020

```
 1      A.    I -- I wouldn't know.  I've never been to
 2  Georgetown.  It sounds about right.
 3      Q.    Okay.  Not a lot there.  Not a lot there.
 4            And was it your understanding that he'd gone up
 5  there with a -- with his -- with a handgun or at least a
 6  weapon with him?
 7      A.    Yes.  I asked him what he -- how -- you know,
 8  what did he take.  What was he going to do.
 9      Q.    And what did he tell you?
10      A.    He said he had his service pistol.
11      Q.    Okay.  Did he tell you how it was he -- or why
12  it was he thought he would find them in Georgetown?
13      A.    I don't remember exactly.
14      Q.    At some point did he ever confide in you -- and
15  I understand it's a little awkward in the sense that --
16  but, you know, when you're hearing these things sort of
17  in a personal note and then here being asked about them.
18            But -- but did he tell you that he had a
19  tracking application placed on Mary's telephone?
20      A.    No.
21      Q.    Did he tell you if this was something he'd been
22  thinking about for a long time, the killing?
23      A.    No.
24      Q.    Okay.  And so did he tell you what happened
25  when he got up there?
```

David P. Ward - December 21, 2020

```
 1      A.     No.

 2      Q.     Or when he got to the cabin?

 3      A.     Other than he didn't -- he didn't find them.

 4      Q.     Okay.  Did you ask him why he was telling you

 5   this?

 6      A.     No.

 7      Q.     Okay.  Did he say he was glad he didn't find

 8   them?

 9      A.     I don't remember.

10      Q.     Okay.  Now, I -- I assume that this caught your

11   attention when he tells you that he'd gone up there to

12   kill two people; correct?

13      A.     Yes.

14      Q.     And is it a correct assumption that you've

15   never heard a -- certainly you've never heard a fellow

16   officer tell you that they'd gone looking to kill

17   someone; correct?

18      A.     Correct.

19      Q.     Had, at any point in your life, you'd ever

20   heard someone tell you that they'd gone looking for

21   someone to kill them with a gun?

22      A.     No.

23      Q.     And would I be correct that this caused you

24   considerable concern hearing this?

25      A.     Yes.
```

David P. Ward - December 21, 2020

```
1      Q.    Okay.  Did you try to find out where he was,
2  where Brad was?
3      A.    That became my first concern as to where he
4  was, if he was in Amador County, and to make sure that
5  the action was not continuing that night to give me time
6  to react.
7      Q.    Okay.  And were you able to find out where he
8  was?
9      A.    It was one of two places.  He was -- I believe
10 he was at home or he was heading to family in Jackson.
11 And exactly -- I knew it was one of two places, but
12 the -- the destination of where he was going was to be
13 with family because there was -- the family was
14 providing support at the time.
15     Q.    Okay.  So you found out where he was, and what
16 actions did you attempt to take at that point?  Or did
17 you have a course of conduct -- a sort of plan?  Were
18 you forming a plan as to what you might be able to do at
19 that point?
20     A.    At that point, I had to switch from peer
21 support over to a law enforcement role and notify
22 supervisors.  And I started -- I basically got in the
23 car and started towards Amador County.
24     Q.    Okay.  And that's both -- that's common sense,
25 and that's actually what -- is that consistent with what
```

Ward 12-21-2020

David P. Ward - December 21, 2020

 1   they taught your duty was in the peer support program,
 2   to be able to -- to recognize when you had to make that
 3   switch?
 4       A.     I don't know that they ever gave us that
 5   training to, you know, make a switch from peer support
 6   to law enforcement officer, but it was -- at that point,
 7   I knew that was my job.
 8       Q.     Okay.  Did you ever receive any type of
 9   positive recognition for your -- for the role you
10   performed on that day?  Any type of commendation or
11   anything for doing what you were supposed to do?
12       A.     Written?  No.
13       Q.     Okay.  But orally, people -- I assume you were
14   sort of thanked and commended for the job you did on
15   that --
16       A.     Yes, sir.
17       Q.     -- day?
18              Okay.  So you've switched hats.  You're now in
19   a law enforcement capacity, if you will.
20              So what do you -- what do you do then?
21       A.     Notified my sergeant at the time, Sergeant
22   Dobler.
23       Q.     Okay.  And --
24       A.     And --
25       Q.     Go on.  I didn't mean to interrupt you.

David P. Ward - December 21, 2020

1      A.     And notified the commander.

2      Q.     And the commander.  That would be Lieutenant --

3   then-Lieutenant Todd Brown?

4      A.     Correct.

5      Q.     And do you recall how it was you attempted to

6   contact both of those individuals?

7      A.     By phone.

8      Q.     Were you able to reach Sergeant Dobler at that

9   time by phone?

10     A.     Yes.

11     Q.     Okay.  Were you able to reach Lieutenant Brown

12  by phone initially?

13     A.     I don't remember initially or how many attempts

14  it took, but I -- I was eventually able to contact him

15  by phone.

16     Q.     Okay.  Would it -- would I -- did you reach

17  Sergeant Dobler first in terms of speaking with

18  somebody?

19     A.     I -- I don't remember who was first.  I know I

20  was contacting both of them.  I wish I could remember.

21  I don't remember who was -- who I got the message

22  through to first.

23     Q.     Okay.  So you get ahold of either Sergeant

24  Dobler or Lieutenant Brown.

25     A.     (Nodding head.)

David P. Ward - December 21, 2020

```
 1      Q.     Okay.  So how does Brad respond to that?

 2      A.     In -- in terms of the weapon, he had absolutely

 3   no problem with it.  He -- he said, "That's fine.  No

 4   problem."  And I believe -- and it's a belief -- that

 5   Brad was not wanting the notification to go up because

 6   he asked me to wait until Monday.

 7      Q.     Okay.  Did you have a -- did he tell you why he

 8   wanted you to wait?

 9      A.     No.

10      Q.     Did you have an idea in your mind, as you're

11   talking to him, as to why he wanted to wait till Monday?

12      A.     No.  I didn't speculate.

13      Q.     So -- and do you tell him that, unfortunately,

14   you had a duty to make notifications now?

15      A.     Immediately.  Yes.

16      Q.     And did he -- did he accept that fact when you

17   told him that?

18      A.     Yes, sir.

19      Q.     Okay.  So you're with him.  Are there any other

20   officers inside the office at this time?

21      A.     I know one -- there was other officers in

22   there.  My partner for the night was there because it

23   was approximately near the time -- by -- by the time all

24   of that had transpired, my partner for the night was

25   there.  Officer Folweiler was here.
```

David P. Ward - December 21, 2020

```
 1          They were -- it was nobody else's business to
 2   know exactly what was going on.  We didn't discuss it
 3   with anybody, and they were -- they were just aware
 4   that -- that I was talking to Brad in a -- in a
 5   closed-door session.
 6      Q.    Okay.  So does Brad go out to get the gun
 7   alone?  Did you go with him?  How does that go?  Does he
 8   go get the gun?
 9      A.    I went with Brad to his car to -- to retrieve
10   his service pistol.
11      Q.    Okay.  And was that to both reassure him and
12   make sure he doesn't change his mind?
13      A.    I needed to see it.
14      Q.    Okay.  And does he retrieve the weapon?
15      A.    He did.
16      Q.    Okay.  And so he gets the weapon.  When he gets
17   the weapon out of the car, is it in a holster or is it
18   unholstered, or how -- how is the weapon kept?
19      A.    It was in a holster.
20      Q.    Okay.  And was the holster attached to any type
21   of duty belt or just a holster that clips on or attaches
22   to a duty belt?
23      A.    Yeah.  I believe we call them a pancake
24   holster.  It's one of the off-duty holsters that you'd
25   use to -- like when we're in court, like -- I believe it
```

David P. Ward - December 21, 2020

```
 1   was like a leather holster.

 2       Q.     Okay.

 3       A.     That kind.

 4       Q.     Okay.  So the weapon's in what you folks call a

 5   pancake holster?

 6       A.     (Nodding head.)

 7       Q.     Does he carry it?  Do you go back inside with

 8   him at that point?

 9       A.     We walked back directly into the locker room.

10       Q.     Okay.  And does he still have physical

11   possession of the handgun?

12       A.     Yes.

13       Q.     Okay.  And what is -- what does he do with the

14   handgun at that point?

15       A.     He opened up his locker, put the pistol in

16   the -- up in the top shelf of his locker.

17       Q.     Okay.

18       A.     And then gave me his combo for his lock in case

19   anything happened to where I needed to -- to get access

20   to it.

21       Q.     Okay.  And then what's the next thing that

22   happened with you and Brad at that point?

23       A.     Brad said he needed to go back to his family.

24   They were in the middle of talking.  They were all

25   waiting.  The whole family was there to provide support
```

David P. Ward - December 21, 2020

```
 1      A.     Yes.

 2      Q.     Is anyone else there?

 3      A.     Mary's brother, and I can't remember what his

 4   first name was.  I know there was a Matthew and a Mark

 5   and a -- I did -- I could not tell you which -- which

 6   one it was.

 7      Q.     One -- one of the Evans.

 8      A.     Yes, sir.

 9      Q.     And when you first see Brad, where -- do you

10   remember where in the house he was?

11      A.     I don't.  It was one of two places.  It was

12   either at the front door or it was in the kitchen.

13      Q.     Okay.  And did you see Mary's -- the brother of

14   Mary's that was there, was he with Brad?

15      A.     And that's what brings to mind the kitchen

16   because there was -- at one point early in the contact,

17   it was his -- it was Mary's brother, Brad, Sergeant

18   Dobler, and myself in the kitchen.

19      Q.     Okay.  Thank you for that specific

20   recollection.

21             And so you're all in the kitchen.  First of

22   all, when you're going over there with Sergeant Dobler,

23   were you driving -- I know it's not a very long drive,

24   but was there any discussion about what you're going to

25   do when you saw -- when you got there?  What you were
```

David P. Ward - December 21, 2020

1  going to say to Brad or say?

2      A.    If there was, I don't remember exactly what it

3  was.

4      Q.    Okay.  And then I apologize for maybe my

5  inprecision.

6            Before you left to go -- with Sergeant Dobler

7  to go to Brad's house, do you recall any discussion with

8  Sergeant Dobler about what you were going to do at

9  Brad's house?

10     A.    Exactly, no.  I don't -- I don't remember

11  exactly what it was the intent was other than to get to

12  Brad.

13     Q.    Okay.  Had he told you whether or not he'd

14  spoken with anyone else after speaking with you about

15  the situation?

16     A.    "He" as in who?

17     Q.    Thank you.  Sergeant Dobler.

18     A.    Sergeant Dobler did not mention anybody else he

19  had spoken to.

20     Q.    Okay.  So you and he get to Brad's house.  You

21  encounter Brad and his brother-in-law.  What's the next

22  thing you recall happening?

23     A.    The brother-in-law left.  Thanked us for being

24  there to talk to Brad.  My understanding is he was fully

25  aware of everything that happened and was going on and

David P. Ward - December 21, 2020

```
 1   that he was going to let us speak to him, and that

 2   somewhere along the line contact had been made with EEO

 3   to provide a person to talk to for Brad above -- above

 4   our level, at least.

 5        Q.    Okay.

 6        A.    It was -- I -- I don't remember if it was at,

 7   en route to that area.

 8        Q.    Okay.  And then when you say Brad's brother --

 9   do you believe that Brad's brother knew that -- I'm

10   sorry; Brad's brother-in-law knew that Brad had gone to

11   kill his sister?

12        A.    Exactly, I don't remember.  My -- my

13   recollection is -- is that he was aware of everything,

14   and that, to me, it wasn't my place to ask a family

15   member what "everything" was other than "Thanks very

16   much for letting us in the home.  We just need to talk

17   to Brad and provide some help if we can."

18        Q.    Okay.  So did -- so just -- I do want to try to

19   be clear about this.

20             Was it your assumption, based upon what Brad

21   said, that his brother-in-law knew what was going on?

22        A.    Again, I don't remember exactly.  It was more

23   of a everything --

24        Q.    Okay.

25        A.    -- general thing.
```

David P. Ward - December 21, 2020

```
 1      Q.     Well, let me just be specific, if you will.

 2             Did the brother-in-law ever tell you that he

 3      was aware that Brad had gone to kill his sister?

 4      A.     He did not, no.

 5      Q.     And would I be correct that wasn't a topic that

 6      you -- that you raised with him?

 7      A.     Correct.  I did not.

 8      Q.     Did Sergeant Dobler have any conversation with

 9      the brother-in-law that you witnessed but did not take

10      part in?

11      A.     If he did, I am unaware of it.

12      Q.     Okay.  So at that point, you learned that a

13      call has been made, or that -- so when you say "EEO,"

14      what is it?  Do you remember --

15      A.     Pardon me.  Not EEO, EAP.

16      Q.     EA --

17      A.     So -- right.  There's -- there's somebody

18      coming that will provide some level of -- of counseling

19      above the level of our ability, and in the -- the sense

20      of counselor.

21      Q.     Okay.  And how did you learn that?  Was it from

22      a phone call yourself, or did Sergeant Dobler tell you?

23      Or how did -- how did you know that was coming?

24      A.     I believe that came from Sergeant Dobler.

25      Q.     Okay.  And so the brother-in-law excuses
```

David P. Ward - December 21, 2020

1   himself and leaves, and you thank him for letting you in

2   and the support he was providing.

3          What's the next thing you recall happening?

4    A.    Waiting for the -- the person to arrive at the

5   house, and we just sat at the -- at -- in the living

6   room having small talk with -- with Brad.

7    Q.    Okay.   Was there any talk concerning what he'd

8   just had done or just small talk, just sort of?

9    A.    It was small talk.   Nothing to do with --

10   Q.    Did his demeanor seem to change, or he still

11  seemed defeated or more defeated, or how would you

12  describe his demeanor?

13   A.    He seemed much better.

14   Q.    Okay.  All right.  And then what's the next

15  thing you recall?

16   A.    The counselor -- I believe it was Sabrena --

17  arrived.

18   Q.    Okay.  And did she come alone?

19   A.    Yes.

20   Q.    Okay.  And you say "Sabrena."  Is -- do you

21  remember her name, or is that something you've had other

22  contact with either before or since?

23   A.    She presented her -- it was Sabrena that night.

24  I don't know -- it was no -- no contact prior to or

25  after, but it was just Sabrena that night.

David P. Ward - December 21, 2020

1    Q.    Okay.  So she shows up.  Does she tell you what
2    she's there for?  In other words, what she's going to
3    do.
4    A.    No.  It was -- it was assumed, based on the
5    call, that we knew generally who was coming and what
6    services they provided.
7    Q.    Okay.  And was that from a conversation that
8    Sergeant Dobler had had that he was relaying to you?
9    A.    Yes.  And I was aware of the services,
10   obviously, from the peer support program -- what
11   services above the ability or training of a peer support
12   counselor that there was, and that they had requested
13   that service and that somebody from that area of our
14   department was en route.
15   Q.    Okay.  So it was your understanding that
16   someone from the department was coming out to address
17   the situation?
18   A.    At least somebody the department had called.
19   Q.    Okay.  So she arrives.  What's the next thing
20   you recall happening?
21   A.    Once she arrived, we wanted them to have a
22   comfortable place to sit.  So somebody started a pot of
23   coffee, and Sergeant Dobler and I went into the kitchen
24   to get out of the living room to give them a place to
25   talk, and he and I just sat there drinking coffee for a

David P. Ward - December 21, 2020

```
 1      Q.      In your 20 years or so with -- with the CHP,
 2   have you ever had a -- have you ever 5150'd anyone?
 3      A.      Yes.
 4      Q.      How many times do you think you've done that?
 5      A.      Maybe half a dozen, a dozen, if -- if at all.
 6      Q.      Do you remember the circumstances of any of
 7   those?
 8      A.      The majority of them were in Stockton, and we
 9   were dealing primarily with transients.
10      Q.      Okay.  Have you ever had a -- or had a
11   situation about 5150-ing someone who was making threats
12   of either harming themselves or someone else with a
13   weapon?
14      A.      No.
15      Q.      I know in a law enforcement capacity you
16   contacted your supervisors.  Did it ever occur to you to
17   contact any other law enforcement agency, or was it your
18   belief that the CHP would determine the right agency to
19   investigate?
20      A.      I made no other contact with any other agency
21   and assumed that the highway patrol would handle from my
22   notification on.
23           MR. KATZ:  Okay.  You know, why don't we take a
24   short break, and I think that we're making really good
25   progress here.  So let's go off the record for maybe --
```

David P. Ward - December 21, 2020

```
 1   2:56.  How about till 3:10?  Does that work for

 2   everybody?

 3          MS. McTAVISH:  That's fine.

 4          MR. KATZ:  So we'll go off the record.  And

 5   then we also have a breakout, so do you want a breakout

 6   room for anyone, Amie?

 7          MS. McTAVISH:  No, we're good.

 8          MR. KATZ:  Okay.  And I'll set one up for my

 9   folks.

10          MS. McTAVISH:  Okay.  All right.  See you in 13

11   minutes.

12          MR. KATZ:  Yes.

13          (Recess.)

14          MR. KATZ:  Are we ready to go back on the

15   record?

16          MS. McTAVISH:  Yes.

17   Q.     BY MR. KATZ:  All right.  Officer Ward, has

18   your memory been refreshed as to any of the things we

19   were discussing earlier, by any chance?

20   A.     No, sir.

21   Q.     Okay.  So let me ask this.

22          So now you mentioned that -- and again, this

23   may be an obvious question, but -- so once you find out

24   that Brad said that he went to -- to kill Trae and his

25   wife, that you realized you had to switch hats from peer
```

David P. Ward - December 21, 2020

1    counselor to law enforcement; correct?

2        A.    Yes, sir.

3        Q.    Why is that?

4        A.    If -- if the person you're talking to is saying

5    they did something that was unsafe or beyond the

6    reasonable expectation of the safety to the public, then

7    that's when a peace officer has to step in.

8        Q.    Okay.  And did it cross your -- did it cross

9    your mind, either that night or since, that he -- that

10   Brad Wheat was describing attempted murder?

11       A.    It crossed my mind that he said he wanted to

12   kill them.

13       Q.    Right.  And he'd gone up there to do so;

14   correct?

15       A.    Yes, sir.

16       Q.    With a weapon; correct?

17       A.    Yes, sir.

18       Q.    And the reason he didn't kill them is because

19   he couldn't find them; correct?

20       A.    Based on what he explained to me.

21       Q.    Okay.  So when you say you had to put -- you

22   realized you had to put your law enforcement hat on at

23   that point, was part of the reason that hat went back on

24   because you realized that a crime might have been

25   committed?

David P. Ward - December 21, 2020

 1      A.    I believe that the statement he made to me
 2  warranted me to put aside peer support duties and go
 3  more towards the departmental responsibilities of making
 4  notification based on that statement alone.
 5      Q.    Okay.  And was it your belief that the -- based
 6  on your notifications, that an investigation would
 7  follow as to whether or not these were criminal acts?
 8      A.    I did not have a belief at that time whether or
 9  not there was going to be a criminal investigation on
10  that.
11      Q.    Well, did you think they investigated as to
12  whether or not there should be a criminal investigation?
13      A.    I did not think of that at the time, no.
14      Q.    Okay.  Well, when -- so you make notifications.
15  What did you think was going to happen as a result of
16  your notifications?
17      A.    Based on -- on my notification, I had the
18  belief that the department was going to handle it in a
19  capacity that was appropriate to dealing with a
20  situation like that.
21      Q.    Okay.  So you live in Sacramento County,
22  generally speaking, or you did; correct?  So let's just
23  assume that --
24      A.    Still do.
25      Q.    -- someone flags down a sheriff and says,

David P. Ward - December 21, 2020

```
 1  that I don't remember.  He may have said that, but the
 2  exact statement of whether or not he intended on killing
 3  himself, I don't remember.  He very well could have said
 4  that to me.
 5         The main thing that I -- that I remember him
 6  stating was the intent to go into that area and find the
 7  two of them and kill them.  And then whether or not he
 8  had said that, I just -- honestly, I don't remember him
 9  saying that.  He very well could have.
10     Q.   Okay.  And you didn't make any type of notes on
11  this at all?
12     A.   No.
13     Q.   Did -- have you ever heard of any other
14  situations where an officer told anyone that they were
15  out to kill someone?
16     A.   No.
17         MS. McTAVISH:  Stewart, I don't know if you
18  realize this.  We lost your video.
19         MR. KATZ:  Oh.  I didn't notice it, but let me
20  see if --
21         MS. McTAVISH:  There you are.
22     Q.   BY MR. KATZ:  All right.  Did you -- did you
23  think that Brad would be assessed as to whether or not
24  he was -- through 5150?
25         MS. McTAVISH:  Objection; calls for
```

David P. Ward - December 21, 2020

```
 1   speculation.

 2          You can answer if you know.

 3          THE WITNESS:  I would be unaware of that.

 4      Q.    BY MR. KATZ:  Okay.  So you had no idea -- you

 5   had no thoughts as to what the outcomes of this might

 6   be?

 7      A.    My only assumption on -- on this prior -- after

 8   he made notification that night happened, is that they

 9   were going to potentially provide him with support and

10   some sort of therapy.

11      Q.    Well, when Brad said that he didn't want to --

12   didn't want you to make notifications right away, did

13   Brad convey to you his recognition that he thought bad

14   things were going to happen to him as a result of your

15   notifications?

16      A.    No.  He just asked if we could wait -- wait

17   through the weekend.

18      Q.    Did he say why?

19      A.    No.

20      Q.    Did you ask him why?

21      A.    No.  Because I needed to be almost assertive in

22   that -- that moment to say no, it needs to be done

23   immediately.

24      Q.    Okay.  And why was it you recognized that his

25   gun needed to be secured immediately?
```

David P. Ward - December 21, 2020

```
 1     A.     If he stated that he had done it previously,
 2   that I needed to at least fulfill the responsibility
 3   that if he felt at one point that was the appropriate
 4   thing to do, that I was at least taking away that weapon
 5   to prevent it in the future if he ever felt that way.
 6     Q.     Okay.  So it would be a fair statement that you
 7   knew you had to take away the weapon because you
 8   recognized the possibility that he might attempt to do
 9   that again?
10     A.     Well, at that point, it was more of a
11   department -- department responsibility to -- to make
12   sure that he secured his weapon and that -- that the
13   supervisors had the ability to take whatever appropriate
14   action that may be.
15     Q.     And apart from what you told Brown, did -- did
16   anyone ever ask you for more details as to what Brad had
17   related to you?
18     A.     Past the information that it was relayed
19   immediately about his statement, no.  Not to my
20   recollection, at least.
21     Q.     Okay.  Do you have an understanding as to what
22   the elements of attempted murder are?
23     A.     Basic -- basic understanding, obviously.
24     Q.     And what is that basic understanding of what
25   the elements of attempted murder are in California?
```

David P. Ward - December 21, 2020

```
 1      A.    The -- the ability and -- and attempt to locate

 2   and/or carry out the action unsuccessfully.

 3      Q.    Okay.  And isn't that what occurred here?

 4            MS. McTAVISH:  Objection; calls for a legal

 5   conclusion.

 6            You can answer if you can.

 7            THE WITNESS:  I did not investigate further

 8   than what his statement was to say whether or not it had

 9   actually occurred.

10      Q.    BY MR. KATZ:  Right.  So I understand that, but

11   it would be -- would I be correct that -- based on your

12   understanding, that if he -- he had the ability because

13   he had a fireman that he knew how to use; correct?

14      A.    Yes.

15      Q.    Okay.  And he had it with him, at least

16   believing what he said.

17      A.    Yes, sir.  Yes, sir.

18      Q.    And he had the -- and he attempted to find them

19   with that purp -- he had the purpose to do that bad

20   thing; correct?  The terrible thing.

21      A.    Can you restate that?

22      Q.    Sure.  He informed you that he'd had the

23   intention of killing people, Trae.

24      A.    Based on his statement.

25      Q.    Yes.
```

1              REPORTER'S CERTIFICATE

2                 --o0o--

3        I certify that the witness in the foregoing

4 deposition,

5                DAVID P. WARD,

6 was administered the oath remotely by me to testify to

7 the truth, the whole truth, and nothing but the truth in

8 the within-entitled cause; that the deposition was taken

9 remotely at the time and place named; that the testimony

10 of the witness was reported remotely by me, a duly

11 certified shorthand reporter; that it was thereafter

12 transcribed into typewriting, and that the transcript is

13 a true record of the testimony given.

14        Pursuant to Federal Rule 30(e), transcript

15 review was not requested.

16        I further certify that I am not financially

17 interested in the action, nor a relative or employee of

18 any attorney or any party to the action.

19

20 Dated:  December 30, 2020

21

22

23 _____

24      DEBRA P. CODIGA, CSR No. 5647

25      State of California