1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10                                 ----oo0oo----

11

12   PHILIP DEBEAUBIEN,                    No. 2:19-cv-01329-WBS-DB

13                Plaintiff,

14        v.                               MEMORANDUM AND ORDER RE:
                                           CALIFORNIA AND CALIFORNIA
15   STATE OF CALIFORNIA, CALIFORNIA       HIGHWAY PATROL DEFENDANTS'
     HIGHWAY PATROL, TODD BROWN,           MOTION FOR SUMMARY JUDGMENT
16   SABRENA SWAIN, JOY GRAF, REGGIE
     WHITEHEAD, RYAN STONEBRAKER,
17   BRENT NEWMAN, and JEREMY DOBLER,

18                Defendants.

19

20                                 ----oo0oo----

21           Plaintiff Philip Debeaubien ("plaintiff") brought this

22   section 1983 action against the State of California; the

23   California Highway Patrol ("CHP"); CHP officers Todd Brown,

24   Reggie Whitehead, Ryan Stonebraker, Brent Newman, and Jeremy

25   Dobler (collectively the "CHP defendants"); Joy Graf; and Sabrena

26   Swain; for various alleged constitutional and state tort

27   offenses.[1]   (See First Amended Complaint ("FAC") (Docket No.

28   _____
             [1]    Defendant Whitehead has since been dismissed from the

                                        1

1  30).)   The case arises out of events on September 3, 2018,

2  wherein CHP officer Brad Wheat ("Wheat") shot plaintiff before

3  fatally shooting Wheat's wife and himself.  (Id.)

4         The First Amended Complaint asserts two claims under

5  section 1983 and five claims under state law sounding in

6  negligence.  (See id.)  The crux of plaintiff's claims is that

7  the CHP defendants knew that Wheat had -- unbeknownst to

8  plaintiff -- attempted to murder plaintiff one month earlier but,

9  in violation of plaintiff's due process rights and of various

10  California statutes, they both failed to take actions that would

11  have prevented the September 3 shootings and affirmatively acted

12  in ways that enabled Wheat to carry out the attack.  (See id.)

13         The State and the CHP defendants now move for summary

14  judgment on all claims against them.  (Mot. (Docket No. 121).)[2]

15  The motion was scheduled to be heard on February 22, 2022, but

16  because of incurable problems with the Zoom connection, the court

17  took the motion under submission without oral argument.  (Docket

18  No. 128.)

19  I.   Factual and Procedural Background

20         The following facts are not in dispute.  In 2018, Wheat

21  was a CHP officer in CHP's Amador Area Office and was married to

22  Mary Wheat.  (Pl.'s Resp. to Defs.' Statement of Undisp. Facts &

23  Statement of Add'l Facts ("Pl.'s Resp.") at ¶¶ 1-2 (Docket No.

24  

25  _____

   action pursuant to a stipulation by the parties.  (See Docket No.

26  120.)

27         [2]   As defendants Swain and Graf have not moved for summary
   judgment, the court will only discuss them when relevant to the
28  resolution of plaintiff's claims against the other defendants.

125).)[3]  Plaintiff operated a fitness business next to a gym Mary owned and operated, and in 2018 he and Mary began an extra-marital affair.  (Id. at ¶¶ 4-5.)  Although Brad and Mary Wheat were married, they were not living together; Brad Wheat was living with Mary's brother, Matthew Hooper, and two of the Wheats' children.  (See id. at ¶¶ 2-3.)

By July of 2018, Wheat became aware of the affair, and he called plaintiff about it on July 8.  (Id. at ¶ 6 (citing Depo. of Philip Debeaubien ("Debeaubien Depo.") at 21:7-13 (Docket No. 121-2 at 11).)[4]  On the evening of August 2 or after midnight on August 3, Wheat drove to a house where plaintiff and Mary were staying, which Wheat had identified by tracking Mary's location through her phone and by speaking with Hooper.  (Id. at ¶ 8; see Debeaubien Depo. at 42:19-43:6 (Docket No. 125 at 105).) The Wheats' son, Warren, told Hooper that Wheat was driving toward the house and was armed, and that Warren was afraid about what Wheat might do because of Wheat's angry demeanor.  (Pl.'s Resp. at ¶ 9; Depo. of Matthew Hooper at 20:16-22:24 (Docket No.

---

[3]    In support of their motion, defendants submitted a statement of facts they assert are undisputed.  (Docket No. 121-1.)  In support of his opposition, plaintiff submitted a separate statement responding to those facts -- noting whether they are in fact undisputed, whether they are disputed and why, or offering clarifications -- and providing additional facts.  (Docket No. 124-1.)  Defendants have not submitted a response to plaintiff's statement disputing the facts therein or demonstrating that the disputes plaintiff identifies are not genuine.  Accordingly, the court will rely on plaintiff's statement except where it is contradicted by the underlying exhibits, including those identified in defendants' original statement of facts.

[4]    Aside from the fact that it pertained to the affair, the substance of this conversation is disputed, including whether Wheat told plaintiff to end the affair.  (See id.)

1   125 at 274-76).)

2          Because of these concerns, and after unsuccessfully

3   attempting to contact Wheat, Hooper called 911 and told the

4   dispatcher that Wheat was driving to Mary's location and was

5   armed with a gun, though he denied that Wheat said he intended to

6   use the gun once there.  (Pl.'s Resp. at ¶¶ 10-13.)  Hooper also

7   called his niece, Madison, who lived near where plaintiff and

8   Mary were staying and warned them Wheat was coming.  (Id. at

9   ¶¶ 14-15.)  Hooper's brother, Monty, also called Mary to tell her

10  that plaintiff should leave, and plaintiff left to avoid a

11  confrontation with Wheat.  (Id. at ¶¶ 14, 16-17.)  Wheat arrived

12  at the house and, after finding Mary there alone, verbally

13  assaulted her, took her phone charger, and left.  (Id. at ¶ 18.)

14          On August 3, 2018, the following day, Wheat spoke to

15  Hooper about the incident and told Hooper that he had intended to

16  confront plaintiff and Mary and that the confrontation could have

17  become violent or lethal.  (Id. at ¶ 19.)  Wheat also spoke with

18  CHP officer David Ward that day and told Ward that, the night

19  before, he had taken his duty weapon and gone looking for Mary

20  and plaintiff to kill them but did not find them.  (Id. at ¶¶ 30-

21  31.)  At Ward's request, Wheat agreed to store his duty weapon in

22  his locker and gave Ward the combination, and after Wheat left

23  Ward moved the gun into his own locker.  (Id. at ¶¶ 32-33.)

24          Ward notified defendant Dobler, a sergeant at the CHP

25  Amador office, what had happened, and Dobler notified defendant

26  Brown, a CHP lieutenant and commander of the Amador office.  (Id.

27  at ¶¶ 26-27, 34.)  Brown then notified Frank Newman of CHP's

28  Office of Employee Safety and Assistance, with the expectation

                                  4

1  that Newman would arrange for a mental health professional to go

2  to Wheat's house and evaluate him.  (<u>Id.</u> at ¶ 36.)  The CHP

3  contracts with Magellan Health Services of California, which

4  employs mental health counselors who respond to incidents on an

5  urgent basis, and which sent defendant Swain to Wheat's house to

6  speak with him and to determine how the CHP should proceed.  (<u>Id.</u>

7  at ¶¶ 37, 44-45.)[5]

8       Dobler and Ward drove to Wheat's house, where they

9  spoke to Wheat and where Wheat surrendered all of the firearms in

10  the house -- three rifles -- and they waited for Swain to arrive.

11  (<u>Id.</u> at ¶¶ 35, 38-39, 69.)[6]  Swain arrived early in the morning

12       [5]  Although Brown believed Frank Newman would have a
13  psychiatrist or psychologist sent to evaluate Wheat, plaintiff
    disputes that Swain or other professionals employed by Magellan
14  are more than "therapists" or have the training required to
    evaluate officers' emotional and mental condition, determine
15  whether that condition might adversely affect an officer's powers
    as a peace officer, or otherwise determine an officer's fitness
16  for duty.  (<u>Id.</u> at ¶¶ 36-37.)

17       [6]  The extent to which Wheat's surrender of these firearms
18  was voluntary is disputed in light of evidence indicating they
    were taken pursuant to an order given by defendant Brown.  (<u>Id.</u>
19  at ¶ 43.)  The substance of any conversation Dobler and Ward may
    have had with Wheat while at his house is also disputed, largely
20  on the basis of inconsistent testimony offered by Dobler and
    that, in Ward's deposition, Ward testified that the conversation
21  consisted only of "small talk."  (<u>See</u> <u>id.</u> at ¶ 39.)  Whether
    Dobler and Ward also spoke with Hooper about the situation is
22  also disputed, and thus so is whether such a conversation led
    Dobler and Ward to believe Wheat no longer posed a threat to
23  plaintiff.  (<u>See</u> <u>id.</u> at ¶¶ 40-42.)
24       Plaintiff also disputes nearly all facts in defendants'
    statement that rely on Dobler's testimony, based on substantial
25  contradictions between testimony Dobler gave in an August 2020
    deposition and statements he provided in a January 2022
26  declaration.  (<u>See</u> <u>id.</u> at ¶ 39.)  Most notably, during his
    deposition Dobler stated that he did not learn of the August 2,
27  2018 incident until after the September 3 shooting, but in his
28  declaration he describes in detail how he learned about the

1    on August 4, 2018, and spoke with Wheat for two hours.  (Id. at

2    ¶ 46.)  Based on this conversation, Swain told Brown that she did

3    not believe Wheat posed a threat to plaintiff, Mary, or himself.

4    (Id. at ¶¶ 46-48.)[7]  Brown then advised defendant Stonebraker,

5    who was Assistant Chief in CHP's Valley Division and responsible

6    for the Amador office, of what Wheat had told Ward about the

7    evening of August 2, of the fact that CHP personnel had

8    possession of Wheat's duty weapon and other firearms, and about

9    Swain's evaluation.  (Id. at ¶¶ 28, 38.)  Through communications

10   with Stonebraker, Brown, and other CHP officials, defendant

11   Newman, who was Chief of the CHP's Valley Division, received this

12   information as well.  (Id. at ¶¶ 29, 52; Decl. of Brent Newman at

13   ¶¶ 4-5 (Docket No. 121-2 at 187-88).)

14          Following Swain's evaluation, Dobler and Ward returned

15   to the CHP office, retrieved Wheat's duty weapon from Ward's

16   locker, and stored it and Wheat's rifles in a locked closet in

17   the sergeants' office.  (Id. at ¶ 50.)  Wheat requested and was

18   granted time off from work and did not return to duty until

19   August 20, 2018.  (Id. at ¶ 51.)

20

21   August 2 incident on August 3 and how he and other CHP officers
     responded.  (See Depo. of Jeremy Dobler at 7:6-10:16 (Docket No.

22   125 at 206-09); Decl. of Jeremy Dobler at ¶¶ 9-15, 19 (Docket No.
     121-2 at 163-67).)

23

24          [7]   Whether Swain made similar statements to Dobler, and
     whether she told Dobler she believed Wheat appeared to be coping

25   with the situation and that it was safe for him to have firearms,
     is disputed.  (Id. at ¶ 47.)  Plaintiff also disputes that

26   Swain's evaluation of Wheat was competent, citing a declaration
     from plaintiff's expert, Dr. Kris Mohandie, in which Mohandie

27   states that Swain's opinions about Wheat's condition were
     erroneous.  (Id. at ¶ 48 (citing Decl. of Kris Mohandie

28   ("Mohandie Decl.") at ¶¶ 4-9 (Docket No. 124-1 at 308)).)

1    By August 4, 2018, plaintiff had heard that Wheat had
2    told a colleague that Wheat had gone to confront plaintiff and
3    that CHP personnel and a counselor had gone to Wheat's house to
4    talk to Wheat about it.  (Id. at ¶ 20.)  However, plaintiff did
5    not learn until Brown's deposition on September 20, 2020 that on
6    August 2, 2018, Wheat had driven with his duty weapon to the
7    house where plaintiff and Mary were staying with the intent to
8    kill plaintiff before killing himself.  (Id. at ¶¶ 81-82.)

9    On August 15, 2018, Wheat went to the office for a
10   critical incident stress debrief session made available to staff
11   following the arrest of a colleague, which was facilitated by
12   defendant Graf, another Magellan Health Services therapist.  (Id.
13   at ¶ 53.)  After the debrief session, Graf spoke with Wheat
14   privately, discussed plaintiff's and Mary's affair, and learned
15   that Wheat had attempted to confront them.  (Id. at ¶ 54.)

16   However, during a ten-minute conversation Graf had with
17   Brown about Wheat either before or immediately after she and
18   Wheat spoke, Brown did not inform her that Wheat had sought to
19   kill plaintiff and himself on August 2 or that the CHP was in
20   possession of Wheat's guns.  (Id. at ¶ 55; Depo. of Joy Graf
21   ("Graf Depo.") at 68:10-17 (Docket No. 125 at 254).)  Based on
22   her conversation with Brown, Graf believed she was speaking with
23   Wheat because he had recently been in three car accidents while
24   on duty.  (Graf Depo. at 175:6-18.)  Following her conversation
25   with Wheat, Graf did not believe he posed a threat to plaintiff
26   or Mary and shared this opinion with Brown, who shared it with

27

28

1    Stonebraker and Newman.  (Pl.'s Resp. at ¶¶ 55-56, 58.)[8]

2           Wheat returned to work on limited duty as the front

3    desk officer on August 20, 2018, and Dobler gave Wheat the duty

4    weapon Ward had taken after advising Brown he would do so.  (Id.

5    at ¶¶ 59, 71, 74.)  Brown understood that Wheat would receive his

6    duty weapon when he returned.  (Id. at ¶ 61.)[9]  Stonebraker also

7    learned at some point in August of 2018 that Wheat had returned

8    to duty and that his duty weapon had been returned to him.  (Id.

9    at ¶ 66.)[10]  However, Dobler retained custody of the three rifles

10   Wheat had surrendered.  (Id. at ¶ 74.)

11          On August 21, 2018, Graf spoke to Wheat again, by

12   telephone, for ten to twelve minutes.  (Id. at ¶ 63.)  Based on

13   this call, Graf believed Wheat seemed to be doing well and told

14   this to Brown.  (Id. at ¶ 65.)[11]

15          However, around this time, Dobler was also aware that

16   Wheat was frequently distracted at work by personal issues (and

17   ─────────────────────

18       [8]   Defendants assert that Graf also shared this view with
     Dobler, which plaintiff disputes.  (Id. at ¶ 57.)  Like with
19   Swain, plaintiff also disputes that Graf's evaluation of Wheat
     was competent, citing Dr. Mohandie's declaration stating that
20   Graf's opinions about Wheat's condition were erroneous.  (Id.
     (citing Mohandie Decl. at ¶¶ 4-9); see supra n.5.)

21
         [9]   Plaintiff asserts, based on the conduct described in
22   Brown's declaration, that Brown also demonstrated his approval of
     Dobler giving the gun to Wheat upon Wheat's return to work.  (Id.
23   at ¶ 72.)  Whether Brown's declaration actually demonstrates this
     is unclear.  (See Decl. of Todd Brown at ¶¶ 19-23.)

24
25       [10]  Whether Newman was aware before September 3, 2018 that
     Wheat's duty weapon had been returned to him is disputed.  (Id.
26   at ¶ 67.)

27       [11]  Although defendants assert that Graf also told Dobler,
     relying on Dobler's declaration, plaintiff disputes this.  (Id.
28   at ¶ 64; see also supra n.6.)

1  discussed this with Brown); that Wheat had been assigned to work

2  at the front desk after being in two car crashes while on duty,

3  because of this distraction; and that Wheat had begun to

4  frequently write in a personal journal while on duty.  (See Depo.

5  of Jeremy Dobler ("Dobler Depo.") at 56:7-12, 70:20-72:25 (Docket

6  No. 125 at 211, 219-21).)  Additionally, when speaking with Graf

7  about Wheat on August 15, Brown noted that Wheat had been in

8  three car accidents and that this conduct was "unusual for him."

9  (Graf Depo. at 193:7-194:7 (Docket No. 125 at 193-94).)  At some

10 point in August after the August 2 incident, Brown also became

11 aware that Wheat had sent Mary "unprofessional or inappropriate

12 texts" that "weren't nice"; that during a ride-along Wheat had

13 asked another officer to drive by plaintiff's gym, of which the

14 officer informed Dobler; and that Wheat continued to be able to

15 track Mary's location via her phone.  (Pl.'s Resp. at ¶ 93;

16 Chronological Summary of Todd Brown (Docket No. 125 at 200-01).)

17        On the evening of September 3, 2018, Wheat went to

18 plaintiff's gym, where plaintiff and Mary were staying at the

19 time.  (Pl.'s Resp. at ¶ 25.)  Using his duty weapon, Wheat shot

20 plaintiff in the shoulder before fatally shooting Mary and then

21 himself.  (Id. at ¶¶ 25, 75.)  Plaintiff brought this action in

22 Sacramento County Superior Court on May 29, 2019, and defendants

23 removed to this court on July 16, 2019.  (See Docket No. 1.)

24 II.  Legal Standard

25        Summary judgment is proper "if the movant shows that

26 there is no genuine dispute as to any material fact and the

27 movant is entitled to judgment as a matter of law."  Fed. R. Civ.

28 P. 56(a).  A material fact is one "that might affect the outcome

1 of the suit under the governing law," and a genuine issue is one

2 that could permit a reasonable trier of fact to enter a verdict

3 in the non-moving party's favor.  Anderson v. Liberty Lobby,

4 Inc., 477 U.S. 242, 248 (1986).

5      The moving party bears the initial burden of

6 establishing the absence of a genuine issue of material fact and

7 may satisfy this burden by presenting evidence that negates an

8 essential element of the non-moving party's case.  See Celotex

9 Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Alternatively,

10 the movant may demonstrate that the non-moving party cannot

11 provide evidence to support an essential element upon which it

12 will bear the burden of proof at trial.  Id.  The burden then

13 shifts to the non-moving party to set forth specific facts to

14 show that there is a genuine issue for trial.  See id. at 324.

15 Any inferences drawn from the underlying facts must, however, be

16 viewed in the light most favorable to the non-moving party.  See

17 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

18 587 (1986).

19 III. Discussion

20      A.   State-Created Danger

21      Plaintiff first contends that defendants Dobler, Brown,

22 Stonebraker, Swain, and Graf violated his Fourteenth Amendment

23 right to substantive due process by giving Wheat his duty weapon

24 upon his return to work and by allowing Wheat to continue to

25 serve as a CHP officer.  (FAC at ¶¶ 79-80.)

26      In their motion, defendants raise the defense of

27 qualified immunity.  (Mot. at 19-21.)  "In determining whether a

28 state official is entitled to qualified immunity in the context

1   of summary judgment, [courts] consider (1) whether the evidence
2   viewed in the light most favorable to the plaintiff is sufficient
3   to show a violation of a constitutional right and (2) whether
4   that right was 'clearly established at the time of the
5   violation.'"   Sandoval v. Cnty. of San Diego, 985 F.3d 657, 671
6   (9th Cir. 2021) (quoting Horton ex rel. Horton v. City of Santa
7   Maria, 915 F.3d 592, 599 (9th Cir. 2019)).

8            The court has the discretion to decide which of
9   qualified immunity's two prongs to address first and, if analysis
10  of one prong proves dispositive, the court need not analyze the
11  other.   See Pearson v. Callahan, 555 U.S. 223, 236 (2009).
12  However, "summary judgment in favor of moving defendants is
13  inappropriate where a genuine issue of material fact prevents a
14  determination of qualified immunity until after trial on the
15  merits."   Estate of Lopez ex rel. Lopez v. Gelhaus, 871 F.3d 998,
16  1021 (9th Cir. 2017).   The court will exercise its discretion to
17  begin with qualified immunity's first prong: whether there is
18  sufficient evidence to demonstrate the violation of a
19  constitutional right.

20            1.   Violation of Constitutional Right

21            "The Due Process Clause is a limitation on state action
22  and is not a 'guarantee of certain minimal levels of safety and
23  security.'"   Martinez v. City of Clovis, 943 F.3d 1260, 1271 (9th
24  Cir. 2019) (quoting DeShaney v. Winnebago Cnty. Dep't of Soc.
25  Servs., 489 U.S. 189, 195 (1989)).   "Simply failing to prevent
26  acts of a private party is insufficient to establish liability."
27  Id. (citing Patel v. Kent Sch. Dist., 648 F.3d 965, 971 (9th Cir.
28  2011)).   "'The general rule is that a state is not liable for its

1  omissions' and the Due Process Clause does not 'impose a duty on

2  the state to protect individuals from third parties.'"  Id.

3       One exception to this general rule, however, provides

4  that "the state may be constitutionally required to protect a

5  plaintiff that it 'affirmatively places in danger by acting with

6  deliberate indifference to a known or obvious danger.'"  Id.

7  (quoting Patel, 648 F.3d at 971-72) (alteration adopted).  To

8  succeed on a state-created danger claim, a plaintiff must show

9  that (1) "the officers' affirmative actions created or exposed

10  [him] to an actual, particularized danger that [ ]he would not

11  otherwise have faced," (2) "that the injury [ ]he suffered was

12  foreseeable," and (3) that the officers "acted with 'deliberate

13  indifference'" to the "known or obvious danger."  Id. (citation

14  omitted); Hernandez v. City of San Jose, 897 F.3d 1125, 1133 (9th

15  Cir. 2018) (quoting Patel, 648 F.3d at 974).

16                i.   Danger Created by Affirmative Act

17       To prevail on a state-created danger claim, plaintiff

18  must show that defendants took affirmative action that "left

19  [him] in a situation that was more dangerous than the one in

20  which [defendants] found him."  Hernandez, 897 F.3d at 1133

21  (citing Munger v. City of Glasgow Police Dep't, 227 F.3d 1082,

22  1086 (9th Cir. 2000)).  Whether defendants created a new danger

23  or enhanced an existing one is not material; the focus is on

24  whether there was "state action [versus] inaction in placing an

25  individual at risk."  See id. at 1134-35 (quoting Penilla v. City

26  of Huntington Park, 115 F.3d 707, 710 (9th Cir. 1997)); Kennedy

27  v. City of Ridgefield, 439 F.3d 1055, 1063 n.4 (9th Cir. 2006).

28       Here, it is undisputed that Dobler gave the gun to

1   Wheat upon Wheat's return to work on August 20, 2018.  (Pl.'s

2   Resp. at ¶ 59.)  Although defendants argue that this did not

3   constitute an affirmative act on the basis that Dobler "had no

4   legal basis to preclude" Wheat from obtaining the weapon, they

5   offer no authority demonstrating this assertion's legal

6   significance in determining whether giving Wheat the weapon was

7   an affirmative act within the meaning of the state-created danger

8   framework.  (See Mot. at 23; Reply at 6 (Docket No. 126).)  The

9   Ninth Circuit has found a wide range of conduct by law

10  enforcement to constitute affirmative acts, see, e.g., Hernandez,

11  897 F.3d at 1133-35 (directing rally attendees toward violent

12  crowd); Kennedy, 439 F.3d at 1063 (disclosing child molestation

13  allegations to accused individual's mother); Munger, 227 F.3d at

14  1087 (ejecting patron from bar); Penilla, 115 F.3d at 708, 710

15  (canceling paramedic request, breaking lock on door of

16  plaintiff's home, and placing plaintiff inside), and it is not

17  apparent why giving an individual a gun would not qualify.

18         Further, as evidence plaintiff has offered shows, the

19  weapon Wheat received was the property of the CHP, not Wheat's

20  own, and superior officers have authority to determine whether

21  subordinate officers may carry a service weapon.  (See Pl.'s

22  Resp. at ¶¶ 75-77.)  Accordingly, there is at the very least a

23  triable issue of fact as to whether, as defendants contend, they

24  were unable to prevent Wheat from obtaining the gun.

25         Additionally, based on the evidence presented, a trier

26  of fact could conclude that Brown was an integral participant in

27  the decision to give the gun to Wheat and that Dobler would not

28  have done so without Brown's approval.  (See id. at ¶¶ 61, 71.)

As such, there remains a triable issue of fact as to whether
Brown too engaged in an affirmative act via his role in giving
Wheat the gun.

On the other hand, there is no indication Stonebraker
or Newman had anything more than a passive role in giving the gun
to Wheat on August 20.  Although the evidence indicates that, at
some point in August, Stonebraker became aware Wheat had received
the gun, (id. at ¶¶ 66, 73), and although when Newman became
aware of this is disputed, (see supra n.10), plaintiff has put
forward no evidence indicating that they had any involvement in
the decision to give the gun to Wheat.  Accordingly, the court
concludes that there exists no disputed issue of material fact as
to whether Stonebraker or Newman engaged in an affirmative act
and will therefore grant summary judgment for these defendants on
this claim.

Defendants also argue that, even if giving Wheat the
gun constituted an affirmative act, it did not put plaintiff in
greater danger than he had been in previously, primarily on the
basis that Dobler and Brown "were involved in having Wheat hand
over his duty weapon in the first place."  (See Mot. at 23-24;
Reply at 6-8.)  Thus, they argue, plaintiff was not "left . . .
in a situation that was more dangerous than the one in which they
found him."  (Mot. at 24 (quoting Munger, 227 F.3d at 1086).)
However, this ignores the fact that it was Ward, who is not a
defendant in this action -- not Dobler or Brown -- who asked
Wheat to hand over his service weapon and transferred it to his
own locker, thereby depriving Wheat of access.  (Pl.'s Resp. at
¶¶ 32-33.)

14

1    Further, defendants have emphasized that when Dobler

2  asked Wheat if he would surrender the firearms Wheat had in his

3  home, he did so as a friend.  (Opp. at 13; see Pl.'s Resp. at

4  ¶¶ 38, 78; but see supra n.6.)  Defendants do not contest this

5  point but argue that it is not legally significant.  (See Reply

6  at 8.)  This ignores the long-settled principle, however, that by

7  § 1983's own terms, it is only official conduct done "under color

8  of law" that bears legal significance when determining liability

9  under § 1983.  See 42 U.S.C. § 1983; Monroe v. Pape, 365 U.S.

10  167, 184 (1961) ("action taken 'under color of' state law,"

11  within meaning of § 1983, is "[ ]use of power, possessed by

12  virtue of state law and made possible only because the [actor] is

13  clothed with the authority of state law") (quoting United States

14  v. Classic, 313 U.S. 299, 325-26 (1946)), overturned on other

15  grounds, Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S.

16  658 (1978); Screws v. United States, 325 U.S. 91, 111 (1945)

17  ("acts of officers in the ambit of their personal pursuits are

18  plainly excluded" from meaning of "under color of law").

19    Viewing the facts in the light most favorable to

20  plaintiff, a factfinder could find it clear that plaintiff was in

21  greater danger after Wheat received his service weapon on August

22  20 than when Wheat had no service weapon based on the basic fact

23  that Wheat used that weapon to shoot plaintiff on September 3.

24  See Kennedy, 439 F.3d at 1063.  Thus, a reasonable jury could

25  conclude that, by giving Wheat the gun at a time when he

26  possessed no service weapon -- indeed, no guns of any kind, (see

27

28

15

1   Pl.'s Resp. at ¶ 69)[12] -- Dobler and Brown "created 'an

2   opportunity for [Wheat] to assault [plaintiff]'" with a firearm

3   "that otherwise would not have existed." Kennedy, 439 F.3d at

4   1063 (quoting L.W. v. Grubbs, 974 F.2d 119, 121 (9th Cir. 1992)).

5                    ii.  Foreseeability

6        To prevail, plaintiff must also "show that h[is]

7   'ultimate injury' was 'foreseeable.'" Martinez, 943 F.3d 1273

8   (quoting Hernandez, 897 F.3d at 1133).  "This does not mean that

9   the exact injury must be foreseeable.  Rather, 'the state actor

10  is liable for creating the foreseeable danger of injury given the

11  particular circumstances.'" Id. at 1273-74 (quoting Kennedy, 439

12  F.3d at 1064 n.5).

13       A reasonable jury could conclude that, "[a]s a matter

14  of common sense, the assault[ ] [plaintiff] suffered" after

15  defendants gave Wheat the gun was "objectively foreseeable." Id.

16  at 1274 (citations omitted).  In particular, a jury could find

17  that Dobler and Brown were aware both that Wheat had previously

18  tried to murder plaintiff with the very same gun and that Wheat

19  had displayed signs of a continued fixation on plaintiff,

20  notwithstanding Swain's and Graf's positive evaluations, and

21  therefore it could conclude that the risk Wheat would use the gun

22  to shoot plaintiff was apparent.  See Hernandez, 897 F.3d at 1133

23  (that protesters would hurt attendees of political rally once

24  outside of venue was foreseeable given officers' awareness of

25

26       [12]  Although defendants assert that "even without his duty
    weapon, Wheat could have accessed another gun" to use in
27  attacking plaintiff -- such that the danger plaintiff faced did
    not increase when Wheat received the gun -- they offer no support
28  for this assertion.  (See Mot. at 24.)

                              16

1   violence by protesters at previous rallies); Kennedy, 439 F.3d at

2   1063, 1064 n.5 (that neighbor would harm plaintiff after learning

3   of plaintiff's allegations against him was foreseeable given

4   officer's awareness of neighbor's violent tendencies).

5        Moreover, in addressing other state-created danger

6   claims, the Ninth Circuit has concluded assaults were foreseeable

7   even where the danger was less concrete and particularized than a

8   jury could find it was here.  See, e.g., Grubbs, 974 F.2d at 121

9   (where defendants knowingly assigned plaintiff to work with

10  prisoner, danger was foreseeable based on prisoner's history of

11  violence toward women, likelihood plaintiff would be left alone

12  with him, and fact plaintiff would not be prepared to defend

13  herself); Wood v. Ostrander, 879 F.2d 583, 590 (9th Cir. 1989)

14  ("[T]he inherent danger facing a woman left alone at night in an

15  unsafe area is a matter of common sense."); Kennedy, 439 F.3d at

16  1063.  Indeed, viewing the facts in the light most favorable to

17  plaintiff, a reasonable jury could conclude that "the exact

18  injury" plaintiff suffered was in fact foreseeable.  Martinez,

19  943 F.3d at 1273.

20              iii. Deliberate Indifference

21        Finally, plaintiff must "show that [defendants] acted

22  'with deliberate indifference to a known or obvious danger,'" id.

23  at 1274 (quoting Hernandez, 897 F.3d at 1133), i.e., that they

24  "disregarded a known or obvious consequence of [their] actions,"

25  Hernandez, 897 F.3d 1135 (quoting Patel, 648 F.3d at 974);

26  Kennedy, 439 F.3d at 1064 (quoting Bd. of Cnty. Comm'rs of Bryan

27  Cnty. v. Brown, 520 U.S. 397, 410 (1997)).  Deliberate

28  indifference may be established by showing that an officer "had

                                17

1  'knowledge of the danger' to the plaintiff" or "failed to make

2  'any inquiry at all as to the plaintiff's ability'" to safely

3  avoid the danger to which the officer exposed him.  See

4  Hernandez, 897 F.3d at 1135-36 (quoting Wood, 879 F.2d at 590)

5  (alterations adopted).

6        It is undisputed that on August 20, 2018, Dobler and

7  Brown were aware that Wheat had admitted to having just recently

8  driven to the house where plaintiff and Mary were staying in

9  order to use his duty weapon to murder plaintiff before killing

10  himself.  (Pl.'s Resp. at ¶¶ 26-27, 34.)  Based on their

11  knowledge that Wheat had told Ward he had gone looking for

12  plaintiff and Mary to kill them but did not find them, (id. at

13  ¶¶ 30, 34), a trier of fact could conclude that Dobler and Brown

14  were aware that the only reason Wheat had not killed plaintiff on

15  the night of August 2 was that plaintiff had left before Wheat

16  arrived, (see also id. at ¶ 83).  It is also undisputed that

17  neither Dobler or Brown informed plaintiff at any point that

18  Wheat had tried to kill him on the night of August 2, suggested

19  to anyone that the CHP investigate Wheat's conduct that night,

20  contacted any other law enforcement agencies about the incident,

21  or prepared a report about it.  (Id. at ¶¶ 89-92, 94.)

22        Viewing the evidence in the light most favorable to

23  plaintiff, a jury could find that Dobler and Brown were also

24  aware that, after trying to kill plaintiff on August 2, Wheat

25  continued to send harassing text messages to Mary and exhibited a

26  continued fixation on plaintiff, including by asking a colleague

27  to drive him past plaintiff's gym while on a ride-along.  (Id. at

28  ¶ 93.)  This information contradicted the evaluations of two

therapists -- one of whom was wholly unaware of the August 2 incident -- that Wheat was fit for duty.  (Id. at ¶¶ 46-48, 55-56; Graf Depo. at 68:10-17.)  A jury could also find that Dobler and Brown were aware that Wheat had given other indications that he was mentally or emotionally unwell, including being frequently distracted while on duty, which led to multiple car accidents and his being placed on desk duty.  (Dobler Depo. at 56:7-12, 70:20-72:25; Graf Depo. at 193:7-194:7.)

With this knowledge, Dobler and Brown nevertheless gave Wheat the very gun Wheat had taken with him during his previous effort to kill plaintiff.  Further, based on Brown's failure to advise Graf about the August 2 incident when speaking with her in connection with her August 15 evaluation of Wheat, (see Graf Depo. at 68:10-17), a factfinder could infer that Brown intentionally omitted this information, which was clearly essential to an accurate evaluation, and upon which he would have known other officers would rely in deciding whether to allow Wheat to return to duty.

On the evidence presented, a reasonable jury could conclude that giving the gun to Wheat under these circumstances without ever attempting to contact plaintiff, to otherwise ensure he was aware of the August 2 incident, to ensure an official report was prepared, or to initiate an internal investigation demonstrated deliberate indifference to the known risk Dobler and Brown had created.  Indeed, in Kennedy, the Ninth Circuit held that deliberate indifference was shown even though the defendant police officer there had warned the plaintiff of the danger he had created and attempted to protect her from it, given that the

19

1    police protection he promised "was either never provided or

2    plainly ineffective." <u>Kennedy</u>, 439 F.3d at 1065.  Here, not even

3    a warning was provided.

4          Accordingly, a reasonable jury could determine that

5    defendants Dobler and Brown violated plaintiff's due process

6    rights by "affirmatively increasing the known and obvious danger

7    [he] faced." <u>Martinez</u>, 943 F.3d at 1274.

8              2.   <u>Clearly Established Right</u>

9          Dobler and Brown may nonetheless be entitled to summary

10   judgment if the right at issue was not clearly established at the

11   time by existing law. <u>See</u> <u>Sandoval</u>, 985 F.3d at 678.  Qualified

12   immunity "protects government officials 'from liability for civil

13   damages insofar as their conduct does not violate clearly

14   established statutory or constitutional rights of which a

15   reasonable person would have known.'" <u>Pearson</u>, 555 U.S. at 231

16   (citation omitted).  "A clearly established right is one that is

17   'sufficiently clear that every reasonable official would have

18   understood that what he is doing violates that right.'" <u>Mullenix</u>

19   <u>v. Luna</u>, 577 U.S. 7, 11 (2015) (citation omitted).  "This inquiry

20   'must be undertaken in light of the specific context of the case,

21   not as a broad general proposition.'" <u>Rivas-Villegas v.</u>

22   <u>Cortesluna</u>, 142 S. Ct. 4, 8 (2021) (citation omitted).  "This is

23   not to say that an official action is protected by qualified

24   immunity unless the very action in question has previously been

25   held unlawful, but it is to say that in the light of pre-existing

26   law the unlawfulness must be apparent." <u>Hope v. Pelzer</u>, 536 U.S.

27

28

1 730, 739 (2002).[13]

2       Plaintiff argues that the right at issue was clearly

3 established by Hernandez, 897 F.3d 1125.  There, the plaintiffs

4 alleged that in preparing for a rally by then-Presidential

5 candidate Donald Trump, and knowing that such rallies in other

6 cities had "spurred violent anti-Trump protests," the defendant

7 law enforcement officials "instructed all officers to stand by,

8 watch as [any] attacks occurred, and not intervene."  Id. at

9 1129.  "As part of their crowd control plan, the [o]fficers only

10 allowed the [a]ttendees to leave from [one] exit of the

11 [c]onvention [c]enter and actively prevented them from leaving

12 through alternative exits."  Id. (internal quotation marks

13 omitted, alterations adopted).

14       From there, officers directed attendees "to proceed

15 . . . into the crowd of violent anti-Trump protesters" and

16 "actively prevented" them from leaving in an alternate direction,

17 away from danger.  Id.  As a result, the plaintiff attendees were

18 repeatedly assaulted as they attempted to leave, while the

19 defendant officers "looked on."  Id. at 1129-30.  The Ninth

20 Circuit held that because the plaintiffs had alleged that the

21 defendants both (1) affirmatively acted in ways that increased

22 the danger plaintiffs faced and (2) were deliberately indifferent

23

24      [13]  The qualified immunity analysis is an objective one,
25 "even when the constitutional claim at issue involves subjective
elements."  Sandoval, 985 F.3d at 674 (citing Crawford-El v.
26 Britton, 523 U.S. 574, 588-89 (1998)).  Accordingly, when
addressing such claims, including those involving deliberate
27 indifference, courts do not "examine[ ] the defendant's mental
state in assessing the clearly established law prong of qualified
28 immunity."  Id. at 675.

1    to the high risk of violence the plaintiffs would face due to the

2    defendants' plan, the plaintiffs had stated a claim under the

3    state-created danger doctrine.  See id. at 1133-37.

4         Given the substantial differences between the

5    circumstances in Hernandez and in this case, the court does not

6    agree that Hernandez would have put Dobler and Brown on notice

7    that their conduct here was unlawful.  However, plaintiff cites

8    not only to Hernandez itself, but also to "the series of

9    decisions on which it relied."  (Opp. at 23 (Docket No. 124).)

10   One such decision, Kennedy v. City of Ridgefield -- discussed at

11   length in Hernandez -- addressed circumstances much nearer to

12   those in this case.

13        There, the plaintiff contacted the local police

14   department and alleged that a thirteen-year-old neighbor had

15   molested the plaintiff's nine-year-old daughter.  439 F.3d at

16   1057.  The plaintiff told the responding officer that "she had

17   seen a lot of violence in [the neighbor's] home" and that he had

18   "known, violent tendencies" based on "several violent incidents,"

19   including being "involved in fights at school," having "lit a cat

20   on fire," and having "broken into his girlfriend's house and

21   attacked her with a baseball bat."  Id.  The officer assured the

22   plaintiff that she would be given notice prior to any police

23   contact with the neighbor's family about her allegations.  Id. at

24   1058.  After some investigation had occurred, the officer

25   nonetheless went to the neighbor's home, informed his mother of

26   the allegations, and then notified the plaintiff.  Id.

27        The plaintiff became upset and told the officer that

28   she feared for her safety, and the officer assured her that the

                                  22

police would patrol the area around her and her neighbor's houses
that evening to keep an eye on the neighbor.  Id.  In reliance on
this assurance, the plaintiff and her husband decided to spend
the night at home but planned to leave town the next morning.
Id.  Early the next morning, however, the neighbor broke into the
plaintiff's house and shot her and her husband while they slept,
injuring the plaintiff and killing her husband.  Id.  The
plaintiff sued the officer under the state-created danger
doctrine.  Id. at 1058-59.

On appeal of the district court's denial of summary
judgment for the defendant, the Ninth Circuit determined that
because the defendant had driven to the neighbor's home and
notified his family of the allegations against him, the defendant
had "affirmatively created an actual, particularized danger [the
plaintiff] would not otherwise have faced."  Id. at 1063.  It
noted that the warning he gave to the plaintiff after doing so
did not affect this determination because it "did not obviate or
cure th[e] danger[,] nor did it give [her] a reasonable
opportunity to protect her family from it."  Id.  Further, by
virtue of the defendant's promise to protect the plaintiff and
her family, his "misrepresentation as to the risk [they] faced
. . . ma[de] them more vulnerable to the danger he had already
created."  Id.

The court also determined that, taking the facts in the
light most favorable to the plaintiff, the fact that the
defendant had been told in detail of the neighbor's violent
tendencies would have made it "obvious that [the neighbor] had a
predilection for violence and was capable of the attack he in

1  fact perpetrated on the [plaintiff's family]." Id. at 1064.

2  Based on this determination, the fact that the defendant had

3  nonetheless proceeded to inform the neighbor's family of the

4  allegations, and the fact that he had failed to provide adequate

5  protection to plaintiff against the obvious risk he had created,

6  the court concluded that the facts were sufficient to establish

7  deliberate indifference. Id. at 1065. Accordingly, it held that

8  plaintiff had put forward sufficient facts for her state-created

9  danger claim to survive summary judgment. See id. at 1065, 1067.

10        Based on Kennedy, as of 2006, in the Ninth Circuit it

11  was clearly established that where law enforcement officials have

12  particularized knowledge that an individual is unstable and poses

13  a specific threat to another person, where they provide the

14  unstable individual with the means or opportunity to carry out

15  that threat, and where they fail to adequately protect the

16  threatened individual from the danger they have created, their

17  conduct violates the victim's right to be free from state-created

18  danger under the Fourteenth Amendment. Thus, in "the specific

19  context of th[is] case," Rivas-Villegas, 142 S. Ct. at 8, it

20  would have been clear to every reasonable law enforcement

21  official that giving a service weapon to an officer who they knew

22  had recently tried to use that weapon to kill another person and

23  himself, and who had since continued to act erratically and

24  engage in stalking behavior toward that person -- indicating a

25  continued intent to harm them -- without so much as warning that

26  person of the known danger violated that person's due process

27  rights. See Kennedy, 439 F.3d 1055.

28        Defendants argue that qualified immunity must be

24

1   granted because plaintiff has failed to identify sufficiently

2   "factually similar circuit precedent" establishing the

3   unconstitutionality of their alleged conduct.  (Reply at 5; see

4   Mot. at 19 ("The CHP defendants have not found Ninth Circuit

5   precedent . . . declaring a constitutional violation based on a

6   set of facts close to those alleged in this case . . . .").)[14]

7   However, in their briefing they do not acknowledge or discuss the

8   Ninth Circuit's decision in Kennedy, despite the fact that it is

9   referenced multiple times in plaintiff's opposition.  (Opp. at

10   10, 14, 17-18; see Mot.; Reply.)

11          Although it is true that the Supreme Court has

12   emphasized that a greater degree of factual similarity is

13   required in excessive force cases brought under the Fourth

14   Amendment, "in which the result depends very much on the facts of

15   each case," it has also made clear that this requirement is

16   attributable to the "hazy border" that exists "between excessive

17   and acceptable force," justifying the requirement that precedent

18   "provide an officer notice that a specific use of force is

19   unlawful."  Kisela v. Hughes, 138 S. Ct. 1148, 1152-53 (2018)

20   (quoting Mullenix, 577 U.S. at 12-13, 18); see also Mattos v.

21   Agarano, 661 F.3d 433, 442 (9th Cir. 2011) (en banc) (specificity

22   requirement "allow[s] 'for the fact that police officers are

23

----

24          [14]   Defendants also rely on Swain's and Graf's positive
     evaluations of Wheat on August 3, 15, and 21 in arguing that they
25   believed, by the time Wheat returned to duty, that he no longer
     posed a threat to plaintiff and that there was thus no reason not
26   to give Wheat the duty weapon.  (See Mot. at 24-25; Reply at 6.)
     However, whether they actually believed this is not relevant to
27   whether they are entitled to qualified immunity.  See supra n.13;
     Sandoval, 985 F.3d at 675.
28

1 often forced to make split-second judgments [ ] in circumstances

2 that are tense, uncertain, and rapidly evolving'") (quoting

3 Graham v. Connor, 490 U.S. 386, 369-97 (1989)).

4       However, because plaintiff's is not a Fourth Amendment

5 claim, this heightened requirement does not apply.  Accordingly,

6 while there are indeed factual distinctions between Kennedy and

7 this case -- for example, the affirmative act exposing the

8 Kennedy plaintiff to danger was the defendant informing the

9 neighbor about the plaintiff's allegations, whereas here it was

10 giving Wheat the gun with which he shot plaintiff -- these

11 distinctions are not enough to overcome the more important

12 similarities between the two cases.  See Rivas-Villegas, 142 S.

13 Ct. at 8.  Nor are they enough to call into question the

14 applicability of the Kennedy court's reasoning to this case.  See

15 Hernandez, 897 F.3d at 1138 (noting that, there, "[t]he

16 reasoning" of a prior Ninth Circuit decision "gave fair warning

17 to [defendants] that their conduct crossed the line of what is

18 constitutionally permissible") (citation omitted); Hope, 536 U.S.

19 at 739.

20       Drawing all factual inferences in the manner most

21 favorable to plaintiff, as the court must in deciding qualified

22 immunity at the summary judgment stage, see Matsushita, 475 U.S.

23 at 587; Sandoval, 985 F.3d at 671, the court cannot conclude that

24 defendants Dobler and Brown are entitled to qualified immunity.

25 Accordingly, the court will deny summary judgment to Dobler and

26 Brown on plaintiff's state-created danger claim.[15]

27 ───────────

28     [15]   On the other hand, although Kennedy clearly established plaintiff's right to be free from the increased danger created by

26

1          B.    Supervisory Liability Under § 1983

2              The second claim presented in the First Amended

3  Complaint, also brought under § 1983, is titled "Individual

4  Liability/Ratification."  (FAC at 14.)  It alleges that

5  defendants caused the harm plaintiff suffered by "failing to

6  investigate the shooting and by failing to promulgate policies

7  and establish practices to prevent and deal with domestic

8  violence and other related abuses by law enforcement personnel,"

9  thereby "ratif[ying] [ ] the violation of [plaintiff]'s

10 constitutional rights."  (Id. at ¶¶ 83-86.)  This claim names

11 Dobler, Brown, Stonebraker, and Newman as defendants.  (Id.)  In

12 their motion, defendants logically read this as asserting a claim

13 for municipal liability under Monell, under which a municipality

14 may be held liable for a constitutional violation if the

15 unconstitutional actions of a subordinate were "ratified" by an

16 official with final policymaking authority.  (See Mot. at 25-27

17 (citing Christie v. Iopa, 176 F.3d 1231, 1239 (9th Cir. 1999)).)

18             In his opposition, however, plaintiff states that such

19 a reading of this claim is based on "inartful[ ]" language in the

20 complaint; that he "does not seek to impose liability on any

21 [d]efendant under Monell"; that he instead intended to assert a

22 claim for supervisory liability, a distinct claim available under

23 § 1983; and that he intended to do so solely against Newman, as

24 chief of the CHP's Valley Division, based on Newman's failure to

25 defendants giving the gun to Wheat under these circumstances, it
   did not make clear that mere knowledge that Wheat received the
26 gun, after the fact, violated plaintiff's rights.  Accordingly,
   Stonebraker and Newman are entitled to qualified immunity, and
27 the court will grant summary judgment as to them on this
   additional ground.
28

intervene and prevent the gun from being given to Wheat.  (See
Opp. at 19-21 & n.3 (citing Rodriguez v. Cnty. of Los Angeles,
891 F.3d 776, 798 (9th Cir. 2018).)  This claim is not presented
in plaintiff's complaint, which gives no hint that he seeks
§ 1983 liability based on Newman's involvement in the decision to
give the gun to Wheat, and instead references Newman's failure
"to investigate the shooting" and to "promulgate policies . . .
to prevent and deal with domestic violence."  (FAC at ¶ 84.)

          Even assuming such a claim is adequately presented,
however, and even viewing the facts in the light most favorable
to plaintiff, plaintiff has failed to raise a genuine dispute of
material fact as to whether Newman is liable as a supervisor
under § 1983.  Supervisory liability requires either (1) personal
involvement in the constitutional violation or (2) "a sufficient
causal connection between the supervisor's wrongful conduct and
the constitutional violation."  Rodriguez, 891 F.3d at 798.  "The
requisite causal connection can be established . . . by setting
in motion a series of acts by others or by knowingly refusing to
terminate a series of acts by others, which the supervisor knew
or reasonably should have known would cause others to inflict a
constitutional injury."  Id. (alterations adopted).

          Here, plaintiff has not made either showing.  The
evidence shows that at some point before September 3, 2018,
Newman learned that the gun had been given to Wheat following the
August 2 incident, but Newman did not know by whom.  (Depo. of
Brent Newman at 72:11-23 (Docket No. 125 at 337); see Pl.'s Resp.
at ¶ 67.)  Newman also was informed that Wheat had been evaluated
by at least one therapist and that the therapist's evaluation had

1  been positive.  (See Pl.'s Resp. at ¶¶ 52, 58.)  However, unlike

2  with Dobler and Brown, plaintiff has identified no evidence

3  indicating Newman had any reason to disbelieve that evaluation,

4  such that Newman would have been aware that Wheat still posed a

5  threat to plaintiff when the gun was given to Wheat.

6        Thus, even viewing the facts in the light most

7  favorable to plaintiff, no reasonable jury could conclude that

8  Newman "knowingly refus[ed] to terminate a series of acts by

9  others, which [he] knew or reasonably should have known would

10  cause others to inflict a constitutional injury."  Rodriguez, 891

11  F.3d at 798.  Even assuming Newman "knowingly refus[ed]" to

12  intervene to prevent the gun from being given to Wheat, or to

13  have it taken from him afterward, there is no evidence that

14  Newman "knew or reasonably should have known" Wheat would use the

15  gun to shoot plaintiff.  Accordingly, the court will grant

16  summary judgment for defendants on plaintiff's supervisory

17  liability claim.

18      C.   Negligence Claims

19        Plaintiff has also brought several claims alleging

20  negligence.  (FAC at ¶¶ 87-113.)  To establish a claim for

21  negligence, "the plaintiff must show that the defendant had a

22  duty to use due care, that he breached that duty, and that the

23  breach was the proximate or legal cause of the resulting injury."

24  Brown v. USA Taekwondo, 11 Cal. 5th 204, 213 (2021) (citation and

25  internal quotation marks omitted).  Although plaintiff's

26  complaint presents five distinct claims for negligence, the

27  critical distinction between each is the source of the alleged

28  duty owed to plaintiff.  (See FAC at ¶¶ 87-113; Opp. at 25-38.)

1    Accordingly, in resolving defendants' motion, the court will

2    address each theory of duty advanced by plaintiff.

3                    1.   Failure to Provide Tarasoff Warning

4          The complaint first asserts a claim for negligence

5    against Swain, Graf, the State, and the CHP based on alleged

6    duties arising under Tarasoff v. Regents of Univ. of Cal., 17

7    Cal. 3d 425 (1976).  (FAC at ¶¶ 87-93; see Mot. at 31-32.)

8    However, plaintiff concedes that this claim is not viable against

9    the State or the CHP.  (See Opp. at 25-26.)  Accordingly, the

10   court will grant summary judgment for the State and the CHP on

11   the issue of whether they owed plaintiff a duty to warn under

12   Tarasoff.  See Fed. R. Civ. P. 56(g).

13                   2.   Mandatory Duty Imposed by Enactment

14         Plaintiff also alleges negligence on the ground that

15   defendants violated a mandatory duty they owed him, citing

16   section 815.6 of the California Government Code.  (FAC at ¶¶ 94-

17   98.)  Section 815.6 recognizes that public entities may be liable

18   in negligence for violation of certain mandatory duties.  See

19   Cal. Gov. Code § 815.6; State Dept. of State Hosps. v. Super.

20   Ct., 61 Cal. 4th 339, 348 (2015).

21         Specifically, under section 815.6, "the government may

22   be liable when (1) a mandatory duty is imposed by enactment,

23   (2) the duty was designed to protect against the kind of injury

24   allegedly suffered, and (3) breach of the duty proximately caused

25   injury."  State Dept. of State Hosps., 61 Cal. 4th at 348.  To

26   create a mandatory duty, not only must the enactment require a

27   public entity or official to perform a particular function,

28   without the exercise of discretion, but performance of the

1  function itself also must not involve exercise of discretion.

2  Id. (citing Haggis v. City of Los Angeles, 22 Cal. 4th 490, 498-

3  99 (2000)).  Further, the enactment must "provide[ ] implementing

4  guidelines" for carrying out the mandatory duty.  Id. (quoting

5  Guzman v. Cnty. of Monterey, 46 Cal. 4th 887, 898 (2009)).

6         Plaintiff argues that three California statutes each

7  created a mandatory duty under section 815.6 and that defendants

8  breached each one.  (Opp. at 26-35.)  He first points to section

9  1031 of the Government Code, which imposes minimum standards on

10 peace officers, including a requirement that they "[b]e found to

11 be free from any physical, emotional, or mental condition that

12 might adversely affect the exercise of the powers of a peace

13 officer."  Cal. Gov. Code § 1031(f).  It further provides that

14 "[e]motional and mental condition shall be evaluated by either" a

15 physician with certain specified qualifications relating to

16 treatment of emotional and mental disorders or a psychologist,

17 with similar specified qualifications.  Id. at § 1031(f)(2).

18        Plaintiff contends that, once defendants became aware

19 that Wheat had tried to murder him on August 2, 2018, section

20 1031(f) obligated the CHP to have Wheat evaluated by a physician

21 or mental health professional with the specified qualifications

22 and find him free of any relevant "emotional[ ] or mental

23 condition" before giving him a gun and allowing him to resume

24 duty.  (See Opp. at 26-31.)  Critically here, however, although

25 section 1031(f) requires that peace officers be found free of

26 emotional or mental conditions that might impact their ability to

27 serve and specifies who must perform this evaluation, it says

28 nothing about when or under what circumstances such evaluations

1    must be conducted.

2           Although plaintiff contends that this question is

3    answered by the fact that section 1031(f)'s "requirements apply

4    categorically whenever there is 'any emotional and mental

5    evaluation done,'" (id. at 30), this does not speak to the events

6    or conditions that actually trigger an agency's obligation to

7    order an evaluation.  This is important because, if section

8    1031(f) did impose an enforceable mandatory duty as written,

9    public agencies would be left without any indication of when that

10   duty must be fulfilled or how often.  That the CHP here chose to

11   have Swain evaluate Wheat after learning about Wheat's effort to

12   kill plaintiff -- which plaintiff argues violated the duty

13   because Swain did not have the statutorily required

14   qualifications, (id. at 28-29; see supra n.7) -- does not mean a

15   mandatory duty to evaluate Wheat existed in the first place.

16   Because section 1031(f) leaves room for discretion in determining

17   when the required evaluations are to be performed, it does not

18   create a mandatory duty under section 815.6.  See State Dept. of

19   State Hosps., 61 Cal. 4th at 348.

20          Plaintiff next contends that a mandatory duty existed

21   under section 6275 of the California Family Code.  (Opp. at 31-

22   33.)  This section provides:

23       A law enforcement officer who responds to a situation
         in which the officer believes that there may be
24       grounds for the issuance of an emergency protective
         order pursuant to Section 6250 of this code or Section
25       646.91 of the Penal Code, shall inform the person for
         whom an emergency protective order may be sought . . .
26       that the person may request the officer to request an
         emergency protective order . . . .
27

28   Cal. Fam. Code § 6275(a).

1          Like with section 1031(f), the conditions triggering

2   this asserted duty are discretionary.  Section 6275(a) specifies

3   that the obligation to inform an individual of his ability to

4   request a protective order arises when an officer "believes" that

5   grounds for the order "may" exist.  Id.  This requires the

6   officer to consider the requirements of the separate provisions

7   referenced in section 6275(a), each of which requires a

8   determination of whether there are "reasonable grounds to

9   believe" the individual is "in imminent and present danger" of

10  violence, abuse, or stalking.  See Cal. Fam. Code § 6250; Cal.

11  Pen. Code § 646.91.  Because these determinations are subjective

12  and thus are inherently discretionary, section 6275(a) does not

13  create a mandatory duty under section 815.6.

14          Finally, plaintiff argues that a mandatory duty existed

15  under section 13730 of the California Penal Code, which provides

16  that "[e]ach law enforcement agency shall develop an incident

17  report form" for use by officers who respond to incidents of

18  domestic violence, and delineates specific information officers

19  must provide in completing them.  (See Opp. at 33-35); Cal. Pen.

20  Code § 13730(c).  Plaintiff argues that, by failing to complete

21  such a form, defendants breached this duty, causing his ultimate

22  injury by preventing Swain and Graf from accessing the form when

23  evaluating Wheat -- leading them to erroneously conclude Wheat

24  was fit for duty -- and by preventing local law enforcement from

25  learning of the danger Wheat posed.  (Opp. at 34-35.)

26          Even assuming section 13730 creates a mandatory duty,

27  plaintiff's theory of negligence based on this duty cannot

28  succeed for the independent reason that he cannot show

1  defendants' breach of such a duty proximately caused his injury.

2  Even viewing the evidence in the light most favorable to

3  plaintiff, a reasonable jury could not conclude that Swain's

4  determination of whether Wheat should have a gun would have

5  changed based on access to a domestic violence incident report,

6  when she was already aware of the August 2, 2018 incident.  See

7  State Dept. of State Hosps., 61 Cal. 4th at 352 (to qualify as a

8  proximate cause, challenged act must be "a necessary antecedent"

9  of an injury) (citation omitted).

10       Further, given that Graf was not told about the August

11  2 incident and was led to believe she was evaluating Wheat

12  because of his car accidents, there is no indication that she

13  would have received an incident report even had one been created.

14  Nor has plaintiff presented evidence indicating that, had such a

15  report been created, local law enforcement would have seen it and

16  intervened in some way to protect plaintiff from Wheat.

17  Accordingly, this theory of negligence also cannot succeed, and

18  the court will grant summary judgment to defendants on the issue

19  of whether they owed plaintiff a mandatory duty pursuant to

20  section 815.6.

21           3.  Special Relationship

22       Plaintiff also contends that defendants owed him a duty

23  based on the existence of a special relationship between him and

24  defendants.  (FAC at ¶¶ 99-103.)  As a general rule, "one owes no

25  duty to control the conduct of another, nor to warn those

26  endangered by such conduct."  Regents of Univ. of Cal. v. Super.

27  Ct., 4 Cal. 5th 607, 619 (2018) (quoting Davidson v. City of

28  Westminster, 32 Cal. 3d 197, 203 (1982)).  Thus, there is also

34

generally "no duty to act to protect others from the conduct of third parties."  <u>Brown</u>, 11 Cal. 5th at 214 (citation omitted).

One exception to this rule, however, provides that, "[i]n a case involving harm caused by a third party, a person may have an affirmative duty to protect the victim of another's harm if that person is in what the law calls a 'special relationship' with either the victim or the person who created the harm."  <u>Id.</u> at 215 (citations omitted).  "A special relationship between the defendant and the victim is one that gives the victim a right to expect protection from the defendant . . . ."  <u>Id.</u> at 216 (citation and internal quotation marks omitted).

One type of special relationship "creat[ing] an affirmative duty to protect the plaintiff from harm" arises "[w]here the defendant has . . . performed an act that increases the risk of injury to the plaintiff," i.e., "when the defendant is responsible for making the plaintiff's position worse."  <u>See id.</u> at 214, 216 (citations and internal quotation marks omitted). Thus, although "a special relationship with a person in peril is not established simply because police officers responded to a call for assistance and took some action at the scene," <u>Adams v. City of Fremont</u>, 68 Cal. App. 4th 243, 279 (1st Dist. 1998) (collecting cases), <u>disapproved of on other grounds</u>, <u>Brown</u>, 11 Cal. 5th at 219, officers "may have a duty to members of the public to exercise due care when . . . [their] actions . . . place a person in peril or increase the risk of harm," <u>Greyhound Lines, Inc. v. Dep't of Cal. Highway Patrol</u>, 213 Cal. App. 4th

1  1129, 1136 (5th Dist. 2013).[16]

2         Here, as the court has explained, a trier of fact could

3  conclude that Dobler's and Brown's affirmative actions placed

4  plaintiff at an increased risk of harm.  This would give rise to

5  a duty to protect plaintiff from that increased risk.  See id.

6  Accordingly, defendants' argument that Dobler and Brown were not

7  negligent as a matter of law because they owed no duty to

8  plaintiff fails.  The court will therefore deny summary judgment

9  to Dobler and Brown on the issue of whether they had a duty to

10  protect plaintiff based on a special relationship.

11         However, as the court has also determined that a

12  reasonable jury could not conclude the other CHP defendants

13  affirmatively acted to place plaintiff in danger, those

14  defendants formed no special relationship with plaintiff and thus

15  had no duty to protect him.  The court will therefore grant

16  summary judgment to defendants Stonebraker, California, and CHP

17  on this issue.

18              4.   Negligent Entrustment of Firearm

19  ─────────────────────────

20       [16]   Defendants' argument that Adams precludes creation of
special relationships where a police officer increases an
existing risk of harm to the plaintiff is unavailing.  (See Reply

21  at 12 (citing Adams, 68 Cal. App. 4th at 282-83).)  First, more
recent precedent indicates that this is not so.  See Greyhound

22  Lines, 213 Cal. App. 4th at 1136.

23       Further, California Supreme Court precedent
interpreting the decision on which Adams relied, McCorkle v. City

24  of Los Angeles, 70 Cal. 2d 252 (1969) (en banc), makes clear that
the duty there arose because the officer had "voluntarily

25  assume[d] a protective duty" toward the plaintiff, "thereby
inducing reliance," and that plaintiff had been placed in

26  increased risk of harm was simply a means of showing breach of
that duty.  See Williams v. California, 34 Cal. 3d 18, 24 (1983).

27  Thus, neither Adams nor McCorkle establish that no duty may arise

28  from an officer placing a plaintiff in increased risk of harm.

1          Plaintiff also contends defendants breached a duty they
2     owed to him by entrusting Wheat with a firearm.  (FAC at ¶¶ 104-
3     08.)  In their motion, defendants have presented argument in
4     support of summary judgment on plaintiff's claims based on a
5     special relationship, negligent entrustment, and negligent
6     supervision under a single heading.  (See Mot. at 28-31; see also
7     Reply at 11-12.)

8          However, except in briefly addressing negligent
9     supervision, defendants' argument exclusively addresses whether a
10    special relationship existed between plaintiff and defendants,
11    and thus whether defendants had a duty to warn plaintiff about
12    the danger Wheat posed to him, as discussed above.  Although
13    defendants move for summary judgment on the negligent entrustment
14    claim as well, they have advanced no argument as to why they did
15    not owe plaintiff a separate duty of care not to entrust Wheat
16    with a weapon when, as explained, a trier of fact could conclude
17    that the risk he would use it to shoot Wheat was foreseeable.
18    See J.L. v. Children's Institute, Inc., 177 Cal. App. 4th 388,
19    396 (2d Dist. 2009) (noting, as a general matter of negligence
20    law, that "[t]he existence and scope of any duty" to another
21    "depends on the foreseeability of the harm").

22         Nor have defendants advanced any other argument
23    challenging plaintiff's negligent entrustment theory.  To be
24    entitled to summary judgment, the moving party must demonstrate
25    either the absence of an essential element of the non-moving
26    party's case or that the non-moving party cannot provide evidence
27    to support an essential element.  Celotex, 477 U.S. at 322-23;
28    see Fed. R. Civ. P. 56(a).  Because defendants have not done so,

1  the court will deny summary judgment on the issue of whether

2  defendants owed a duty to plaintiff not to entrust Wheat with a

3  firearm.

4          5.   Negligent Supervision

5          Plaintiff also contends defendants owed him "a duty of

6  care to supervise law enforcement personnel" to ensure he was not

7  harmed in the manner he was and that defendants breached this

8  duty by failing to supervise, investigate, and discipline Wheat.

9  (FAC at ¶¶ 109-13.)  Claims for negligence based on negligent

10 supervision "ha[ve] developed in California in factual settings

11 where the plaintiff's injury occurred in the workplace, or the

12 contact between the plaintiff and the employee was generated by

13 the employment relationship."  Mendoza v. City of Los Angeles, 66

14 Cal. App. 4th 1333, 1339-40 (2d Dist. 1998).  Neither is the case

15 here, however, and plaintiff has not identified the source of a

16 duty defendants owed him to supervise Wheat while he was off duty

17 and out of the office, and where the contact between plaintiff

18 and Wheat was derived not from an employment relationship but

19 from personal relationships with Mary and with each other.

20         Plaintiff argues that California precedent demonstrates

21 that tortious conduct by an employee need not be within the scope

22 of the tortfeasor's employment for the conduct to trigger

23 liability for the employer.  (See Opp. at 37 (citing Liberty

24 Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co., 5 Cal. 5th

25 216, 223 (2018)) (collecting cases).)  However, what this

26 precedent establishes is that such conduct may trigger liability

27 for negligent supervision when done during work hours or while

28 the tortfeasor is acting in the capacity in which he is employed,

1    not that an employee's tortious conduct may trigger such

2    liability regardless of when and where the conduct occurs.  <u>See,</u>

3    <u>e.g.</u>, <u>C.A. v. William S. Hart Union High Sch. Dist.</u>, 53 Cal. 4th

4    861 (2012) (recognizing supervisory liability for school district

5    where guidance counselor sexually harassed and abused students at

6    school or by exploiting authority conferred by position); <u>Evan F.</u>

7    <u>v. Hughson United Methodist Church</u>, 8 Cal. App. 4th 828 (3d Dist.

8    1992) (recognizing supervisory liability for church where pastor

9    sexually molested child parishioner).  Here, there is no

10   suggestion that Wheat was on duty or acting in his capacity as a

11   CHP officer when he attacked plaintiff and Mary.

12        Plaintiff also points to precedent explaining that,

13        [i]n cases where the employee was an off-duty police
          officer, some courts have found police departments

14        liable for the employee's acts of violence against
          members of the general public.  The departments were

15        held liable where the employees' acts were made
          possible by the use of the officers' service revolvers

16        which they were required to carry at all times.
          . . .  In addition, the officer had displayed many

17        signs of mental or emotional problems, such as
          excessive sick leave and incomplete performance

18        reports.

19   <u>Mendoza</u>, 66 Cal. App. 4th at 1340 (citations omitted).  However,

20   plaintiff has identified no requirement, nor put forward evidence

21   establishing, that CHP officers are required to carry their duty

22   weapon at all times, as opposed to simply when they are on duty.

23   (<u>See</u> Opp. at 37 n.4; Pl.'s Resp. at ¶¶ 74-75.)

24        Even if there were such a requirement, precedent makes

25   clear that there can be no liability for negligent supervision

26   based on an employee's conduct unless "the plaintiff's injury

27   occurred in the workplace," <u>Mendoza</u>, 66 Cal. App. 4th at 1339-40,

28   "the contact between the plaintiff and the employee was generated

1  by the employment relationship," id. at 1340, or the employee was

2  otherwise acting in the role for which he was employed, see C.A.,

3  53 Cal. 4th 861; Evan F., 8 Cal. App. 4th 828.  The court will

4  therefore grant summary judgment to defendants on the issue of

5  whether defendants owed plaintiff a duty of care under a

6  supervisory negligence theory.

7          6.   Statutory Immunity

8          Defendants also argue that Dobler, Brown, Stonebraker,

9  and Newman are entitled to statutory immunity from plaintiff's

10  state law claims.  (Mot. at 36-37.)  Specifically, they argue

11  various sections of the California Government Code bar liability

12  for officers' failure to make an arrest or detain an individual -

13  - in part because officers have discretion as to whether to do so

14  -- or for officers' failure to provide police protection.  (Id.

15  (citing Cal. Gov. Code §§ 818.2, 820.2, 845, 846).)

16          However, neither the First Amended Complaint nor

17  plaintiff's opposition indicate that the state law claims or

18  theories of liability plaintiff pursues are premised on

19  defendants' failure to arrest Wheat.  Rather, they posit that

20  defendants breached duties owed to plaintiff to ensure Wheat was

21  adequately determined to be emotionally and mentally well before

22  giving him a gun and returning him to duty, to notify plaintiff

23  of the threat Wheat posed to him, and to adequately supervise

24  Wheat.  (See FAC at ¶¶ 94-113; Opp. at 26-39.)

25          To the extent that plaintiff's negligence claim based

26  on a special relationship asserts that defendants' negligence

27  created an obligation to protect him from Wheat, precedent makes

28  clear that defendants are not entitled to immunity.  See Wallace

40

1  v. City of Los Angeles, 12 Cal. App. 4th 1385, 1402 (2d Dist.

2  1993) ("[S]ection 845 does not provide immunity against a

3  particular police officer's negligence in the performance of his

4  duty in a particular situation."). Accordingly, the court will

5  deny summary judgment to defendants on the issue of whether they

6  are entitled to immunity under state law.

7      D.    Request for Punitive Damages

8       Defendants also seek summary judgment on plaintiff's

9  claim for punitive damages against Dobler, Brown, Stonebraker,

10  and Newman asserted in connection with plaintiff's § 1983 claims.

11  (Mot. at 38.) Defendants cite the relevant Ninth Circuit Model

12  Jury Instruction, which states in part:

> You may award punitive damages only if you find that
> the defendant's conduct that harmed the plaintiff was
> malicious, oppressive or in reckless disregard of the
> plaintiff's rights. . . . Conduct is in reckless
> disregard of the plaintiff's rights if, under the
> circumstances, it reflects complete indifference to
> the plaintiff's safety or rights, or if the defendant
> acts in the face of a perceived risk that its actions
> will violate the plaintiff's rights under federal law.

18  Ninth Circuit Model Jury Instr. 5.5.

19       As explained in addressing plaintiff's state-created

20  danger claim, viewing the evidence in the light most favorable to

21  plaintiff, a reasonable jury could conclude that Dobler and Brown

22  were deliberately indifferent to the risk of harm plaintiff faced

23  as a result of them giving the gun to Wheat. In the terms of the

24  Ninth Circuit instruction, this means a reasonable jury could

25  conclude that Dobler's and Brown's conduct was in "reckless

26  disregard of the plaintiff's rights" in that "it reflect[ed]

27  complete indifference to the plaintiff's safety." Id.

28       Accordingly, the court will deny summary judgment on

1  plaintiff's claim for punitive damages as to Dobler and Brown.
2  On the other hand, because the court will grant summary judgment
3  for defendants on plaintiff's § 1983 claim for supervisory
4  liability, which is the only claim for which plaintiff seeks
5  punitive damages against Newman, the court will also grant
6  summary judgment on plaintiff's claim for punitive damages as to
7  Newman.  Further, because in his opposition plaintiff states that
8  he "withdraws his claim for punitive damages against [defendant]
9  Stonebraker," (Opp. at 40 n.5), the court will grant summary
10  judgment on plaintiff's claim for punitive damages as to
11  Stonebraker as well.

12          IT IS THEREFORE ORDERED that summary judgment on
13  plaintiff's § 1983 claim for violation of substantive due process
14  rights based on state-created danger, be, and the same hereby is,
15  DENIED as to defendants Dobler and Brown, and GRANTED as to
16  defendants Stonebraker and Newman.

17          IT IS FURTHER ORDERED that summary judgment on
18  plaintiff's § 1983 claim for supervisory liability be, and the
19  same hereby is, GRANTED as to defendants Dobler, Brown,
20  Stonebraker, and Newman.

21          IT IS FURTHER ORDERED that summary judgment on
22  plaintiff's claims for negligence under state law is GRANTED and
23  DENIED as follows:

24              1. GRANTED as to defendants State of California and
25                 California Highway Patrol on the issue of whether
26                 these defendants owed plaintiff a duty to provide
27                 a Tarasoff warning;

28              2. GRANTED as to defendants State of California and

1    California Highway Patrol on the issue of whether
2    these defendants owed plaintiff mandatory duties
3    pursuant to California Government Code § 815.6;
4    3. DENIED as to defendants Dobler and Brown on the
5    issue of whether these defendants owed plaintiff a
6    duty to protect based on the existence of a
7    special relationship, and GRANTED as to defendants
8    Stonebraker, State of California, and California
9    Highway Patrol;
10   4. DENIED as to defendants Dobler, Brown,
11   Stonebraker, State of California, and California
12   Highway Patrol on the issue of whether these
13   defendants owed plaintiff a duty not to entrust
14   Wheat with a firearm; and
15   5. GRANTED as to defendants Dobler, Brown,
16   Stonebraker, and Newman on the issue of whether
17   these defendants owed plaintiff a duty to
18   supervise Wheat.
19        IT IS FURTHER ORDERED that summary judgment on
20   plaintiff's request for punitive damages be, and the same hereby
21   is, DENIED as to defendants Dobler and Brown, and GRANTED as to
22   defendants Stonebraker and Newman.
23   Dated:   February 25, 2022

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

43